IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ST. BERNARD HOUSING RECOVERY ) | |
| & DEVELOPMENT CORPORATION, Inc,; ) | |
| GLORIA IRVING; ) | |
| STEPHANIE MINGO ) | |
| SHIRLEY MORRIS; and ) | |
| CHANTEL YOUNG ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.                                   ) | CIVIL ACTION NO. |
| ) | 1:07-cv-02231 |
| U.S DEPARTMENT OF HOUSING ) | |
| AND URBAN DEVELOPMENT; ) | |
| HOUSING AUTHORITY OF NEW ORLEANS; ) | |
| U.S DEPARTMENT OF HOUSING ) | |
| AND URBAN DEVELOPMENT, AS RECEIVER OF ) | |
| HOUSING AUTHORITY OF NEW ORLEANS; ) | |
| ALPHONSO JACKSON, Secretary of the United ) | |
| States Department of Housing and Urban ) | |
| Development; ) | |
| ORLANDO CABRERA, Assistant Secretary of the ) | |
| United States Department of Housing and Urban ) | |
| Development ) | |
| C. DONALD BABERS, Board of Commissioners, ) | |
| Housing Authority of New Orleans; ) | |
| KAREN CATO-TURNER, Executive Administrator, ) | |
| Housing Authority of New Orleans, and, ) | |
| And each individual defendant in his official capacity, ) | |
| ) | |
| Defendants. ) | |

_____)

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

Plaintiffs submit this motion for a temporary restraining order or, in the alternative, a

preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local

Rule, LCvR 65.1(a) and (c), in order to prevent the imminent and unlawful demolition of

approximately 1391 residential housing units within St. Bernard public housing project and the resulting exacerbation of homelessness among low-income families within post-Katrina New Orleans. The grounds for this motion are fully set forth in the accompanying memorandum and several affidavits, all of which are filed herewith and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this Court:

1)      a.      Issue a temporary restraining order staying Defendants Housing Authority of New Orleans ("HANO") and U.S. Department of Housing and Urban Development Agency ("HUD"), in its capacity as the federal agency that is responsible for ensuring the proper implementation of the National Housing Act of 1937 as well as in its capacity as receiver for HANO, from demolishing and/or disposing of the St Bernard public housing development, or any of the buildings contained therein, until full Order of the Court; or, in the alternative:

b.      Issue a preliminary injunction enjoining the defendants Housing Authority of New Orleans ("HANO") and U.S. Housing and Urban Development Agency ("HUD"), in its capacity as the federal agency that is responsible for ensuring the proper implementation of the Nation Housing Act of 1937 as well as in its capacity as receiver for HANO, from demolishing and/or disposing of the St Bernard housing development, or any of the buildings contained therein, until further order of the Court; and

2)      waive the security requirement under Fed. R.Civ.P.65(c).

Respectfully submitted,

ST. BERNARD HOUSING RECOVERY&
DEVELOPMENT CORPORATION, Inc.;
GLORIA IRVING;
STEPHANIE MINGO;
SHIRLEY MORRIS; and
CHANTEL YOUNG

By their Attorneys,


       /s/ Saul A. Schapiro
Saul A. Schapiro, Esq., BBO No. 444820
(Motion for *pro hac vice* pending)
ROSENBERG & SCHAPIRO, P.C.
44 School Street, Suite 800
Boston, MA 02108
Phone: (617) 723-7440
Fax: (617) 723-8849
sschapiro@rosen-schap.com


       /s/ Charles H. Carpenter
Charles H. Carpenter, Esq. (DC Bar #432004)
William J. Bethune, Esq. (DC Bar #66696)
PEPPER HAMILTON, LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005
Phone: (202) 220-1203
Fax: (202) 478-2118
bethunew@pepperlaw.com


William Quigley, Esq.
Loyola University New Orleans
7214 St. Charles Avenue, Campus Box 902
New Orleans, LA 70118
Phone (504) 861-2709
Fax:    (504) 861-5440
duprestars@yahoo.com


Tracie L. Washington, Esq.
THE LOUISIANA JUSTICE INSTITUTE
1631 Elysian Fields Avenue
New Orleans, LA 70117
Phone: (504) 872-9134
Fax: (504) 872-9878


Dated:  December 12, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| ST. BERNARD HOUSING RECOVERY | ) | |
| & DEVELOPMENT CORPORATION, Inc. | ) | |
| GLORIA IRVING; | ) | |
| STEPHANIE MINGO; | ) | |
| SHIRLEY MORRIS; and | ) | |
| CHANTEL YOUNG | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| U.S DEPARTMENT OF HOUSING | ) | 07-2231 |
| AND URBAN DEVELOPMENT; | ) | |
| HOUSING AUTHORITY OF NEW ORLEANS; | ) | |
| U.S DEPARTMENT OF HOUSING | ) | |
| AND URBAN DEVELOPMENT, AS RECEIVER OF | ) | |
| HOUSING AUTHORITY OF NEW ORLEANS; | ) | |
| ALPHONSO JACKSON, Secretary of the United | ) | |
| States Department of Housing and Urban | ) | |
| Development; | ) | |
| ORLANDO CABRERA, Assistant Secretary of the | ) | |
| United States Department of Housing and Urban | ) | |
| Development | ) | |
| C. DONALD BABERS, Board of Commissioners, | ) | |
| Housing Authority of New Orleans; | ) | |
| KAREN CATO-TURNER, Executive Administrator, | ) | |
| Housing Authority of New Orleans; | ) | |
| And each individual defendant in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

Plaintiffs submit this memorandum of law in support of their motion for a temporary

restraining order or, in the alternative, preliminary injunction, filed herewith.

Plaintiffs seek immediate injunctive relief in order to prevent the imminent and unlawful demolition of approximately 1436 residential units within St. Bernard public housing project. Without such immediate relief, the destruction of the public housing project will not only *irrevocabl*y deny plaintiffs their statutory right to acquire, rehabilitate, and reoccupy the housing project pursuant to a well-funded tenant-backed plan, but it will further exacerbate an already escalating homelessness crisis within post-Katrina New Orleans.[1]

## INTRODUCTION

*A.    The Lawsuit.* This is a suit brought by tenants of the St. Bernard public housing project individually and through their duly incorporated non-profit development corporation, St. Bernard Housing Recovery & Development Corporation, Inc. ("SBHR&DC"), against the Housing Authority of New Orleans ("HANO"), which is in receivership and against the United States Department of Housing and Urban Development ("HUD"), its receiver. The gravamen of their claim is two-fold: *first*, that they have been illegally deprived of their right under the U.S. Housing Act to acquire and redevelop the St. Bernard public housing project ("St. Bernard's"), through their redevelopment entity, and to return to, and reoccupy, their homes at St. Bernard, and *second*, that defendants, instead, unlawfully have approved the total demolition of St. Bernard, and are granting certain development rights to a team of private entities[2] based upon an financially unsound and otherwise unviable proposal.

Plaintiffs further allege that this wrongful conduct by public agencies, all of which will be shown to be in contravention of their statutory and regulatory duties, is part of a larger

---

[1] As indicated in the attached Rule 65.1 certificate, counsel for plaintiffs has notified defendants' counsel of the filing of this motion.

[2] One of the entities is Columbia Residential ("Columbia"), which is reported to have financial ties to HUD Secretary Jackson.

programmatic scheme to rid New Orleans of low-income public housing tenants. In fact, HANO, under the direction of HUD, is on the verge of wiping out the multifamily public housing stock of New Orleans through the demolition of the St. Bernard project and three other major public housing projects in the City.[3]

**B.    *The Need for Immediate Injunctive Relief*.** The Plaintiffs now bring this request for immediate injunctive relief in the form of a restraining order or, in the alternative, a preliminary injunction because on November 29, 2007, the HANO Board, consisting of one HUD employee serving as the sole member/Chairman of the Board of Commissioners of HANO in connection with HUD's receivership of HANO, approved a $9 million no-bid service contract for the demolition and removal of the buildings on the St. Bernard site, and on information and belief, such demolition is to occur <u>by or before December 15, 2007</u>.[4]  Schapiro Aff. at Exhibits A and B.

As is more fully discussed below, the circumstances presented in this action calls out for judicial intervention by way of immediate injunctive relief for the following reasons.

*First*, plaintiffs are likely to succeed on the merits as they present evidence of clear violations of defendants' obligations under the U.S. Housing Act and related regulations. Plaintiffs will show that HUD/HANO failed to provide the tenants with an opportunity to acquire the project in order to rehabilitate and reoccupy the units as contemplated by the applicable statute and regulations. Instead, HUD /HANO have asserted that they were not required to make an "offer to sell" to the tenants based upon a certain regulatory exception. As is discussed in

---

[3] Through the complete demolition of Laffite, St. Bernard, B.W. Cooper and C.J. Peete, 4,529 units of public housing will be completely lost and will be replaced (at most) with only 1,953 units, and only one-third of those will be affordable to public housing-eligible families.  In other words, once rebuilt, only about 13% of the pre-storm units would be affordable to public housing tenants.   Schapiro Aff. at Exhibit C.

[4]  One of the entities is a Manager or Member of St. Bernard Redevelopment, LLC, the entity selected by HANO to perform demolition services at St. Bernard, is Columbia Residential ("Columbia"), which is reported to have financial ties to HUD Secretary Jackson.

more detail below, however, that regulatory exception (24 CFR section 970.9(3) (ii)), which relates to privately financed developments to assist low-income families, does not apply, and any claim to the contrary is a pretext. In fact, there is clear evidence that HUD/HANO long intended to knock down the housing at St. Bernard (rather than provide the tenants with the opportunity to rehabilitate and reoccupy the units), months *before* a demolition application was even prepared or submitted to HUD by HANO as local housing authority.

Nor may HUD/HANO argue that their refusal to provide the tenants an acquisition opportunity was within their discretion as public housing agencies. HUD/HANO's own documents show that they made the decision to demolish the housing units without having any of the required studies, analyses, or information before them, and having failed to conduct the Congressionally-mandated needs assessment of low-income families and the required tenant consultations. Such analysis and studies, moreover, were required under federal law *prior* to making a demolition determination. Under such circumstances, there is no place for judicial deference to administrative discretion. On this point, federal courts recently have been clear: although courts are not empowered to substitute their judgment for that of a federal agency, where, as here, the federal agency "entirely failed to consider an important aspect of the problem;" or where, as here, its decision is not "fully informed and well-considered;" or where, as here, the agency "has taken action without observance of the procedure required by law," that action or decision must be set aside by the court. *Sierra Club v. Bosworth*, 2007 U.S. App. LEXIS 28013 at p. 7 (9th Cir., December 5, 2007), (citations omitted); *see also Massachusetts v. E.P.A.*, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007).

*Second*, it is clear that without injunctive relief, plaintiffs will be irreparably harmed as the defendants are about to commence the whole-scale dismantling of the St. Bernard project,

thereby irreversibly depriving plaintiffs of their statutory rights to acquire and reoccupy the units. Moreover, defendants are proceeding with the imminent demolition of St. Bernard in the face of a well-funded, comprehensive redevelopment plan submitted by SBHR&DC, a plan that provides for acquisition and revitalization of the housing units at St. Bernard's. Yet, defendants have failed to consider and/or to respond to the SBHR&DC proposal, and instead are proceeding with the demolition and the granting of certain disposition rights in the project based upon a financially unsound and otherwise unviable development proposal submitted by a team of private entities (one of which, parenthetically, is reported to have financial ties to HUD Secretary Jackson). See Schapiro Aff. at Exhibit D.

*Third*, nor, as is discussed further below, will HUD/HANO be able to demonstrate that the entry of the requested injunctive relief – that is, enjoining the destruction of St. Bernard pending an opportunity for the plaintiffs to be heard on the matter-- will cause them substantial harm as the putative impending date to commence the demolition of the housing units, December 15, 2007, is largely, and demonstrably, self-imposed.

*Finally*, in a city where more than 70,000 people live in poverty and where over 50,000 units of rental housing were destroyed by the recent hurricanes, national and local policy should emphasize the *con*struction and not the *des*truction of housing affordable for low-income families. Schapiro Aff. at Exhibit C. In short, in light of the escalating homelessness and desperate need for safe affordable housing in post-Katrina New Orleans, the balancing of harms and weighing of the public interest require preservation of the status quo, *at least* until this Court has had an opportunity to hear the merits of this important case.

## STATEMENT OF FACTS

Briefly, the pertinent facts are as follows. The individual named plaintiffs are residents of St. Bernard, who were involuntarily displaced as a result of Hurricane Katrina, and currently seek to return to their homes at St. Bernard. Irving Aff., Mingo Aff., Morris Aff., and Young Aff. The St. Bernard Housing Recovery & Development Corporation, Inc. ("SBHR&DC"), is a Louisiana non-profit corporation founded by St. Bernard residents for the purpose of serving as the vehicle to organize the residents together and to work formally with other community groups and/or prospective developers to redevelop and rehabilitate St. Bernard. Id.

The defendants include U.S. Department of Housing and Urban Development ("HUD"), the federal agency with oversight and enforcement of Title 42, Chapter 8 of the United States Code and related federal regulations, Alphonso Jackson ("Jackson"), the Secretary of HUD, and Orlando Cabrera ("Cabrera"), the Assistant Secretary of HUD. The agency's and individuals' offices are located at 451 7th Street S.W., Washington, D.C..  Defendant Housing Authority of New Orleans ("HANO"), is the local housing agency responsible for the implementation of the various programs contained in the federal housing act and implementing regulations within New Orleans Parish in the State of Louisiana. Since February of 2002, HUD has been serving as administrative receiver of HANO, with day to day control of the operations of HANO. Defendant C. Donald Babers ("Babers"), serves as the sole Member/Chairman of the Board of Commissioners of HANO and is an employee of HUD, with offices in Fort Worth, Texas.[5]

---

[5] Defendant Karen Cato-Turner is the Executive Administrator of HANO and is an employee of HUD, with office at in Miami, Florida.

In this action, SBHR&DC and the individual plaintiffs assert several claims against defendants,[6] which raise serious and complex issues regarding, *one*, the failure of government agencies to comply with important Congressional mandates under the U.S. Housing Act and related regulations with respect to the demolition and disposition of public housing, and, *two*, violations of plaintiff-tenants' federal statutory rights to acquire, revitalize, and reoccupy the critically-needed units of St. Bernard's. These violations of plaintiffs' rights occurred, moreover, in the context of HUD's implementation (in its dual role as federal housing agency and receiver of the local housing authority), of its larger plan to eliminate all public housing developments in New Orleans.[7]  All of these concerns, furthermore, also have grave public interest implications for homelessness in New Orleans, a municipality already struggling under a post-Hurricane Katrina burgeoning population of homeless citizens and the critical lack of safe housing for its residents.

More specifically, the evidence will establish the following chronology of key events.

Commencing in or about 2002, HUD established an administrative receivership of the New Orleans local housing authority, and took over the sole and exclusive control of the daily operations of HANO. Schapiro Aff. at Exhibit E.  As a result, thereafter, and continuing for all

---

[6] They included unlawful denial of plaintiffs' opportunity to purchase St. Bernard (Count I), unlawful submission and approval of demolition and disposition application of Columbia Residential (Count II), mandamus with respect to HUD's and HANO's failure to fulfill their statutory obligations under the federal Housing Act (Count III), and engaging in arbitrary and capricious action in failing to fulfill the defendants' statutory obligations under the federal Housing Act (Count IV).

[7] Plaintiffs will show that HANO and HUD (both in its own right and as receiver of HANO), have been openly and publicly engaged in a systematic and unlawful plan to reduce the number of, or to eliminate entirely, public housing units available for occupancy in New Orleans. In 1996 there were 14,000 public housing units in New Orleans. The numbers of units decreased during the formal administrative receivership of HANO by HUD, and as of August 28, 2005, when the hurricane Katrina hit New Orleans, there were only 7,100 public housing units in New Orleans, 5,146 of which were occupied. It is the expressed plan of HUD and HANO at the present time to reduce this number by 3,201 units by demolishing 3,669 units in three major developments, one of which is St. Bernard, and replacing only 468 of those public housing units.  Nor has HUD/HANO built a single new public housing unit in New Orleans for over ten (10) years.

times relevant to this action, all of the actions of HANO have been those of a single federal employee of HUD, who has been serving as the sole Chair/Member of the Board of Commissioners of the Housing Authority of New Orleans.  Id.

During the period of HUD's receivership of HANO, 2002 to the present, HUD operated HANO in a manner inconsistent with the statutory and regulatory scheme established under the federal housing laws. For instance, as receiver of the local housing authority, HUD largely ignored the relevant statute with respect to the requirement that a local housing authority (LHA) conduct an assessment of the housing needs of low-income and very low-income families residing in the jurisdiction served by the public housing agency (see 42 USC 1437c-1(d)). Schapiro Aff. at Exhibit F. HUD, acting as HANO's receiver, also largely ignored the statutory requirements that the LHA develop an annual and five-year plan (see 42 USC 1437c-1); conduct a public hearing to discuss the public housing agency plan; and invite public comment regarding that plan before it is submitted for HUD approval. See 42 USC 1437c-1(f)(1)-(3).  Id.

Moreover, the evidence will show that August 2005, following the evacuation of the New Orleans public housing developments, HUD/HANO decided that the public housing residents of St. Bernard (and elsewhere), would not be permitted to return and reoccupy their units, and that the buildings of St. Bernard (and other public housing projects), would not be repaired or maintained for purposes of reoccupation of the recently evacuated residents. Schapiro Aff. at Exhibit G.

Then, in or about June 2006, defendant HUD Secretary Jackson made public announcements that HUD and HANO would demolish more than 4,500 public housing units in New Orleans, including more than 1400 units in St. Bernard, and replace them with mix-income developments. Id. Secretary Jackson made such stark announcements notwithstanding the fact

that HUD/HANO had failed to conduct any of the statutorily required needs assessments, studies, analyses, and tenant consultations.

Approximately four months later, in or about <u>October 2006</u>, HUD employee Babers, acting as sole commissioner of HANO, submitted to HUD on behalf of HANO a document entitled "5 Year Plan for Fiscal Years 2006-2010 / Annual Plan for Fiscal Year 2007 for Fiscal Year Beginning 10/2006" (hereinafter the "Annual and Five Year Plan"). The Annual and Five Year Plan, however, was prepared and submitted *without* HUD/HANO having conducted any of the required public hearings, *without* HUD/HANO having received and reviewed all public comments, and thus *without* HUD/HANO making any and all appropriate changes in the public housing agency plan in consultation with the resident advisory board – all in violation of HUD/HANO's statutory obligations under 42 USC 1437c-1(f)(3). Schapiro Aff. at Exhibit F.

In addition, in or about <u>October 2006</u>, HUD employee Babers, acting as sole commissioner of HANO, also submitted to HUD on behalf of HANO an application for the demolition and disposition of St. Bernard's. Schapiro Aff. at Exhibit H. Specifically, the request sought approval of the demolition of 66 dwelling buildings containing 671 units and disposition of 28.50 acres of underlying land at St. Bernard and 61 dwelling buildings containing 720 units and disposition of 20.20 acres of underlying land at St. Bernard Extension (together, containing 1391 units and 48.70 acres of land.)[8] <u>Id</u>. At the time of the demolition/disposition application, however, HANO had not yet received HUD's approval of either a Five Year Plan or an Annual Plan. A duly approved plan, moreover, was not only required by the National Housing Act, but it was a requirement for an application to demolish and dispose of a public housing development. Nor had HANO or HUD, acting in its own capacity or a receiver for HANO, consulted with the

---

[8] In addition, HUD/HANO's demolition plans include another 45 units for which demolition was approved in about 1996, for a total of 1436 units now slated for immediate destruction.  Schapiro Aff. at Exhibit J.

tenants and/or other members of the public as was required by law, again, as a *prerequisite* to the preparation of the Annual and Five Year Plans. Schapiro Aff. at Exhibit F.

In fact, the evidence shows that the first tenant meeting regarding the demolition and disposition of St. Bernard was not held until November 29, 2006; that is, well *after* the demolition application was submitted and well *after* the Annual and Five Year Plan was submitted, in contravention to the federal housing law. Schapiro Aff. at Exhibit I. In fact, the first tenant meeting occurred about *five months after* Secretary Jackson first announced the demolition of St. Bernard. Id.

On February 7, 2007, HUD approved HANO's Annual and Five Year Plan (submitted in October 2006), notwithstanding the fact that the Plan did not comply with the statutory requirements regarding needs assessments and studies or tenant consultations. Schapiro Aff. at Exhibit F. HUD's approval therefore was improper as the Annual and Five Year Plan was wholly deficient and did not comply with the statutory requirements: it failed to include the required studies of low-income families' housing needs and failed to take cognizance of and/or to analyze studies provided by others of these housing needs in New Orleans. HUD/HANO also ignored and/or willfully refused to meet their obligations imposed by statute, as well as HUD's own regulations, to meaningfully consult with public housing resident and to work with them to plan the future of public housing in New Orleans.  Schapiro Aff. at Exhibit I.

During this period, moreover, HANO, through its HUD receiver, continued to supplement its application with respect to the pending request for approval of the demolition and disposition of St. Bernard (and several other projects). HUD, as HANO's receiver, made a final submission to HUD on September 20, 2007. Schapiro Aff. at Exhibit H.

The next day, <u>on September 21, 2007</u>, HUD issued a thirty (31) page letter approving

HANO's application for demolition and disposition ("HUD Approval Letter").[9] <u>Id</u>. In the HUD

Approval Letter, HUD acknowledged the requirement under the applicable housing regulations

to offer the tenants the right to purchase the project prior to disposition. Specifically, HUD stated

that "24 CFR Section 970.9 requires that HANO provide resident organizations at the

development affected by the proposed disposition with the appropriate opportunity to purchase

the property for disposition."  HUD went on, however, to adopt and approve the position taken

by HANO, through its HUD-employee receiver, that although HANO did not provide such an

opportunity, it was not required to under a specific regulatory exception found in 24 CFR Section

970.9 (3)(ii). (The exception provides that when a public housing agency ("PHA") seeks

disposition "outside the public housing program to privately finance or otherwise develop a

facility to benefit low-income families (*e.g.* day care center, administrative building, mixed-

finance housing under …subpart F, or other types of low-income housing)," the PHA does not

need to provide the tenant organization with an opportunity to acquire the project.) Based upon

this purported exception, HUD then found that HANO was not required to offer the project to the

tenants, and that the HUD/HANO application thus was consistent with the federal housing act

and the implementing regulations, 24 CFR Section 970, including requirements relating to,

among other things, the resident's opportunity to purchase the property. Schapiro Aff. at Exhibit

H. Based upon this September 2007 determination (that the tenants did not have to be provided

an acquisition opportunity), HUD then approved the very demolition of the St. Bernard (and

---

[9] The HUD approval letter addressed HANO's application for the demolition of several other New Orleans public housing projects in addition to St. Bernard.

other) housing projects that had been announced by Secretary Jackson in June 2006 – *about fourteen (14) months earlier*. Id. and Schapiro Aff. at Exhibit E.

As the plaintiffs will show, however, HUD/HANO's reliance upon the regulatory exception, Section 970.9 (3)(ii), is misplaced. The exception does not apply because the proposed project on the St. Bernard is neither privately financed nor for the benefit of low income families.

*As to the first issue*, the proposed development for the St. Bernard site is <u>not</u> privately financed. Rather, in early 2007, HUD/HANO selected a development team of private entities, including Columbia Residential (together referred to as "Columbia"),[10] in connection with the disposition of the St. Bernard's project site. Schapiro Aff. at Exhibit K. Columbia's proposal for St. Bernard anticipates the complete demolition and destruction of all of the existing housing units at St. Bernard and proposes the construction, in its place, of a smaller mixed income project that will provide only one-ninth (1/9) the number of public housing units that had existed there before the storm. Schapiro Aff. at Exhibits C and L. The financing of the project, moreover, is not private, but rather is largely *public* in nature. Most of the funding sources (about 90%) for the $75 million project is slated to come from low-income housing tax credit program (about $42M), and federal funds in the form of community development block grants (about $25M). <u>Id</u>.

Nor can the proposed Columbia development be said to be "a development for the benefit of low-income families." The Columbia development plan will significantly and permanently reduce the number of public housing units at the St. Bernard site. The numbers are telling. St. Bernard currently contains a total of 1436 public housing units. After demolition, the Columbia

---

[10] It is reported that Secretary Jackson had been a partner/consultant with Columbia Residential prior to his becoming the HUD Secretary, and that he has continuing and substantial financial ties to Columbia.

development plan calls for the creation of a total of only 465 units and of those units only one-third (153 units), will be public housing units. Id. The remaining 66% of the units will be for higher income individuals and families, and will include market-rate units. Schapiro Aff. at Exhibit L. Thus, the Columbia development proposal will result in a drastic 84% reduction in public housing units at St. Bernard. Therefore, the proposed development being pursued by HUD/ HANO does not fall within the regulatory exception as it is neither privately funded, nor a development for the benefit of low-income families. As such, the regulatory exception under Section 970.9 (3)(ii), by its express terms, does not apply.

As there is no dispute that HUD/ HANO failed to offer or provide the St. Bernard tenants or their representative organization with an opportunity to purchase the St. Bernard public housing project (for purposes of revitalizing and reoccupying the housing units or otherwise), and as it is otherwise clear that the regulatory exception does not apply, the HANO demolition/ disposition application was <u>not</u> in compliance with federal housing law. Congress, moreover, has specifically mandated that HUD *must disapprove* an application for demolition/ disposition if the application that has not met certain statutory consultation requirements. *See* 42 USC 1437p (b). Here, the HANO demolition/disposition application was deficient in several ways,[11] including the unexcused failure to provide the tenants with the opportunity to purchase (and redevelop the project), and HUD, accordingly, was statutorily required to disapprove it.

Plaintiffs' case, in other words, is strong on the merits and there is a likelihood of their success upon a full hearing.

---

[11] In fact, the September 21 Approval Letter issued by HUD reports that the first tenant meeting on the subject of demolition was held on November 29, 2006, over a month <u>after</u> the application for demolition/disposition was first received by HUD. Schapiro Aff. at Exhibit H. This conclusively demonstrates not only that the application was not developed in consultation with the tenants as required by law but that HUD knew this critical fact at the time it approved the Application. HUD had no choice but to disapprove the application.

All of this, furthermore, is in the face of a proper proposal for the redevelopment of St. Bernard, which has been submitted by SBHR&DC, in conjunction with the AFL-CIO Investment Trust Corporation ("ITC") and the AFL-CIO Housing Investment Trust ("HIT"). Schapiro Aff. at Exhibit M. The SBHR&DC plan, moreover, specifically provides for the maximum retention of available public housing, with the attendant redevelopment and modernization of the St. Bernard buildings, and the de-concentration of low-income and very low-income families residing in St. Bernard. Schapiro Aff. at Exhibits C and M. It, more specifically, would accomplish the restoration of 1,085 housing units on site, including 866 units that would be available for the displaced tenants who occupied the premises prior to the hurricane.[12] Schapiro Aff. at Exhibit M. The cooperation between the ITC, HIT and SBHR&DC also is significant, as it demonstrates that the tenants and their organization have the capacity to restore their units, and that their plan is financially viable.[13] (This is in notable contrast to the Columbia proposal, which, as further explained in the Complaint, is not financially viable and is premised on promises that are not funded in the proposal.)[14]

SBHR&DC and the individual plaintiffs thus have provided HUD / HANO with a realistic alternative to its self-generated and self-approved development plans, and have actualized a well-thought through, financially viable plan for the acquisition, redevelopment, and reoccupation of their homes at St. Bernard. HUD and HANO, however, have failed *even to*

---

[12] The plaintiffs' plan, moreover, seeks to reduce the time and expense required for development/redevelopment of St. Bernard by salvaging, to the greatest extent possible, the existing buildings at the site, and it identifies sources of available and committed funding for the proposal and includes market analysis demonstrating the feasibility of the plan.

[13] HIT has invested more than $5 billion dollars in the last four decades to create or preserve over 85,000 units of single family or multifamily housing units across the United States.

[14] *See* Schapiro Aff. at Exhibits C and L, regarding reasons that Columbia proposal not viable or financially sound.

*respond* to this proposal. Instead, HUD and HANO are proceeding with the Columbia proposal, and with the full-scale demolition of the St. Bernard housing project. Schapiro Aff. at Exhibit A. (Thus, instead of acting to alleviate the housing shortage in New Orleans, as is their Congressional mandate, HUD, acting on its own account and as receiver of HANO, is acting in a manner that is demonstrably contributing to homelessness in New Orleans. In Pre-Katrina New Orleans there were approximately 6,200 homeless persons in a population of approximately 450,000 (1.4%), now there are approximately 12,000 homeless persons in a population of approximately 250,000 (4.8%). Schapiro Aff. at Exhibits N and O. Nothing in HUD and HANO's approved demolition and disposition plan seeks to address the housing needs of the public housing residents dislocated by Katrina or this significant rise in homelessness.)

Without the requested injunctive relief to preserve the *status quo*, the St. Bernard's buildings will come down, and SBHR&DC and the individual plaintiffs will lose forever their rights to acquire, redevelop, and reoccupy St. Bernard.

Based upon the above facts, the plaintiffs have brought this action in four counts: Count I (Unlawful Denial of Plaintiffs' Opportunity to Purchase and Preserve St. Bernard); Count II (Unlawful Submission and Approval of Application for Demolition and Disposition of St. Bernard; Count III (HUD's and HANO's Failure to Fulfill Their Statutory Obligations Under the U.S. Housing Act of 1937 to the Detriment of Plaintiffs, Mandamus); and Count IV (HUD's and HANO's Failure to Fulfill Their Statutory Obligations Under the U.S. Housing Act of 1937 to the Detriment of Plaintiffs, Arbitrary and Capricious Action).

Finally, with respect to the urgency of the injunctive relief, HUD/HANO recently decided to proceed with demolition of St. Bernard's immediately and out-of-phase. Specifically, on November 29, 2007, defendant Babers, the HUD employee with the operational control over

HANO in his role as receiver and sole Member/Chairman of the HANO Board of

Commissioners, voted and approved a services contract in the not to exceed amount of

$9,008,670 for the demolition and removal of approximately 1400 units and the remaining

buildings on St. Bernard site *in advance* of final negotiation of terms and execution of a master

development agreement (which is scheduled for mid 2008). Schapiro Aff. at Exhibits P and A.

The HUD/HANO demolition start date has been set for December 15, 2007. Schapiro Aff. at

Exhibits P.

      Contrary to the representations of HUD/HANO, however, the decision to commence the

demolition of St. Bernard by <u>December 15, 2007</u> and out-of-phase (before the master agreement

is signed), is not based upon a requirement of the Louisiana Housing and Finance Authority

("LHFA"). Rather, according to the LHFA's legal counsel, Leslie C. Strahan, "LHFA never

required demolition by HANO by any specific date. The LHFA did not set the timeline for

demolition or construction. …The date slated for demolition was chosen by HUD/HANO."

Schapiro Aff. at Exhibit Q.

## ARGUMENT

A.     **The Standard for Issuance of a Temporary Restraining Order/Preliminary Injunction**.

      In this Circuit, the standard for granting a temporary restraining order has been held to be

the same as for the issuance of a preliminary injunction. The plaintiff must show it is likely to

prevail on the merits, that it will suffer irreparable harm if the requested injunctive relief is not

granted, that other parties to the action will not suffer substantial harm if the requested injunctive

relief is issued, and that the public interest would be served by the granting of such relief. *United States of America v. Gillette Company, et al.,* 1990 U.S. Dist. LEXIS 350; *1990-1 Trade Case. (CCH) P68,893* (D.D.C. 1990), *citing Howard University v. The National Collegiate Athletic Association, et al.,* 675 F. Supp. 652 (D.D.C.1987)*; Washington Metropolitan Area Transit Com. v. Holiday Tours, Inc*., 559 F.2d 841 (U.S. App. D.C 1977) (same); *Ramirez v. United States Customs & Border Prot*., 477 F. Supp. 2d 150, 154-155 (D.D.C. 2007)(stating that the four factors to be considered by the Court on a request for a preliminary injunction are plaintiff's (1) irreparable injury and (2) likelihood of success; (3) substantially injury to other parties; and (4) the public interest), *citing Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001.)

These four factors, moreover, "interrelate on a sliding scale and must be balanced against each other." *Serono Labs, Inc. v. Shalala,*158 F.3d 1313, 1318 (D.C. Cir. 1998). In other words, in this Circuit "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). When "the balance of hardships tips decidedly toward the movant, it will 'ordinarily be enough that the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Ramirez,* 477 F. Supp. 2d at 155*; see also Washington Metropolitan Area Transit Com. v. Holiday Tours, Inc*., 559 F.2d 841, 844 (U.S. App. D.C 1977) ("To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i.e*., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more

17

deliberative investigation"), *citing Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953). *See also Doe v. Hammond,* 502 F. Supp. 2d 94 (D.D.C. 2007)(same); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)("A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.. …. If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak… Despite this flexibility, though, a movant must demonstrate 'at least some injury' for a preliminary injunction to issue … , for 'the basis of injunctive relief in the federal courts has always been irreparable harm,' *Sampson v. Murray*, 415 U.S. 61 (1974)(quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959).")(internal citations omitted).

In other words, the degree of 'possibility of success' required for injunctive relief will vary according to the court's assessment of the other factors (*i.e*., irreparable harm to plaintiffs and the public interest), such that injunctive relief should be granted where "[t]here is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Washington Metropolitan,* 559 F.2d at 843-844 (stating that, even where a more searching inquiry into the merits might compel the tentative conclusion that plaintiffs is less likely than not to prevail on the merits, injunctive relief might well be appropriate where the case is a difficult one warranting plenary review and the balance of equities favor preserving the status quo.)

## B.  <u>Plaintiffs Are Entitled to Immediate Injunctive Relief to Preserve the Status Quo Pending Hearing on the Merits.</u>

Plaintiffs' request for injunctive relief to preserve the *status quo* pending a hearing on the merits of the important issues raised in the complaint is proper, and should be allowed. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297("The purpose of a preliminary injunction

is merely to preserve the relative positions of the parties until a trial on the merits can be held."),

*citing Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The reasons, moreover, are many.

First, at this juncture, two of the factors to be considered in connection with the granting of injunctive relief weigh overwhelmingly in plaintiffs' favor: irreparable harm to plaintiffs and the public interest. In the federal courts, "[t]he basis for injunctive relief . . . has always been irreparable harm and inadequacy of legal remedies." *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, et al.,* 758 F.2d 669, 674 (D.C. Cir. 1985), *citing Sampson v. Murray*, 15 U.S. 61, 88 (1974). Moreover, although the concept of 'irreparable harm' does not readily lend itself to definition, the well known requirements have been met where, as here, such injury to plaintiffs is "certain and great; . . .actual and not theoretical." *Id.* Here, without the requested relief the imminent harm to befall plaintiffs is *certain*, *actual* and *great*: it is that the roughly 1400 housing units to which they have statutorily protected acquisition and redevelopment rights (and of which they have the intention of reoccupying), are about to be torn down and dismantled in their entirety, commencing this week, pursuant to a recent vote by HUD/HANO to approve a government demolition contract in the amount of $9 million. The injury, therefore, is "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* In other words, no legal remedies could be provided to redress this injury in the event that plaintiffs ultimately prevail on the merits. *See Sampson v. Murray,* 415 U.S. 61, 88 ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")

The overall public interest in preserving the *status quo* (that is keeping the residential units intact until the Court has had a chance to hear the case on the merits), likewise could not be stronger. If the injunctive relief is not granted, not only would plaintiffs be denied, irrevocably,

their statutory protections under the federal housing act, including, most important, their right to

purchase and rehabilitate the St. Bernard project, but there would be a large-scale destruction of

available public housing – the dismantling of the bricks and mortar of St. Bernard's 1400

residential units – and the inexcusable exacerbation of an already critical housing shortage and

the burgeoning population of homeless citizens in post-Katrina New Orleans. Injunctive relief,

therefore, is the only way to address the public interest in avoiding the imminent, and potentially

unlawful, wholesale destruction of almost 1400 critically-needed housing units at St. Bernard

until the plaintiffs' claims – that they have a right and a sound plan to preserve and reoccupy the

units – may be heard by this Court.

Moreover, based upon the facts developed to date, the plaintiffs' claims have undeniable

merit and, correspondingly, some likelihood of success following a full hearing on the matter.

To summarize the above discussion on this point, HUD's own document, the September

21, 2007 letter approving the demolition/disposition of St. Bernard's, acknowledges the

requirement that under the federal housing laws and regulations HANO was to have provided the

tenant-plaintiffs with the opportunity to acquire /redevelop the St. Bernard project. That

opportunity, however, was **never** provided. Nor does the regulatory exception upon which

HUD/HANO exclusively rely in defending their failure to comply with the tenant acquisition

regulation apply. That exception only applies to developments that are both privately funded and

"for the benefit of low income families." Here, however, as set forth above, the actual proposal

selected by HUD/HANO (the Columbia proposal) – and upon which HUD /HANO is proceeding

-- is neither.  The Columbia project is not, *one*, privately funded or, *two*, a development for the

benefit of low-income families. Thus, HUD's conclusion that the regulatory exception *did* apply

(which, conveniently, obviated the need for HANO to offer the tenants the opportunity to acquire

and rehabilitate (rather than demolish) the project's housing units), ran counter to the very evidence that was before the agency. Moreover, as the exception was not available to HANO, its application was not compliant with the housing laws and regulations and, for this reason alone, HUD was *required* -- by Congressional mandate -- to reject the HANO demolition/disposition application, and require that it, HANO, provide the tenants with their statutorily protected right to acquire the project.[15] *See, e.g.,* 42 USC 1437p (b) (wherein Congress mandated that HUD *must disapprove* an application for demolition/ disposition if the application that has not met certain statutory consultation requirements.)

Nor will HUD be able to successfully defend this lawsuit by asserting that its decision to approve the demolition of the 1400 housing units was with its, or HANO's, discretion as public housing agencies.

First, under the Administrative Procedure Act ("APA"), a court may set aside an agency action if the court determines that the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. §706(2)(A); *Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002).  Under the APA we must uphold the Secretary's decision unless it is 'arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law,' or 'unsupported by substantial evidence.' 5 U.S.C. §706. This test requires that the Secretary's decision contain a 'rational connection between the facts found and the choice made.'" )(citation omitted); *Sierra Club v. Bosworth*, 2007 U.S. App. LEXIS 28013, *supra*, at p. 6, *citing Marsh v.*

---

[15] In fact, the HANO demolition/disposition application was deficient in several ways. For instance, the September 21 approval letter issued by HUD acknowledges that the first tenant meeting on the subject of demolition was held on November 29, 2006, over a month <u>after</u> the application for demolition/disposition was first received by HUD. This conclusively demonstrates not only that the application was not developed in consultation with the tenants as required by law, but that HUD knew this critical fact at the time it approved the Application. HUD had no choice but to disapprove the application.

*Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Thus, although the deferential standard applies to judicial review of administrative agency discretionary actions, courts may reverse such decisions where the agency:

> relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Sierra Club v. Bosworth*, 2007 U.S. App. LEXIS 28013, *supra,* at p. 6 (citations omitted). In other words, a federal court will defer to an agency's decision "only if it is 'fully informed and well-considered,' …and … will disapprove of an agency's decision if it made 'a clear error of judgment.'" *Id.* (internal citations omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made. . . .In reviewing that explanation, [federal courts] . . . must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' …. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.")(citation omitted). Moreover, where an agency takes action without observing the procedures required by law, that action will be set aside by the court. *Sierra Club, supra, citing Idaho Sporting Cong., Inc. v. Alexander,* 222 F.3d 562, 567-68 (9th Cir. 2000).

To illustrate, in *Sierra Club v. Bosworth*, *supra*, at p. 1, the Ninth Circuit Court of Appeals concluded that the Forest Service's discretionary promulgation of a categorical exception ("CE") under its regulations (and upon which it claimed it was exempt from having to prepare a certain environmental assessment), was arbitrary and capricious where the public

agency failed to assess properly the significance of the applicable (hazardous fuels reduction) categorical exclusion and thus failed to demonstrate that it made a "reasoned decision" to promulgate the CE based on relevant factors and information. Moreover, the Court found that the Service had erred in that it "inappropriately decided to establish a categorical exception . . . *before* conducting a data [review]." *Id.*, at p. 10. (emphasis added). The Ninth Circuit emphasized that "[p]ost-hoc examination of data to support a pre-determined conclusion is not permissible…" (*Id.*), and that "[p]ost-decision information [] may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *Id.* On the facts before it, the Ninth Circuit found that the Forest Service failed to perform an impact analysis prior to promulgating the CE, failed to assess significance of the information properly, and failed to consider the 'outpouring of public protest' against its action. *Id.* It held, therefore, that plaintiff Sierra Club had made the requisite showing for injunctive relief, noting that "the balance of equities and the public interest favor issuance of the injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of .. ." the federal environmental laws. *Id.* at p. 17.

Likewise, on the matter before this Court, HUD /HANO are seeking to proceed on a course of action that will result in the destruction of 1400 critically-needed public housing units in a City struggling under a homelessness crisis. Moreover the HUD/HANO demolition program comes in the face of clear evidence of the agencies' post-hoc decision-making: HUD's explanation for ignoring the requirement to offer tenants the opportunity to acquire and rehab St. Bernard – the HUD/HANO claim of a regulatory exception – not only runs counter to the evidence that was before HUD/HANO (as to the nature and funding of the Columbia proposal),

but such post-hoc explanation merely "justifies" HUD's *pre*-determination (as early as June 2006) that it would have St. Bernard's torn down and demolished in its entirety.

The plaintiffs' case, therefore, is strong and under well established principles of federal court review of agency action has some likelihood of success on the merits.

Finally, consideration of the remaining factor, that is, whether there would be any substantial harm to defendants in the event that injunctive relief was granted, also weighs in plaintiffs' favor. There simply is no substantial harm that would befall the defendants by allowance of a slight delay in the commencement of the demolition in order to provide the plaintiffs, and this Court, with an opportunity to have this important matter heard in a deliberative fashion and on its merits, rather than under the gun of an imminent, wholesale destruction of the St. Bernard's public housing. In fact, the facts developed to date demonstrate that there is nothing imperative about the so-called start date of December 15, 2007, and that to the contrary the December 15 start date, and the related schedule, was developed by HUD/HANO and is largely self-imposed by HUD/HANO. On these facts, there simply is no substantial harm that would befall the defendants as a result of entry of the requested injunctive relief. Plaintiffs, moreover, are willing and able to prepare this matter to be heard on an expedited basis, and as early as early 2008. Thus, injunctive relief may enter without a substantial disruption to the existing schedule developed by HUD/HANO.

Thus, on the record before this Court, and in light of the serious questions raised, the balance of equities requires the issuance of a temporary restraining order or, in the alternative, preliminary injunction as "the balance of hardships tips sharply in [plaintiffs'] favor." *Washington Metropolitan, supra*, at 844 ("One moving for a preliminary injunction assumes the burden of demonstrating *either* a combination of probable success and the possibility of

irreparable injury *or* that serious questions are raised and the balance of hardships tip sharply in [its]. . .favor.") (emphasis added.)  For all the reasons set forth above, the destruction of the almost 1400 structurally sound housing units – units that the plaintiffs seek to rehabilitate and reoccupy – must be enjoined at this time.[16]

## **CONCLUSION**

For all the reasons stated above, and in weighing the equities, plaintiffs are entitled to injunctive relief in the form of a temporary restraining order or, in the alternative, preliminary injunction pending the hearing on the merits.

Respectfully submitted,

ST. BERNARD HOUSING RECOVERY&
DEVELOPMENT CORPORATION, Inc.;
GLORIA IRVING;
STEPHANIE MINGO;
SHIRLEY MORRIS; and
CHANTEL YOUNG
By their Attorneys,

_____/s/ Saul A. Schapiro_____
Saul A. Schapiro, Esq.
BBO No. 444820
(Motion for *pro hac vice* pending)
ROSENBERG & SCHAPIRO, P.C.
44 School Street, Suite 800
Boston, MA 02108
Phone: (617) 723-7440
Fax: (617) 723-8849
sschapiro@rosen-schap.com

---

[16] In an effort to prevent the demolition from going forward, plaintiffs, through counsel, sent a letter electronically on December 11, 2007 to HUD officials requesting that they suspend demolition activities voluntarily.  They have not consented to do so.

_____/s/ Charles H. Carpenter_____
Charles H. Carpenter, Esq. (DC Bar No. 432004)
William J. Bethune, Esq. (DC Bar No. 66696)
PEPPER HAMILTON, LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005
Phone: (202) 220-1203
Fax: (202) 478-2118
bethunew@pepperlaw.com
Local Counsel for Plaintiffs

William Quigley, Esq.
Loyola University New Orleans
7214 St. Charles Avenue, Campus Box 902
New Orleans, LA 70118
Phone (504) 861-2709
Fax:    (504) 861-5440
duprestars@yahoo.com
Co-Counsel for Plaintiffs

Tracie L. Washington, Esq.
THE LOUISIANA JUSTICE INSTITUTE
1631 Elysian Fields Avenue
New Orleans, LA 70117
Phone: (504) 872-9134
Fax: (504) 872-9878
Co-Counsel for Plaintiffs

Dated:  December 12, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, Inc.;<br>GLORIA IRVING;<br>STEPHANIE MINGO;<br>SHIRLEY MORRIS; and<br>CHANTEL YOUNG<br><br>Plaintiffs,<br><br>v.<br><br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT;<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, AS RECEIVER OF<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>ALPHONSO JACKSON, Secretary of the United<br>States Department of Housing and Urban<br>Development;<br>ORLANDO CABRERA, Assistant Secretary of the<br>United States Department of Housing and Urban<br>Development<br>C. DONALD BABERS, Board of Commissioners,<br>Housing Authority of New Orleans;<br>KAREN CATO-TURNER, Executive Administrator,<br>Housing Authority of New Orleans; and<br>And each individual defendant in his official capacity,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br><br>_____ |

## AFFIDAVIT OF CHANTEL YOUNG

I, Chantel Young, having first been duly sworn, depose, and say as follows:

1.      My name is Chantel Young.

2.    Immediately prior to Hurricane Katrina my mother and I resided at the St.
Bernard public housing development (the "St. Bernard"). I grew up there. I
attended local schools and was my 9th grade Class Valedictorian, Home Coming
Queen, and a cheerleader.

3.    Prior to Hurricane Katrina, I worked as a crossing guard under the New Orleans
Police Department and performed answering services for a local funeral parlor. I
also attended Delgado Community College studying criminal justice.

4.    When Hurricane Katrina was predicted to hit New Orleans local family members
left their homes in subdivisions outside of the St. Bernard and came to stay with
me and my mother in the St. Bernard. They had expressed to me that because of
the solid construction of the St. Bernard they believed they would be safe.

5.    After Hurricane Katrina hit, I was evacuated the next day.

6.    Upon my evacuation from the St. Bernard I was sent to a shelter in Houston. I
stayed there for about 3 weeks but was told I had to leave because of Hurricane
Rita.

7.    From there I went to a hotel in Euclid, Ohio. I stayed in Euclid for about 2 weeks
until I learned that my father, who had had an extended hospitalization and had
stayed in New Orleans throughout the storm and after, was dying.

8.    I moved to Plaquemine, Louisiana to stay with family and we brought my father
there. He died after about 2-3 weeks there. I stayed there for about a total of a
month.

9.    From Plaquemine I moved to Baton Rouge and stayed in a 2 bedroom place with
my mother and extended family members. We got the place in Baton Rouge
through FEMA and I stayed there for about 18 months.

10.     Living in Baton Rouge was expensive for us because we had to pay our own utilities. I became very depressed and suffer from high blood pressure. I wanted to come home and missed my friends and family.

11.     I learned that Iberville public housing development (the "Iberville") was open and got in touch with HANO.

12.     I currently live at the Iberville with my mother.

13.     I don't like living at the Iberville. I'm not comfortable there, I don't know the people, and there isn't enough room. I want to get out of the inner city. There is too much noise and a lot of crime at the Iberville.

14.     Prior to the hurricane, I was very active in my church and participated in the Catholic Youth Organization and Young Adult Club. The local church near the Iberville has no activities for young people.

15.     I want to go home to the St. Bernard.

16.     At the St. Bernard people looked out for one another and looked out for the children. Prior to the hurricane, there was an organization of the residents that worked towards making improvements at the St. Bernard.

17.     I learned about HANO's plans to demolish and dispose of the St. Bernard from the news, newspapers, and by talking to people. Friends and family would call even when I was in Baton Rouge. HANO didn't send me any notices.

18.     I believe the residents of St. Bernard have been treated with disrespect since the storm – we have been barred from their homes, many have been kept from getting

their belongings, and we have been deprived of any legitimate opportunity to participate in crucial decision making about the future of our community.

19.   I joined with other residents of the St. Bernard and formed the St. Bernard Housing Recovery & Development Corporation, Inc. (the "Corporation").

20.   I am a member of the Board of the Corporation.

21.   The Corporation was formed to serve as a vehicle to organize all residents of the St. Bernard to work formally with other community groups and/or prospective developers interested in working to realize the goal of redevelopment and rehabilitation of the St. Bernard.

22.   The Corporation meets regularly and has actively solicited support and technical assistance from numerous groups and professionals who share common interests. Working with these groups, the Corporation has developed a comprehensive plan for the tenants, working with private partners, to rebuild our homes, maintain affordability, and preserve our community at the St. Bernard.

23.   The Corporation submitted a proposal for it to purchase and redevelop the St. Bernard.  I am in favor of that proposal.

24.   I believe the Corporation's proposal provides HUD/HANO with the unique opportunity to prevent an injustice to our community.  The proposal is a statement of what I want and how I believe it can be achieved.

Signed and sworn to under the pains and penalties of perjury this __10__ day of December, 2007.

Chantel Young

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, Inc.;<br>GLORIA IRVING;<br>STEPHANIE MINGO;<br>SHIRLEY MORRIS; and<br>CHANTEL YOUNG<br><br>Plaintiffs,<br><br>v.<br><br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT;<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, AS RECEIVER OF<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>ALPHONSO JACKSON, Secretary of the United<br>States Department of Housing and Urban<br>Development;<br>ORLANDO CABRERA, Assistant Secretary of the<br>United States Department of Housing and Urban<br>Development<br>C. DONALD BABERS, Board of Commissioners,<br>Housing Authority of New Orleans;<br>KAREN CATO-TURNER, Executive Administrator,<br>Housing Authority of New Orleans; and<br>And each individual defendant in his official capacity,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br><br>_____ |

## AFFIDAVIT OF GLORIA IRVING

I, Gloria Irving, having first been duly sworn, depose, and say as follows:

1.      My name is Gloria Irving.

2.     Immediately prior to Hurricane Katrina I resided at the St. Bernard public housing development (the "St. Bernard"). I had resided in the St. Bernard since beginning in the 1970's. I had been a member of the Resident Counsel.

3.     When Hurricane Katrina hit New Orleans, I did not want to leave my home. Even though my apartment had lost power and was flooded, I did not want to leave the St. Bernard. I stayed for several days in a neighbor's second floor apartment.

4.     I was evacuated from the St. Bernard because of Hurricane Katrina.

5.     Upon my evacuation from the St. Bernard I was immediately taken by ambulance to LSU in Baton Rouge due to my health. I had had double bypass surgery shortly before the hurricane. After several days in the hospital I was sent to a church shelter where by health again deteriorated and I was sent back to the hospital.

6.     After I was discharged from second stay at the hospital since the hurricane, I stayed with my grandniece in Baton Rouge for two days.

7.     From Baton Rouge, I went to live with my sister and niece in Desota, Texas for several months. While living with my sister, my brother helped me get an apartment in Houston under a voucher program. I stayed about 2 years total in Houston.

8.     I got very depressed in Houston and wanted to come home. I got in touch with the people at HANO to come home.

9.     No one was helping me to get home. They didn't pay my moving expenses. I rode in the moving truck back to New Orleans and got pneumonia.

10.     I currently live at the Fisher Senior Citizen Village (the "Fisher").

11.   This apartment is smaller than my apartment at the St. Bernard. I had to get rid of some of my furniture and had to buy furniture that would fit this apartment.

12.   While I lived in the St. Bernard I took care of my goddaughter who also lived at the St. Bernard. Since Hurricane Katrina, I have only visited with her once. That was while I was in Houston and she came from Seattle.

13.   I can't have children stay with me at the Fisher. I can't take care of my goddaughter at the Fisher.

14.   I'm glad to have a roof over my head but I want to go home to the St. Bernard.

15.   I learned about HANO's plans to demolish and dispose of the St. Bernard by talking to people. HANO didn't send me any notices.

16.   I believe the residents of St. Bernard have been treated with disrespect since the storm – we have been barred from their homes, many have been kept from getting their belongings, and we have been deprived of any legitimate opportunity to participate in crucial decision making about the future of our community.

17.   I joined with other residents of the St. Bernard and formed the St. Bernard Housing Recovery & Development Corporation, Inc. (the "Corporation").

18.   I am the Secretary of the Corporation.

19.   The Corporation was formed to serve as a vehicle to organize all residents of the St. Bernard to work formally with other community groups and/or prospective developers interested in working to realize the goal of redevelopment and rehabilitation of the St. Bernard.

20.    The Corporation meets regularly and has actively solicited support and technical assistance from numerous groups and professionals who share common interests. Working with these groups, the Corporation has developed a comprehensive plan for the tenants, working with private partners, to rebuild our homes, maintain affordability, and preserve our community at the St. Bernard.

21.    The Corporation submitted a proposal for it to purchase and redevelop the St. Bernard. I am in favor of that proposal.

22.    I believe the Corporation's proposal provides HUD/HANO with the unique opportunity to prevent an injustice to our community. The proposal is a statement of what I want and how I believe it can be achieved.

Signed and sworn to under the pains and penalties of perjury this ___10___ day of December, 2007.


_Gloria Irving_
Gloria Irving

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, inc.;<br>GLORIA IRVING;<br>STEPHANIE MINGO;<br>SHIRLEY MORRIS; and<br>CHANTEL YOUNG<br><br>Plaintiffs,<br><br>v.<br><br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT;<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, AS RECEIVER OF<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>ALPHONSO JACKSON, Secretary of the United<br>States Department of Housing and Urban<br>Development;<br>ORLANDO CABRERA, Assistant Secretary of the<br>United States Department of Housing and Urban<br>Development<br>C. DONALD BABERS, Board of Commissioners,<br>Housing Authority of New Orleans;<br>KAREN CATO-TURNER, Executive Administrator,<br>Housing Authority of New Orleans; and<br>And each individual defendant in his official capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br><br>_____ |

## AFFIDAVIT OF SAUL A. SCHAPIRO, ESQ.

I, Saul A Schapiro, Esq., having first been duly sworn, depose, and say as follows:

1.     My name is Saul A. Schapiro, Esq.  I am counsel to the plaintiffs in the instant
        action.

2.    Attached hereto, at the tab letters indicated below, are true and accurate copies of the following documents obtained by and/or provided to me:

A.    Housing Authority of New Orleans ("HANO") Board of Commissions' Notice and Agenda for Regular Meeting of November 29, 2007.

B.    Louisiana Secretary of State Detailed Record of the St. Bernard Redevelopment, LLC.

C.    October 8, 2007 letter to U.S. Department of Housing and Urban Development ("HUD") and HANO from the plaintiff corporation, St. Bernard Housing Recovery & Development Corporation, Inc., regarding the St. Bernard Public Housing Project.

D.    National Journal News Feature entitled "Katrina Aftermath Questionable Contracts" dated October 4, 2007.

E.    HUD News Release entitled "HUD Names New Recovery Advisor and Receiver to Advance Current HANO Hurricane Recovery Efforts" dated April 14, 2006.

F.    Excerpts from HANO's 5 Year Plan for Fiscal Years 2006-2010, Annual Plan for Fiscal Year 2007, Annual Plan for Fiscal Year Beginning 10/2006, Approved by HUD, February 9, 2007.

G.    Excerpt from The Time-Picayune new article entitled "Four N.O. housing developments will be demolished" dated June 15, 2006.

H.    HUD Memorandum for Cheryl Williams, Director, New Orleans Office of Public Housing, 6H, from Ainars Rodins, P.E., Director, Special Applications

Center (SAC), PIA, Subject, Approval of the HANO Request for Demolition and Disposition, dated September 21, 2007.

I.    Excerpts of transcript from HANO Demolition and Disposition Resident Consultation Meeting on Proposed Demolition/Disposition Meeting, dated November 29, 2006.

J.    HANO Demolition & Disposition Matrix.

K.    HUD News Release entitled "Housing Authority of New Orleans Board Approves Firms to Plan the Redevelopment of St. Bernard, C.J. Peete, B.W. Cooper" dated March 28, 2007.

L.    Excerpt from Columbia Residential, *at al*, response to HANO request for Proposal, namely a Duvernay + Brooks, LLC memorandum regarding St. Bernard Financing Narrative, dated January 4, 2007.

M.    The Bernard Housing Recovery & Development Corporation, Inc.'s proposal entitled "St. Bernard Tenants Proposal Submission to HUD/HANO" dated November 2007.

N.    September 21, 2007 letter to HUD Secretary Jackson from Senator Mary L. Landrieu.

O.    U.S. Census Bureau, State & County QuickFacts, Orleans Parish, Louisiana; infoplease web based information for New Orleans, La.; and Rand News Release entitled "Rand Study Estimates New Orleans Population to Climb to About 272,000 in 2008, dated March 15, 2006.

P.    November 14, 2007 Louisiana Housing Finance Agency Resolution regarding schedules for the St. Bernard Project obtained by fax from the

Louisiana Housing Finance Agency.

Q.     December 7, 2007 email from Leslie C. Strahan, Attorney, Louisiana Housing Finance Agency to Tracie Washington, Esq., co-counsel to the plaintiffs.

3.     The attached documents are the materials upon which the plaintiffs are relying in the Motion for Temporary Restraining Order or, in the alternative, Preliminary Injunction filed herewith.

Signed and sworn to under the pains and penalties of perjury this ___ day of December, 2007.

Saul A Schapiro, Esq.

# EXHIBIT A

AR MEETING OF THE BOARD OF COMMISSIONERS



**Housing Authority of New Orleans**

**HOUSING AUTHORITY OF NEW ORLEANS
BOARD OF COMMISSIONERS
REGULAR MEETING**

You are hereby notified that the **Board of Commissioners of the Housing Authority of New Orleans** will meet in **Regular Session** in the **Fischer Community Center** located at **1400 Semmes Street** in the **City of New Orleans, Louisiana 70114** at **10:00 a.m.** on the **29**th **day of November, 2007.**

C. Donald Babers
Board of Commissioners

Cc:     Hon. C. Ray Nagin, Mayor, City of New Orleans
        City Council of New Orleans
        HUD Field Office
        Resident Council Presidents
        New Orleans Legal Assistance Organization
        Fair Housing Action Center
        The Times-Picayune
        Louisiana Weekly

HOUSING AUTHORITY OF NEW ORLEANS
BOARD OF COMMISSIONERS
REGULAR MEETING
FISCHER COMMUNITY CENTER
1400 SEMMES STREET
NEW ORLEANS, LA 70114
NOVEMBER 29, 2007
10:00 a.m.

# AGENDA

I. **CALL TO ORDER**

II. **APPROVAL OF THE MINUTES OF THE MEETING HELD ON OCTOBER 17, 2007**

III. **ITEMS FOR APPROVAL**

   <u>**AUTHORIZATIONS**</u>

   1. **Resolution #2007-64** approving the extension of Section 901 of the Emergency Supplemental Appropriations (PL 109-148) of public housing assistance to PHAs affected by Hurricanes Katrina or Rita. **TAB 1**

   2. **Resolution #2007-65** approving an amendment to the Section 8 Administrative Plan to allow HANO to establish and maintain separate Project-based Voucher (PBV) waiting lists and selection preferences for each PBV project. **TAB 2**

   3. **Resolution #2007-66** approving Amendment No. 1 to the contract with **Ballard, Spahr, Andrews and Ingersoll** to include additional services required for the mixed-finance development projects thereby increasing the contract amount from not to exceed $900,000 to not to exceed $1,200,000 for the year ending October 19, 2006 and the option year ending October 19, 2007. **TAB 3**

   4, **Resolution #2007-67** authorizing the Executive Administrator to enter into a Demolition Services Agreement with **Keith B. Key Enterprises** in an amount not to exceed $6,000,000 to be paid from HANO Capital Funds to provide for the demolition and removal of all remaining buildings (other than Retained Buildings) on the B.W. Cooper Site, and to contract for and commence such activities in advance of final negotiation of terms and execution of a Master Development Agreement in order to permit timely progress of redevelopment activities. **TAB 4**

   5. **Resolution #2007-68** authorizing the Executive Administrator to enter into a Demolition Services Agreement with **St. Bernard Redevelopment** in an amount not to exceed $9,008,670 to be paid from HANO Capital Funds to provide for the demolition and removal of all remaining buildings (other than Retained Buildings) on the St. Bernard site, and to contract for and commence such activities in advance of final negotiation of terms and execution of a Master Development Agreement in order to permit timely progress of redevelopment activities. **TAB 5**

AGENDA FOR THE REGULAR MEETING OF THE BOARD OF COMMISSIONERS
NOVEMBER 29, 2007

a.                    ITEMS FOR APPROVAL (cont.)

<u>AUTHORIZATIONS</u> (cont.)

6. **Resolution 32007-69** authorizing the Executive Administrator to enter into a Demolition Services Agreement with **Central City Partners** in an amount not to exceed $5,830,000 to be paid from HANO Capital Funds to provide for the demolition and removal of all remaining buildings (other than Retained Buildings, as hereinafter defined) on the C.J. Peete Site, and to contract for and commence such activities in advance of final negotiation of terms and execution of a Master Development Agreement in order to permit timely progress of redevelopment activities. **TAB 6**

7.      **Resolution #2007-70** authorizing the Executive Administrator to loan funds from HANO in a total amount not to exceed $645,000.00 to **St. Bernard I, LLC** for the purpose of paying for certain predevelopment expenses to facilitate the Project, and execute any documents and take any actions necessary to effectuate the transactions described above in this resolution. **TAB 7**

8.      **Resolution #2007-71** authorizing the Executive Administrator to make available $8.2 million in funding from HOPE VI and/or Capital Funds to Phase I of the New Savoy project. Said funds may be made available as a loan to the project to complete the funding required for immediate financial closing. **TAB 8**

9.      **Resolution #2007-72** authorizing the Executive Administrator to execute Change Order No. 1 to the Contract with Durr Heavy Construction, LLC for the demolition of 14 buildings at the B.W. Cooper Development, LA 1-12 (Contract **#05-130-06-09**) in the amount of **$254,634.00.** (*Demolition Grant for B.W. Cooper).* **TAB 9**

<u>AWARDS</u>

10.     **Resolution #2007-73** approving the Award of a Contract to **C. Miller Landscaping Service** to provide grass cutting services at St. Thomas off site properties and various vacant lots in the firm fixed amount of $160,030.00. (G*eneral Operating Fund*). **TAB 10**

11.     **Resolution #2007-74** approving the Award of a Requirements Type Contract to **Marsh** to provide a comprehensive range of risk management services at the rates proposed in an amount not to exceed $400,000.00. *(General Operating Fund FY 2007).* **TAB 11**

12.     **Resolution #2007-75** approving the Award of a Contract to **D.H. Griffon of Texas, Inc.** in the fixed-price amount of $2,526,116.10 to provide for the demolition of 70 buildings and associated infrastructure at the Lafitte Development LA1-05. (*Capital Fund Grant, FY 2006 and the 901 Fungibility Account).* **TAB 12**

13.   **Resolution #2007-76** approving the Award of a Contract to **Boh Brothers Construction Company, LLC** in the fixed-price amount of $6,365,000.00 to provide for the demolition of existing buildings, utilities, paving, and the construction of streets, lighting, utility infrastructure and grading needed to support the development of future housing units on Parcel 3A of the Fischer Housing Development. *(HOPE VI Demolition Grant and Replacement Housing Program Funds FY 2005 and 2006).* **TAB 13**

<u>RATIFICATION</u>

14.   **Resolution #2007-77** ratifying the execution of the Predevelopment Loan Agreement and related documents by the Executive Administrator for purposes of loaning funds in a total amount not to exceed $955,000.00 to **Keith B. Key Enterprises, LLC** to pay for certain predevelopment expenses, and to take any actions necessary to effectuate the transactions described in this resolution . **TAB 14**

IV.   **PUBLIC COMMENT**

V.    **ADJOURNMENT**

# EXHIBIT B

 Louisiana Secretary of State
# COMMERCIAL DIVISION
## Corporations Database


*Louisiana Secretary of State*
*Detailed Record*

Charter/Organization ID: 36549085K

Name: ST. BERNARD REDEVELOPMENT, LLC

Type Entity: Limited Liability Company

Status: Active

Annual Report Status: In Good Standing        **Add Certificate of Good Standing to Shopping Cart**

Mailing Address: C/O GERALD BAROUSSE, 335 JULIA STREET, STE. A, NEW ORLEANS, LA 70130

Domicile Address: 335 JULIA STREET, STE. A, NEW ORLEANS, LA 70130

File Date: 09/25/2007

Registered Agent (Appointed 9/25/2007): GERALD BAROUSSE, 335 JULIA STREET, STE. A, NEW ORLEANS, LA 70130

Member or Manager: COLUMBIA RESIDENTIAL, LLC, 1718 PEACHTREE ST., STE. 684 SOUTH, ALTANTA, GA 30309

Member or Manager: BAYOU DISTRICT FOUNDATION, INC., 335 JULIA ST., STE. A, NEW ORLEANS, LA 70130

New Search    View Cart

1

# EXHIBIT C

October 8, 2007

Orlando Cabrera
Assistant Secretary, Public and Indian Housing
United States Department of Housing and Urban Development
451 7th Street, S.W.
Washington, D.C. 20410

C. Donald Babers
Board of Commissioners
Housing Authority of New Orleans
4100 Touro Street
New Orleans, Louisiana 70122

                Re: St. Bernard Proposal Public Housing Project

Dear Sirs:

There is an old proverb we use that states "Nothing About Us, Without Us, Is For Us."
In this spirit, this proposal is presented by the St. Bernard Housing Recovery &
Development Corporation, Inc. on behalf of the tenants of St. Bernard to redevelop the
St. Bernard public housing project.   We believe our proposal provides HUD/HANO with
the unique opportunity to prevent an injustice to our community

Many of us have lived in the St. Bernard community for most of our lives.  It is home
every bit as much as any homeowner's home is their own.  St. Bernard is our community
and no voucher program in Houston, Atlanta, Memphis or New Orleans for that matter,
can change this.  We have been treated miserably since the storm -- barred from our
homes, kept from getting our belongings, and deprived of any legitimate opportunity to
participate in crucial decision making about the future of our community.

We have been working tirelessly while waiting patiently to return home.  Yet at every
turn HUD and HANO have tried to ignore us.  We are only asking to be heard in
accordance with our legitimate rights.  People in power have tried to hold us down - some
residents have even lost hope in their dream of returning home; but, we will rise up and
persevere in our desire to participate in the rebuilding of our community.  This proposal
is our statement of what we want and how we can achieve it.  Your assistance in helping
us reach this goal would be warmly welcomed.

--------------------

**The Proposal**

This proposal is submitted in collaboration with the AFL-CIO Investment Trust Corporation and the AFL-CIO Housing Investment Trust. It stands in contrast to the proposal from Columbia Residential selected by HUD/HANO for the property. Most distinctly, our proposal will:

- create one-for-one replacement of the pre-Katrina occupied units in the first phase allowing all former residents the right to return to their homes;
- finance five times the number of affordable housing units for the same amount of public subsidy;
- explore the use of historic rehabilitation tax credits to increase affordability in the community by preserving the historic character of the neighborhood; and
- allow public housing families to have a meaningful role in the redevelopment process and in the management of their community.

The St. Bernard Housing Recovery & Development Corporation, Inc. (St. Bernard HRDC) was founded by the residents of St. Bernard on April 10, 2007 as a not for profit open to all residents of St. Bernard at the time of the storm.[1] It is serving as a vehicle to organize residents to work formally with other community groups and/or prospective developers interested in working to realize the goal of the redevelopment and rehabilitation of St. Bernard. The St. Bernard HRDC meets regularly and has actively solicited support and technical assistance from numerous groups and professionals who share common interests, including, for example, the AFL-CIO Investment Trust Corporation, the AFL-CIO Housing Investment Trust, Telesis Corporation, the architectural firm Goody Clancy, and other groups. These groups have helped to design, develop and finance affordable housing across the country and they will work with us to assist in developing the comprehensive plan for the redevelopment of St. Bernard.

We are submitting this proposal to HUD/HANO in accordance with 24 CFR 970.9. This regulation requires that HUD/HANO provide resident organizations with the opportunity to purchase the property proposed for disposition. HUD/HANO asserts that they are exempt from applicable regulations in part because the disposition of the public housing project is being privately financed.[2] However, by its own terms this exception is only available to HUD and HANO when the project is "privately financed" and is to the

---

[1] 24 CFR 970.9 states that "the PHA shall, in appropriate circumstances as determined by the Assistant Secretary, initially offer the property for disposition to…a nonprofit organization acting on behalf of the residents at any development proposed for disposition…" The comments to these regulations further specify that "a nonprofit organization is one that is 'validly incorporated under the laws of the state in which it is located.'" The St. Bernard HRDC was incorporated in the State of Louisiana thus meeting the regulatory requirement.

[2] See Memorandum dated September 21, 2007 from HUD Special Applications Center relating to Approval for the Housing Authority of New Orleans' (HANO) Request for the Demolition of [66 Dwelling Buildings Containing 671 Units and Disposition of 28.50 Acres of Underlying Land at St. Bernard, LA001008 and 61 Dwelling Buildings Containing 720 Units and Disposition of 20.20 Acres of Underlying Land at St. Bernard Extension, LA001013].

"benefit of low-income families."[3] It is neither. The Columbia proposal is utilizing more than $100 million in public subsidies to develop 465 units of housing. When completed only 19% of former residents would be able to afford to live there, with the remaining 81% of the property being rented to market rate tenants. Their proposal meets neither part of the exemption test.

## Unprecedented Elimination of Public Housing

HANO, under the direction of HUD as its administrative receiver, is on the verge of wiping out the multifamily public housing stock of New Orleans through the demolition of the St. Bernard project and three other major public housing projects in the City. Through the complete demolition of Laffite, St. Bernard, B.W. Cooper and C.J. Peete, 4,529 units of public housing will be completely lost and will be replaced with 1,935 units, one-third of which will be affordable to public housing-eligible families. Once rebuilt, only 13% of the pre-storm units would be affordable to public housing tenants. This cannot possibly be the public policy goal our nation is trying to achieve in the aftermath of the most devastating natural disasters in our history.

These proposed demolitions will be one of the largest single displacements of African-American families in memory [4] and will permanently change the complexion of New Orleans. [5]  They are being carried out in a manner that turns the laudable public policy embodied in such successful federal housing programs as HOPE VI on its head.[6] Demolition and redevelopment of public housing on the scale proposed and approved by HUD/HANO is normally carefully sequenced to ensure the adequacy of private financing for the proposed replacement housing. It is also planned so as to ensure that the local housing authority can ramp up its capacity to manage these complex development projects. HANO has been in receivership for five years and has done no new development in more than ten. There is grave concern as to whether it has capacity to oversee the reconstruction of four major projects concurrently.

In a city where more than 70,000 people live in poverty and where over 50,000 units of rental housing were destroyed, national and local housing policy should emphasize the

---

[3] 24 CFR 970.9(b)(3)(ii).

[4] "The aftermath of Katrina has already resulted in the largest displacement of black families since the Civil War," Michael H. Cottman, *Black Politicians, Activists Decry Iraq War Spending vs. Katrina Relief Aid*, December 4, 2005. See also "The federal government might as well have put an ad in the paper: 'Blacks Not Wanted.'" *Who Exiled New Orleans' Poor*, Judith Browne-Dianis, Washington Post, Thursday, May 17, 2007; Page A17.

[5] A recent report of the Brookings Institution which reports that those driven out by Katrina were "younger, poorer, more likely to be black, and more likely to have children." The Brookings Institute reports that the number of black students in the City is proportionately shrinking. African-American communities that were economically depressed before the hurricane have been hit the hardest. *Resettling New Orleans: The First Full Picture from the Census*, The Brookings Institution Metropolitan Policy Program, September 2007.

[6] In the seven years of the HOPE VI program for which data is available (FY1996-2003), HUD awarded $395 million for the demolition of 57,000 public housing units nationwide. This is an annual average of 8,143 units annually across 127 public housing authorities. If the HUD/HANO plan is actualized, the demolition of these four projects in New Orleans would be the largest one-year approval on record.

construction and not the demolition of affordable housing. How can HUD/HANO decide that demolishing 65% of the city's total public housing stock (88% of the occupied pre-storm units) at once is sound public policy in a city where there is a severe shortage of rental housing? No housing authority has ever experienced such a dramatic reduction in its affordable public housing stock. In fact, only once in the last decade has HUD even come close to permitting demolition on this scale when it approved the destruction of 5,233 units in Chicago. However, for Chicago this represented only a 12% reduction in its public housing stock, resulting in a much smaller impact on this community.[7] If HANO were an independent local agency, led and staffed by members of the community rather than directed by HUD, there is little doubt that a different result would have occurred. We simply cannot understand how or why HUD/HANO has chosen this course.

The Columbia proposal will be undertaken at a time when the market for housing in New Orleans is uncertain. In 2006, only 500 new single family and multifamily unit building permits were issued by the City of New Orleans while at the same time rents in the city rose by 40-70% above pre-Katrina levels.[8] Even if all the projects which received an allocation of GO Zone tax credits in the City of New Orleans were completed, it would only result in 7,507 new units of housing, a replacement of less than 15% of the units which were damaged in the storm.[9] This leaves public housing tenants with very few affordable market alternatives.

Financing for multifamily housing is virtually non-existent in New Orleans. Since Hurricane Katrina, HUD's FHA has not insured a new construction, substantial rehabilitation or refinance transaction in the city of New Orleans. In addition, the primary activities of Fannie Mae within the city of New Orleans have focused on refinance and moderate rehabilitation transactions. There are serious questions about the market feasibility of HUD/HANO's replacement housing plan to wipe out more than 4,500 units and replace them with privately financed rental housing.

**The Third Way: Meeting New Orleans' Real Housing Needs**

We propose a better way of redeveloping public housing, an alternative model where tenants, working with private partners, rebuild their homes, maintain affordability, and preserve their communities. One way to achieve these goals is through the creation of a leased cooperative under which the tenants would participate actively in the management and which would eventually evolve into a limited equity housing cooperative.[10] Under

---

[7] The next largest approval for demolition under HOPE VI was in HANO's first year of receivership (2002) when HUD approved the demolition of 1,563 units in New Orleans. HOPE VI Demolition Grants: FY 1996-2003. **www.hud.gov/offices/pih/programs/ph/hope6/grants/demolition/2003master_dem.pdf**.

[8] *Affordable Rental Housing in Healthy Communities: Rebuilding after Hurricanes Katrina and Rita,* Urban Institute, May 2007.

[9] *Public Investment, Private Developers: How Louisiana Deployed its GO Zone Housing Tax Credits.* Bureau of Governmental Research, May 2007.

[10] Limited Equity Housing Cooperatives (LEHCs) are business corporations in which residents share ownership of a building. LEHCs offer ownership opportunities to lower income households while limiting

the St. Bernard HRDC plan, the cooperative would be created upon the initial financing of the project. During the tax credit period, the tenant management team would work closely with the property manager on significant management issues such as lease and tenant occupancy terms, preventive maintenance issues, eviction criteria, and a tenant grievance policy. Following the expiration of the tax credits, the tenants would be given the right to purchase the property outright and form a limited equity housing cooperative, ultimately bringing them many of the benefits of homeownership.

Our proposal will create and preserve a total of 1,085 units on the St. Bernard site, 866 units, or approximately 80% of the total units, will be affordable to former St. Bernard residents--the number of units which were occupied just prior to Hurricane Katrina. The other 219 units will be affordable to families making less than 60% of the AMI. We are still puzzled over the announcement to demolish the existing structures, which have been found to have no structural or non-structural damage. [11] Instead, we will preserve the majority of the existing structures in order to maintain the character of the community while also seeking to make Historic Rehabilitation Tax Credits available as an additional source of financing for the project. [12]

Another critical element of our plan which is absent from the Columbia proposal, is the creation of a neighborhood improvement program. For example, all off-site housing financed by our plan would be targeted to our own neighborhood and not scattered city-wide. We envision a broader community development approach as part of this process. While the redevelopment of St. Bernard and our return to our community is our top priority, we realize the need for comprehensive neighborhood development that goes along with the St. Bernard redevelopment.  In order to strengthen our community we will:

- *Make St. Bernard a catalyst project for the neighborhood.* We are already surveying the neighborhood in order to identify both families nearby who need help rebuilding their homes as well as abandoned properties which could be acquired for redevelopment. This broader community development will further leverage every public dollar allocated to the St. Bernard project.

---

the return from resale that they can receive from the housing. They contrast with market rate cooperatives, where membership can be transferred at market value.

LEHCs provide high quality, safe affordable housing for low-income families.  LEHCs are vehicles which allow for many of the benefits of homeownership to low-income families who might not otherwise be able to own.  For example, LEHCs allow members to pass their shares onto family members, allow for more active tenant management, and allow the tenants to benefit from appreciation that occurs in the property. LEHCs offer stable housing costs in rising real estate markets and resistance to defaults in down markets while requiring similar or lower subsidies than other comparable rental housing.

[11] Affidavit of John F. Hernandez, United States District Court for the Eastern District of Louisiana, October 23, 2006, Anderson v. Jackson (Civil Action No. 06-3298) (see attached).
[12] The Federal Historic Preservation Tax Incentives program is one of the nation's most successful and cost-effective community revitalization programs. The program fosters private sector rehabilitation of historic buildings and promotes economic revitalization. In this case, local and federal approvals would be required to qualify the project and the neighborhood.

- *Provide access to economic opportunity.* We are partnering with the Gulf Coast Construction Careers Center to provide job training opportunities and access to construction careers, both at St. Bernard and throughout New Orleans. Access to this type of comprehensive workforce development program will help reduce employment barriers while also ensuring a strong economy and a more just foundation for St. Bernard and the entire New Orleans community. With 1,423 on-site jobs in our proposal, more than twice the number in the Columbia plan, there would be real employment opportunities for tenants, not empty promises.

- *Create a Neighborhood Advisory Council.* We have created a neighborhood Advisory Council comprised of 15 members of the surrounding community who will participate in carrying out our vision for the neighborhood.

- *Stimulate Construction Innovation.* To meet the enormous housing needs of the City of New Orleans and the Gulf Coast area, innovations in housing construction must occur. The St. Bernard HRDC plan will help stimulate this by requiring factory-built steel framing in the on-site construction and off-site development. It is a sounder method of construction, withstanding hurricane force storms and resisting mold, rotting and termite infestation associated with wood. Such construction is environmentally sound because it uses recycled steel. Finally, the factory that builds these frames will provide jobs for residents of the St. Bernard community.

## A Tale of Two Proposals

Our proposal intends to make use of all the subsidies currently set aside for the St. Bernard development which includes $74 million of low income housing tax credits as well as $27 million of Community Development Block Grant (CDBG) funds. In addition, to finance the development of an additional 320 units of affordable housing on-site, our proposal would also seek an allocation of historic tax credits in the amount of $36 million, subject to the property being awarded Federal Historic Register designation.

The Columbia proposal contains potential financing gaps. It assigns amounts for total development costs that appear to be significantly below actual costs incurred in the market today.[13] This suggests either a very low wage number, which would not comply with Davis Bacon wage rates, or numbers that simply do not reflect actual current costs in New Orleans. Applying a more accurate number for hard costs reveals a funding gap for the project in the order of $24.5 million.[14]

---

[13] The Columbia proposal shows total development costs of $121.83 per square foot while recent market surveys show that the median TDC per square foot for public housing redevelopment is $242 and for all low income developments is $156.00. *Public Investment, Private Developers: How Louisiana Deployed its GO Zone Housing Tax Credits.* Bureau of Governmental Research, May 2007.

[14] One possible way to bridge such a gap, which is reflected in our proposal, would be to use Historic Tax Credits—credits that are not available if the buildings have been demolished. This would require local and federal approvals and may involve seeking a historic designation for the neighborhood.

### Comparison of Proposals: St. Bernard HRDC v. Columbia

| | St. Bernard HRDC Proposal | Columbia Proposal | Advantage |
|---|---|---|---|
| Total on-site units | 1085 units | 465 units | St. Bernard HRDC |
| Total on-site affordable – 30% AMI | 866 units | 160 units | St. Bernard HRDC |
| Ability for former tenants to return | 100% | 19% | St. Bernard HRDC |
| Total Cost per Gross Square Foot | $156.00 | $121.83 | St. Bernard HRDC |
| TDC allocated to housing (%) | 99.4% | 64.4% | St. Bernard HRDC |
| On-site construction-related jobs | 1,423 | 677 | St. Bernard HRDC |
| Tax Credits and CDBG Allocated per Affordable Housing Unit | $116,705 | $630,666 | St. Bernard HRDC |

If you apply the above seven criteria, designed to test the objectives of the redevelopment of any public housing project, most importantly increasing the supply of affordable housing, the St. Bernard HRDC proposal is superior to the Columbia plan on all counts.

The cost of each unit of affordable housing produced under the Columbia plan is more than five times the proposal being submitted today (roughly $116,705 to $630,666). Under the Columbia plan the approximately 1,430 units at St. Bernard would be demolished and replaced by 465 units, *only 153 of which would service the St. Bernard residents displaced by Hurricane Katrina and subsequent demolition of the project.* The "redeveloped" St. Bernard will be a federally subsidized public housing development that houses high income renters and few to none of the public housing families displaced by the storm.

In our view, the Columbia proposal is filled with a wish list of items that everyone would support at face value—a PGA golf course, a YMCA, parks and open space. Who in their right mind would oppose these things? The people whose homes would be destroyed to satisfying this wish list.[15] The golf course is actually proposed to be developed in the New Orleans City Park, land that is not under the control of either HUD or HANO.[16] The Columbia plan also includes founding two charter schools, one for pre-K through 8th grade and one for high school. As with the golf course, the creation of the schools is a matter for governmental authorities other than HUD and HANO and certainly not within the control of Columbia. Finally, the plan calls for a 45,000 square foot YMCA. Again there is no reference in the proposal of how this will be financed, who will pay for it,

---

[15] We believe that the proper business of HUD is not to develop golf courses, particularly at a time when the city is faced with a formidable housing affordability crisis. Orleans Parish had nearly 52,000 units of rental housing damaged in Hurricane Katrina. Even if all Go Zone Tax credit units are completed, this will only provide 7,507 units of affordable housing, a mere 15% of the current need.
[16] *City Park Revisiting Master Plan,* Posted by The Times-Picayune, September 24, 2007, 9:17PM, by Frank Donze.

when this facility will be built, and/or whether the YMCA has agreed to this proposal. We strongly recommend that Columbia pursue its golf course plan with the appropriate agencies and we strongly recommend that we be allowed to redevelop our community. It is possible to achieve their goals and ours.

All of these proposals – a new PGA golf course that could boost tourism, charter schools, and a new YMCA – may have merit, but they should not be developed at the expense of our homes. The sad truth is that there are many abandoned and neglected parcels of land in our beloved city, places that would be suitable homes for a golf course, schools and a new YMCA. Why must our homes be destroyed by HUD/HANO to accommodate these non-housing uses when affordable housing is so desperately needed in New Orleans?

## Conclusion: An Open Question

The open question that must be answered, and the answer will sound through time, is this: In a city where some 50,000 rental housing units were destroyed or severely damaged, where homelessness has doubled, where rents are skyrocketing out of control—is it sound public policy to blow up multifamily public housing to make way for a golf course? And, is this the proper response to the catastrophe that was Hurricane Katrina? We think the answer in both instances is no.

The goal of HUD and HANO should simply be "more people housed better." The measure of their success should be the leveraging of public dollars to produce the most units of affordable housing in more viable communities. We believe our proposal meets this standard and the Columbia proposal does not.

This letter is a response to the HUD Memorandum dated September 21, 2007[17] which we deem a de facto "initial written notice of sale of property" under 24 CFR 970.11(a). This letter represents our "initial expression of interest" in accordance with 24 CFR 970.11(b). It is the intent of the St. Bernard HRDC to prepare and submit a proposal for the purchase of St. Bernard by December 10, 2007 in accordance with the regulations and we expect the HUD resources identified in the RFQ, namely the low income housing tax credits and CDBG funding, to be made available to our designated development entity.

We respectfully request that you consider and respond to this expression of interest and the concept laid out in our initial plan. Because demolition of the buildings is imminent, we further request that you meet with us to discuss the proposal as promptly as possible and we further request that no action be taken to demolish these properties until such time as we have submitted our proposal as provided in the regulations and HUD/HANO has sufficient time to review its merits.

Scripture tells us that it is by their deeds you shall know them. Our sincere hope is that the rush to judgment that could lead to the demolition and wiping out of our community be stopped and that the U.S. Department of Housing and Urban Development, America's housing agency, fulfill its statutory obligations to provide "decent, safe, affordable

---

[17] See Footnote 2, supra.

- 8 -

housing" for the low and moderate income families of New Orleans. The St. Bernard HRDC plan gives HUD/HANO a chance to give meaning to the promise contained these many years in the law that the residents of public housing can be empowered to rebuild their community. Either decision—to partner with us to rebuild our community or to destroy our homes will make history. It is up to you, HUD/HANO, to decide what history you want to make and how your actions will be judged.

Sincerely,

Ms. Sharon Jasper, President
St. Bernard Housing Recovery &
Development Corporation

Ms. Stephanie Mingo, Vice President
St. Bernard Housing Recovery &
Development Corporation

Ms. Lynette Bickham, Treasurer
St. Bernard Housing Recovery &
Development Corporation

Ms. Gloria Irving, Secretary
St. Bernard Housing Recovery &
Development Corporation

cc (w/attachment):    Karen Turner, Director
                      Housing Authority of New Orleans
                      Department of Procurement and Contracts
                      4100 Touro Street
                      New Orleans, Louisiana, 70122

# Saint Bernard Housing Recovery and Development Corporation

| Name | Organization/Position | Address | Phone |
|---|---|---|---|
| Shawanda Miller | | 3822 Duplessis St #N | 450-4693 |
| | | 7821 Dorsett Dr. | |
| Theresa Henry | | 4022 Duplessis St #B | 304-8307 |
| | | 1327 Annette St. | |
| Sharon Avery | | 3921 Gibson St #B | 504 |
| | | 4104 Paris Ave. | 931-0159 |
| Linda Gabriel | | 1500 Senate St. | 613-8201 |
| | | 4100 Encampment | |
| Lamock Theut | | 4009 Gibson St. | 304-6667 |
| | | 4100 Encampment St. | 288-2224 |
| | | 1308 Foy Park Apt #G | |
| Shadika zeno | | 2538 Buchanon St. | 377-1150 |
| Rose Duy | | 1539 Milton Apt D | 617-8279 |
| | | 1932 Ap. Jaurand | |
| | | 1638 Milton Apt B | |
| Melva McFadder | | 5233 Milton Marigny | 282-7659 |
| Chantell Julita Young | | 3927 Duplessis Street Apt. M. | 504 312 9893 |
| | | P.O. Box 51942 N.O. La 70151 | 312 9893 |
| Sabryna Hall | | 2617 Paucer St. NO LA 70116 | (469) 328-5077 |
| | | 1457 Sere St #B NO LA 70122 | |
| Claudette LeBlanc | | 2183 Rocheblanc St | 945-4757 |
| | | 3710 Gibson St A | 504-945-475 |
| | | | |
| | | | |
| | | | |
| | | | |

# Saint Bernard Housing Recovery and Development Corporation
## Resident Participants

| Name | Address | Phone |
|---|---|---|
| Cheryl Richardson-Parras | 1538 Senate St. Apt. D. | (504)344-0134 |
| | 4117 Encampment St. Apt. 10 | (504)284-5821 |
| Alvin T. Barrow | 1538 Senate St. Apt. D. | (504)344-0134 |
| | 4117 Encampment St. Apt. 10 | (504)284-5821 |
| Corey A. Richardson | 4005 St. Bernard Ave. Apt. M | (504)628-0483 |
| | 4117 Encampment St. Apt. 10 | (504)284-5821 |
| Dale Marigny | 3966 Gibson #B | |
| | 4100 Encampment #307 N.O. LA 70122 | 504-628-3910 |
| Robin Marigny | 4101 Encampment #1 N.O. LA 70117    Robin.11269@yahoo.com | |
| prior to Katrina | 4008 Hamburg St. #B NOLA 70122 | 214-0269 |
| Gail Norris | 3621 St. Bernard Ave #C | |
| | 3336 Piedmont Dr. N.O. LA 70122 | (504)237-5073 |
| Jenelle Windon | 3705 Gibson St. Apt D. 70122 | 504-948-0423 |
| | 1679 N Roman St. NO. LA 70116 | 504-460-0250 |
| Shirley M. Morris | 3927 Duplessis St. M. 70122 | 235 8981 |
| | 207 Morris St. Apt 4D | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Saint Bernard Housing Recovery and Development Corporation
## Resident Participants

| Name | Address | Phone |
|---|---|---|
| Robin Jones | 3026 George Nick Conners St New Orleans, LA 70117 | |
| Sandra Jones | 423 South Alexit St. Apt D New Orleans, LA 70119 | 504 813 6347 |
| Raynell Williams | 383 3 anette St. New Orleans, LA 70119 | (504) 301-3450 |
| Denise Simon | 3019 South Philip St. New Orleans LA 70119 | 504 485 6435 |
| Vivan Joseph | 423 South Alexit St Apt B New Orleans, LA 70119 | (504) 813 6347 |
| Lawanda Anderson | 1955 1/2 Hope St. New Orleans, LA 70119 | (504) 909 4627 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Saint Bernard Housing Recovery and Development Corporation
## Advisory Board

| Name | Organization/Position | Address | Phone |
|------|----------------------|---------|-------|
| Viola Washington | Welfare Rights Org | 2600 Banks St | 504 507-5122 |
| Neal Livingston | St. John #5 CompACE REAF LLC. | 3613 Hamburg St. 70122 | (504) 416 4065 |
| Kenneth Wiley | Galvez Medical Clinic | 1401 Pety St NO LA 70117 | 804 9400820 |
| J___ ___ | Attorney At Law | 4118 Copernicus St N. OL+ 70114 | 504 400-3398 |
| Rev Andrew Darby | 4104 Dale St Nola 70126 St Bernard Com. B.C | | 504-241-077 |
| Elliot Willard | St. Bernard Community Council | 1670 Sere St. N.O. La 78122 | 504-283-88 " 650 1479 |
| Maria Davis | | 2401 Pauny St New Orleans La 70116 | 504-919-05 |
| Bill Quigley | Loyola Law Clinic Attorney/Director | 526 Pine St New Orleans LA 70118 | 504 861-5591 |
| Martin A Newlad | Third Leg Consultants | 4678 Arts St New Orleans 70122 | 504 307-0128 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Signature Sheets**

St. Bernard Housing Recovery & Development
Corporation Board Members

1. Sharon Jasper – President
2. Stephanie Mingo – Vice President
3. Lynette Bickham – Treasurer
4. Gloria Irving – Secretary
5. Shawanda Miller
6. Theresa Henry
7. Sharon Avery
8. Linda Gabriel
9. Laura French
10. Shadrika Zeno
11. Rose Guy
12. Melva McFadden
13. Chantel Young
14. Sabrina Hall
15. Claudette LeBlanc

St. Bernard Housing Recovery & Development
Corporation Advisory Board Members

1. Viola Washington
2. Deborah Davenport
3. Kenneth Wiley
4. Rev. Andrew Darby
5. Elliot Willard
6. Maria Davis
7. Bill Quigley
8. Martin Rowland
9. Joseph Rome

St. Bernard Residents

1. Cheryl Barrow
2. Alvin Barrow
3. Cory Richardson
4. Dale Marigny
5. Robin Marigny
6. Gail Norris
7. Jenelle Windon
8. Shirley Morris
9. Robin Jones
10. Sandra Jones
11. Raynell Williams
12. Denise Simon
13. Viwon Joseph
14. Kawanda Anderson

# EXHIBIT D

NationalJournal.com Home    National Journal Magazine    The Hotline    Congress Daily    Technology Daily

## News Features

Oct. 5, 2007

**National Journal Group**
Learn more about our publications and sign up for a free trial.

**E-Mail Alerts**
Get notified the moment your favorite features are updated.

**Need A Reprint?**
Click here for details on reprints, permissions and back issues.

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

**Go Wireless**
Get daily political updates on your handheld computer.

GOVERNMENT
EXECUTIVE.com

KATRINA AFTERMATH
## Questionable Contracts

By Edward T. Pound, *National Journal*
© National Journal Group Inc.
Thursday, Oct. 4, 2007

In April last year, Housing Secretary **Alphonso Jackson** traveled to Dallas to deliver a speech to a group of minority real estate executives. The event should have been pretty routine stuff. But Jackson -- and these are his words -- shot off his mouth by describing how he believed contracts should be awarded by the Department of Housing and Urban Development. The secretary recalled, for instance, how he once had killed a contract award because the contractor had disparaged his friend **President Bush**.

Ad Spotlight
Almanac
Buzz Columns
Campaigns
Daybook
Earlybird
Markup Reports
News Features
Poll Track

Search

Not too long after his speech, when he was back in Washington, Jackson realized he had blundered. Democratic lawmakers, citing concerns about political favoritism in HUD contract awards, called for an investigation by the department's inspector general. One powerful senator demanded Jackson's resignation. Jackson, meanwhile, issued an apology: HUD contracts, he said, were never "awarded, rejected, or rescinded" because of political influence or bias.



Alfonso Jackson                Photo by Sam Kittner

The matter, however, didn't end there. HUD Inspector General **Kenneth Donohue** launched an investigation. In September 2006, Donohue rendered his verdict in a lengthy report: Although Jackson had, in fact, urged senior aides to consider the political views of contractors in doling out department business, "no direct evidence" linked political favoritism to such awards. Jackson, it seemed, had dodged a bullet.

But perhaps not, because federal investigators are once again on Jackson's trail. And this time, the investigation seems more serious. Donohue's investigators are now working with the FBI, a federal grand jury in Washington, and prosecutors from the Justice Department's Public Integrity Section. The investigation appears to focus, in part, on whether Jackson misled Congress when he testified earlier this year that he had never intervened in awarding HUD contracts. "I don't touch contracts," the HUD boss told a Senate panel on May 3.

Investigators are exploring whether Jackson, despite that testimony, had actually lined up a contract at the HUD-controlled Housing Authority of New Orleans, or HANO, for a golfing buddy and social friend from Hilton Head Island, S.C. The friend, **William Hairston**, was paid more than $485,000 for working at HANO during an 18-month period, according to figures provided by HUD and a former HANO official. The work was not competitively bid.

In an interview, Hairston, a stucco contractor, said that Jackson had indeed helped him land the job at HANO. He said that the New Orleans housing agency, which HUD manages under receivership, was struggling to repair and rehab its housing units in the wake of Hurricane Katrina, and needed a construction manager. "The secretary asked me if I would go to New Orleans and help them out," Hairston told *National Journal.*

Jackson declined to be interviewed for this story, but his office put together a written response to questions posed by *NJ.* In the answers, his spokesman, **Jerry Brown**, did not respond directly to the question of whether Jackson had asked Hairston to assist the New Orleans housing authority.

Instead, Brown responded that Hairston was one of three construction managers whose names Jackson had passed along, through an aide, to HANO. According to Brown, the secretary suggested the names after a HUD-appointed receiver at HANO approached him and said she was in "desperate need of a construction manager."

Brown also said that Jackson was a friend of Hairston's, that HANO hired the contractor on an "emergency" basis, and that the secretary had not misled Congress. "Secretary Jackson," Brown wrote, "has always been forthright with members of Congress." Asked if Jackson had been questioned by investigators or if his or any other HUD records had been subpoenaed, Brown responded, "HUD cannot comment on IG activities."

The criminal investigation of Jackson was confirmed by Hairston, by others once or currently affiliated with HANO and HUD, and by other government officials. Hairston said he believed that HANO let him go last June because of the federal inquiry. Investigators have seized his computer at the New Orleans housing agency, he said.

According to a HANO employee, who asked not to be identified, FBI and HUD IG agents recently delivered a grand jury subpoena to the housing agency. "The FBI and the IG asked... for everything -- written notes, e-mails, minutes, telephone messages -- in relation to this contract with Hairston Construction Services," the employee told *National Journal.* "They wanted whatever pertained to William Hairston."

Federal investigators declined to confirm the inquiry. "We do not confirm or deny the existence or nonexistence of a case," said **Helen Albert**, a senior official in the HUD inspector general's office.

**Familiar Path?**
Jackson, 62, a Texas native, has a long history of involvement in housing and community development. He directed the operations of public housing authorities in St. Louis, Washington, D.C., and Dallas before becoming president of American Electric Power-Texas, a $13 billion utility in Austin. He joined the Bush administration in June 2001 as HUD's deputy secretary, and he became secretary in March 2004.

Former HUD senior officials described Jackson as a passionate man who frequently threatened to fire employees for disagreeing with him. Supporters say, however, that although Jackson sometimes shoots from the hip, he is dedicated to promoting economic development and providing affordable housing to the poor.

At the same time, the secretary still has financial ties to one housing developer. According to Jackson's financial disclosure reports, an Atlanta-

based development company, Columbia Residential, owes him $250,000 to $500,000. Before joining HUD, his spokesman said, Jackson was a "partner/consultant" for the developer.

According to his disclosure reports, Jackson is to receive periodic payments "for past services" under a separation agreement with the company. He has received only one such payment in the past six years -- $35,000 in 2003. HUD officials said that Jackson avoids any dealings with Columbia Residential. They released a memo he wrote in August 2001 in which he recused himself from HUD matters having "a direct and predictable effect on the ability or willingness" of the company "to satisfy its obligation to compensate me for prior service rendered."

Columbia Residential recently was part of a team that won a $127 million competitive contract from HANO to redevelop the St. Bernard public housing project, which has been shuttered since Katrina. In his written responses, HUD spokesman Brown said that Jackson was not part of the selection team and played no "role in the selection of any team members." The four-member selection panel included **Scott Keller**, who was until recently Jackson's deputy chief of staff and who is often described within HUD as Jackson's "right-hand man." But in an interview, Keller said that because of the press of other HUD business he did not participate in, or influence, the selection of the Columbia Residential team. Keller left HUD in August to become a private consultant.

The Housing and Urban Development Department is certainly no stranger to scandal. **President Clinton's** former Housing secretary, **Henry Cisneros**, pleaded guilty in 1999 to a misdemeanor count of lying to the FBI about payments to his former mistress. Clinton later pardoned him.

Much worse was the HUD influence-peddling scandal in the Reagan administration. Although Secretary **Samuel Pierce** was not charged, 16 people, including some of his closest aides, were convicted in the high-profile scandal that emerged in the spring of 1989, shortly after **President Reagan** left office.

Whether the investigation of Jackson will follow a similar path remains to be seen. Still, his role in HUD contracting has been a subject of interest to Democrats on Capitol Hill since he stubbed his toe at the Dallas meeting last year. Indeed, Jackson and Sen. **Frank Lautenberg**, D-N.J., engaged in a verbal shoot-out on May 3 during a hearing of the Senate Appropriations Subcommittee on Transportation, Housing and Urban Development, and Related Agencies.

Lautenberg, who wants Jackson out, asked the secretary if he believed that "contract awards should be based on political favoritism." Jackson responded, "I do not interfere with any contract that is given in HUD -- period." Lautenberg pressed on, prompting Jackson to say, "I don't touch contracts." And a short time later, Jackson threw down the gauntlet: "Senator, I have not touched one contract; not one. Now, if you can prove that I interfered with a contract, then you should do that."

### Conflict At HANO

Those words may well come back to haunt Jackson. His friend William Hairston said he went to work at HANO around January 2006, after Jackson had recommended him. Hairston was put on the payroll of NKA Contractors, a company owned by **Nadine Jarmon**, who was then HUD's appointed receiver at the New Orleans housing authority.

In an interview, Jarmon said she knew nothing at all about Hairston. "He was brought to our attention," Jarmon said, "by the people at headquarters." She said that her deputy, **Lori Moon**, a close friend of Jackson's who had worked with him at the public housing authorities in St. Louis, Washington, and Dallas, was approached by someone in Jackson's office and asked to hire Hairston. Moon did not return several phone calls seeking comment.

HUD's account differs from Jarmon's. In its written responses to *NJ*, the department said that it was Moon who approached Jackson and asked for help in finding a construction manager. Hairston, according to HUD, was one of three contractors whom Jackson later suggested to Moon.

Jarmon said that on Moon's recommendation, she put Hairston on her payroll at $175 an hour. She said that Hairston was retained to provide construction management, but she made it clear that she and Hairston did not always see eye-to-eye.

In fact, the differences led HUD to order her and Moon to Washington for a meeting with Jackson's top two aides on March 22, 2006, Jarmon said. "We were called on the carpet," Jarmon said in an interview, describing the meeting. "We got our hands slapped, we got a little spanking; that's what it was." Hairston was also called to the meeting, she said, and "they slapped him around a little bit," too. One person who attended the meeting, but asked not to be identified, said that the subject matter also covered other issues -- including HANO's failure to pay its bills.

Three weeks after the meeting Jarmon's work with HANO ended. HUD decided not to extend her contract, the department said, because it believed that change was needed at HANO, despite Jarmon's "exemplary" work. Jarmon told *National Journal* that she believed her resistance to "micromanaging by HUD headquarters," along with her differences with Hairston, led to her dismissal. Jarmon also said that a HUD investigator and an FBI agent had interviewed her in August at a New Orleans hotel. "They were very straightforward," she said. "They said, 'We want information on William Hairston.'"

Hairston remained on the job after Jarmon was ousted. HANO's records show that Hairston Construction Services was awarded a "firm fixed price contract" for $167,858 on July 19, 2006. HANO considered no other proposals. Hairston's hiring was described as an "emergency," according to resolution No. 2006-32 of HANO's board of commissioners. The contract was approved by **C. Donald Babers**, a senior HUD official who serves as the sole member of the HANO board, according to a copy of the board's minutes. Babers, like other HUD officials, did not respond to calls seeking comment.

At the meeting, **Donald Vallee**, a retired banker and the president of a landlords association in New Orleans, questioned the propriety of the award. The minutes of the board's July 19 meeting described Vallee's concerns: "Mr. Vallee stated years ago HANO had problems with inside deals and things not being done above board. It was hoped that this administration would do things differently."

When another member of the audience complained about HANO's wasting money on contractors, Babers cut her off. The minutes say: "Mr. Babers stated that



Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 33 of 85

they could not be second-guessed as they attempted to move forward with getting residents into units, but the urgency of the situation dictated that they move in this direction."

In an interview, Vallee said that Babers "blew me off," but that he was not so easily rebuffed. He called a friend at HUD headquarters in Washington and "raised a stink about" the contract, Vallee said. A week or two later, he said, he discovered that HUD officials had refused to sign Hairston's contract. Vallee said that federal investigators questioned him recently. "They pressed me on how much involvement did the secretary have in the contract," Vallee recalled. He said he told them that he had no information on Jackson.

Hairston was well paid by housing officials. HUD told *National Journal* that HANO paid Hairston $392,000 for his work, which ended in June 2007. Separately, Jarmon said she paid Hairston $93,777 as a subcontractor from January through April of 2006. In interviews, Hairston confirmed that he never received a signed contract from HANO. "No one signed it," he said, "but they told me to stay."

Hairston said he more than earned his fees, saving HANO millions of dollars by cutting costs on construction projects. He confirmed that federal investigators were looking at his relationship with Jackson, whom he described as the most "righteous man I have ever met in my life." Hairston, who said he had not been questioned by investigators, added, "I have done nothing wrong."

### Family Friendship
Hairston said he knows Jackson from the secretary's visits to Hilton Head, where both men have homes. They socialize together, he said, adding that their wives are much closer friends. Jackson and his wife, **Marcia**, were among the guests at a Christmas party that the Hairstons gave at their Hilton Head home last year.

Hairston also said he never discusses business or politics when he sees Jackson in Hilton Head. "When I am with the secretary," Hairston said, "we don't talk business, we don't talk politics."

But Hairston left no doubt that Jackson aided him in getting the job at HANO. Describing events that led him to HANO, he said he understood that a friend of his in Congress had recommended him to Jackson for work at the New Orleans housing agency. Sometime in 2005, he said, Jackson called him on the phone. From that conversation, he said, he understood that HANO "didn't have any construction experience -- they did not have anyone on their team that knew anything about construction."

Although his business had been slow at times, Hairston said he was working on a big project when Jackson called, and that he did not solicit Jackson's help. Asked if Jackson recommended him for the HANO work, Hairston responded, "It was Mr. Jackson who recommended me."

A few months after Jackson's call, Hairston said, he met with HANO officials and started work at the housing agency. Hairston said that it became clear to him soon after his arrival in New Orleans in January 2006 that HANO was being significantly overcharged on some of its contracts. His efforts to clean up that mess, he said, caused friction both at HANO and at HUD headquarters. But he pressed on, he said, because Jackson had promised to bring home people who had been displaced by Katrina. "I do know that the secretary promised the governor and the mayor that he would

put 2,000 [housing] units back on line," Hairston said, "and that was my mission.... I promised the secretary to help out."

Looking at what's happened in the past year, the friction with local and federal housing officials, losing his job at HANO, and the federal inquiry, Hairston expressed amazement that investigators are focused on Jackson's ties to him. Millions of dollars, he said, are being wasted on contracts at HANO, and he wonders, "Why worry about some dumb chump change that I was getting?"

In the coming months, federal investigators may well sort the whole thing out and perhaps provide Hairston some answers.

---

Sign up now to get four free issues of *National Journal* or two free weeks of *CongressDaily*.

---

**Need A Reprint Of This Article?**
National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication. Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]
[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2007 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.

# EXHIBIT E



Newsroom                                      En español | Text only | Search/index

## News Release

HUD News
Newsroom
Priorities
About HUD

Homes
Buying
Owning
Selling
Renting
Homeless
Home improvements
HUD homes
Fair housing
FHA refunds
Foreclosure
Consumer info

Communities
About communities
Volunteering
Organizing
Economic development

Working with HUD
Grants
Programs
Contracts
Work online
HUD Jobs
Complaints

Resources
Library
Handbooks/ forms
Common questions

Tools
Webcasts
Mailing lists
RSS Feeds
Contact us
Help



 **Information by State**
 **Esta página en español**
**Print version**
**Email this to a friend**

**HUD No. 06-043**
**Donna White**
**(800) 328-1856**
**www.hud.gov/news/**

**For Release**
**Friday**
**April 14, 2006**

---

**HUD NAMES NEW RECOVERY ADVISOR AND RECEIVER TO ADVANCE CURRENT HANO HURRICANE RECOVERY EFFORTS**
*New management to strengthen services to displaced families, progress public housing plan*

WASHINGTON – U.S. Department of Housing and Urban Development Assistant Secretary Orlando Cabrera appointed two senior HUD managers to serve as Receiver and Recovery Advisor for the Housing Authority of New Orleans today. The new management team will further the city's public housing recovery efforts.

Cabrera named C. Donald Babers, a 35-year HUD veteran, HANO's Recovery Advisor and William Thorson, another HUD manager with more than 30 years experience, the Receiver.

"Combined, this team has more than 60 years of housing experience," said Cabrera, who heads up HUD's Office of Public and Indian Housing. "Messrs. Babers and Thorson bring the expertise necessary for our next phase of recovery after the massive destruction Hurricanes Katrina and Rita caused this city's public housing.

"I applaud the commitment and dedication of the current Receiver Nadine Jarmon, Deputy Receiver Lori Moon and HUD's Mirza Negron Morales. Their many sacrifices and untiring service to HANO residents has brought us far since Katrina to allow this transition," said Cabrera.

Babers and Thorson began their official duties on Wednesday. Jarmon and Moon will assist with the transition until mid-May. Negron, who also serves as Public Housing Director in HUD's New York Field Office, will continue to advise Cabrera on HANO.

As Receiver, Thorson will manage the day-to-day operations of the housing authority. He will review current assessments of damages to HANO's more than 7,000 public housing units and develop a comprehensive redevelopment plan. As Recovery Advisor, Babers will be responsible for overseeing practices and procedures that will lead to full recovery.

Thorson's most recent assignment at HUD is the Director of HUD's Capital Improvements, the office that manages approximately $2.3 billion in capital improvement funding to more than 3,100 public housing authorities nationwide. He has held numerous management positions within the agency, including overseeing public housing development, maintenance, procurement and energy conservation.

Babers began his career at HUD in the 1970s in HUD's Fort Worth, Tex. Regional Office. He is now Deputy Regional Director of the office. As second in command, Babers supervises HUD programs and services to more than 33 million Americans living in Texas, Oklahoma, Louisiana, Arkansas, and New Mexico. Babers has served in several management positions at HUD including Field Office Director in Dallas.

HUD took control of the failing housing authority in 2002 to address serious

management and financial concerns that plagued the agency for numerous years. These persistent problems led to deterioration of the public housing units, prior to Katrina. HUD's receiver team had begun, through HUD capital improvement programs, a massive redevelopment effort of the city's public housing. Some of HANO's largest public housing developments, including Abundance Square (formerly Desire), River Gardens (formally St. Thomas) Fischer, Florida and Guste, had undergone or were undergoing redevelopment to bring quality public housing back to the city.

Days after Katrina ravaged the city, the receivership team quickly assembled a skeleton staff to continue operations – establishing satellite offices in Dallas, Houston and Atlanta to help displaced HANO families to find temporary housing and other support services. They successfully helped residents transition back to New Orleans months after the storm. Soon after the storm assessments began to determine what units suffered the least amount of damage. More than 60 percent of HANO's public housing units have mold damage and HANO continues to inspect and repair units to determine they are safe for families to return. There are now 877 families living in Iberville, Hendee Homes, Guste, Fischer and River Gardens and selected scattered sites.

HUD is the nation's housing agency committed to increasing homeownership, particularly among minorities; creating affordable housing opportunities for low-income Americans; and supporting the homeless, elderly, people with disabilities and people living with AIDS. The Department also promotes economic and community development as well as enforces the nation's fair housing laws. More information about HUD and its programs is available on the Internet at **www.hud.gov** and **espanol.hud.gov**.

<div align="center">###</div>

 **Back to Top**



FOIA    Privacy    Web Policies and Important Links    Home    

U.S. Department of Housing and Urban Development
451 7th Street S.W., Washington, DC 20410
Telephone: (202) 708-1112   TTY: (202) 708-1455
Find the address of a HUD office near you

# EXHIBIT F

OMB Approval No: 2577-0226
(exp. 02/28/2006)

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

# PHA Plans
5 Year Plan for Fiscal Years 2006 - 2010
Annual Plan for Fiscal Year 2007

## Annual Plan for Fiscal Year Beginning 10/2006

## Approved by HUD
## February 9, 2007

NOTE: THIS PHA PLANS TEMPLATE (HUD 50075) IS TO BE COMPLETED IN ACCORDANCE WITH
INSTRUCTIONS LOCATED IN APPLICABLE PIH NOTICES

## A. Housing Needs of Families in the Jurisdiction/s Served by the PHA

Based upon the information contained in the Consolidated Plan/s applicable to the jurisdiction, and/or other data available to the PHA, provide a statement of the housing needs in the jurisdiction by completing the following table. In the "Overall" Needs column, provide the estimated number of renter families that have housing needs. For the remaining characteristics, rate the impact of that factor on the housing needs for each family type, from 1 to 5, with 1 being "no impact" and 5 being "severe impact." Use N/A to indicate that no information is available upon which the PHA can make this assessment.

| Housing Needs of Families in the Jurisdiction by Family Type | | | | | | | |
|---|---|---|---|---|---|---|---|
| Family Type | Overall | Afford-ability | Supply | Quality | Access-ibility | Size | Loca-tion |
| Income <= 30% of AMI | 24,150 | N/A | N/A | N/A | N/A | N/A | N/A |
| Income >30% but <=50% of AMI | 22,56 | N/A | N/A | N/A | N/A | N/A | N/A |
| Income >50% but <80% of AMI | .,78 | N/A | N/A | N/A | N/A | N/A | N/A |
| Elderly | .0. | N/A | N/A | N/A | N/A | N/A | N/A |
| Families with Disabilities | ..8 | N/A | N/A | N/A | N/A | N/A | N/A |
| Race/Ethnicity (Black) | ..30 | N/A | N/A | N/A | N/A | N/A | N/A |
| Race/Ethnicity (Hispanic) | 1,715 | N/A | N/A | N/A | N/A | N/A | N/A |
| Race/Ethnicity (White) | 11,085 | N/A | N/A | N/A | N/A | N/A | N/A |

**Note: The Needs Assessment is based upon 2000 census data.**

What sources of information did the PHA use to conduct this analysis? (Check all that apply; all materials must be made available for public inspection.)

☒ Consolidated Plan of the Jurisdiction/s
   Indicate year: *2006-2010*
☒ U.S. Census data: the Comprehensive Housing Affordability Strategy ("CHAS") dataset: *Housing Problems Output for all Households*
☐ American Housing Survey data
   Indicate year:
☐ Other housing market study
   Indicate year:
☐ Other sources: (list and indicate year of information)









| Demolition/Disposition Activity Description |
|---|
| 1a. Development name: **B.W. Cooper** |
| 1b. Development (project) number: **LA1-12** |
| 2. Activity type:  Demolition ☐ <br> Disposition ☒ |
| 3. Application status (select one) <br>      Approved ☐ <br>      Submitted, pending approval ☐ <br>      Planned application ☒ |
| 4. Date application approved, submitted, or planned for submission: **October 2006** |
| 5. Number of units affected: **792** |
| 6.  Coverage of action (select one) <br> ☐ Part of the development <br> ☒ Total development |
| 7.  Timeline for activity: <br>      a. Actual or projected start date of activity: **FY 2006** <br>      b. Projected end date of activity: **FY 2010** |

| Demolition/Disposition Activity Description |
|---|
| 1a. Development name: **St. Bernard** |
| 1b. Development (project) number: **LA1-8** |
| 2. Activity type:  Demolition ☒ <br> Disposition ☐ |
| 3. Application status (select one) <br>      Approved ☒ <br>      Submitted, pending approval ☐ <br>      Planned application ☐ |
| 4. Date application approved, submitted, or planned for submission: **August 21, 1996** |
| 5. Number of units affected: **45** |
| 6.  Coverage of action (select one) <br> ☒ Part of the development <br> ☐ Total development |
| 7.  Timeline for activity: <br>      a. Actual or projected start date of activity: **FY 2006** <br>      b. Projected end date of activity: **FY 2007** |

35

| Demolition/Disposition Activity Description |
| --- |
| 1a. Development name: *St. Bernard* |
| 1b. Development (project) number: *LA1-8* |
| 2. Activity type:  Demolition ☒<br>　　　　　　　　　Disposition ☐ |
| 3. Application status (select one)<br>　　　Approved ☐<br>　　　Submitted, pending approval ☐<br>　　　Planned application ☒ |
| 4. Date application approved, submitted, or planned for submission: __October 2006__ |
| 5. Number of units affected: 671 |
| 6.  Coverage of action (select one)<br>☒ Part of the development<br>☐ Total development<br>**(This application will include the all the remaining units on the site with the exclusion of the 45 units previously approved for demolition)** |
| 7.  Timeline for activity:<br>　　　a. Actual or projected start date of activity: **FY 2006**<br>　　　b. Projected end date of activity: **FY 2007** |

| Demolition/Disposition Activity Description |
| --- |
| 1a. Development name: *St. Bernard* |
| 1b. Development (project) number: *LA1-8* |
| 2. Activity type:  Demolition ☐<br>　　　　　　　　　Disposition ☒ |
| 3. Application status (select one)<br>　　　Approved ☐<br>　　　Submitted, pending approval ☐<br>　　　Planned application ☒ |
| 4. Date application approved, submitted, or planned for submission: __October 2006__ |
| 5. Number of units affected: 716 |
| 6.  Coverage of action (select one)<br>☐ Part of the development<br>☒ Total development |
| 7.  Timeline for activity:<br>　　　a. Actual or projected start date of activity: **FY 2006**<br>　　　b. Projected end date of activity: **FY 2007** |

36

| Demolition/Disposition Activity Description |
|---|
| 1a. Development name: *St. Bernard* |
| 1b. Development (project) number: *LA1-13* |
| 2. Activity type:  Demolition ☒<br>             Disposition ☒ |
| 3. Application status (select one)<br>     Approved ☐<br>     Submitted, pending approval ☐<br>     Planned application ☒ |
| 4. Date application approved, submitted, or planned for submission: **October 2006** |
| 5. Number of units affected: **720** |
| 6.  Coverage of action (select one)<br>☐ Part of the development<br>☒ Total development |
| 7.  Timeline for activity:<br>     a. Actual or projected start date of activity: **FY 2006**<br>     b. Projected end date of activity: **FY 2007** |

| Demolition/Disposition Activity Description |
|---|
| 1a. Development name: *Lafitte* |
| 1b. Development (project) number: *LA1-5* |
| 2. Activity type:  Demolition ☒<br>             Disposition ☒ |
| 3. Application status (select one)<br>     Approved ☐<br>     Submitted, pending approval ☐<br>     Planned application ☒ |
| 4. Date application approved, submitted, or planned for submission:  **October 2006** |
| 5. Number of units affected: **896** |
| 6.  Coverage of action (select one)<br>☐ Part of the development<br>☒ Total development |
| 7.  Timeline for activity:<br>     a. Actual or projected start date of activity: **FY 2006**<br>     b. Projected end date of activity: **FY 2007** |

37

2.  What types of asset management activities will the PHA undertake? (select all that apply)
- ☐ Not applicable
- ☒ Private management
- ☒ Development-based accounting
- ☒ Comprehensive stock assessment
- ☒ Other: (list below)
  *Resident Management and Asset Management under the new Public Housing Operating Fund Rule (24 CFR 990)*

3. ☐ Yes ☒ No:   Has the PHA included descriptions of asset management activities in the **optional Public Housing Asset Management Table?**

## 18.  Other Information
[24 CFR Part 903.7 9 (r)]

### A.  Resident Advisory Board Recommendations

1. ☐ Yes ☐ No:   Did the PHA receive any comments on the PHA Plan from the Resident Advisory Board/s?

**Note: Meetings with the Resident Advisory Board are forthcoming. Comments will be recorded.**

2. If yes, the comments are: (if comments were received, the PHA **MUST** select one)
- ☒ Attached at Attachment File Name: **la001e01**
- ☐ Provided below:

3. In what manner did the PHA address those comments? (select all that apply)
- ☐ Considered comments, but determined that no changes to the PHA Plan were necessary.
- ☒ The PHA changed portions of the PHA Plan in response to comments
  List changes below:

- ☐ Other: (list below)

### B.  Description of Election process for Residents on the PHA Board

1. ☐ Yes ☒ No:   Does the PHA meet the exemption criteria provided section 2(b)(2) of the U.S. Housing Act of 1937? (If no, continue to question 2; if yes, skip to sub-component C.)

2. ☐ Yes ☒ No:   Was the resident who serves on the PHA Board elected by the residents? (If yes, continue to question 3; if no, skip to sub-component C.)

74

3. Description of Resident Election Process
Note: *HANO is currently under HUD Receivership and does not have a traditional Governing Board in place.*

a. Nomination of candidates for place on the ballot: (select all that apply)
- ☐ Candidates were nominated by resident and assisted family organizations
- ☐ Candidates could be nominated by any adult recipient of PHA assistance
- ☐ Self-nomination: Candidates registered with the PHA and requested a place on ballot
- ☐ Other: (describe)

b. Eligible candidates: (select one)
- ☐ Any recipient of PHA assistance
- ☐ Any head of household receiving PHA assistance
- ☐ Any adult recipient of PHA assistance
- ☐ Any adult member of a resident or assisted family organization
- ☐ Other (list)

c. Eligible voters: (select all that apply)
- ☐ All adult recipients of PHA assistance (public housing and section 8 tenant-based assistance)
- ☐ Representatives of all PHA resident and assisted family organizations
- ☐ Other (list)

## C. Statement of Consistency with the Consolidated Plan
For each applicable Consolidated Plan, make the following statement (copy questions as many times as necessary).

1. Consolidated Plan jurisdiction: **The City of New Orleans**

2. The PHA has taken the following steps to ensure consistency of this PHA Plan with the Consolidated Plan for the jurisdiction: (select all that apply)

- ☒ The PHA has based its statement of needs of families in the jurisdiction on the needs expressed in the Consolidated Plan/s.
- ☒ The PHA has participated in any consultation process organized and offered by the Consolidated Plan agency in the development of the Consolidated Plan.
- ☒ The PHA has consulted with the Consolidated Plan agency during the development of this PHA Plan.
- ☒ Activities to be undertaken by the PHA in the coming year are consistent with the initiatives contained in the Consolidated Plan. (list below)
- ☐ Other: (list below)

3. The Consolidated Plan of the jurisdiction supports the PHA Plan with the following actions and commitments: (describe below)

75

# EXHIBIT G



# WATERFRONT CONDOS
## STARTING AT $79,500

UPDATED: 12:21 p.m. CDT, June 15, 2007    New Orleans, Partly Sunny with Thunderstorms 82° F    • Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us |
Advertise


nola.COM
Everything New Orleans

SEARCH: Enter Keyword(s)    GO!

Beau Rivage
RESORT & CASINO • BILOXI

| NEWS | SPORTS | FORUMS | BLOGS | CAMS | ENTERTAINMENT | MORE TOPICS | JOBS | AUTOS | REAL ESTATE | CLASSIFIEDS |

NOLA.com - The Times-Picayune

## The Times-Picayune
• Subscribe
• Today's Paper & More



**PRINT EDITION**

**More Stories**
• House backs LSU hospital in N.O.
• Accident ended a life brimming with promise
• Witnesses say police stormed their quiet neighborhood bar and brutally attacked the owner, but he had done nothing wrong
• More Headlines

**MULTIMEDIA**

**Photos**
• Ed Bradley honored with Jazz funeral
• Legislative session kicks off
• April 29, 2007 - Around New Orleans
• More Audio, Video, Multimedia, and Graphics

**BLOGS**

**News Updates**
• Marinello misses court hearing for health reason 11:01 a.m. CT
• FEMA may have authorized flood insurance overbilling 8:49 p.m. CT
• 7 new troopers hitting the highway 11:29 a.m. CT
• Local gas price dips again 11:26 a.m. CT
• Photo: Gunman sought in Metairie business robberies 10:15 a.m. CT
• More

**Sports Updates**
• Delgado falls to Western Nevada
• More

**North Shore Updates**
• St. Tammany deputy killed during fellow deputy's funeral 4:45 p.m. CT
• Power restored to the north shore 2:37 p.m. CT
• Construction to begin soon on Pearl River museum 2:03 p.m. CT
• More

**Business Updates**
• Jefferson Chamber headed to D.C. 2:53 p.m. CT
• More

# Four N.O. housing developments will be demolished

**But 1,000 other units to reopen by August**

Thursday, June 15, 2006
By Gwen Filosa

Promising a renaissance for public housing in New Orleans, federal housing officials said Wednesday that they will reopen 1,000 units by summer's end and within three years demolish four decades-old complexes, changing sections of the city's landscape by replacing the sprawling brick developments with a mix of single-family homes and apartments.

"We want to redevelop these old, obsolete and just dangerous properties," said Scott Keller, deputy chief of staff for the U.S. Department of Housing and Urban Development. "We also want to return folks home."

Barracks-style brick buildings with deep concentrations of poverty are not in New Orleans' future, HUD Secretary Alphonso Jackson repeated Wednesday.

▼ Advertisement                    |CONTINUE STORY|



"Katrina put a spotlight on the condition of public housing in New Orleans," Jackson said. "I'm here to tell you we can do better."

St. Bernard, which had 1,300 units bounded by St. Bernard Avenue and Gibson, Senate and St. Denis streets, is among the properties HANO plans to eventually demolish and redevelop as modern-day public housing, Jackson said. The others are C.J. Peete in Central City, B.W. Cooper off Earhart Boulevard, and Lafitte near Treme.

St. Bernard is not on HUD's list of complexes that will reopen. Instead, units at C.J. Peete and Cooper will reopen in the coming months, with demolition and rebuilding happening around residents, just as it had pre-Katrina.

Wednesday's announcement by HUD is the first plan the agency has released since public housing was devastated by the deadly flooding after Hurricane Katrina.

Within the next 60 days, the Housing Authority of New Orleans will repair and reopen 1,000 units to public housing families who lived in the city before Katrina made landfall Aug. 29, HUD officials said.

Half the reopened units will be in the Iberville development, which was built in 1941 directly behind Canal Street and near the French Quarter.

The 1,000 units would restore New Orleans public housing to half of its capacity pre-Katrina.

CONTINUED 1|2|3|4|5 Next

**SHARE THIS STORY**
⊛ Reddit
⊛ Digg
⊛ del.icio.us
⊛ Google
⊛ Yahoo
• How Does It Work?

**SITE TOOLS**
✉ E-mail This
🖨 Print This
📰 Newsletters



**CONTESTS & EVENTS**
• Get your news delivered for FREE!
• Check out our contests!
• Win tickets to the CAC's Bourbon & Burlesque
• Win Primeval on DVD
• Career Fair June 19th
• Girl Scouts Present Rhapsody in Green June 23rd
• Win Zephyr's tickets

# EXHIBIT H



OFFICE OF PUBLIC HOUSING

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Special Applications Center
77 W. Jackson Blvd., Room 2401
Chicago, Illinois 60604-3507
Phone: (312) 886-9754   Fax: (312) 886-6413

SEP 21 2007

MEMORANDUM FOR: Cheryl Williams, Director, New Orleans Office of Public
Housing, 6H

FROM:  Ainars Rodins, P.E., Director, Special Applications Center (SAC), PIA

SUBJECT:  Approval for the Housing Authority of New Orleans' (HANO) Request for the
Demolition of 40 Dwelling Buildings Containing 521 Units and 1 Non-
Residential Building and Disposition of 21.30 Acres of Underlying Land at C.J.
Peete, LA001002; 77 Dwelling Buildings Containing 896 Units and Disposition
of 27.20 Acres of Underlying Land at Lafitte, LA001005; 40 Dwelling Buildings
Containing 568 Units and 1 Non-Residential Buildings and Disposition of 27.62
Acres of Underlying Land at B.W. Cooper, LA001007; 66 Dwelling Buildings
Containing 671 Units and Disposition of 28.50 Acres of Underlying Land at St.
Bernard, LA001008; 30 Dwelling Buildings Containing 572 Units and
Disposition of 22.99 Acres of Underlying Land at B.W. Cooper Extension,
LA001012; and 61 Dwelling Buildings Containing 720 Units and Disposition of
20.20 Acres of Underlying Land at St. Bernard Extension, LA001013

In furtherance of the Housing Authority of New Orleans' (HANO) efforts to rebuild
public housing, HANO submitted an application for the demolition and disposition of the above
referenced public housing developments. The Department's Special Application Center (SAC)
received this application on October 17, 2006, via the Public and Indian Housing Information
Center (PIC), DDA0002290. Supplemental information was received through September 20,
2007. The Environmental Assessment was completed by the Department on September 17, 2007
in accordance with 24 CFR Section 50.

HANO submitted this application in order to further its plan of revitalizing its ten major
developments (including C.J. Peete, Lafitte, B.W. Cooper and St. Bernard) and providing better
housing and living conditions for HANO residents. Due to the long-standing dilapidated and
substandard conditions of these many of the developments, HANO had embarked on this plan
even prior to Hurricane Katrina. The demolition/disposition proposed in this application will
allow HANO to begin its implementation of a major redevelopment of public housing in New
Orleans. HANO is dedicated to replacing all of its 5,146 units occupied prior to the Hurricane
with affordable housing opportunities and the approval of this demolition/disposition application
will allow HANO to implement the initial redevelopment phases of these four projects, which
will result in the creation of over 2,000 new units, most of which will be affordable housing
serving New Orleans earning up to 60% of area median income (AMI), including 744 public

2

housing units. As detailed in this Memo, HANO plans to offer extensive relocation assistance, including Housing Choice Vouchers, to current HANO residents. HANO also plans to make certain public housing developments available for HANO residents, on a temporary basis, until redevelopment has concluded. The Department has considered views that oppose this demolition/disposition and is more persuaded by HANO's position that demolition, disposition, and redevelopment of these developments is the correct course of action.

The Department reviewed this application pursuant to Section 18 of the United States Housing Act of 1937, codified at 42 U.S.C. sec 1437p (the "Act") and the Department's implementing regulations at 24 CFR Section 970.

Under 24 CFR Section 970.7(a)(1), in order for a demolition or disposition application to be approved after November 24, 2006, the effective date of this regulation, a Public Housing Agency (PHA) must provide "A certification that the PHA has described the demolition or disposition in the PHA Annual Plan and timetable under 24 CFR Section 903 and that the description in the PHA Annual Plan is identical to the application submitted pursuant to this section and otherwise complies with section 18 of the Act (42 U.S.C. 1437p) and this part." On February 7, 2007, the HUD New Orleans Field Office approved HANO's agency plan, which includes the subject action.

## Description of Proposed Demolition

HANO proposed the demolition of 40 dwelling buildings containing 521 units and 1 non-residential building at C.J. Peete, LA001002; 77 dwelling buildings containing 896 units and 0 non-residential buildings at Lafitte, LA001005; 40 dwelling buildings containing 568 units and 1 non-residential building at B.W. Cooper, LA001007; 66 dwelling buildings containing 671 units at St. Bernard, LA001008; 30 dwelling buildings containing 572 units at B.W. Cooper Extension, LA001012; and 61 dwelling buildings containing 720 units at St. Bernard Extension, LA001013. Details of the proposed demolition are as follows:

| C. J. PEETE, LA001002 DOFA: 01/31/1941 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 205 | 292 | 24 | 0 | 521 |
| **Proposed Units** | **205** | **292** | **24** | **0** | **521** |
| Number of Dwelling Buildings Proposed | | | | | 40 |
| Number of Non-Dwelling Buildings Proposed | | | | | 1 |

| LAFITTE, LA001005 DOFA: 08/31/1941 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 355 | 401 | 140 | 0 | 896 |
| **Proposed Units** | **355** | **401** | **140** | **0** | **896** |
| Number of Dwelling Buildings Proposed | | | | | 77 |
| Number of Non-Dwelling Buildings Proposed | | | | | 0 |

3

| B.W. Cooper, LA001007 DOFA: 06/30/1941 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 225 | 229 | 114 | 0 | 568 |
| **Proposed Units** | 225 | 229 | 114 | 0 | 568 |
| Number of Dwelling Buildings Proposed | | | | | 40 |
| Number of Non-Dwelling Buildings Proposed | | | | | 1 |

| St. Bernard, LA001008 DOFA: 05/31/1942 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 172 | 392 | 94 | 13 | 671 |
| **Proposed Units** | 172 | 392 | 94 | 13 | 671 |
| Number of Dwelling Buildings Proposed | | | | | 66 |

| B.W. Cooper Extension, LA001012 DOFA: 08/31/1954 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 49 | 511 | 12 | 0 | 572 |
| **Proposed Units** | 49 | 511 | 12 | 0 | 572 |
| Number of Dwelling Buildings Proposed | | | | | 29 |

| St. Bernard, LA001013 DOFA: 06/30/1953 | | | | | |
|---|---|---|---|---|---|
| Bedroom Size | 1-BR | 2-BR | 3-BR | 4+BR | Total |
| Existing Units | 222 | 216 | 133 | 149 | 720 |
| **Proposed Units** | 222 | 216 | 133 | 149 | 720 |
| Number of Dwelling Buildings Proposed | | | | | 61 |

Notwithstanding the proposed demolition of these units, in order to alleviate the severe shortage of affordable housing in New Orleans following Hurricane Katrina, HANO is making available for occupancy by former HANO residents approximately 425 units at B.W. Cooper, LA001007, and 196 units at Lafitte, LA001005. Once HANO identifies which units it will make available for re-occupancy by former HANO residents, HANO will notify the Department to account for the temporary occupancy of these units. The Department acknowledges that HANO has requested a waiver from the Department to permit the units (approved for demolition/disposition) that are used for temporary occupancy to continue to be eligible to receive operating subsidy during any such temporary occupancy.

However, for historic purposes, in accordance with four separate Memoranda of Agreement (MOA) between several agencies – the Department, HANO, the Advisory Council on Historic Preservation and the Louisiana Division of Historic Preservation – the administration building and a limited number of buildings proximate to the administration building will be retained and rehabilitated at each of the four sites. The determination of the specific buildings to be retained will be made at a later date; the future use may not include housing. In addition, to

4

alleviate the severe shortage of affordable housing, former residents will reoccupy, on a temporary basis, approximately 425 units at B.W. Cooper, LA001007 and 196 units at Lafitte, LA001005. Residents will be relocated by HANO in preparation for demolition and new construction at these sites. To support the re-occupancy effort, HANO is seeking a regulatory waiver from the Department that will allow HANO to receive operating subsidy during temporary re-occupancy. HANO will notify the Department about the temporary occupancy of these units.

### Reasons for Action (Justification)

HANO proposed the demolition based on 24 CFR Section 970.15, which requires the PHA to certify that the project is obsolete as to physical condition, location, or other factors, making it unsuitable for housing purposes, and no reasonable program of modifications is cost-effective to return the public housing project or portion of the project to useful life.

HANO had first approached the Department about the demolition of public housing in New Orleans, including public housing at these developments prior to Hurricane Katrina. Prior to Hurricane Katrina, HANO had embarked on a plan to revitalize its ten major developments, including C.J. Peete, Lafitte, B.W. Cooper and St. Bernard. Prior to Hurricane Katrina, much of HANO's inventory was already functionally and economically obsolete and in need of substantial repair. The inappropriate design and layout of the projects contributed to a sense of isolation and the persistence of crime. The condition of the units consistently received failing scores under the Public Housing Assessment System (PHAS), which led to the Department's administrative receivership of HANO in 2002. The devastation of Hurricane Katrina caused HANO to re-evaluate and accelerate its development plans.

The Department has carefully reviewed all of the analyses and reports provided by HANO evidencing this justification for demolition, as well as the submissions and comments provided by the National Housing Law Project (NHLP) and others regarding the proposed demolition. Specifically, the Department reviewed a number of documents, including but not limited to, the following reports and submissions:

(1) ECM Consultants, Inc. Report ("ECMI Report");
(2) Physical Condition Assessment Report of Lafitte, St. Bernard, C.J. Peete and B.W. Cooper Housing Developments by Jeffrey Paris, AIA, of Draper & Associates ("Draper Report");
(3) A letter to the Department from the National Housing Law Project (and other parties) dated August 31, 2007 ("NHLP Letter");
(4) A report by Professor John Emmanuel Fernandez, dated May 16, 2007, and a supplemental report by Professor John Emmanuel Fernandez, dated June 11, 2007 ("Fernandez Report");
(5) Soil Sampling Report Phase II Environmental Site Assessments, by PPM, dated October 26, 2006 ("PPM Report");
(6) A Declaration by David Martinez dated October 23, 2006, from Anderson vs. Jackson (Civil Action No. 06-3298) ("Martinez Declaration");

5

(7) Federal Defendants' Motion *In Limine* to Exclude the Expert Testimony of David Martinez dated August 27, 2007, from Anderson vs. Jackson (Civil Action No. 06-3298); and

(8) Federal Defendants' Motion *In Limine* to Exclude the Expert Testimony of John Fernandez dated August 27, 2007, from Anderson vs. Jackson (Civil Action No. 06-3298).

After reviewing HANO's submission, as well as these reports and information, the Department has determined that it accepts HANO's certification that all four of these developments are obsolete as to physical condition, as defined at 24 CFR 970.15, and that no reasonable program of modifications is cost-effective to return the public housing project or portion of the project to useful life.

The Department found the Draper Report to be particularly credible and persuasive and relied heavily on it in making its determination. The Department made this determination in part because the Department found the firm of Draper & Associates, as well as Mr. Paris, to be best qualified to render a report on the physical conditions of these developments. Draper & Associates has extensive experience in assessing affordable housing properties, including public housing. In addition, Draper & Associates has specific experience in overseeing the development of mold and mildew management plans for multifamily housing. Mr. Paris has nearly 30 years of experience as both an architect and contract administrator and decades of actual design and construction experience. Mr. Paris has years of servicing the Atlanta Housing Authority (AHA) within its Real Estate Management Division.

Furthermore, the Department found the methodology used to create the Draper Report to be trustworthy and reliable. To create its report, Draper examined the condition of the developments well beyond the appearance of the exterior shell and selected views of the interiors of the units. The Draper inspection team consisted of experienced consultants, knowledgeable in HUD inspection methodologies. Draper used customized inspection spreadsheet programs and tablet PCs to approximate a HUD REAC inspection, and used a HUD-defined review process to assess the true condition of the units and buildings.

On the other hand, the Department found that Professor Fernandez lacks the qualifications and relevant experience to provide a reliable opinion on the physical condition and the costs of repairing the developments and bringing the sites, buildings, and units to meet HUD minimum standards, as he has little experience in affordable or multifamily housing. Professor Fernandez has little experience that qualifies him to draw the sweeping conclusions he draws or to provide accurate cost estimates for the rehabilitation and modernization of these large multifamily public housing developments. During his deposition in the <u>Anderson v. Jackson</u> litigation, Fernandez admitted that he had no prior experience working on the design and construction of any large multifamily public housing developments. He stated that he could not recall working on any project involving housing that was subject to regulation by the Department of Housing and Urban Development. Fernandez also stated that during his career, he has worked as a senior designer on only one project that involved <u>any</u> type of large multifamily residential development. That work was done approximately fifteen years ago in Jakarta, Indonesia. The

work did not involve public housing or housing intended for low-income persons. By his own account, Fernandez's role in the design of a large multifamily residential development would have ranged from "helping out with presentation drawings" to "general massing of the overall massing on the design of units." At his deposition, Fernandez could not recall the approximate budget for the Indonesia project, and could not recall any other example where he provided an estimate of the cost to repair a large multifamily residential development. Moreover, prior to his engagement by Plaintiffs' counsel in <u>Anderson</u>, Fernandez had never inspected any properties damaged by a hurricane. Moreover, the Department determined that Professor Fernandez's cost estimates were unreliable, as they omitted several key potential costs, including: (i) the cost of remediation of any potential environmental hazards, including mold, asbestos, and lead-based paint; (ii) the cost of bringing the developments in compliance with current building codes and with the Americans with Disabilities Act, if necessary; and (iii) the cost necessary to repair electrical service panels damaged by the flood or the new equipment necessary for the developments' electrical distribution systems.

The Department determined that neither the scope of work nor the dollar amounts in the Fernandez Report could possibly bring the sites, buildings, and units to the minimum conditions required by HUD regulations. The Department also determined that the Fernandez Report does not address the use of mandated, stronger materials or the use of energy efficient systems, both of which will make the repairs to the existing structures more costly than that report projects. The Fernandez Report also ignores the costs associated with the need for repairs caused by long-term deterioration, post-storm material scavenging and the impact these items have on the ability to readily occupy these developments.

In addition, the Department found the Draper Report's rebuttal of the Fernandez Report to be convincing and accurate and accepted its conclusions. Specifically, based on objectively measured evidence, the Draper Report found that the Fernandez Report was based upon incomplete inspections and unsubstantiated assumptions. The Draper Report found that the Fernandez Report failed to account for long-standing and new laws, and regulations and requirements in its analysis of the appropriate remedies for the developments and the result was a report filled with flawed and unreliable conclusions. It found that the Fernandez Report appeared to have reached its conclusions based only upon analysis of damage caused by Hurricanes Katrina and Rita and ignored both old and new environmental hazards. It disregarded HUD regulations and discounted obsolete infrastructure and utility service conditions. It also did not take into account the long-term management of lead paint hazards and the increased potential lead exposure to residents and workers. Moreover, it significantly underestimated the amount of effort, manpower, materials, and funds needed to make these units comply with these and numerous other applicable laws and regulations. It also failed to mention the fact that there is no insulating material within the exterior wall construction of the developments to buffer the residents from temperature extremes.

Overall, the Department agrees with the Draper Report's conclusion that "the shaky facts and inaccurate assumptions on which Fernandez bases his conclusions do not support his assertions that repairing the Big Four Developments is a viable option to meet family requirements, current building codes, and government mandates."

7

The NHLP Letter included a copy of the Martinez Declaration, which described a report dated October 15, 2006 by Martinez Environmental Consulting, Inc. on mold at the developments. The NHLP Letter noted that Mr. Martinez concluded that "the great majority of the units in these four housing projects could be made environmentally safe and immediately habitable with minor repairs..."However, the Department has determined that it would not rely on the conclusions of Mr. Martinez and would instead rely on the conclusions concerning mold found in the PPM Report. The Department made this determination for the following reasons: (i) the Department agrees with the Draper Report's conclusions that the PPM Report remains objective in its testing methodology, refers back to well-established general industry guidelines, such as those established by the American Industrial Hygiene Association (AIHA), clearly documents the testing and investigation methodology that it uses, and follows ASTM standards for sample collection; (ii) the Draper Report notes that the PPM report, unlike the Martinez report, collected representative indoor and outdoor air samples. Though visual observations only confirm the presence of mold, air sampling provides analytical data to determine the air quality at the time the samples were collected and compare the type and quantity of mold spores identified in the outside air with the indoor air. Moreover, the Draper Report concludes that, based on the air sampling data, mold remediation is not as simple as sanitizing surfaces. Upon removal of the mold-colonized material (furniture, clothes, wood, etc.), the level of air-born mold spores will dramatically increase, further declining the indoor air quality; (iii) the Draper Report notes that Martinez underestimated the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality. The Draper Report notes that although the Martinez report repetitively claims that "the units can be quickly cleaned and sanitized" by wiping down surfaces, this remediation recommendation does not address the removal of personal belongings (furniture, clothes, etc.) left by former residents, which, according to the Martinez report, remain a main source of organic matter that is sustaining mold growth in the units; and (iv) the Martinez Report does not comment on roof damage that has allowed rain/moisture to enter the attic space or flooded crawlspaces that have the potential to be sources of hidden mold within the building.

Finally, the Department has carefully reviewed the information provided in the NHLP Letter and has determined that, with respect to physical conditions at the developments, the NHLP Letter draws its conclusions from the information and data in the Fernandez Report and Martinez Declaration. Accordingly, the Department has considered and rejected the letter's conclusions on these matters in making its determination.

In sum, although the Department did receive information from sources other than HANO that was *allegedly* inconsistent with the information that HANO provided to justify the demolition, pursuant to section 18 of the Act and 24 CFR section 970.29, the Department is not obligated to disapprove HANO's application since, after careful consideration, the Department determined that this other allegedly inconsistent information was neither viable nor trustworthy.

The Department accepted HANO's certification that these developments were obsolete as defined by Section 18 of the Act and 24 CFR section 970.15 based largely on the following general conditions that exist at all of the developments. The Department notes that many of these general conditions pre-existed Hurricane Katrina, and were not caused by it. In many

8

cases, they represent physical conditions that make the Developments obsolete and unsuitable for housing purposes independent of any damage caused by Hurricanes Katrina and Rita, and independent of any damage caused by subsequent vandalism. The storm-related and preexisting conditions contributing to obsolescence and applicable to all projects include the following:

1. Site building and apartment densities dramatically exceed current practice.
2. Soil subsidence, coupled with mature tree root structures, creates an unsafe pedestrian and vehicular environment.
3. Utility distribution networks have been damaged by the storms, have been pilfered for salvage value, and are unsafe until tested by qualified engineers. In all instances, electrical, natural gas, and water distribution has been discontinued in the unoccupied portions of the housing developments.
4. Penetrations of the exterior shells require substantial replacement and repair. Most windows do not meet current hurricane-resistant design standards. Sills leak water. In most cases, the exterior masonry construction does not have a continuous moisture barrier. Roofs require thorough examination, repair, and replacement to stop the unrestrained damage occurring to the upper level apartments.
5. Buildings fail to meet components of the current building codes. Interior stairways are too steep and not wide enough to expedite emergency egress. Most apartment entry doors do not meet minimum 32-inch clear width compliance. Handrails (stairs and fire escapes) do not conform to child protection measures. (2000 International Building Code with New Orleans Amendments.)
6. Water and finish damage to the existing apartments is substantial, and includes mold in approximately 74 percent of the units, as indicated in the PPM Report. Mold does not fade away and the hazards associated with it do not vanish even after being wiped down with bleach. The remediation/retesting process is complex and expensive.
7. Existing environmental concerns include roof, pipe insulation, and floor tile/ mastic composed of asbestos-containing material, and the widespread presence of lead based paint.
8. The apartment construction materials (that the Fernandez Report cites in support of his opinion on building longevity) limit the feasibility to repair, renovate, or modernize the units. The plaster and tile construction of the buildings is not conducive to repair of damaged or destroyed partitions, or to reconfiguring the units to better meet the needs of the residents. Modifications necessary to upgrade mechanical systems and plumbing systems are problematic.
9. Kitchens have minimal countertop surfaces and cabinetry.
10. Apartment plumbing systems are archaic. As an example, a majority of units use a wall mounted valve to direct water flow either to the tub or the sink. Both fixtures cannot be used simultaneously.
11. Water heaters are located in the kitchen, exposing children to the potential risk of super-heated surfaces.
12. Almost all first floor unit appliances require replacement.
13. Wall-mounted gas-fired furnace units are sometimes placed within bedrooms, in direct conflict to current building codes. No method of air movement is currently supplied in the apartments so some rooms become overheated while others remain cold. No air conditioning is provided for these apartments.



Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 63 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 9 of 31

9

14. Apartment electrical panels are undersized for the needs of twenty-first century residents. In the 1940s, there were no microwaves ovens, televisions, hair driers, or computers. Outlets are not available on all (or even a majority) of wall surfaces.

15. Heavy masonry construction and un-insulated roof and attic spaces do not meet current energy conservation standards.

16. There was evidence of corrosion that ultimately damaged the piping and plumbing systems of the sites.

17. There was evidence of subsidence of the existing ground throughout the developments and it is estimated that approximately 4" to 6" of additional fill will be required to bring the existing grounds back to original levels.

18. The moisture barriers (located on the outside face of the interior walls inside the walls' air-space of the exterior walls of the developments) will likely deteriorate over time, increasing the probability that moisture will enter the interior space of the developments. With the numerous water blisters throughout the plaster walls, it is safe to assume that these moisture barriers have failed in a number of locations. The only way to provide new moisture barriers would be to remove the existing brick veneer of all the buildings.

19. The flooring in all units in the developments was damaged and must be replaced.

20. The entire interior of the development must be re-painted.

21. One of the primary conditions causing the mold growth in the units appears to be moisture, which is present in the highly humidified air common in the New Orleans climate. The buildings' envelopes do not effectively eliminate the majority of moisture intrusion into the interior of the spaces. The fact that there is no central air-conditioning system in place at the developments has allowed more humid air into the buildings and is a contributing factor to the buildings' physical obsolescence.

In addition to the foregoing general deficiencies, the Department has considered the following additional physical deficiencies at each development.

<u>C.J. Peete (LA001002)</u>

HANO certified to the Department that C.J. Peete (LA001002) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

1. Massive amounts of materials have been removed from the development. This includes copper wiring, piping, and flashing. Roof vents appear to have been stolen, leaving holes in the roofs allowing the rain to enter the building unhindered.

2. Roofing damage was visible and the gutters and downspouts were often missing.

3. Most piping and electrical cables have been removed. Even pipes located within vertical chases have been removed. Wall surfaces and bathroom fixtures had been destroyed. More exterior wall construction was visible due to this vandalism.

4. Interior walls have been destroyed to allow access between units. It is possible to walk from unit to unit through holes in walls

5. There was visible water damage inside the units from leaking roofs and broken windows. The fire escapes exhibited severe rust at most visible surfaces. Fire escape railings were not safe for children (of any age) to use. Some escapes were accessed



10

through narrow pairs of doors which also violates current life safety code compliance.
6. A majority of the front entry stoops and steps had sufficient handrails, though very few were installed at the rear doors.
7. Soil subsidence created uneven stair riser dimensions and sidewalk heaving, buckling. A majority of the glazing units were broken.
8. Crawl spaces were not secured.
9. Windows and frames were missing.
10. Paint was peeling down to the base material.
11. Interior walls have been destroyed. Inoperable interior electrical panels were rusted.
12. Much of the electrical systems are damaged and missing
13. There was mold on many of the units. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.

## Lafitte (LA001005)

HANO certified to the Department that Lafitte (LA001005) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

1. The copper roof flashing at walls and chimneys were in most instances found to be damaged.
2. There are numerous water blisters throughout the plaster walls.
3. There is evidence of moderate to extensive mold growth in most of the walls and ceilings. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.
4. The kitchen appliances have been damaged.
5. The plumbing throughout the development is substandard and must be updated to today's standard.
6. Most of the shingle roofing has been damaged and will have to be replaced.
7. There is extensive water damage to plaster ceilings at the third floor attic locations. This condition is prevalent throughout the site and would indicate there is a possible damage to the substrate and trusses supporting the roofs.
8. The brick veneer shows signs of cracking and breaking in areas throughout the site.
9. All exterior and unit entry doors were damaged throughout the site.



11

10. No grounding wires or lugs were present in the electrical system.
11. The flooring and baseboards were damaged beyond repair.
12. There was evidence of soil subsidence issues at porches and the attached stairs, substantial amounts of soil must be brought on site in order to remedy unsafe walks and the undermined porches and steps.
13. Small portions of the roof tiles/shingles were gone (at least as visible from the ground) though gutters and downspouts exhibited significant damage and failure, sometimes tearing felts and flashing from the eaves. Some roof surfaces remain covered in tarps from FEMA. Roof tiles were found stacked on one portion of the site. At least a couple of windows were broken on each building.
14. Major issues revolve around the mold remediation & crumbling utility infrastructure, including fallen power poles/ transformers.
15. Crawl spaces were not secured.
16. There were holes in walls and plumbing modifications that were not code compliant.

## B.W. Cooper (LA001007)

HANO certified to the Department that B.W. Cooper (LA001007) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

1. Portions of the development had been protected with chain link fencing topped with barb wire.
2. Some units were protected by security panels, although these panels (unlike Lafitte) allowed no air circulation and may have exacerbated mold growth. B.W. Cooper first floor units experienced flood waters ranging from 12 inches – 18 inches depth.
3. There was damage to the buildings' exteriors. Approximately 30% of the windows and cast stone window seals were broken, and need to be replaced.
4. Extensive mold growth in most of the walls and ceilings. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.
5. There were multiple areas of significant roof damage.
6. The kitchen appliances have been damaged due to flooding.
7. The plumbing system throughout is substandard and must be updated to today's standards.
8. Window units were broken throughout.
9. Crawl spaces were not secured.
10. Interior stairs within the units ranged from 36 ½ inches -28 ½ inches wide, code mandates 36 inches minimum (IBC 2000, 1003.3.3.1, Exception 1).

Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 66 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 12 of 31

12

11.    The stair riser height was not uniform.
12.    All front entry doors were 27 inches clear, code mandates 32 inches clear for egress doors (IBC 2000, 1003.3.1.1).
13.    The existing shingles roofing received severe damage, especially the north facing roof slopes.
14.    Evidence of roofing substrate broken and open to the weather in some locations.
15.    All gutters and downspouts need to be replaced.
16.    Building interior walls are plaster finish over masonry walls. The plaster shows signs of mold, water blisters and damage.
17.    The vinyl asbestos tile flooring and ceramic tile needs to be removed due to extensive deterioration that was accelerated during a period of unoccupied and unconditioned environment.

<u>St. Bernard (LA001008)</u>

HANO certified to the Department that St. Bernard (LA001008) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

1.     There were crumbling second floor deck surfaces.
2.     Fire escapes exhibited rusted-through horizontal floor surfaces and unsafe fire escape handrail assemblies.
3.     Crawl spaces were not secured.
4.     There were multiple areas of significant roof damage.
5.     The building containing 1501 Sere had substantial precast sill damage.
6.     3919 Foy stoops exhibited through cracks in multiple locations.
7.     Porch columns exhibited multiple layers of questionable paint products.
8.     Evidence existed that there had been many areas of the façade where grout had been recently inserted.
9.     Exposed electrical cables were present where meters had been removed.
10.    The two observed playgrounds were unsafe.
11.    Internal and external mold was present in large quantities. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.
12.    There were inconsistent and unsafe riser dimension steps from the stoop to grade.
13.    Thresholds and plumbing lines (with crawl spaces) have been scavenged.
14.    Site cast iron fencing was often damaged and was occasionally missing sections.
15.    No grounding wires or lugs were present in the electrical system.
16.    Inoperable interior electrical panels were rusted.
17.    The bedroom electrical circuit breaks are not AFCI which and are not code compliant.

13

18.  There are no outdoor weather proof GFCI outlets.
19.  Windows do not meet hurricane impact requirements per IBC (2003) – 1609.1.4 for the code requirement.

## B.W. Cooper (LA001012)

HANO certified to the Department that B.W. Cooper (LA001012) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

1.  Electrical (wiring without grounding) – Receptacles throughout do not have a
2.  The bedroom electrical circuit breakers are not AFCI which is also code compliant.
3.  The buildings showed numerous signs of decay and disrepair.
4.  Exterior doors are missing at the stairwells and the remaining wood frames have extensive termite deterioration.
5.  All aluminum windows show extensive deterioration and must be replaced.
6.  The flat roof systems are at the end of their life expectancy and should be replaced.
7.  The site indicates extensive subsidence of the grades throughout the development.
8.  The bottom steps of the concrete stoops indicate a least a foot or more of subsidence.
9.  The subsidence has caused extreme cracking and breaking of the concrete paving throughout the site.
10.  The brick veneer shows signs of cracking and breaking in areas throughout the site.
11.  All front entry doors were 27 inches clear, code mandates 32 inches clear for egress doors (IBC 2000, 1003.3.1.1).
12.  There is extensive visible mold growth throughout the units. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.
13.  The kitchen appliances have been damaged.
14.  All flooring in the units is damaged and needs to be replaced.

## St. Bernard (LA001013)

HANO certified to the Department that St. Bernard (LA001013) was obsolete based on the findings of the Draper Report, the PPM Report, and the ECMI Report and specifically based its certifications on the following findings of those reports:

14

1. Electrical (wiring without grounding) – Receptacles throughout do not have a ground lug; it is a two wire system.
2. The receptacles in the bathrooms and kitchens are not GFCI type.
3. Windows do not meet hurricane impact requirements.
4. Flood water caused flooding of the first floor units by approximately 12 to 24 inches.
5. The crawl spaces were flooded.
6. There was damage to the buildings' exteriors. Approximately 30% of the windows and cast stone window seals were broken, and need to be replaced.
7. The copper roof flashing at walls and chimneys was in most instances damaged.
8. Extensive mold growth in most of the walls and ceilings. According to the PPM Report, indoor mold spore counts were consistently higher than those found in outdoor air and "marker molds" (that are not typically found in indoor environments and may indicate sustained growth of mold within buildings) were identified in a majority of the units in the development. The PPM Report concluded that the level of remediation needed to remove all visible and hidden mold and improve the indoor air quality is considerable, and the cost of the abatement of that mold would be substantial.
9. There were multiple areas of significant roof damage.
10. The kitchen appliances were damaged and will likely need to be replaced.
11. The plumbing system throughout is substandard and must be updated to today's standards.
12. Window units were broken throughout.
13. Crawl spaces were not secured.
14. Interior stairs within the units ranged from 36 ½ inches -28 ½ inches wide, code mandates 36 inches minimum (IBC 2000, 1003.3.3.1, Exception 1).
15. Fire escape railings had been updated in recent years, but the metal surfaces are in dire need of scraping and new paint. It is recommended that the material strength of the escape floor surfaces be tested to ascertain if the heavy rust has diminished their safety.
16. Settlement, soil subsidence (long term or Katrina-based) occurred throughout the development. It may be too early to conclusively state whether this will evolve into a building foundation concern. Regardless, the addition of soil is necessary to make the use of some porch stairs, non-life threatening.
17. The stair riser height was not uniform.
18. All front entry doors were 27 inches clear, code mandates 32 inches clear for egress doors (IBC 2000, 1003.3.1.1).
19. Vinyl Asbestos Tile (VAT) was observed in 1315 Prieur Street. VAT and asbestos containing mastic is likely present beneath more recently installed VCT or sheet vinyl products in a large number of other units. The B.W. Cooper Demolition specifications produced by HANO estimate that VAT covers almost 154,000 square feet of this development.
20. Sink and bathtubs were rusted.
21. Paint has peeled revealing the base surface.
22. There was leakage below intact windows.
23. There were holes in the ceiling where plumbing was accessed for repair.

15

For all the foregoing reasons, the Department has determined that it accepts HANO's conclusion that developments are obsolete as to physical condition, as defined at 24 CFR 970.15.

<u>Cost-Effectiveness of Repair and Rehabilitation</u>

The Total Development Cost (TDC) limit for the units proposed for demolition is calculated below. The Department used the TDC applicable at the time of submission of this demolition application.

| C.J. Peete, LA001002<br>TDC per PIH 2006-22, Type of Structure: Walk-up<br>Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 205 | $102,732.00 | $21,060,060.00 |
| 2-BR | 292 | $130,904.00 | $38,223,968.00 |
| 3-BR | 24 | $173,845.00 | $4,172,280.00 |
| TOTAL | | | $63,456,308.00 |

HANO provided the cost estimate for the rehabilitation of C.J. Peete, LA001002, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $82,041,302.00, which is 129.2 percent of the TDC limit.

| Lafitte, LA001005<br>TDC per PIH 2006-22, Type of Structure: Walk-up<br>Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 355 | $102,732.00 | $36,469,860.00 |
| 2-BR | 401 | $130,904.00 | $52,492,504.00 |
| 3-BR | 140 | $173,845.00 | 24,338,300.00 |
| TOTAL | | | $113,300,664.00 |

HANO provided the cost estimate for rehabilitation of Lafitte, LA001005, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $151,272,602.00, which is 133.5 percent of the TDC limit.

| B.W. Cooper, LA001007<br>TDC per PIH 2006-22, Type of Structure: Walk-up<br>Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 225 | $102,732.00 | $23,114,700.00 |
| 2-BR | 229 | $130,904.00 | $29,977,016.00 |
| 3-BR | 114 | $173,845.00 | $19,818,330.00 |
| TOTAL | | | $72,910,046.00 |

Case 1:07-cv-02231-RWR   Document 4-5   Filed 12/12/2007   Page 70 of 85
Case 2:06-cv-03298-ILRL-ALC   Document 464-2   Filed 09/24/2007   Page 16 of 31

16

HANO provided the cost estimate for the rehabilitation of B.W. Cooper, LA001007, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $95,496,877.00, which is 130.9 percent of the TDC limit.

| St. Bernard, LA001008 TDC per PIH 2006-22, Type of Structure: Walk-up Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 172 | $102,732.00 | $17,669,904.00 |
| 2-BR | 392 | $130,904.00 | $51,314,368.00 |
| 3-BR | 94 | $173,845.00 | $16,341,430.00 |
| 4-BR | 13 | $215,457.00 | 2,800,941.00 |
| TOTAL | | | $88,126,643.00 |

HANO provided the cost estimate for the rehabilitation of St. Bernard, LA001008, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $120,120,365.00, which is 136.3 percent of the TDC limit.

| B.W. Cooper Extension, LA001012 TDC per PIH 2006-22, Type of Structure: Walk-up Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 49 | $102,732.00 | $5,033,868.00 |
| 2-BR | 511 | $130,904.00 | $66,891,944.00 |
| 3-BR | 12 | $173,845.00 | $2,086,140.00 |
| TOTAL | | | $74,011,952.00 |

HANO provided the cost estimate for the rehabilitation of B.W. Cooper Extension, LA001012, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $99,355,745.00, which is 134.2 percent of the TDC limit.

| St. Bernard Extension, LA001013 TDC per PIH 2006-22, Type of Structure: Walk-up Area: New Orleans | | | |
|---|---|---|---|
| Bedroom Size | Number of Unit | TDC/Unit | Total Cost |
| 1-BR | 222 | $102,732.00 | $22,806,504.00 |
| 2-BR | 216 | $130,904.00 | $28,275,264.00 |
| 3-BR | 133 | $173,845.00 | $23,121,385.00 |
| 4-BR | 149 | $215,457.00 | $32,103,093.00 |
| TOTAL | | | $106,306,246.00 |

17

HANO provided the cost estimate for the rehabilitation of St. Bernard Extension, LA001013, rehabilitation based on the existing conditions of the units. The rehabilitation cost was estimated by the ECMI Report to be $152,601,988.00, which is 143.5 percent of the TDC limit.

The Department carefully reviewed the cost estimates of rehabilitation that were provided in the ECMI Report and the Draper Report as well as the cost estimates of rehabilitation that were provided in the Fernandez Report and other reports. The Department has determined that it accepts HANO's certifications that the cost estimates of repair and rehabilitation that were provided in the ECMI Report are valid and has used those cost estimates in doing the TDC analysis for the developments. (The Department notes that it would have also accepted the cost estimates in the Draper Report as valid, but since those cost estimates were consistently higher than the cost estimates in the ECMI Report, and the cost estimates of the ECMI Report well exceeded TDC requirements, it would not have changed the conclusions of the Department's TDC analysis).

The Department based its decision to rely on the cost estimates of the ECMI Report and the Draper Report, and not the Fernandez Report for the following primary reasons:

(1)    As indicated in the Draper Report, a large number of the remediation items that the Draper Report found to be critical and necessary were omitted from the Fernandez budget cost calculations for repair of the units;

(2)    Draper also points to discrepancies in unit costs, quantities needed, and source of cost estimates between ECM and Fernandez. The Department finds Draper's determinations on these matters to be the most reasonable.

(3)    Draper notes that ECM did not include a contingency factor in its estimate while Fernandez did. Draper includes a contingency factor of 15%, which the Department finds to be reasonable.

Accordingly, although Department did receive information from sources other than HANO that was *allegedly* inconsistent with the information that HANO provided of the cost estimates of repair and rehabilitation of the developments, pursuant to 24 CFR Section 970.29, the Department is not obligated to disapprove HANO's application since, after careful consideration, the Department determined that this other allegedly inconsistent information was neither viable nor trustworthy.

For all the above reasons, the Department concurs with HANO's certifications that all of the developments, as outlined above, are obsolete as to physical condition, location, or other factors, making them unsuitable for housing purposes. The Department also concurs with HANO's determination that no reasonable program of modifications is cost-effective to return them to their useful life and that demolition and new construction of these developments is the logical and most cost effective remedy to ensure the viability of the C.J. Peete, LA001002; Lafitte, LA001005; B.W. Cooper, LA001007; St. Bernard, LA001008; B.W. Cooper Extension, LA001012; and St. Bernard Extension, LA001013 developments. The Department agrees with

HANO that repairs will not correct all deficiencies and rehabilitation will likely leave structural problems yet to be identified. The Department agrees with HANO that the demolition and new construction of these developments is the remedy to ensure that the future residents of these sites will live in decent, safe and sanitary housing.

## Future Use of Property

HANO has indicated that after demolition, the Central City Partners (CCP) will redevelop the C.J. Peete sites into a mixed-income residential community. The planned redevelopment will include the C.J. Peete, LA001002, and C.J. Peete Extension, LA001010, sites. The LA001010 site is the subject a separate disposition application that was received by the Department on September 13, 2007. A total of 460 rental units and two new community/management buildings are planned for the two sites. The Providence Community Housing and Enterprise Community Partners (PCHECP) will construct a total of 1,500 units on the Lafitte, LA001005, site and in the surrounding neighborhood. The KBK Enterprises (KBKE) and B.W. Cooper Resident Management Corporation (B.W. CRMC) will construct approximately 660 new housing units on the B.W. Cooper, LA001007, and B.W. Cooper, LA001012, sites. The proposed developers for the St. Bernard sites, For Kids Foundation (FKF), Columbia Residential (CR) and Baton Rouge Area Foundation (BRAF), will construct approximately 624 new housing units at the St. Bernard, LA001008, and St. Bernard Extension, LA001013, sites.

## Demolition Cost

The application states that it will cost approximately $3,470,400.00 to demolish the subject units/buildings at C.J. Peete, LA001002; $4,300,800.00 to demolish the subject units/buildings at Lafitte, LA001005; $2,726,400 to demolish the subject units/buildings at B.W. Cooper, LA001007; $3,436,800.00 to demolish the subject units/buildings at St. Bernard, LA001008; $3,801,600.00 to demolish the subject units/buildings at B.W. Cooper Extension, LA001012; and $3,456,000.00 to demolish the subject units/buildings at St. Bernard Extension, LA001013. HANO plans to use funding approved by the Department under Section 901, as well as Capital Funds to cover the cost of demolition.

## Description of Proposed Disposition

HANO proposed the disposition of 21.30 acres of underlying land at C.J. Peete, LA001002; 27.20 acres of underlying land at Lafitte, LA001005; 27.62 acres of underlying land at B.W. Cooper, LA001007; 28.50 acres of underlying land at St. Bernard, LA001008; 22.99 acres of underlying land at B.W. Cooper Extension, LA001012; and 20.20 acres of underlying land at St. Bernard Extension, LA001013. Details of the proposed disposition are shown below. Only the disposition of the entire sites for C.J. Peete, LA001002 and Lafitte, LA001005, are know at this time. The disposition described below for B.W. Cooper, LA001005, B.W. Cooper Extension, LA001012, St. Bernard, LA001008, and St. Bernard Extension, LA001013, are only

19

for the first phase of the redevelopment projects. HANO will need to submit a request to the Department's Special Application Center (SAC) to amend its disposition approval as soon as the information regarding the second phase of the disposition becomes available.

| C.J. Peete, LA001002 DOFA: 01/31/1941 | |
|---|---|
| Existing Land | 21.30 Acres |
| Proposed Land | 21.30 Acres |

| Lafitte, LA001005 DOFA: 08/31/1941 | |
|---|---|
| Existing Land | 27.20 Acres |
| Proposed Land | 27.20 Acres |

| B.W. Cooper, LA001007 DOFA: 06/30/1941 | |
|---|---|
| Existing Land | 27.62 Acres |
| Proposed Land | 27.62 Acres |

| St. Bernard, LA001008 DOFA: 05/31/1942 | |
|---|---|
| Existing Land | 28.50 Acres |
| Proposed Land | 28.50 Acres |

| B.W. Cooper Extension, LA001012 DOFA: 08/31/1954 | |
|---|---|
| Existing Land | 22.99 Acres |
| Proposed Land | 22.99 Acres |

| St. Bernard Extension, LA001013 DOFA: 05/31/1942 | |
|---|---|
| Existing Land | 20.20 Acres |
| Proposed Land | 20.20 Acres |

**Reasons for Action (Justification)**

HANO proposed the disposition based on 24 CFR Section 970.17, which requires the PHA to certify that the retention of the property is not in the best interests of the residents or the PHA because HANO has otherwise determined the disposition to be appropriate for reasons that are consistent with the goals of the PHA and the PHA Plan and that are otherwise consistent with the Act.

Following Hurricane Katrina, HANO inspected and analyzed its entire inventory of public housing units to determine the conditions of the units and its capacity to continue providing decent, safe and affordable housing for low-income residents. Upon inspection, it was found that numerous units in HANO inventory are no longer viable. Therefore, on

Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 74 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 20 of 31

20

December 20, 2006, the Board of Commissioners authorized HANO to prepare and submit an application for the demolition and disposition of C.J. Peete, LA001002, Lafitte, LA001005, B.W. Cooper, LA001007, St. Bernard, LA001008, B.W. Cooper Extension, LA001012, and St. Bernard Extension, LA001013.

### C.J. Peete

HANO has selected an alliance of firms partnering under the name of Central City Partners (CCP) including McCormack Baron Salazar, KAI Design & Build, and the New Orleans Neighborhood Development Collaborative (NONDC) as the developer for the C.J. Peete site. The CCP will be admitted to the ownership entity that has received the tax credits. The CCP will redevelop the site into a mixed-income residential community. The planned redevelopment site will include a mix of approximately one-third market-rate rental units, one-third tax credit and one-third public housing units. In late 2006, the HANO received an allocation of low-income housing tax credits for a 410-unit project at the C.J. Peete site.

HANO proposed to dispose of the C.J. Peete, LA001002, site (as well as a portion of the C.J. Peete, LA001010 site) for the C.J. Peete III low-income housing tax credit project through a 99-year ground lease with a lease consideration of $10,500,000 of which 10% will be due upon execution of the lease and the remaining 90% will be paid pursuant to the terms of the Promissory Note between HANO and the Owner. Beginning the second year of the lease term an annual rent payment of $10.00 will be due. This redevelopment project will include the entire C.J. Peete, LA001002, and a portion of the C.J. Peete Extension, LA001010, (the C.J. Peete Extension, LA001010, site is currently vacant and is included in a separate request for disposition approval). To preserve the property tax exemption, the disposition will be made through a long term ground lease, in which the land will ultimately be leased to the New Orleans Industrial Development Board (NOIDB), who will sublease the property to the Owner as will be more fully described in the mixed finance evidentiary documents.

The C.J. Peete III tax credit project will be constructed on the C.J. Peete, LA001002, and a portion of the C.J. Peete Extension, LA001010. The C.J. Peete III project will include the construction of 410 mixed income rental units. These units will be in addition to the 50 units to be constructed on C.J. Peete Extension, LA001010, under a separate allocation of tax credits. A total of 460 rental units and two new community/management buildings will be constructed on the two sites. Allocations of tax credits have been received for these units.

The initial planned unit distribution is shown in the table below. The Department acknowledges that these plans are subject to change during the negotiations of the development agreement, and if these plans change, HANO should submit a request to the SAC to amend this disposition approval.

21

## C.J. Peete – Proposed Redevelopment

| Name | ACC UNITS | ACC/TAX CREDITS | SECTION 8 PBV/TAX CREDIT | TAX CREDIT ONLY | MARKET RATE RENTAL | TOTAL |
|---|---|---|---|---|---|---|
| C. J. Peete III to be constructed on C.J. Peete, LA001002 and a portion of C.J. Pete Extension, LA001010, which is currently vacant and is the subject of a separate request for disposition approval | 7 | 147 | 0 | 133 | 123 | 410 |
| C.J. Peete I, to be constructed on C.J. Pete Extension, LA001010, which is currently vacant and is the subject of separate request for disposition approval. | 0 | 39 | 11 | 0 | 0 | 50 |
| Total for combined sites | 7 | 186 | 11 | 133 | 123 | 460 |

### Lafitte

HANO has selected to Providence Community Housing and Enterprise Community Partners (PCHECP) to redevelop the Lafitte site. The PCHECP will redevelop the site into a mixed-income residential community and anticipates constructing 1,500 new housing units on the site and in the neighborhood. The planned redevelopment will include both rental and homeownership units affordable to a mix of low- and moderate-income families and seniors.

HANO proposed the disposition of a portion of Lafitte, LA001005, via a 65-year ground lease with a lease consideration of $11,000,000, of which 10% will be due upon execution of the lease and the remaining 90% will be paid pursuant to the terms of the Balance of Total Rent Payment Note between HANO and the Owner. To preserve the property tax exemption, the disposition will be made through a long term ground lease, in which the land will ultimately be leased to NOIDB, who will sublease the property to the owner as will be more fully described in the mixed finance evidentiary documents. As the anticipated rent for the site is nominal, no net proceeds are anticipated. An allocation of low-income housing tax credits was awarded in late 2006 for the first phase of construction.

The HANO anticipates a portion of the Lafitte site will be developed with homeownership units. This portion of the site will be sold to the homebuyer. HANO should to submit a request to the SAC to amend this disposition request for this disposition activity once more information is known.

The initial planned unit distribution is shown in the table below. The Department acknowledges that these plans are subject to change during the negotiations of the development agreement, and if these plans change, HANO should submit a request to the SAC to amend this disposition approval.

22

### Lafitte – Proposed Redevelopment

| Name | ACC/TAX CREDIT | SECTION 8 PBV | TAX CREDIT ONLY | Homeownership 60% – 80% AMI | Homeownership 80% - 120% AMI | TOTAL |
|---|---|---|---|---|---|---|
| Phase 1 On-Site Rental – Senior | 100 | | | | | 100 |
| Phase 1 On-Site Rental – Family | 176 | | 100 | | | 276 |
| Phase 1 Off-Site Rental - Family | | 192 | | | | 192 |
| Phase 1 On-Site Homeownership | | | | 40 | 140 | 180 |
| Phase 1 Off-Site Homeownership | | | | | 64 | 64 |
| Phase 2 Off-Site Rental | 100 | 232 | | | | 332 |
| Phase 2 Homeownership | | | | | 356 | 356 |
| Total for combined sites | 376 | 424 | 100 | 40 | 560 | 1,500 |

### B.W. Cooper, LA001007 and B.W. Cooper Extension, LA001012

HANO has selected KBK Enterprises (KBKE) and the B.W. Cooper Resident Management Corporation (B.W. CRMC) as the developer for the B.W. Cooper site. Initial plans are to construct approximately 660 new housing units on the Cooper sites. The planned redeveloped site will include a mixed-income residential community comprising approximately one-third market-rate units, one-third low-income housing tax credits units and one-third public housing units. In late 2006, HANO received an allocation of low-income housing tax credits for a 410-unit project at the B.W. Cooper site.

HANO proposed the disposition of B.W. Cooper, LA001007, and B.W. Cooper, LA001012, for the B.W. Cooper I low-income housing tax credit project through a 99-year ground lease with a lease consideration of $10,500,000 of which 10% will be due upon execution of the lease and the remaining 90% will be paid pursuant to the terms of the Promissory Note between HANO and the Owner. Beginning the second year of the lease term an annual rent payment of $10.00 will be due. To preserve the property tax exemption, the disposition will be made through a long term ground lease to NOIDB, who will sublease the property to the Owner as more fully described in the mixed finance evidentiary documents.

The remaining portion of B.W. Cooper will be disposed of to the developer under separate negotiations. HANO should submit a request to the SAC to amend this disposition approval for the remaining portion of the B.W. Cooper sites.

23

The initial planned unit distribution is shown in the table below. The Department acknowledges that these plans are subject to change during the negotiations of the development agreement, and if these plans change, HANO should submit a request to the SAC to amend this disposition approval.

### B.W. Cooper – Proposed Redevelopment

| Name | ACC Only | ACC/Tax Credit | Tax Credit Only | Market Rental | Total |
|------|----------|----------------|-----------------|---------------|-------|
| Cooper I (to be constructed on parts of B.W. Cooper, LA001007, and B.W. Cooper, LA001012) [tax-credit allocation received] | 7 | 147 | 133 | 123 | 410 |
| Cooper II (to be constructed on parts of B.W. Cooper, LA001007 and B.W. Cooper Extension, LA001012) | 0 | 66 | 87 | 97 | 250 |
| Total on Combined Cooper Sites | 7 | 213 | 220 | 220 | 660 |

### St. Bernard, LA001008 and St. Bernard Extension, LA001013

HANO selected a partnership that includes For Kids Foundation (FKF), Columbia Residential (CR), and the Baton Rouge Area Foundation (BRAF) as the developer for the St. Bernard site. Initial plans are to construct 624 new housing units on the St. Bernard sites. The planned redevelopment site will include a mixed-income residential community comprising approximately one-third market-rate units, one-third low-income housing tax credits units and one-third public housing units. In late 2006, the HANO received an allocation of low-income housing tax credits for a 465-unit project at the St. Bernard sites.

HANO proposed the disposition of St. Bernard, LA001008, and St. Bernard, LA001013 for the St. Bernard I low-income housing tax credit project through a 99-year ground lease with a lease consideration of $11,500,000 of which 10% will be due upon execution of the lease and the remaining 90% will be paid pursuant to the terms of the Promissory Note between HANO and the Owner. Beginning the second year of the lease term an annual rent payment of $10.00 will be due. To preserve the property tax exemption, the disposition will be made through a long term ground lease, in which the land will ultimately be leased to NOIDB, who will sublease the property to the owner as will be more fully described in the mixed finance evidentiary documents.

The remaining portion of St. Bernard will be disposed of to the developer under separate negotiations. HANO should submit a request to the SAC to amend this disposition approval for the remaining portion of the St. Bernard sites.

The initial planned unit distribution is shown in the table below. The Department acknowledges that these plans are subject to change during the negotiations of the development agreement, and if these plans change, HANO should submit a request to the SAC to amend this disposition approval.

24

### St. Bernard – Proposed Redevelopment

|  | ACC Only | ACC/Tax Credit | Tax Credit Only | Market Rental | Total |
|---|---|---|---|---|---|
| St. Bernard I (to be constructed on parts of St. Bernard, LA001008 and St. Bernard Extension, LA001013 [tax-credit allocation received] | 7 | 153 | 160 | 145 | 465 |
| St. Bernard II (to be constructed on parts St. Bernard, LA001008, and St. Bernard Extension, LA001013) | 0 | 48 | 48 | 63 | 159 |
| Total on Combined St. Bernard Sites | 7 | 201 | 160 | 208 | 624 |

We concur with HANO's determination that the disposition of these six developments, as outlined above, is in the best interests of the residents and the PHA because HANO has otherwise determined the disposition to be appropriate for reasons that are consistent with the goals of the PHA and the PHA Plan and that are otherwise consistent with the Act.

### Appraisal

HANO submitted an estimate of the Fair Market Value (FMV) of each housing development with the application. The estimates were prepared by Mr. R. Dunbar Argote, MAI, and Mr. Arthur L. Schwertz, independent appraisers. As required by 24 CFR Section 970.19(d), the Department has determined that this method of valuation is acceptable to establish an estimate of the FMV for the subject properties. The estimated FMV for C.J. Peete, LA001002, is $8.5 million; Lafitte, LA001005, is $11.0 million; B.W. Cooper (including LA001007 and LA001012) is $34.3 million; and St. Bernard, LA001008 and St. Bernard Extension, LA001013, are $13.5 million.

### Negotiated Sale

For the C.J. Peete III low-income housing tax credit project, HANO proposed the disposition via a negotiated sale via a 99-year ground lease, with a lease consideration of $10,500,000 and an annual lease payment of $10.00. For the Lafitte site, LA001005, HANO proposed the disposition of the site via a negotiated sale to PCHECP via a 65-year ground lease with a lease consideration of $11,000,000. For the B.W. Cooper I low-income housing tax credit project, HANO proposed disposition via a negotiated sale to KBKE and B.W. CRMC via a 99-year ground lease, with a lease consideration of $10,500,000 and an annual lease payment of $10.00 year for portions of B.W. Cooper Extension, LA001012, and B.W. Cooper, LA001007. For the St. Bernard I low-income housing tax credit site, HANO proposed disposition via a negotiated sale to FKF, CR and BRAF via a 99-year ground lease with a lease consideration of $11,500,000 and an annual lease payment of $10.00 for portions of St. Bernard, LA001008, and St. Bernard Extension, LA0010012. To preserve the property tax exemption, the disposition will

Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 79 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 25 of 31

25

be made through a long term ground lease, in which the land will ultimately be leased to NOIDB, who will sublease the property to the owner as will be more fully described in the mixed finance evidentiary documents.

## Commensurate Public Benefits

An allocation of Low Income Housing Tax Credits were approved for the proposed sites, ensuring that affordable rental units will be constructed for families with incomes at or below 60 percent of area median income. Additional units will be constructed for families with incomes at or below 80% of area median income. The redevelopment plan for C.J. Peete, B.W. Cooper, St. Benard and Lafitte will include 897 units that will be under the Annual Contributions Contract (ACC) and 1,245 will be affordable rental non-ACC units. Therefore, although the negotiated sale price is less than FMV, because of the benefits arising from the negotiated sale, the negotiated sale is in the best interest of the public housing residents and the PHA, and will result in a commensurate public benefit, as required in 24 CFR Section 970.19.

## Use of Proceeds

According to the Office of the Chief Financial Officer, there is no outstanding debt for C.J. Peete, LA001002, Lafitte, LA001005, B.W. Cooper, LA001007, St. Bernard, LA001008, B.W. Cooper Extension, LA001012, and St. Bernard Extension, LA001013. HANO will realize net proceeds from this disposition. In the application, HANO proposes to use the proceeds of sale to leverage funds for constructing affordable rental units that benefit residents of HANO. The Department has determined that this use of proceeds meets the requirements of Section 18(a)(5) of the Act.

## Relocation

At the time HANO submitted its application to the Department, only 30 of the units proposed for demolition were occupied. All 30 of the units that were occupied were located at B.W. Cooper, LA001007. 24 CFR section 970.21(a) only requires HANO to offer comparable housing to the residents of the dwelling units proposed for demolition/disposition that are occupied on the day the application is submitted. However, HANO has indicated that it will offer comparable housing to all residents who were residing in the units proposed for demolition prior to Hurricane Katrina.

In addition, to help alleviate the shortage of affordable housing in New Orleans following Hurricane Katrina, HANO is temporarily making available for occupancy by former HANO residents, approximately 425 units at B.W. Cooper, LA001007, and 196 units at Lafitte, LA001005. These units will be temporarily occupied subject to receipt of necessary regulatory waivers.

HANO has submitted the certification regarding relocation required by 24 CFR Sections 970.21(e) and (f). HANO estimated the relocation cost for the remaining 30 residents at B.W. Cooper, LA001007 to be $20,430.00 (or approximately $681 per family), which includes moving expenses and counseling/advisory services. The funds for relocation are allocated under Section

26

901 funds. In addition, HANO will pay all reasonable moving expenses and counseling/advisory services necessary to permanently relocate the following families into comparable housing: (i) the families who will temporarily occupy the 425 units at B.W. Cooper, LA001007, and the 196 units at Lafitte, LA001005; and (ii) the families who were residing in the developments prior to Hurricane Katrina.

For purposes of 24 CFR Section 970, comparable housing means housing: (1) that meets housing quality standards (HQS); (2) that is located in an area that is generally not less desirable than the displaced resident's original development; and (3) which may include: (i) tenant-based assistance (housing choice voucher); (ii) project-based assistance; or (iii) occupancy in a unit owned, operated, or assisted by the PHA at a rental rate paid by the resident that is comparable to the rental rate applicable to the unit from which the resident is vacating.

Taking into consideration the extenuating circumstances created by Hurricane Katrina, and the subsequent inability to repopulate the developments, the Department has determined that HANO is eligible to apply for tenant protection vouchers for all units planned for demolition that were occupied prior to Hurricane Katrina. HANO should submit its application for such vouchers in response to HUD's current notice outlining the application procedures.

The Department considers comparable housing offered in the form of tenant-based assistance vouchers to be comparable housing only upon the actual relocation of the resident to private housing with that voucher. In interpreting Section 18(a)(4)(A)(iii)(II) of the Act, the Department will consider that its requirements have been satisfied when displaced residents are relocated into private housing with their vouchers, regardless of whether that housing is in New Orleans or in other neighborhoods that are generally not less desirable than the displaced resident's original development.

### Resident Consultation

1. Projects Specific Resident Organizations:  HANO Residents (HANOR)

2. HANO-wide Resident Organization: Resident Organizations (RO)

3. Resident Advisory Board in accordance with 24 CFR, Section 903.13: RAB

24 CFR Section 970.4(a) requires that an application for disposition be developed in consultation with the residents of the developments involved, any resident organization at the developments involved and any HANO-wide organizations that will be affected by the activity.

Using Pre-Katrina mailing addresses as well as FEMA and KDHAP mailing addresses, HANO notified all affected residents, HANOR, RO, and the RAB to attend a consultation meeting on the proposed demolition and disposition of certain HANO public housing properties. The meeting was held on November 29, 2006. HANO allowed all residents and non-residents participants attending the meeting to sign-in and provide comments. Also, HANO made available to residents at this meeting a list of affected properties and a sheet setting forth frequently asked questions and answers.

Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 81 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 27 of 31

27

Over two hundred people attended, including at least three plaintiffs' counsel, and over 70 interested persons from the community including representatives of political, advocacy and community groups and other organizations. In addition, HANO subsequently held a pre-board resident leaders meeting on December 6, 2006. HANO continues to communicate with present and former resident organizations regarding its plans. The HANOR, RO and RAB questions were answered during these meetings. HANO provided, in its application, copies of the notifications and sign-in sheets of these meetings.

In addition, in March, 2007, HANO conducted a series of outreach meetings in several Texas cities – including Houston, San Antonio, Dallas and Fort Worth, among others – for displaced HANO residents. The purpose of the meetings, attended by approximately 500 persons, was to personally and directly meet with residents to tell them that HANO wanted them to come home. Additionally, the meetings provided a forum to outline the travel arrangements and stipends that would be arranged for them to facilitate their return, if they so chose.

Although HANO has directly contacted many public housing residents to determine the number that seek to return to New Orleans, there are differing opinions regarding the number who seek to return. Accordingly, HANO has selected a contractor to conduct an independent third party survey of 100% of former residents, even those who have already returned to New Orleans, to determine their housing preferences.

### Offer for Sale to the Resident Organization

24 CFR section 970.9 requires that HANO provide the resident organization at the development affected by the proposed disposition with the appropriate opportunity to purchase the property proposed for disposition. HANO has not provided such an opportunity here based on the exception found in 24 CFR section 970.9 (3)(ii). That section states that no such opportunity need be provided when the "PHA seeks (the) disposition outside the public housing program to privately finance or otherwise develop a facility to benefit low-income families (e.g., day care center, administrative building, mixed-finance housing under 24 CFR Section 941 subpart F, or other types of low-income housing)." The Department concurs with HANO's determination that it has complied with the requirements of 24 CFR Section 970.9.

### Board Resolution

As required by 24 CFR Section 970.7(13), HANO's Board of Commissioners approved the submission of the application for demolition of the proposed property on December 20, 2006, via Resolution Number 2006-76. The last resident consultation was on December 6, 2006. The consultation with the local government took place on December 12, 2006.

### Mayor/Local Government Consultation

Local government consultations meetings were held between HUD/HANO the Mayor of New Orleans and other City officials to discuss the Agency's proposed demolition and disposition activity as well as other aspects of HANO's PHA plans and recovery initiatives. The

28

consultations meetings were held in Washington, D.C. on December 7, 2006, and in New Orleans on December 12, 2006. As required by 24 CFR Section 970.7 (14), the application package includes a letter of support from the Honorable C. Ray Nagin, Mayor of the City of New Orleans, dated December 14, 2006.

## Replacement Housing

HUD's adoption of 24 CFR section 970.31 eliminated the requirement for one-for-one replacement of public housing units. Therefore, HANO is not required to provide for one-for-one replacement housing, and the Department is under no obligation to fund one-for-one replacement of public housing units.

## Approval

We have reviewed the application and find it to be consistent with Section 18 of the Act, and the implementing regulations, 24 CFR Section 970, including requirements related to resident consultation, relocation and opportunity to purchase the property by the resident organization. Based upon our review and finding that the requirements of 24 CFR Section 970 and Section 18 of the Act have been met, the proposed demolition/disposition, as described in the application and identified below, is hereby approved. The use of proceeds for the leveraging of funds for the construction of affordable rental units is also approved.

| C. J. PEETE, LA001002 Acres: 21.30 | | | |
|---|---|---|---|
| Total Units to be Redeveloped 410 | Less than 80% of Area Median Income | | |
| | **ACC** | **Non-ACC** | **Market Rate** |
| Rental | 154 | 133 | 123 |
| Proposed Acquiring Entity (Rental Units) | **Central City Partners (CCP)** | | |
| Method of Sale | **Ground Lease for 99 Years** | | |
| Lease Price | **Initial payment of $10,500,000.00 then $10 per year** | | |
| Purpose | **The CCP will redevelop the site into a mixed-income residential community.** | | |

| Lafitte, LA001005 Acres: 27.20 | | | |
|---|---|---|---|
| Total Units to be Redeveloped 556 | Less than 80% of Area Median Income | | |
| | ACC | Non-ACC | Market Rate |
| Rental | 276 | 100 | 0 |
| For Sale | | | 180 |
| Proposed Acquiring Entity (Rental Units) | **Providence Community Housing and Enterprise Community Partners** | | |

29

| | (PCHECP) |
|---|---|
| Proposed Acquiring Entity (For Sale Units) | PCHECP |
| Method of Sale | Ground Lease for 65 Years |
| Lease Price | $11,000,000.00 |
| Purpose | The PCHECP will redevelop the site into a mixed-income residential community. |

| B.W. Cooper, LA001007 B.W. Cooper Extension, LA001012 Acres: 50.6 | | | |
|---|---|---|---|
| Total Units to be Redeveloped 410 | Less than 80% of Area Median Income | | |
| | ACC | Non-ACC | Market Rate |
| Rental | 154 | 133 | 123 |
| Proposed Acquiring Entity (Rental Units) | KBK Enterprises (KBKE) and the B.W. Cooper Resident Management Corporation (B.W. CRMC) | | |
| Method of Sale | Ground Lease for 99 Years | | |
| Lease Price | Initial payment of $10,500,000.00 then $10 per year | | |
| Purpose | The KBKE and B.W. CRMC will redevelop the site into a mixed-income residential community. | | |

| St. Bernard, LA001008 St. Bernard Extension, LA001013 Acres: 48.7 | | | |
|---|---|---|---|
| Total Units to be Redeveloped 465 | Less than 80% of Area Median Income | | |
| | ACC | Non-ACC | Market Rate |
| Rental | 160 | 160 | 145 |
| Proposed Acquiring Entity (Rental Units) | For Kids Foundation (FKF), Columbia Residential (CR), and the Baton Rouge Area Foundation (BRAF) | | |
| Method of Sale | Ground Lease for 99 Years | | |
| Lease Price | Initial payment of $11,500,000.00 then $10 per year | | |
| Purpose | The FKF, CP and BRAF will redevelop the site into a mixed-income residential community. | | |

The approval requires that the disposition documents include a clause stipulating that the lease will terminate, if the purpose for which this disposition was approved is not met.

Case 1:07-cv-02231-RWR    Document 4-5    Filed 12/12/2007    Page 84 of 85
Case 2:06-cv-03298-ILRL-ALC    Document 464-2    Filed 09/24/2007    Page 30 of 31

30

The Department acknowledges that although vacant units that have been approved by the Department for demolition and/or disposition are not typically reoccupied, in order to alleviate the severe shortage of affordable housing in New Orleans following Hurricane Katrina, HANO is making available for occupancy by former HANO residents approximately 425 units at B.W. Cooper, LA001007, and 196 units at Lafitte, LA001005. Once HANO identifies which units it will make available for re-occupancy by former HANO residents, HANO will notify the Department.

The Department also acknowledges that HANO is seeking a waiver to permit units (approved for demolition/disposition) that are used for temporary occupancy to continue to be eligible to receive operating subsidy during any such temporary occupancy.

## Operating Subsidy

The demolition of these units will affect HANO's operating subsidy eligibility significantly. HANO was advised to contact the HUD financial analyst in the local Regional/Field Office for additional information. The Field Office must insure that HANO's annual formula characteristics report is updated properly to reflect these changes.

## PIC and Monitoring

The PHA must enter the "actual" dates of demolition directly into the Inventory Removals sub-module in PIC, for Regional/Field Office approval so that the status of the units in PIC is changed to "removed from inventory"

It is the responsibility of the Field Office to monitor this activity based on its latest risk assessment. The Field Office must verify that the actual data is being entered by HANO as the actions occur to ensure the Department is not over paying in operating subsidy, and the Capital Fund formula data is correct. Since this action expects to generate net proceeds, it is the responsibility of the Field Office to verify the funds were used as approved, and HANO's records are adequately clear to support this assertion.

In accordance with 24 CFR § 970.35, HANO is required to inform the Field Office of the status of these developments approved for demolition/disposition (i.e., delays, actual disposition or other problems). When the demolitions/disposition are complete, please submit a report to the Field Office confirming the action and certifying compliance with all applicable requirements. Files must be maintained which are sufficient for audit purposes and must be made available upon request.

Once this transaction is entered and an application is approved in PIC, HANO must enter the "actual" dates of disposition directly into the Inventory Removals sub-module of PIC for approval by the Field Office so that the status of the units in PIC is changed to "removed from inventory." For land, the disposition dates and number of acres should also be recorded by HANO in the Inventory Removals sub-module, after this feature is made operational in PIC in an upcoming release. This applies to the disposition of vacant land as well as to land with public housing units.

31

Upon completion of disposition, the Regional/Field Office has the responsibility to amend the Annual Contributions Contract and/or to release the parcel from the Declaration of Trust, as applicable, and update PIC to reflect the approved action as appropriate.

# EXHIBIT I

1

1

2                    HOUSING AUTHORITY OF NEW ORLEANS
                        DEMOLITION AND DISPOSITION
3                    RESIDENT CONSULTATION MEETING
                                  ON
4              PROPOSED DEMOLITION/DISPOSITION ACTIVITY

5                    WEDNESDAY, NOVEMBER 29, 2006
                 JOHN MCDONOGH HIGH SCHOOL AUDITORIUM
6                     2462 ESPLANADE AVENUE

7               BEGINNING AT APPROXIMATELY 6:00 P.m.
                 ENDING AT APPROXIMATELY 9:00 p.m.
8

9

10

11

12

13

14

15

16

17

18

19

20   REPORTED BY:

21   Rochelle Billings
     Certified Court Reporter
22   Alliance Reporting, Inc.
     4919 Canal Street, Suite 303
23   New Orleans, Louisiana 70119

24

25

2

1                          I N D E X

2

3    INTRODUCTION & OPENING REMARKS              3
     By:  C. Donald Babers
4

5    OUTLINE OF AGENDA & MEETING FORMAT          6
     By:  Darren Martin
6

7    PLANNED REDEVELOPMENT &
     PROPOSED DEMOLITION
8    AND DISPOSITION ACTIVITY
     SECTION 106 PROCESS                        11
9    By:  Judith Moran

10

     FREQUENTLY ASKED QUESTIONS                 19
11   By:  Dorian Rawles

12

     RESIDENT CONSULTATION & COMMENT PERIOD     23
13   BY:  Darren Martin and HANO residents &
     community stakeholders
14

15   CLOSING & MEETING SUMMARY                 136
     By:  C. Donald Babers
16

17

18

19

20

21

22

23

24

25

3

1          MR. BABERS:

2                  Good evening.  Could I get

3      everyone's attention, please?  Before we get

4      started, I'm going to ask Reverend Galatis if

5      she would come up and lead us in a brief word of

6      prayer, please.

7                          (PRAYER)

8          MR. BABERS:

9                  Thank you, so much.  Good evening.

10     My name is Donald Babers.  And I serve as

11     president chairman of the board of commissioners

12     for the Housing Authority of New Orleans.  Thank

13     you for taking time this evening to attend this

14     meeting.  I welcome you here to discuss the

15     proposal HANO and HUD have for redeveloping

16     HANO's public housing inventory.

17                 Let me make it clear, we want our

18     families back home.  I am sure you are aware,

19     after reviewing the conditions of residents of

20     HANO's public housing developments both before

21     and after Hurricane pre-Katrina, HANO has

22     proposed to demolish four of its major public

23     housing developments and replace them with

24     contemporary mixed-income housing.

25

4

```
1              We have met with the resident
2    leadership on several occasions and recognize
3    the importance of sharing information with all
4    of our customers and community stakeholders,
5    which is the purpose for our presence this
6    evening.  Tonight, we have several members who
7    will briefly describe the current proposal for
8    C.J. Peete, B.W. Cooper, St. Bernard, and
9    Lafitte, as well as proposal for the next phases
10   of Fischer, Guste and some of our Scattered Site
11   properties.
12             We also have staff that will
13   address return and relocation payments, the
14   opportunity to retrieve your belongings from
15   your former housing unit, the opportunity to
16   return to your housing development once it is
17   rebuilt, and housing assistance that is
18   available to you while we are rebuilding your
19   site.  This is very important information about
20   opportunities and assistance that exist in order
21   to remove some barriers that may be preventing
22   you from returning home.
23             Additionally, we have been
24   authorized to work with landlords to resolve
25
```

5

1   lease issues that may be an obstacle to your

2   return home.  We have increased the market rate

3   of our voucher program by 35 percent.  In order

4   to ensure program participates can compete with

5   every person seeking housing, again, let's me

6   say we do want our families back home as soon as

7   possible.

8            Following these presentations by

9   staff, we will open up the floor to hear your

10  comments.  Your opinion does matter to us.  At

11  this point our job is to listen.  In order to

12  give everyone an opportunity to speak, we will

13  forego a question-and-answer format, but instead

14  record all your comments for review after this

15  meeting.  Let me assure you that every

16  consideration will be given to suggestions that

17  can be incorporated into our agency's plan.

18  Therefore, please be sure you have completed and

19  turned in a comment card if you wish to speak.

20            I thank you for your coming, and

21  look forward to our continued meetings in the

22  next several months.  And at this time I want to

23  turn the meeting over to Darren Martin, who will

24  be discussing tonight's agenda and our meeting

25

6

1    format.

2         MR. MARTIN:

3              Thank you, Mr. Babers.  Good

4    evening everybody.  Good evening everybody.

5    There you go.

6              I'm a New Orleans resident.  It's

7    a great -- it's an honor and a privilege to be

8    before you guys.  Before we get started, let's

9    get the RSD and Principal Jackson a round of

10   applause for allowing us to be at the John

11   McDonogh High school.

12             There's a lot of people criticized

13   RSD and, et cetera, and I won't go into that.

14   But this is something that they stepped up to

15   the plate that they know we needed a centralized

16   location.  And, also, the Housing Authority has

17   adopted John McDonogh High School.  We would

18   love to have the media here when we come to

19   mentor to the kids talking about positive

20   choices, several esteem, and et cetera.  Guess

21   what?  Our kids have a future, and that's what

22   it's about here today.

23             Let me share this with you.  I

24   vacated to Houston, Texas.  And upon us coming

25

7

1   back with our plans to rehash and develop our

2   housing, we opened up Iberville first.  If you

3   would have saw some of the looks when I told

4   people in those meetings that we're opening up

5   Iberville, if looks could kill, I would be dead.

6   Plain and simple.  There was sentiment in this

7   city that didn't want us to come back.

8            And I guess you say, "Why you

9   talking about us?  You got on a HANO shirt."

10  The residents know who works with them.  The

11  residents know who cares about them.  HANO staff

12  has been there in Houston, Atlanta, Baton Rouge,

13  et cetera.  We were there.  We represented the

14  city in the DRV and everywhere else.

15           I'm a bit emotional, so I don't

16  know why they got me here.  All right.  I'm here

17  for a purpose.  We care about the residents.

18  HANO is the face of affordable housing.

19           Let me tell you something about

20  Mr. Babers.  All right?  Because I wrote some

21  thing down.  Mr. Babers committed housing for

22  our residents.  And not just housing, jobs.

23  Jobs for the residents.  As we speak, we're

24  employing our residents.  So we're giving them

25

8

1    housing and we're giving them jobs to make a

2    better living for them selves.  And the key

3    point about this, we've got to agree to

4    disagree.

5                HANO and HUD doesn't have all the

6    answer.  We're not perfect.  The major crux of

7    this meeting is to listen to you guys.  Your

8    input counts.  Trust us in that.  I trust

9    Mr. Babers.  He has a direct line to Washington,

10   D.C.

11               So with that being said, the

12   ground rules for tonight.  Any person who

13   desires to speak at the microphone must sign the

14   list.  We will go from the list.  Our first

15   priority is the HANO residents.  Please don't

16   get discouraged by that.  We will call a HANO

17   resident and a concerned citizen.  All right?

18               Approximately about 8:30, if we're

19   running out of time, we're going to basically

20   limit it to HANO residents.  That's our first

21   priority.  Now, trust me.  HANO wants to hear

22   from everyone.  But our first priority is taking

23   care of our residents.  But you must sign the

24   comment card regardless.

25

9

1            Okay.  This is the agenda.  Now,

2    we just will introduction by Mr. Donald

3    Babers.  My name is Darren Martin.  I'm the

4    governmental liaison.  Planned and redevelopment

5    and proposed demolition and disposition

6    activity, that would be Judy Moran, director of

7    development.  Frequently asked questions, that

8    will be Mr. Dorian Rawles our deputy director.

9    Resident consult -- resident comment period,

10   that would be HANO residents and community

11   stakeholders.  And we'll close with Mr. Donald

12   Babers.

13            So without any further adieu,

14   we'll get on with the program.  So Judy.

15       UNIDENTIFIED SPEAKER:

16            I have a question.

17       MR. MARTIN:

18            We're not entertaining questions

19   at this time.

20       UNIDENTIFIED SPEAKER:

21            But I have a question, any way.  I

22   want to know this before we get into the horse

23   and pony show.  Is this about hearing what the

24   residents want in lieu of doing something?

25

10

1    MR. MARTIN:

2         I'm glad you asked that.

3    UNIDENTIFIED SPEAKER:

4         Or you going to demolish

5    everything any way?  You just want to hear it

6    then but tell them, we listen so go tear it

7    down.

8    MR. MARTIN:

9         Okay.  I understand that.  I'm

10    entertain this one question, because --

11    UNIDENTIFIED SPEAKER:

12         You said in the newspaper that you

13    done already decided to demolish everything.

14    Why you got something on the thing about

15    demolition?  You just want to come here and go

16    tell the judge in the courthouse, we had a

17    meeting, we had --

18    MR. MARTIN:

19         Okay.  We understand that.

20    We understand the sentiment.  Okay.  And your

21    question -- your question is duly -- no.  Your

22    question is duly noted.  We're going to go along

23    with our agenda.  And those issues we will

24    listen to each one of those issues.

25

11

```
1           UNIDENTIFIED SPEAKER:

2                I got a motion.  I motion that you

3    change the agenda to hear the people first and

4    then y'all talk.

5                     (APPLAUSE)

6           UNIDENTIFIED SPEAKER:

7                Instead of y'all talk first, y'all

8    listen to us, then y'all can talk.

9        MR. MARTIN:

10               Okay.  That comment is duly noted.

11   But we will stick with the program and the

12   agenda as is stated.

13               Okay.  Right now we're having Ms.

14   Judy Moran.  Thank you all.

15       (AUDIENCE CHANTING:  "PEOPLE FIRST")

16       MR. MARTIN:

17               As stated, we will be sticking

18   with the agenda as planned.  So if y'all would

19   have a seat so we can get started.  And you

20   definitely will be heard from.

21       (AUDIENCE CHANTING:  "PEOPLE FIRST")

22       MS. MORAN:

23               Can I have your attention, please?

24   We would like to present our vision to you so

25
```

12

```
 1   that you would have something to comment on.

 2        MR. MARTIN:

 3            Okay.  At this point, we will --

 4   residents, we understand your sentiments.  We

 5   would love for you to have a seat so we can

 6   proceed with our agenda.  Thank you.

 7     (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

 8        MR. MARTIN:

 9            The agenda will proceed as

10   planned.  Each resident will have enough time at

11   the set time.

12     (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

13        MR. BABERS.

14            Let me just say that you-all are

15   cutting into the time of the residents being

16   able to have that time to speak.  We have a set

17   agenda.  And we're going follow the agenda.

18     (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

19        MR. BABERS:

20            I think you need to know what the

21   plan is, primarily, before you can speak on the

22   plan.

23     (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

24        MR. BABERS:

25
```

13

1           You know the meeting -- at nine

2    o'clock -- we have the auditorium until nine

3    o'clock; so if you-all want to be disruptive,

4           UNIDENTIFIED SPEAKER:

5           Have you ever lived in the housing

6    project?  Have you ever lived in a housing

7    development?  The Mayor said he seen one unit

8    and that's it.  Have you seen him anymore?

9           AUDIENCE:

10          No.

11          UNIDENTIFIED SPEAKER:

12          Anybody heard from him?

13          AUDIENCE:

14          No.

15          UNIDENTIFIED SPEAKER:

16          We have a predetermined solution.

17    Get rid of him.

18          MR. BABERS:

19          At this time, Judith Moran will be

20    our next speaker.

21       (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

22          MS. MORAN:

23          I would like to present to you the

24    vision that HANO has for redevelopment of this.

25

ROCHELLE L. BILLINGS, C.C.R.
ALLIANCE REPORTING, INC.
(504) 488-6624

14

```
1    HANO is proposing to transform its housing sites
2    into mixed-income communities.  That leaves
3    5,000 units, 3,000 being public housing units.
4    We would like to show you evidence of what we've
5    done with other sites:  Fischer redevelopment,
6    the New Desire, and New River Garden.
7        (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)
8        MS. MORAN:
9            We have proposed to redevelop some
10   additional sites; that being C.J. Peete, B.W.
11   Cooper, St. Bernard, Lafitte, Tchopitoulas,
12   Maisant Royal.
13       PASTOR GALATIS:
14           Excuse me everyone.  Would you-all
15   please just listen.  Listen to me one minute.
16   No.  Just listen one minute.  I'm not against
17   you.
18       (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)
19       MR. BABERS:
20           Could we please get your
21   attention, please?  May we get your attention,
22   please?  It is very important that we move the
23   agenda forward.  There are many individuals that
24   are here that would like to hear what we have to
25
```

15

1   say.

2       (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

3           MR. BABERS:

4               Okay.  We're going to move forward

5   with our agenda.  I would appreciate if you-all

6   would give us your attention so we can move our

7   agenda forward.

8               Sir, please sit down.  Thank you

9   very much for your attention.

10          MS. MORAN:

11              I will go quickly.  In order to

12  move forward with any proposed plan, our

13  visions.  We are required and desire to have

14  resident meetings.  We anticipate holding

15  charretts.  We have a design and a financing

16  process to go through.  We have to discuss a

17  relocation plan.  We have demolition and

18  disposition activities to discuss, which are the

19  major subject for tonight's meeting.  We have

20  infrastructure construction, housing

21  construction, and, ultimately, new occupancy, as

22  a part of the vision that we have planned for

23  the new site.

24              At this time, it is upon us to

25

16

1    receive HUD approval of certain activities that

2    we have outlined in the vision.  The first and

3    foremost being that of demolition and

4    disposition applications, which, again, is the

5    primary subject for tonight's meeting.  We

6    welcome and are required to have resident

7    comments and resident involvement in any

8    relocation and demolition plan.  As a part of

9    this plan, you are also required to do

10   environmental assessments, which we're in the

11   middle of doing.  And because certain sites are

12   either historical in nature or have the

13   potential to be historical or maybe adjacent to

14   historical properties, we have to do an extra

15   step of a 106 consultation with historic

16   preservation officers.

17          The demolition disposition

18   process, which is what we're here to talk about,

19   requires resident consultation, which is

20   tonight's meeting.  It requires that we would

21   consider your comments.  You will be given

22   further instructions tonight on your comment

23   period.  It requires board action.  At this time

24   we're scheduled to take the approval process of

25

17

1    the demolition disposition application to our

2    HANO board on December 7.  It requires

3    completing an environmental review record, which

4    also happens for the cases of C.J. Peete, B.W.

5    Cooper, St. Bernard, and Lafitte.  It requires

6    consultation with the historic preservation

7    community on those buildings.  And, finally, the

8    demolition disposition application process

9    requires HUD approval.

10           The plans for C.J. Peete, that are

11   proposed to you tonight includes developing 50

12   units.  That has already been funded for the

13   portion of the site and the demolition of the

14   balance of the site.

15      (AUDIENCE MEMBERS SPEAKING SIMULTANEOUSLY)

16        MS. MORAN:

17           The plan for St. Bernard includes

18   the proposed demolition of the units that are on

19   the site as well as the redevelopment of 465

20   units.

21           The plan for B.W. Cooper includes

22   the development of 410 units, proposed

23   demolition and proposed disposition.

24           The plan for Lafitte includes the

25

# EXHIBIT J

## HANO DEMOLITION & DISPOSITION MATRIX

| Development Name | Develop-ment Number | Activity Type | App Status | Approved, Submitted, Projected Submission | Number of Units | Start | End | Total Subject Props 2B Demolish-ed | Unit Count & Resource Details Supplied in RFQ |
|---|---|---|---|---|---|---|---|---|---|
| 1392 Eagle (2), 1415 General Ogden (2), 1925 Monroe (4), 8725 Plum (2), 9031 Cohn (land), 8729 Plum (land), 1342 Alabo (2), 1501, 1505, 1509, 1513 Benton (8), 1329 Charbonnet (2), 1301 Gordon (2), 1340 Gordon (2), 1424 Gordon (1), 1514 Gordon (2), 1531 Gordon (2), 1416 Lamanche (1), 6000 N. Robertson (2), 6112, 6116 N. Robertson (2), 6301,6309, 6317 N. Robertson (6), 1300 Tupelo (2), 1415 Tupelo (2), 5520 Urquhart (4), 6318 N. Villere (2), 400 Dufossat | LA1-19 | D&D | Planned App | 12/1/2005 | 53 | 2005 | 2007 | | |
| 1400, 1408, 1416, 1424, 1432, 1440 Gen Ogden | LA1-04 | D&D | Planned App | 11/1/2006 | 24 | 2006 | 2007 | | |
| 1433 Gen Ogden | LA1-19 | D&D | Planned App | 11/1/2006 | 4 | 2006 | 2007 | | |
| 1504 Alabo (2), 1423, 1425 Benton, 1410 Caffin (2), 1436, 1440 Caffin (4), 1331 Charbonnet (2), 5600 Claiborne (2), 5718 Claiborne (2), 1318 Gordon (2), 1308 Tupelo (2) | LA1-52 | D&D | Planned App | 12/1/2006 | 22 | 2006 | 2007 | | |
| 1866, 1874 Miro, 2114 Allen, 1821 Galvez | LA1-31 | D&D | Planned App | 12/1/2006 | 16 | 2006 | 2007 | | |
| 2601,2609, 2615,2621,2627,2635,2641 Delery, 6422 Florida, 2600,2608,2614,2620,2626,2634,2640 Dubreuil, 2621 Law | LA1-18 | D&D | Planned App | 12/1/2006 | 32 | 2006 | 2007 | | |
| 2901 Dryades (4), 3013 Mandeville (2) | LA1-51 | D&D | Planned App | 12/1/2006 | 6 | 2006 | 2007 | | |
| 3249 Tchoupitoulas, 410 Pleasant, 3250 St. Thomas | LA1-25 | D&D | Planned App | 11/1/2006 | 22 | 2006 | 2007 | | |
| 4346, 4559, 4526, 4556, 4726, 4750, 4807, 4814, 4839, 4900, 4901, 4910, 4911, 4920, 4921, 4925, 4930 America (34), 4901, 4911 Dale (N), 4814, 4825, 4827, 4834, 4842 Ray (10) | LA1-26 | D&D | Planned App | 12/1/2006 | 48 | 2005 | 2007 | | |

DDMatrix12.9
11.25.2006

## HANO DEMOLITION & DISPOSITION MATRIX

| Development Name | Develop-ment Number | Activity Type | App Status | Approved, Submitted, Projected Submission | Number of Units | Start | End | Total Subject Props 2B Demolish-ed | Unit Count & Resource Details Supplied In RFQ |
|---|---|---|---|---|---|---|---|---|---|
| 4811, 4815 Marais (8), 1740 Poland (4), 1830 (4) | LA1-36 | D&D | Planned App | 12/1/2006 | 16 | 2005 | 2007 | | |
| 518 Cadiz(3), 1000,1008, 1016 Melpomene (21), 517 Robert (2), 930 Seventh (3), 2417 St. Thomas (2), 3318 Danneel (4), 428 7th (land), 2400 St. Thomas (2), 2411 St. Thomas (land), 1120 Thalia (land), 2023 Robertson (4), 2427 Ursuline (3), 3121 Gravier (2), 1915 Feliciana (2), 1227, 1233, 1239 Abibo (10), 1060, 1804, 1808 Gordon (6), 1927 Mandeville (2), 1319 Montegut (16), 1615 Port (4), 4827 N. Rampart (4), 1111 Reynes (4), 1016, 1022, 1028, 1094 Tenessee (12), 1751 Tupelo (2), 4322, 4326, 4432, 4448, 4563, 4556, 4860 America (14), 6662, 6670, 6678, 6688 Chef Menteur & 6601, 6609, 6617, 6541, 5649 Old Gentilly (32), 4860 Wilson (2), 2405 Charbonnet (land) | LA1-25 | D&D | Planned App | 12/1/2006 | 174 | 2006 | 2007 | | |
| 5335,5337 St. Claude | LA1-23 | D&D | Planned App | 12/1/2006 | 21 | 2006 | 2007 | | |
| 610 Lessops (6), 2123 Painters (6) | LA1-21 | D&D | Planned App | 12/1/2006 | 12 | 2006 | 2007 | | |
| B.W.Cooper | LA1-07 | Demoli-tion | Approv-ed | 4/1/2003 | 118 | 2006 | 2007 | | 55 acres, $7MM LIHTC; $27MM CDBG (for 410 Units) (plus 250) (MINUS 814 Units) |
| B.W.Cooper | LA1-12 | Demoli-tion | Approv-ed | 4/1/203 | 234 | 2006 | 2010 | | |
| B.W.Cooper | LA1-07 | Demoli-tion | Planned App | 10/6/2006 | 564 | 2006 | 2009 | | |
| B.W.Cooper | LA1-12 | Demoli-tion | Planned App | 10/6/2006 | 558 | 2006 | 2010 | 1474 | |
| C.J.Peete | LA1-02 | Demoli-tion | Approv-ed | 8/9/1997 | 202 | 2006 | 2007 | | 41 acres, 2006: 50 units plus community center ($19MM includes LIHTC); 2007: $7.3MM LIHTC; $27MM CDBG for 410 units (MINUS 263 Units) |
| C.J.Peete | LA1-02 | Demoli-tion | Planned App | 10/1/2006 | 521 | 2006 | 2007 | 723 | |

DDMatrix:12.9
11.25.2006

## HANO DEMOLITION & DISPOSITION MATRIX

| Development Name | Development Number | Activity Type | App Status | Approved, Submitted, Projected Submission | Number of Units | Start | End | Total Subject Props 2B Demolished | Unit Count & Resource Details Supplied in RFQ |
|---|---|---|---|---|---|---|---|---|---|
| Christopher Park | LA1-30 | D&D | Planned App | 12/1/2006 | 54 | 2006 | 2007 | | |
| Fischer | LA1-16 | Demolition | Approved | 4/1/2003 | 180 | 2006 | 2007 | | |
| Guste | LA1-15 | Demolition | Approved | 4/1/2003 | 228 | 2006 | 2008 | | |
| Imperial Drive | LA1-22 | Demolition | Planned App | 8/5/1997 | 8 | 2006 | 2007 | | |
| Lafitte | LA1-5 | D&D | Planned App | 10/8/2006 | 896 | 2006 | 2007 | | |
| Press Park | LA1-32 | D&D | Planned App | 12/1/2006 | 56 | 2006 | 2007 | | |
| St. Bernard | LA1-08 | Demolition | Approved | 8/21/1996 | 43 | 2006 | 2007 | | 52 acres; $7MM LIHTC, $27MM CDBG for 465 Units (plus 169) (MINUS 802 Units) |
| St. Bernard | LA1-13 | D&D | Planned App | 10/8/2006 | 720 | 2006 | 2007 | | |
| St. Bernard | LA1-8 | Demolition | Planned App | 10/8/2006 | 671 | 2006 | 2007 | 1436 | |
| TOTAL TO BE DEMOLISHED | | | | | 3453 | | | | |
| Fischer | LA1-16 | Disposition | Approved | 11/24/2004 | 180 | 2005 | 2008 | | |
| Guste | LA1-15 | Disposition | Approved | 10/18/2005 | 228 | 2005 | 2009 | | |
| C.J.Peete | LA1-02 | Disposition | Planned App | 38991 | 723 | 2006 | 2007 | | |
| C.J.Peeta | LA1-10 | Disposition | Planned App | 38996 | 0 | 2006 | 2007 | | |
| B.W.Cooper | LA1-07 | Disposition | Planned App | 38996 | 682 | 2006 | 2010 | | |
| B.W.Cooper | LA1-12 | Disposition | Planned App | 38996 | 792 | 2006 | 2010 | | |
| St. Bernard | LA1-8 | Disposition | Planned App | 38996 | 716 | 2006 | 2007 | | |
| 2318 Chipewa | LA1-25 | Disposition | Planned App | 12/1/2006 | 6 | 2005 | 2007 | | |
| 2930-32 Dryades | LA1-25 | Disposition | Planned App | 12/1/2006 | 12 | 2005 | 2007 | | |
| 4324 Gen Ogden | LA1-25 | Disposition | Planned App | 12/1/2006 | Land | 2005 | 2007 | | |
| TOTAL FOR DISPOSITION | | | | | 3339 | | | | |

# EXHIBIT K

Case 1:07-cv-02223-RWR Document 4-6 Filed 12/12/2007 Page 24 of 78

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities
Web site at **http://www.hud.gov/news/release.cfm?CONTENT=pr07-030.cfm**.



# News Release

**HUD No. 07-030**
**Donna White**
**(202) 708-0685**
www.hud.gov/news/

**For Release**
**Wednesday**
**March 28, 2007**

---

**HOUSING AUTHORITY OF NEW ORLEANS BOARD APPROVES FIRMS TO PLAN THE
REDEVELOPMENT OF ST. BERNARD, C.J. PEETE, B.W. COOPER**

NEW ORLEANS - A collaboration of experienced, mixed-income housing developers
and local non-profits organizations have been selected to plan the redevelopment
of New Orleans' damaged public housing communities at St. Bernard, C.J. Peete
and B.W. Cooper. The announcement was made today at the Housing Authority of
New Orleans (HANO) board meeting.

"Secretary Jackson has said that every family who wants to come home to New
Orleans should be given the opportunity to come back to quality housing in safe
neighborhoods," said C. Donald Babers, the HUD-appointed HANO Board. "We
believe these teams can make it happen. Each of these teams have a solid track-
record of developing mixed-income housing communities and working well with
residents."

HANO approved the following teams to begin planning the redevelopment of the
public housing properties.

- Planning the redevelopment of St. Bernard will be a partnership team that
  includes the Fore! Kids Foundation, Columbia Residential and the Baton
  Rouge Area Foundation
- An alliance of firms will partner under the name Central City Partners will
  plan the redevelopment of C.J. Peete, The partners - McCormack Baron
  Salazar and KAI Design & Build - will form Peete Redevelopment LLC, to
  partner with the New Orleans Neighborhood Development Collaborative.
- KBK will partner with B.W. Cooper Resident Management Corporation to plan
  the redevelopment of B.W. Cooper.

These developer teams were selected from a pool of qualified firms that responded
to three separate requests for qualifications (RFQs) that HANO issued last October.
The three highest ranked teams were selected from a total of 11 different
applicants, with some teams proposing for more than one site. In addition to
demonstrating technical and financial capacity, the teams were required to show
their experience in the development of multi-family, mixed-income communities
using complex financing strategies, involving funding sources such as Low-Income
Housing Tax Credits. Each team was also required to demonstrate evidence of
their ability to integrate community and supportive services into the development
and management of mixed-income communities.

HUD announced in June 2006 that it would redevelop C.J. Peete, B.W. Cooper,
Lafitte and St. Bernard, to make way for revitalized mixed-income communities
that would include public housing, affordable market-rate housing as well as
market-rate single-family homes. This concept of affordable housing has
eliminated concentrations of poverty in cities like Atlanta, Washington, D.C. and
Boston. These four public housing communities suffered moderate to severe

damage rendering a majority of them uninhabitable.

In August last year, HUD approved a public-private alliance between HANO, Providence Community Housing and Enterprise Community Partners to plan the redevelopment of the Lafitte public housing property. This will include providing more affordable housing opportunities in the surrounding Treme, Tulane and Gravier neighborhoods. For nearly a year, the partners have worked closely with Lafitte residents and community leaders to plan the new community.

HUD is the nation's housing agency committed to increasing homeownership, particularly among minorities; creating affordable housing opportunities for low-income Americans; and supporting the homeless, elderly, people with disabilities and people living with AIDS. The Department also promotes economic and community development, and enforces the nation's fair housing laws. More information about HUD and its programs is available on the Internet at www.hud.gov and espanol.hud.gov.

*For more information about the selected firms see the attached Fact Sheet*

###

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112  Find the address of a HUD office near you

# EXHIBIT L

# Duvernay ✚ Brooks LLC

210 ELEVENTH AVENUE, SUITE 404  NEW YORK, NEW YORK 10001  PHONE: 646 230-0551  FAX: 646 230-0552

# M E M O R A N D U M

**Date:** January 4, 2007

**To:** Gerry Barousse

**From:** Marc Norman

**CC:** Noel Kahlil

**Re:** St. Bernard Financing Narrative

The team has put together preliminary projections for the financing of Phase I of St. Bernard. As stated in our proposal we believe that any plan for St. Bernard needs to address the wider neighborhood and address the deficiencies and lack of community and supportive services that exist in the greater St. Bernard neighborhood. To this end, we have crafted a financing plan for the 465 units which leverages the CDBG and tax credit equity in order to provide funding for larger neighborhood initiatives.

The development of our financing plan for the 465 units were modeled to conform to HANO's RFQ requirements.

| | |
|---|---|
| Total Public Housing Tax Credit Units | 153 |
| Total Tax Credit Units | 160 |
| Total Market Rate | 145 |

In financing these units we have assumed that the development will be built with a mix of tax credits, CDBG, Federal Home Loan Bank affordable housing grant funds and conventional mortgage debt. The table below lists the sources and uses of funds in a summary fashion.

Understanding that public housing units cannot support long-term debt, we have leveraged conventional financing supported by LIHTC and market rate rental income. Under the scenario we have developed we do not contemplate using neither the entire CDBG allocation, nor the full tax credit allocation for the 465 units. Total CDBG we see allocated to this phase totals $25.1 million, while equity totals $42.6 million. This equity amount equates to $4.7 million in annual allocation. We contemplate that these funds will leverage $6.5 million in conventional debt as well as $1 million in Federal Home Loan Bank affordable housing grant funds. It is assumed that demolition, site preparation and infrastructure costs will be funded outside of the residential development structure.

## Project Summary Phase I Residential Development

### Permanent Sources

| | |
|---|---|
| Private 1st Mortgage | $6,502,128 |
| Authority Capital Funds | $0 |
| New Market Tax Credit Equity | 0 |
| LHFA Flexible CDBG | 25,126,785 |
| Federal Home Loan Bank AHP | $1,000,000 |
| Low-Income Housing Tax Credit Equity | $42,610,846 |
| **Total Sources** | **75,239,759** |

### Permanent Uses

| | |
|---|---|
| Hard Costs | $57,648,077 |
| Soft Costs | $11,084,389 |
| Developer's Fee | $6,507,293 |
| **Total Uses** | **75,239,759** |

While our detailed financing proposal focuses specifically on the Phase I rental component, we are prepared to use various grant sources, new market tax credits and tax exempt bonds as necessary to complete a wider revitalization of the St. Bernard neighborhood. Our goal in this preliminary financing plan is to create the opportunity for additional public housing, tax credit and market rate units in the same proportions are stated in the RFQ documents. It is our assumption that projections will be refined as the development process progresses. The extraordinary amount of experience our team brings in the area of mixed finance, mixed income housing development will ensure success in this endeavor.

# EXHIBIT M

# St. Bernard Tenants Proposal
## Submission to HUD/HANO
## November 2007

I.      Introduction

II.     The Team

- St. Bernard Housing Recovery & Development Corporation
- AFL-CIO Housing Investment Trust
- AFL-CIO Investment Trust Corporation

III.    Financing Proposal

IV.     Explanation of Limited Equity Cooperatives

V.      Design Concepts and Physical Plan

VI.     Comprehensive Neighborhood Redevelopment

VII.    Tenant Outreach Plan

VIII.   Exhibits

# Introduction

This proposal is presented by the St. Bernard Housing Recovery & Development Corporation, Inc. ("St. Bernard HRDC"), on behalf of the tenants of St. Bernard, in collaboration with the AFL-CIO Housing Investment Trust (HIT) and the AFL-CIO Investment Trust Corporation (ITC).

Since Hurricane Katrina struck New Orleans over two years ago, we, the tenants of St. Bernard, have been turned out of our homes—forced to live as internally displaced persons in distant cities, doubled up with relatives or in temporary housing. This is not merely wrong—it is a violation of the public housing laws of the United States. Those laws grant tenants multiple rights to participate in the process of the redevelopment of the public housing in which they live. HUD and HANO have trampled these rights. Cast out by both the storm and our own government, we have organized and worked together to develop this proposal for the redevelopment of St. Bernard—doing by ourselves what the law required of HUD and HANO.

On August 29th, 2005, Hurricane Katrina displaced the residents of 866 units at St. Bernard. Two years later, the residents of St. Bernard still have not been allowed to return home, regardless of whether our individual units had been made less habitable by the storm. Worse, public housing units that were "acceptable" prior to the storm are now uninhabitable because of the negligence of HANO.

Instead of working rapidly and efficiently to restore residents to their homes, the response of HUD and HANO is an international scandal. These agencies, working in concert, have used the Hurricane Katrina disaster as an opportunity to make sweeping changes to HANO's inventory of public housing and in so doing to change the complexion of New Orleans. It is no accident that a recent report of the Brookings Institution reports that those driven out by Katrina were "younger, poorer, more likely to be black, and more likely to have children."[1]

St. Bernard HRDC was founded in April 2007 by the residents of St. Bernard as a vehicle to organize together and work formally with other community groups and/or prospective developers interested in working with us to realize our goal of redevelopment and rehabilitation of St. Bernard. St. Bernard HRDC has set the following goals:

> ➢ To allow the return of all residents to their homes immediately without massive demolition and redevelopment;

---

[1] The Brookings Institution reports that the number of black students in the City is proportionately shrinking. African-American communities that were economically depressed before the hurricane have been hit the hardest. Two years after the storm many children are still plagued by the trauma of their horrific experiences of survival in the aftermath of the storm. "Katrina's Children—A Call to Conscience and Action," prepared in March 2007 by the Children's Defense Fund, found that more than 100,000 children still do not live where they did when the hurricane struck. Tens of thousands of children suffer from disorientation and isolation.

> To be actively involved in the planning phase of any redevelopment effort, including the right of first refusal to any sale of the property;
> To be actively involved in the redevelopment management and ownership opportunities;
> To ensure there is a legitimate chance for all tenants at the time of the storm to return to St. Bernard; and
> To ensure there is a legitimate chance to obtain the job training and jobs that will be created through redevelopment, i.e., the so-called HUD section 3 requirements.

The St. Bernard HRDC is a not-for-profit open to all residents of St. Bernard at the time of the storm. Non-residents may not be members. It meets regularly and has actively solicited support and technical assistance from numerous groups and professionals whose interests are aligned with ours, including HIT and ITC. These groups have worked with us to assist us in developing a comprehensive plan for the redevelopment of St. Bernard that will meet our needs as tenants to return home to a vibrant, sustainable community—with safe, affordable housing and appropriate support services, including job training, health services, childcare and youth programs.

Our proposal is set forth in detail in the following pages. It stands in stark contrast to the Columbia proposal, which we believe was approved in contravention of federal law and which is no more than an abusive land grab, in which private interests use Katrina to carry out an economic development agenda that pre-existed the storm. Instead of demolishing units of public housing, our plan will preserve access to public housing units at pre-storm levels. This is a key difference, because under the HUD/HANO/Columbia plan the majority of the redeveloped units will likely be market rate under the prevailing "mixed income" public housing development model, so that less than half of the already reduced number of redeveloped units will be considered "affordable." Add to that the wide latitude developers have in setting criteria for the "affordable" units and New Orleans will wind up with new federally subsidized public housing developments that house middle class people and few to none of the public housing residents displaced by the storm.[2]

The St. Bernard tenants were not consulted on the plan to demolish our homes and reduce the number of public housing units, nor were we involved in the process for development of a Five Year Plan or the Annual Plan for HANO, as required by law. Significantly, neither at that time, nor subsequently, has HANO done the necessary work—as required by federal statutes and HUD regulations—to study the needs of the low income residents of New Orleans in deciding on how St. Bernard should be treated.

The failure of HANO to comply with applicable federal law is particularly troublesome in that HANO is in fact under HUD administrative receivership and is governed by a one

---

[2] Under the proposal submitted by Columbia the approximately 1,430 units at St. Bernard would be demolished and replaced by 465 units, only 153 of which would service the St. Bernard residents displaced by Hurricane Katrina and subsequent demolition of the project. There are no provisions in the proposal for housing the balance of St. Bernard tenants. These tenants could not relocate to Section 8 units elsewhere in the City of New Orleans because there are no available units.

person board, that person being an employee of HUD. HUD has the legal obligation to oversee housing authorities such as HANO and to ensure that they comply in all respects with Congressional mandates and its own regulations.

The essence of the Columbia proposal is that the entire community will be constructed around the development of a golf course connected with the PGA Tour. To achieve this, some unspecified party would have to take control of the existing public park in the area and convert it to an upscale golfing facility. Since neither Columbia, nor HANO or HUD has the ability to convert this public park, the proposal is at best hypothetical. Further, the construction of this golf course is dependent on raising millions of dollars in donations from private sources, which cannot be relied upon in any objective financial analysis of the proposal. This is key because the community benefits promised in the plan are to be funded by projected future profits from the operation of the golf course.

The Columbia plan also includes founding two charter schools, one for pre-K through 8th grade and one for high school. As with the golf course, the creation of the schools is a matter for governmental authorities other than HUD and HANO and certainly not within the control of Columbia.

Finally, the plan calls for a 45,000 square foot YMCA with an indoor pool, track gym, weight room, workout room and daycare facility. Again there is no reference in the proposal to how this will be financed, who will pay for it, when this facility will be built, and/or whether the YMCA has agreed to this proposal.

Had there been a bona fide consultation process with tenants, the Columbia plan could not have been selected. We believe that HUD/HANO must consider and respond to our plan as laid out in these pages.

4

# The Team

## St. Bernard Housing Recovery & Development Corporation, Inc.

Displaced tenants from St. Bernard have established the St. Bernard Housing Recovery & Development Corporation, Inc. (St. Bernard HRDC) in order to pursue redevelopment in keeping with tenant needs and objectives. The St. Bernard HRDC was founded on April 10, 2007, as a vehicle for the tenants to organize themselves and a mechanism through which the tenants can formally work with other community groups and/or prospective developers interested in working with them to realize their goals.

The tenants' goals are: 1) To return to their homes immediately without massive demolition and redevelopment, 2) to be actively involved in the planning phase of any redevelopment effort, 3) to be actively involved in the redevelopment management and ownership, 4) to ensure there is a legitimate chance for all former tenants at the time of the storm to return, and 5) to have a legitimate chance to obtain the job training and jobs that will be created through redevelopment, i.e., the so-called HUD section 3 requirements.

The St. Bernard HRDC is a not-for-profit open to all former residents of St. Bernard. Non-residents may not be members. The corporation appointed four former tenants as board members: Sharon Jasper – President; Stephanie Mingo – Vice President; Lynette Bickham – Treasurer; and Gloria Irving – Secretary.

St. Bernard HRDC has entered into a Memorandum of Understanding (MOU) with the AFL-CIO Investment Trust Corporation (ITC) and the AFL-CIO Housing Investment Trust (HIT) that establishes the basic foundation for this proposal. It commits the parties to the following principles:

- That every single one of the pre-Katrina residents of the St. Bernard housing development have the right to return to their neighborhood and live in a decent, safe and sanitary apartment, paying no more than 30% of their income for that rental unit;

- That a one-for-one replacement of affordable housing units in the St. Bernard neighborhood will guide overall redevelopment;

- That pre-Katrina residents of St. Bernard be given preferences in the training and hiring of construction workers in any re-opening, redevelopment, rebuilding or repair of the St. Bernard development, provided that all construction work must be performed by 100% union labor;

- That every effort be made to find all the displaced residents of St. Bernard and determine what their current housing needs are, whether they wish to return to St. Bernard and on what schedule;

5

- That a plan be developed to maximize resident ownership and control of the development on the St. Bernard site to the extent reasonably possible; and

- That, to the maximum extent reasonable possible, a resident corporation and/or affiliate organization be provided the right to purchase the development once any tax credit compliance period has elapsed and that this corporation or affiliate have a significant opportunity to participate in decisions in the development in the meantime.

In furtherance of these principles, St. Bernard HRDC, ITC and the HIT are submitting this proposal which more fully reflects the shared goals and objectives delineated above.

## AFL-CIO Investment Trust Corporation (ITC)

The AFL-CIO Investment Trust Corporation (ITC) is a taxable, District of Columbia not-for-profit corporation that provides a variety of services in support of labor-sponsored institutional real estate investment. The ITC has raised over $1 billion in investment capital for two pooled real estate funds, including the $2.7 billion AFL-CIO Building Investment Trust (BIT). It also provides investor relations and labor relations services for the BIT.

Shortly after Katrina, ITC established an office in New Orleans to help coordinate the AFL-CIO's Gulf Coast Revitalization Program (GCRP), an initiative of the ITC, HIT and BIT that has pledged to invest $700 million in housing and economic development in the hurricane-devastated region. The ITC's New Orleans office, under the leadership of ITC Vice President Tom O'Malley, now maintains a permanent staff of four. In 2005, the City of New Orleans selected the ITC and its partner, Providence Community Housing, to redevelop 196 "adjudicated" properties within the boundaries of Treme/Lafitte and Tulane/Gravier. The ITC has also provided extensive technical support for the launch of Housing International Gulf Coast, a panelized housing manufacturer serving New Orleans and the Gulf Coast region as an efficient source of high-quality housing while also supporting well-paying permanent jobs for local residents.

## AFL-CIO Housing Investment Trust (HIT)

The AFL-CIO Housing Investment Trust (HIT) could be a potential financing source for the construction of the project under this proposal. The HIT, a registered investment company, has a long history of investing in the development and preservation of housing. Together with its predecessor fund, the HIT has invested more than $5 billion over the last four decades to create or preserve over 85,000 units of multifamily and single-family housing. These investments have produced competitive returns for HIT's investors while providing collateral benefits important to working people – such as creating more than 48,000 units of affordable housing for working families, promoting the development of sound communities, and creating approximately 50,000 union jobs in construction and related industries.

Throughout its 40 year history, the HIT has successfully utilized a community investment initiative approach for certain of its investments, focusing outreach efforts on a particular market to build relationships in order to make a substantial impact on the community's housing needs. A good example of this is HIT's New York City Community Investment Initiative. Following the tragic events of 9/11, the New York City Community Investment Initiative was launched, and in the first four years of the Initiative, over $800 million was invested by the HIT and BIT in the five boroughs of New York City. This investment represented over $2 billion in real estate value and 13,600 units of housing. A second phase was launched in 2006 targeting an additional $500 million in multifamily and commercial real estate investments and, through HIT's homeownership partnership with Chase, $1 billion in single family mortgages over the next five years.

# Financing Proposal

St. Bernard HRDC is proposing to create and preserve a total of 1,085 units on the St. Bernard site. The plan calls for the renovation and rehabilitation of a large number of the existing buildings on the site, adding streets and open space and building new for-sale housing in duplex buildings. This will result in 716 units in the retained buildings and an additional 219 newly constructed for-sale units and 150 senior housing units. This proposal will result in approximately $180 million of total development costs and more than one million square feet of developed space creating a vibrant mixed-income, mixed-finance community. As a second phase of the project, we would also propose acquiring property in the surrounding neighborhood on which to develop an additional 350 units of mixed-income housing as well as coordinating with our neighbors to bring the surrounding community back to life. One possible location for such development would be the vacant Imperial Drive site, owned by HANO, which is nearby.

**Affordability**

As proposed, the St. Bernard site would have 1,085 units, with a total of 866 units of housing affordable to former St. Bernard residents, the number of units which were occupied just prior to Hurricane Katrina. In addition, 219 units of additional for-sale housing would be constructed on-site, available to families earning 65% of AMI. This unit mix will provide a realistically achievable mixed-income component for the St. Bernard redevelopment reflecting actual surrounding area sales prices. An additional 350 units of market rate housing, also available to families earning 65% of AMI, is proposed in the neighborhood immediately adjoining St. Bernard as a subsequent phase to the on-site development.

The proposed 1,085 on-site units will be comprised of 641 public housing units and 75 section 8 lease-to-own/homeownership units within the existing structures. In the duplex structures on the property, 150 units of senior housing will be constructed. All 866 of these units will be affordable to public housing-eligible families whose incomes are 30% or less of the New Orleans area median income. In addition, 219 for-sale town homes will be constructed on the property. These homes will be sold at an average price of $126,000, making them affordable to families making less than 65% of area median income.

The total number of on- and off-site affordable housing units thus contemplated in this proposal is 1,435, which equals the total number of units once available on the St. Bernard site at its full occupancy and is distributed as follows:

8

|  | Affordability | Phase I: on site | Phase II: off site | TOTAL |
|---|---|---|---|---|
| Public Housing with ACC | 30% AMI | 641* |  | 641 |
| Senior Housing | 30% AMI | 150* |  | 150 |
| Section 8 / Homeownership | 30% AMI | 75* |  | 75 |
| For-Sale Housing | 65% AMI | 219 |  | 569 |
| Off-Site—Phase II | 65% AMI |  | 350 | 350 |
| TOTAL |  | 1,085 | 350 | 1,435 |

\*    Public housing units – these amount to a total of 866 on-site public housing units.

## Tenant Management—The Leased Cooperative Model

We want to be involved in creating, managing and overseeing our own community in order to bring back the community at St. Bernard that we envision. To ensure community stability and resident involvement in St. Bernard, we are proposing to set up at least 850 of the units as a leased cooperative. This structure would be managed similarly to a limited equity housing cooperative.[3] However, to meet the needs of the tax credit investors in the project, the project would be owned by a partnership between the tenants and a professional property management company for the life of the tax credits. During this time the partnership would lease the building back to the tenants, giving us an opportunity to transition into the day-to-day management of the project when the tax credit period expires. The tenant management team will work closely with the manager on significant management issues such as lease and tenant occupancy terms, preventive maintenance issues, eviction criteria, and a tenant grievance policy.

---

[3] Limited Equity Housing Cooperatives (LEHCs) are business corporations in which residents share ownership of a building. LEHCs offer ownership opportunities to lower income households while limiting the return from resale that they can receive from the housing. They contrast with market rate cooperatives, where membership can be transferred at market value.

LEHCs provide high quality, safe, affordable housing for low-income families.  LEHCs are vehicles which allow for many of the benefits of homeownership to low-income families who might not otherwise be able to own.  For example, LEHCs allow members to pass their shares on to family members, allow for more active tenant management, and allow the tenants to benefit from appreciation that occurs in the property. LEHCs offer stable housing costs in rising real estate markets and resistance to defaults in down markets while requiring similar or lower subsidies than other comparable rental housing.

Upon expiration of the tax credits, the tenants would be given the right to purchase the property outright and form a limited equity housing cooperative ultimately bringing to them many of the benefits of homeownership. By structuring the project as a leased cooperative with a "springing interest" for the tenants, the project can meet the needs of the tax credit investors while providing for resident involvement and a stakeholder interest from the outset, setting the stage for the tenants to purchase the property at a later date.

## Financing Plan Overview

The financial plan developed to implement this proposal integrates identified sources of funds already approved for the St. Bernard redevelopment with additional sources that would be used to attain financial feasibility for a greater number of affordable units than currently proposed by HANO.

The proposal combines 641 units of public housing with ACC contracts, 150 units of senior housing, 75 units of section 8 lease-to-own/homeownership, and 219 for-sale units. The proposal also calls for a 9,000 square-foot community center for a total development cost of $183.4 million.

Funds that have already been identified are $74.1 million of proceeds from the sale of 9% tax credits, $27.0 million in CDBG funds, $10.3 million in first mortgage debt and $18.9 million in HANO Capital Funds for a total of $130.3 million reported in the *Public Investment, Private Developers – How Louisiana Deployed its Go Zone Housing Tax Credit* report dated May 2007 for the Bureau of Governmental Research.

Since this proposal includes the rehabilitation of a significant number of the existing on-site buildings, it presents an opportunity for cost savings for HANO as opposed to the wholesale demolition of all existing on-site buildings. The savings realized through rehabilitating rather than demolishing two-thirds of the existing buildings, as proposed herein, is estimated at $9.0 million, which is applied as an additional source of funds to help maximize the creation of affordable housing. By preserving the existing buildings, we expect to also be able to receive approximately $35.9 million of Historic Tax Credits on the project as well. These funds provide the project with $181.8 million in sources leaving a gap of $1.6 million.

## Business Terms

*Predevelopment Costs*
The financial structure of this project is extremely complex and holds a number of risks that are familiar to our team. We expect to receive predevelopment funding by utilizing existing relationships with organizations that make predevelopment investments in rental housing and retail/commercial developments, including the use of New Market Tax Credits. Overhead expenses during predevelopment will be funded through the same sources. The overhead expenses will be reimbursed at construction closing, which is customary.

10

This proposal complies with the Cost Control and Safe Harbor Standards for Rental Mixed Finance Development (Rev. April 9, 2003) which is 10% of the project costs. This fee is at the lower end of the range provided by HUD and demonstrates our commitment to the redevelopment of St. Bernard.

*Land Lease*

The St. Bernard site will be leased from HANO at a nominal amount of $100 per year for 99 years. As a result, no land cost is included in the budget. We propose to provide HANO with a joint venture interest in the apartment portions of the community, allowing ongoing sharing of cash flows (or, if HANO prefers, their share of cash flow can be used to further write down the rents). The limited equity cooperative documents will specify the terms and conditions of the sale of units to assure long term affordability of the cooperative. We wish to provide the residents of any residential housing the right of first refusal to purchase the property after the 15-year tax credit period. If this right is not exercised by the tenants, HANO will be next in line for purchasing the rental housing. These rights will be memorialized in the Disposition and Development Agreement.

*ACC Contract*

In order to insure affordability for the former very low-income residents, the project will need to receive Annual Contributions Contract financing for each very low-income unit. Since ACC funding barely covers expense costs, the mixture of tax credit and market rents will cross subsidize the expenses incurred in operating the property. A highly capable and efficient management company will oversee property management with close coordination with the resident managers in training to assure that they are part of the process. An onsite property management office will be open for pre-leasing activities during the early stages of redevelopment. Adequate and trained staff to handle administrative, maintenance, leasing, marketing, and tenant and homeownership matters will monitor costs attributable to operating the property. Rigorous preventive maintenance protocols will be established to keep properties in top shape, satisfying owners, tenants, lenders and long-term asset management needs. On the homeownership and rent-to-own units, Housing Choice Vouchers will be targeted to low-income families to assist them in becoming homeowners. Each family must receive financial literacy and homeownership counseling to assure sustainability.

*Fair Housing*

We are committed to an affirmative fair housing marketing plan for all former tenants, as this is our priority in redeveloping the property. We understand that some of the tenants will need training and technical assistance in assuring that they meet the tenant-established lease and occupancy guidelines. These tenants will receive priority for the redeveloped public housing assisted units. For public housing eligible tenants who did not previously live at St. Bernard, we will work with HANO to identify the families who have requested St. Bernard residency from the HANO site-based waiting list.

**Timeline and Critical Path**

11

We have designed this proposal to get us and all former residents who wish to return, back into their homes as quickly as possible while creating our personal vision for our community. To this end, the proposal contemplates units being reoccupied as soon as possible. This will be accomplished through a phased redevelopment to accommodate those families who have returned.

This proposal recognizes the critical need for the FY2007 low-income housing tax credits that have already been awarded to the St. Bernard project to be put in service by the mandatory deadline of December 2010. Given that this proposal calls primarily for the rehabilitation of existing buildings and contemplates the use of panelized housing for the new construction, the timeline for completion should be accelerated.

This proposal is structured to meet the goals of providing all pre-Katrina residents of St. Bernard with a place to return to and making sure that this now happens as quickly as possible. Our community's families have been away from their homes for more than two years now, and it is time to make giving them a home to return to a priority.

12

# Tenant Management – The Leased Cooperative Model

To enhance community stability and resident involvement in the redevelopment of St. Bernard, ownership of the proposed public housing with ACC will be structured as a leased cooperative, to be managed as a limited equity housing cooperative. The formation of the limited equity cooperative will be done in stages as the role of the residents must be acceptable to the low income housing tax credit investor.  The importance of ownership as recognized by all community stakeholders provides an incentive for residents to maintain their units for the long term and to have a substantial stake in the stability of their community.

Cooperative ownership of housing is a form of a Common Interest Development (CID), where a collection of individuals share ownership and management responsibilities for a group of housing units. In a Cooperative, members own shares in the corporation that in turn owns the property.  As a stockholder in the corporation, the shareholder has the right to lease a specific apartment so long as the individual is both a member of the cooperative and abides by the rules and regulations of the cooperative board of directors.

The board of directors of a cooperative is comprised of shareholder/owners often with additional outside board members who bring specific expertise to the board.  Ownership is transferable between individual owners of the stock in the cooperation.  Cooperatives can be nonprofit corporations that own the entire development, unlike condominium owners who each possess individual pieces of real estate.

13

# Design Concepts and Physical Plan

We envision a community of mixed incomes on a pedestrian-oriented site that also is reintegrated with the surrounding street grid. A total of 850 units in existing buildings will be substantially rehabilitated and, in many cases, expanded to provide 425 public housing units together with 425 tax credit subsidized rental housing units. These 850 units will be structured as a leased cooperative. This will allow us to be involved in the day-to-day management of our own community, eventually allowing us to become homeowners through our own tenant-run cooperative. In addition, the Master Plan calls for the development of 219 additional new construction lower density duplex units, intended for immediate home ownership or long term ownership on a lease-to-own basis. Approximately 75 of these units will be affordable to public housing-eligible families; the remainder will be available for sale as condominium units. Significant senior housing is also included on the site, to further enhance the diversity of the community. Any new construction on the site will satisfy FEMA's standards for minimum floor elevations for the neighborhood.

Public open space would be available throughout the site, including a substantial park and playground area on the eastern side, and tree lined streets running both north-south and east-west. A mix of building types will include both preserved multifamily housing stock and lower scale duplex structures. The site is opened up as space between most of the preserved buildings is significantly increased. This building-type mix is intended to enhance neighborhood security while maintaining a density consistent with urban neighborhoods.

Finally, and critical to the master plan concept, is the creation of an anchor facility intended to provide a mix of social and community support services, including job training, job readiness, and financial literacy training together with traditional support services. To accomplish this we plan to work with the AFL-CIO Investment Trust Corporation which is working to acquire funding and supporters for such a facility. This facility would be home to job training services offered by the Gulf Coast Construction Careers Center operated by the Building and Construction Trades Department, AFL-CIO, as well as distance learning services linked to the job training and life skills educational capacity of the National Labor College, which is located just outside Washington, DC.

In order to meet our goal for re-housing our community as quickly as possible, our plan calls for new housing that will be constructed both on and off-site. We will make maximum use of panelized construction technology in order to achieve increased efficiencies, assure high building quality and generate local employment opportunities in the Gulf Coast Region. These buildings will utilize steel and/or wood technologies which have the flexibility to produce components for single family, duplex, and attached residential as well as low-rise multifamily and low-rise commercial projects. It is intended that buildings produced will reflect high standards of architecturally compatible design, functionality, ability to resist storm damage and meet applicable code

14

requirements, energy efficiency and other sustainable concepts. New facilities for producing the panelized housing are now operational in Reserve.

**Principles of the Master Plan**

The proposed Master Plan Concept focuses on the use of highly efficient panelized construction technology for new housing and on the substantial rehabilitation of existing housing stock—approaches that will increase the speed with which the project can be completed. This strategy avoids massive demolition and site clean-up at a time when demolition and hauling resources are strained to the maximum in the region. Project implementation can be accelerated making housing available to residents in the shortest possible time.

We are committed to creating a community filled with St. Bernard families and giving them a place to rebuild their lives and their communities while creating a vibrant community with access to good jobs, job training, affordable housing, quality public education, quality public transportation and quality public healthcare. To carry out this vision we are focused on three primary principles.

First, we and our partners are committed to the right of former New Orleans residents to return to their neighborhoods. By preserving approximately 75% of the existing buildings, the proposed master plan achieves a density of 22 units per acre—less than the current density of 28 units per acre, but substantially more than the 12 units per acre contemplated by Columbia. This higher density makes available more rehabilitated and new housing for returning residents, providing easy access to public transportation routes, while at the same time opening up the site and effectively integrating it into the surrounding community.

A second principle embodied in the proposed Master Plan Concept is a "high road" redevelopment strategy that focuses not just on bricks and mortar, but also on the provision of long-term educational and economic opportunity to support a healthy community over the long-term. Incorporation of job training and the use of panelized building technology from local plants leverages the construction opportunity into life changing economic opportunity.

A third principle embodied in the proposed Master Plan Concept is effective and fully participatory community involvement, from the initial planning process through long-term facility management and individual home-ownership. The proposed master plan concept is intended to be the start of a dialogue with former St. Bernard residents, with the surrounding community, and with HANO. It is critical that we be accorded our legal rights to participate actively in the development and elaboration of the master plan. The proposed master plan concept presented here is intended to demonstrate that it is possible to achieve a balance of higher density development, mixed income housing, mixed building types, preservation, and full integration of the site into the surrounding community. However, a fully participatory process, involving all of the affected parties,

15

will unquestionably result in a plan that differs from and improves upon that presented here in many important details.

The approach to the redevelopment of the St. Bernard Public Housing Site described in the proposed Master Plan Concept has the greatest chance of succeeding in achieving not just the rebuilding of a part of New Orleans but the restoration of a community, the affirmation of respect for our community's residents, and the creation of long-term opportunity that restores hope for a better future.

# Comprehensive Neighborhood Redevelopment

We believe that community and physical development are inseparable. We plan to work with a team of the very best housing and community developers, affordable housing financers and community leaders to ensure that we are involved in the planning, construction, and operation of this community. By doing this, we can assess community assets and work to improve opportunities through a range of initiatives, with a focus on education, health, employment, child care and homeownership. To meet these goals we will seek to increase residents' access to job training and apprenticeship opportunities through our work with the AFL-CIO Investment Trust Corporation and the Gulf Coast Construction Careers Center of the Building and Construction Trades Department, AFL-CIO.

## Provision of Community Services: The Young Men of Color Program

In New Orleans, the ITC and HIT have worked to build upon the Young Men of Color Program initiated by the AFL-CIO. Launched in November 2006, the Young Men of Color Program is a response to the Dellums Commission Report sponsored by the Health Policy Institute of the Joint Center for Political and Economic Studies. The program centers around establishing an "anchor facility" that serves as both a community center and workforce training center designed to motivate young people, increase life skills, improve health and provide access to employment.

The "anchor facility" in the St. Bernard redevelopment would also serve as a meeting place for residents, while housing several of the entities that contribute to the health and success of a community, including job training and career counseling services, a computer lab equipped to offer distance leaning opportunities, classroom/meeting space and child care services. Additionally, this facility could house the management office for the newly developed housing project, particularly if it is structured as a limited equity housing cooperative. The central location and array of services offered at the anchor facility will be crucial to ensuring that it serves as a clearinghouse for input from local residents about what is happening in the community and what changes and improvements should occur in the future. It is intended to seek grants from foundations and corporate donors to both acquire the facility and support its operations.

The distance learning element of the anchor facility would receive special attention. The residents would be able to take advantage of specific programs offered through the National Labor College. Web learning modules in subjects such as computer literacy, math for banking, customer service, personal communications, and sales techniques will be offered. Participants will be able to pursue certificates and/or degrees in a number of different disciplines. The center will offer flexible hours so that students may further their education on a schedule that meets their specific needs. A key offering will be courses in financial literacy, through which participants will learn life skills related to money management that will assist them as they seek to establish good credit or move towards eligibility to purchase a home.

17

Finally, through an alliance with the Building and Construction Trades Department, AFL-CIO, the facility would offer meaningful job training to residents with direct opportunities for job placement.

### Gulf Coast Construction Careers Center (GCCCC): Job Creation

Over the past year, the ITC and HIT have worked closely with the Building and Construction Trades Department (BCTD), AFL-CIO, to make workforce training in New Orleans a reality. Through the dedication of its New Orleans team, headed by Executive Director Art Lujan, the BCTD has launched the Gulf Coast Construction Careers Center (GCCCC), a one-stop center for fast-track training and job placement for careers in the building and construction trades. In December 2006, the GCCCC received a three-year, $3 million grant from the State of Louisiana's Recovery Workforce Training Program to support its three-week pre-apprenticeship course, *Introduction to Construction*. This course is designed as an entry point for workers in the construction industry to access an articulated career path into privately financed apprenticeship training.

In June 2007, the GCCCC opened its doors for its first three-week pre-apprenticeship program. Since that time, classes have been held at the Ironworkers Training Facility located at 8116 Chef Menteur Highway in New Orleans. To date, the GCCCC has graduated five classes. Of the first classes, 73 individuals have graduated, of which 67 are African American males and 6 African American females. Of the 73 graduates, 39 have been accepted into apprenticeship programs and approximately 70% have been successfully placed into employment.

Special priority for on-the-job training and employment at the St. Bernard project will be given to former residents of St. Bernard and other HANO facilities, and through the GCCCC program these residents will be afforded opportunities to pursue careers in the construction industry. To maximize participation of this target group, the GCCCC will establish relationships with other community-based employment and job training programs as well as state employment service offices.

Further, with its long track record of meeting resident employment and training goals in conjunction with housing projects nationwide, the HIT is uniquely qualified to meet both the Section 3 goals and the objectives established by HANO. It is expected that a Project Labor Agreement (PLA) will be negotiated between the development partner and building and construction trades unions covering construction of the project. The PLA will specifically require contractors of every tier to utilize the GCCCC for referrals in compliance with the applicable Section 3 requirements as well as with employment and training goals of HANO. HIT will build on its established relationships with officers of building and construction trades unions at the national level and with local union officers and Joint Apprenticeship and Training Committees to help insure full support and cooperation in achieving these objectives for the St. Bernard project.

18

**Comprehensive Neighborhood Development**

We envision a broader community development approach as part of this process. While the redevelopment of the St. Bernard site and our return to our community is our top priority, we realize the need for comprehensive neighborhood development that goes along with the St. Bernard redevelopment. For this reason, we have begun to survey the neighborhood in the vicinity of the St. Bernard site in order to begin identifying potential property for off-site development and affordable housing. Though numerous Katrina damaged houses still remain in the area immediately adjoining St. Bernard, we feel a number of property owners will be attracted back to them once the redevelopment of St. Bernard itself gets underway.

By also focusing on the redevelopment of the surrounding community, we can hope to achieve a critical mass of housing and community development which will result in a vibrant community where not only St. Bernard residents have returned but the broader community has been assisted in rebuilding and rehabilitating their neighborhood.

# Tenant Outreach Plan

Hurricane Katrina caused a large Diaspora of the former tenants from the St. Bernard development. Tenants are known to be living in Houston, Dallas, Atlanta, Baton Rouge and many other cities. In conjunction with the Advancement Project, HUD and HANO, the St. Bernard Housing Recovery & Development Corporation intends to spearhead a comprehensive effort to reach out to all of these former tenants of the St. Bernard Housing development.

St. Bernard HRDC feels it is critical to undertake a comprehensive outreach effort immediately. It has been over two years since Hurricane Katrina and little has occurred in the way of redevelopment. Ex-tenants are understandably frustrated and anxious to know when they will be able to return home.

Furthermore, this comprehensive outreach effort will provide an excellent opportunity for involving as many of the former tenants as possible in the detailed development of St. Bernard HRDC's proposal for St. Bernard. Ideas for how this can be accomplished at various stages of the outreach effort are provided below.

St. Bernard HRDC will engage in a multifaceted approach to outreach to obtain the highest possibility of success:

- First, using the contact lists compiled by HUD and HANO of the current location of all former tenants, the St. Bernard HRDC will create a phone tree to reach out to all former tenants. Volunteers from the St. Bernard development will be in charge of contacting a manageable number of former residents until all residents have been contacted. This phone tree will serve as a vehicle for keeping all former residents informed on the dates of future meetings, planning events, training courses, etc.

   Tenants expressing an interest in providing input as St. Bernard HRDC's proposal for St. Bernard is developed in detail will receive a project synopsis specially prepared by members of the development team experienced in user participation and will receive a follow-up telephone call soliciting their reactions.

- Second, the St. Bernard HRDC will coordinate a central contact point where former tenants can obtain information pertaining to current happenings and developments in the redevelopment of St. Bernard.

   This central point of contact will be housed in an on-site office that will be staffed by tenant volunteers as well as other members of the development team. In addition to provision of information from this office by telephone and e-mail, on-site materials and displays depicting the proposed redevelopment will be available, providing tenants visiting the site a first hand opportunity to learn about what is happening.

20

- Third, ads will be placed in key markets in which former tenants are known to be currently living. As mentioned above, these markets include Houston, Dallas, Atlanta and Baton Rouge. These ads will include all contact information for the St. Bernard HRDC, and information regarding future meetings and events.

  If enough tenants in any particular market express interest in further involvement in the detailed development of St. Bernard HRDC's proposal for St. Bernard, meetings will be scheduled and advertised in those markets. Additionally, all tenants who expressed such interest as part of the initial phone tree contact will receive follow-up calls with this meeting information.

- Finally, a website will be created to publish this information on the World Wide Web. Tenants visiting the website will be prompted to e-mail the on-site office with their contact information, and if not previously identified via the phone tree, will receive a follow-up phone call so that they can be included in the comprehensive outreach effort going forward.

Wherever possible, St. Bernard HRDC intends to employ former residents of St. Bernard in reaching out to the residents in the Diaspora. We believe that this will lead to the greatest number of responses as tenants reach out to their former neighborhoods. St. Bernard HRDC's proposal for the redevelopment of St. Bernard is a tenant-driven effort seeking to create a welcoming community for the return of all residents of St. Bernard who were displaced by Hurricane Katrina. As such, it is vital that all ex-residents of St. Bernard be identified and contacted in order to provide them information about how they will be able to return. Secondly, in order to be most welcoming, it is important that ex-resident input on the detailed development of St. Bernard HRDC's proposal be solicited and accommodated to the greatest degree practicable. The tenant outreach plan has been developed in order to promote these objectives.

St. Bernard HRDC stands ready to initiate the tenant outreach plan directly upon acceptance of this proposal by HANO. The tenant outreach plan is in fact an integral element of this proposal since the number one priority of St. Bernard HRDC for St. Bernard redevelopment is the replacement of all units at St. Bernard that were occupied pre-Katrina and the opportunity of all people who lived in those units to be able to return home to their community.

21

# Exhibits
# Table of Contents

I.    Site Plans and Drawings

II.   Affidavit of John F. Hernandez



October 2007

**Hamburg Street View**

Redevelopment Plan
St. Bernard HRDC
New Orleans, LA

Proposed Plan

October 2007

Legend

Senior housing
w/ retail (5-story)

Existing to remain

Two-family house

Park space

Other

Redevelopment Plan
St. Bernard HRDC
New Orleans, LA



October 2007

Comprehensive Neighborhood Development

St. Bernard

St. Bernard Ave

St. Bernard Ave

Hamburg St

Hamburg St

Hamburg St

St. Bernard Site
Phase I

Neighborhood Development Area
Phase II

UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, et al.,       )
                              )
               Plaintiffs,  )  CIVIL ACTION NO. 06-3298
                              )
            v.               )  SECTION "B"
                              )  JUDGE LEMELLE
ALPHONSO JACKSON, et al.,      )
                              )  MAGISTRATE 5
              Defendants.  )  MAG. CHASEZ
                              )

## DECLARATION OF JOHN E. FERNANDEZ

I, John E. Fernandez, declare as follows:

1. I am an Associate Professor of Architecture, faculty member of the Department of Architecture, Building Technology Program, at the Massachusetts Institute of Technology. My expertise is in the lifecycle performance and composition of materials used for buildings. I have been conducting research, publishing and teaching at MIT since 1999. I am a registered architect in the State of New York and have a Bachelor Degree from MIT (1985, Department of Architecture) and a Master of Architecture from Princeton University (1989, School of Architecture).

2. These preliminary findings are the result of my assessment of public housing units in New Orleans conducted during the five day period, October 16 to 20, 2006. My consultant services in the production of this assessment were commissioned by the Plaintiff in the case of Anderson, et al. v. Jackson, et al.

3. The intention of the survey was to identify damage to both the buildings and individual residential units that can be directly attributable to Hurricane Katrina. The focus of my survey was the assessment of the physical structure and shell of the buildings and the interior conditions of the residential units themselves.

4. I conducted a visual survey of 140 units in four public housing projects: Lafitte, C.J. Pete, B.W. Cooper, and St. Bernard.

5. My inspection and assessment found that no structural or nonstructural damage was found that would reasonably warrant any cost-effective building demolitions. While I found a range of Katrina-related damage to these buildings, I did not find any conditions in which the integrity of the structure and exterior envelope of the buildings or the interior conditions of residential units themselves could not be brought to safe and livable conditions with relatively minor investment.

6. I also found that there was only a minimum use of cellulose-based materials (wood in rough openings and baseboards and paper in the rare use of gypsum wall board for example). This lack of organic material significantly aided in the very low incidence of moisture retention in the walls and floors of the buildings.

7. LaFitte: I found damage at LaFitte to be minor and consisted primarily of damage to windows and doors from high winds and interior damage from first floor flooding. I found no damage to the structure. The brick masonry is in good condition, showing no signs of Katrina-related damage. Roof damage in several buildings can be easily repaired. Many units only require thorough cleaning to achieve safe and livable conditions. Several units I inspected are essentially in "move-in" condition.

8. C.J. Pete: I found the foundation, brick masonry wall and roofs of buildings at C.J. Pete to be substantially intact and recoverable. Despite missing windows and the many holes in the roof, I did not see widespread water damage to units within. Many units are in good condition. Several I inspected are essentially in "move-in" condition, upon thorough cleaning and some repair to windows. Most interior surfaces of units require only minor plaster patching, baseboard replacement and painting. However, vandalism and theft is apparent and the buildings need to be secured to prevent further damage.

9. B.W. Cooper: My inspection of B.W. Cooper shows that these buildings resisted damage from Katrina quite well. I found the foundation, structure, exterior wall and roof to be substantially intact. The units experienced only minor damage commensurate with the level of flooding in the interior. In first floor units, damage from flooding requires replacement of portions of flooring, wood baseboards, plaster walls, electrical sockets and wiring to achieve a safe and livable condition. In upper units, minor repairs and thorough cleaning alone is required.

10. St. Bernard: I found the foundation and brick masonry of St. Bernard to be in good condition. However, the roofs of many buildings are damaged and are resulting in water entering the units below. This damage can be easily repaired. First floor units that were flooded require renovation to replace portions of baseboards, plaster walls, ceilings, and electrical wiring. I found second and third floor units to be in good condition. Several of these units were in very good "move-in" condition, requiring only a thorough cleaning. Those with water damage from above require some replacement of ceiling and flooring materials.

11. Preliminary general conclusions that pertain to all four housing projects can be arrived at because of the following determining factors: all four projects were constructed of essentially the same materials in the structural and nonstructural portions of the buildings, all four projects were similarly planned in long blocks of units with interspersed courtyards, and damage to units in all projects was primarily dependent on the presence of flooding in the unit.

12. Therefore, the general conclusions are: demolition of any of the buildings of these four projects is not supported by the evidence of the survey, replacement of these buildings

2

with contemporary construction would yield buildings of lower quality and shorter lifetime duration, the original construction methods and materials of these projects are far superior in their resistance to hurricane conditions than typical new construction, and with renovation and regular maintenance, the lifetimes of the buildings in all four projects promise decades of continued service that may be extended indefinitely.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on October 23, 2006

JOHN E. FERNANDEZ
Associate Professor
Massachusetts Institute of Technology

3

# EXHIBIT N

MARY L. LANDRIEU
LOUISIANA

# United States Senate
WASHINGTON, DC 20510-1804

September 21, 2007

The Honorable Alphonso Jackson
Secretary
U.S. Department of Housing & Urban Development
451 7th Street, SW
Washington, DC 20410

Dear Secretary Jackson:

As I indicated to you in our discussion this morning, I have deep reservations regarding your announcement today that the U.S. Department of Housing & Urban Development (HUD) plans to begin disposition/demolition of the four (4) major public housing sites in the City of New Orleans. Central to these concerns is the fact that HUD is moving forward with the demolition of pubic housing without adequate plans to ensure that replacement housing is developed in its place. To do so in the midst of an affordable housing crisis in the area, is both short-sighted and undermines comprehensive Congressional efforts to solve this issue.

You indicated in our discussion that this announcement is not being made not because HUD is required to start demolition by the Louisiana Housing Finance Agency. Instead, you told me that HUD is in danger of losing $7 million of tenant replacement vouchers for these properties at the end of the fiscal year. I understand these concerns, but as a member of the Senate Appropriations Committee, I am worried that HUD did not contact my office or the Appropriations Committee regarding the loss of these vouchers. HUD neither requested an extension nor replacement of the vouchers. That said, given its stated importance to HANO, I commit to you to pursue an extension of these particular vouchers in the upcoming Continuing Resolution.

Prior to Hurricane Katrina and the subsequent Federal levee failures, the Housing Authority of New Orleans (HANO) operated over 7,000 units of public housing in New Orleans. 5,100 of these units were occupied by low-income households. HANO, as you well know, has long been a troubled agency. HANO mismanagement of these properties led in large part to their poor condition and the lack of sufficient opportunities for residents. It is my understanding that the current Administrative Receiver does not even reside in New Orleans but commutes there from Virginia each week. Likewise, the Chairman of the Board is a HUD official in Fort Worth, Texas. Therefore, the current management at HANO leaves my office with little certainty that - left on their own - that they will redevelop these properties in a responsible manner.

Furthermore, as my staff has indicated to you, to date I have only received information on one (1) of the four (4) redevelopment plans for public housing sites. This site, the Lafitte development, is a good model for developing a mixed-income community in a responsible manner. The developer worked closely with public housing residents to develop the project. Most importantly the Lafitte developer is ensuring affordable housing is not lost to the community. The Lafitte development would also meet the requirements set out in legislation currently pending in the Congress. However, there are no guarantees that developers at the other three sites will do the same. For example, it is my understanding that these other developers may replace only a fraction of the original units, making the current housing crisis in the city even worse. Rents in the area have increased at least 40 percent since the storms and our pre-Katrina

Page Two
September 21, 2007

homeless population of 6,300 has doubled to over 12,000 this year – further highlighting the need for affordable housing like these sites. In short, to announce demolition, which could begin as early as November, without sufficient planning in place seems irresponsible. This action will only serve to deepen the ongoing affordable housing crisis for my constituents most in need and further increase distrust in the community with HANO/HUD.

As you know, I co-authored a bill, S.1668, the "Gulf Coast Housing Recovery Act," with Senate Banking Committee Chairman Christopher Dodd which ensures that public housing is replaced, not lost. In doing this, the bill also provides needed flexibility so that the housing authority and developers can create mixed income communities. This bill, which I am scheduled to testify on in committee on Tuesday, September 25, would allow demolition to move forward in New Orleans. S. 1668 would also provide sufficient guarantees for public housing residents. In particular, the bill requires that all units occupied prior to the storm be replaced with public housing or other affordable housing units on or off site. Our bill also requires that unoccupied units be replaced with housing vouchers so there is no net loss of affordable housing in the city. Your announcement today would not provide similar guarantees. I urge you to only move forward with demolition if you can meet these replacement housing requirements. The House of Representatives has already passed these requirements and they are within reach of passing the Senate Banking Committee in the coming weeks.

In closing, I respectfully request that not later than September 24, 2007, HUD provide in writing the following:

- **The complete redevelopment plans for the other three (3) public housing sites in New Orleans**
- **A commitment that HUD will meet the requirements for demolition/redevelopment set out in S. 1668**
- **A response as to whether HUD will formally ask for an extension of the tenant replacement vouchers from the Senate Appropriations Committee**
- **Clarification on whether your announcement is due to LHFA requirements or tenant replacement vouchers**

Thank you for your attention to this important matter.

Sincerely,

*Mary Landrieu*

Mary L. Landrieu
United States Senator


Cc:    The Honorable Christopher Dodd
       The Honorable Robert Byrd
       The Honorable Thad Cochran

# EXHIBIT O

## U.S. Census Bureau

State & County QuickFacts

# Orleans Parish, Louisiana

| People QuickFacts | Orleans Parish | Louisiana |
|---|---|---|
| Population, 2006 estimate | 223,388 | 4,287,768 |
| Population, percent change, April 1, 2000 to July 1, 2006 | -53.9% | -4.1% |
| Population, 2000 | 484,674 | 4,468,976 |
| Persons under 5 years old, percent, 2005 | 7.6% | 7.1% |
| Persons under 18 years old, percent, 2005 | 25.4% | 25.4% |
| Persons 65 years old and over, percent, 2005 | 11.5% | 11.8% |
| Female persons, percent, 2005 | 53.0% | 51.4% |
| White persons, percent, 2005 (a) | 28.8% | 64.1% |
| Black persons, percent, 2005 (a) | 67.5% | 33.1% |
| American Indian and Alaska Native persons, percent, 2005 (a) | 0.2% | 0.6% |
| Asian persons, percent, 2005 (a) | 2.4% | 1.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2005 (a) | 0.0% | 0.0% |
| Persons reporting two or more races, percent, 2005 | 1.0% | 0.8% |
| Persons of Hispanic or Latino origin, percent, 2005 (b) | 3.1% | 2.8% |
| White persons not Hispanic, percent, 2005 | 26.6% | 61.6% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 56.8% | 59.0% |
| Foreign born persons, percent, 2000 | 4.2% | 2.6% |
| Language other than English spoken at home, pct age 5+, 2000 | 8.3% | 9.2% |
| High school graduates, percent of persons age 25+, 2000 | 74.7% | 74.8% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 25.8% | 18.7% |
| Persons with a disability, age 5+, 2000 | 102,122 | 880,047 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 25.7 | 25.7 |
| Housing units, 2005 | 213,137 | 1,940,399 |
| Homeownership rate, 2000 | 46.5% | 67.9% |
| Housing units in multi-unit structures, percent, 2000 | 42.7% | 18.7% |
| Median value of owner-occupied housing units, 2000 | $87,300 | $85,000 |
| Households, 2000 | 188,251 | 1,656,053 |
| Persons per household, 2000 | 2.48 | 2.62 |
| Median household income, 2004 | $27,355 | $35,216 |
| Per capita money income, 1999 | $17,258 | $16,912 |

| | Orleans Parish | Louisiana |
|---|---|---|
| Persons below poverty, percent, 2004 | 27.0% | 19.2% |
| **Business QuickFacts** | **Orleans Parish** | **Louisiana** |
| Private nonfarm establishments, 2005 | 9,698 | 102,790[2] |
| Private nonfarm employment, 2005 | 196,757 | 1,617,507[2] |
| Private nonfarm employment, percent change 2000-2005 | -5.6% | 1.6%[2] |
| Nonemployer establishments, 2004 | 26,195 | 273,154[1] |
| Total number of firms, 2002 | 33,669 | 328,756 |
| Black-owned firms, percent, 2002 | 27.6% | 12.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 0.8% | 0.8% |
| Asian-owned firms, percent, 2002 | 5.6% | 2.5% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | F | S |
| Hispanic-owned firms, percent, 2002 | 3.4% | 2.3% |
| Women-owned firms, percent, 2002 | 30.9% | 26.4% |
| Manufacturers shipments, 2002 ($1000) | 2,226,191 | 89,540,799 |
| Wholesale trade sales, 2002 ($1000) | 2,792,080 | 47,192,153 |
| Retail sales, 2002 ($1000) | 3,158,341 | 41,885,192 |
| Retail sales per capita, 2002 | $6,684 | $9,356 |
| Accommodation and foodservices sales, 2002 ($1000) | 1,944,816 | 7,411,702 |
| Building permits, 2006 | 823 | 28,671 |
| Federal spending, 2004 ($1000) | 6,308,943 | 32,954,059[2] |
| **Geography QuickFacts** | **Orleans Parish** | **Louisiana** |
| Land area, 2000 (square miles) | 180.56 | 43,561.85 |
| Persons per square mile, 2000 | 2,677.8 | 102.6 |
| FIPS Code | 071 | 22 |
| Metropolitan or Micropolitan Statistical Area | New Orleans-Metairie-Kenner, LA Metro Area | |

1: The 2004 Nonemployer totals may be low due to late tax reporting in hurricane-impacted counties/regions in Alabama, Florida, Louisiana, Mississippi, and Texas.
2: Includes data not distributed by county.

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards

X: Not applicable
Z: Value greater than zero but less than half unit of measure shown


Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report

Last Revised: Friday, 31-Aug-2007 10:23:17 EDT



**infoplease**
all the knowledge you need.

Site Map | FAQ

Enter search term   in   [All Infoplease ▼]   [Search]
Search White Pages

Daily Almanac for Dec 9, 2007

Home   Almanacs   Atlas   Encyclopedia   Dictionary   Thesaurus   Features   Quizzes   Timelines   Countries   Winter Holidays

World & News
United States
History & Gov't
Biography
Sports
Arts & Ent.
Business
Society & Culture
Health & Science
Homework Center

Fact Monster
Kid's reference,
games, quizzes

Daily Almanac
  This Day in History
  Today's Birthday
  Word of the Day

Editor's Favorites
  Winter Holidays
  Disasters 2007
  Advent
  Hanukkah
  Pearl Harbor Day
  Campaign 2008
  Pakistan Country
  Profile
  Iraq Timeline
  Presidential Factfile
  NFL Team Profiles
  Santa on Film
  2007 Current Events
  Holidays: Religious
  and Secular, 2008
  2007 Calendar
  2008 Calendar

Search: Infoplease
[          ] [go!]
Info search tips

Search: Biographies
[          ] [go!]
Bio search tips

United States > U.S. Cities > Profiles of the 50 Largest Cities of the United States

## New Orleans, La.

**Mayor:** C. Ray Nagin (to May 2010)

**2000 census population (rank):**
484,674 (31); % change: –2.5; Male:
227,094 (46.9%); Female: 257,580
(53.1%); White: 135,956 (28.1%);
Black: 325,947 (67.3%); American
Indian and Alaska Native: 991 (0.2%);
Asian: 10,972 (2.3%); Other race:
4,498 (0.9%); Two or more races:
6,201 (1.3%); Hispanic/Latino: 14,826
(3.1%). 2000 percent population 18
and over: 73.3%; 65 and over: 11.7%;
Median age: 33.1.

**2005 population estimate (rank):**
454,863 (38)[1]

*See additional census data*

**Land area:** 181 sq mi. (469 sq km);

**Alt.:** Highest, 15 ft.; lowest, –4 ft.

**Avg. daily temp.:** Jan., 51.3° F; July,
81.9° F

**Churches:** 712;

**City-owned parks:** 165;

**Radio stations:** AM, 12; FM, 14;

**Television stations:** 7

**Civilian Labor Force (MSA) April
2006:** 425,700[2];

**Unemployed:** 24,100[2],

**Percent:** 5.7[2];

**Per capita personal income (MSA)
2004:** $31,024[2]

**Chamber of Commerce:** New Orleans
Chamber of Commerce, 1515 Poydras
St., Suite 1010, New Orleans, LA
70112

1. July 2005 figures are pre-Katrina. Census
Bureau estimates that between July 2005 and Jan.
2006, New Orleans's population had fallen by 64%,
to 158,353, with a 22% black population, down
from 67%.
2. New Orleans–Metairie–Kenner, La.

Sponsored Link
**Travel reviews & great
deals at TripAdvisor.**

New
Orleans, the
largest
city
in Louisiana, is located in the
southeast part of the state,
between the Mississippi River
and Lake Pontchartrain. It is
coextensive with Orleans Parish.

One of the few cities of the
nation that has been under three
flags, New Orleans has
belonged to Spain, France, and
the United States. The French
founded it in 1718 and named it
in honor of the Duke of Orleans.
In 1762, France ceded the city
and the territory to Spain. In
1800, the territory was returned
to France, but government
authorities did not take over until
1803, just 20 days before the
region became part of the
United States in the Louisiana
Purchase.

New Orleans is famous for its
French Quarter, with its mixture
of French, Spanish, and native
architectural styles. The Mardi
Gras > a week of carnival held in
New Orleans before the
beginning of Lent—is the most
spectacular festival in the U.S.
and is a popular tourist
attraction. Despite Hurricane
Katrina, the 2006 Mardi Gras
was still scheduled to be held.

New Orleans has one of the
world's greatest international
ports and it is a major focus of
the city's economy. New Orleans
is home to the corporate offices
of oil companies with major
offshore operations in the Gulf of
Mexico, as well as the
distribution and service centers
of offshore equipment suppliers
and fabricators.

The manufacturing industry is a
significant part of the economy,
with petroleum, petrochemical,
shipbuilding, and aerospace
industries all playing a role. The New Orleans region also functions as a

**GET $50 OFF**

Millions of job seekers every day.
24/7 live customer support.
Your next star employee.

Find top local talent for less.

monster        Post a Job Now ▶

Tag Cloud
2000   chang...
current  estimat...
latinos        m...
metro
percentage
states statistics
What's this?

Infoplease Tools
  Calculator
  Spelling Checker
  Place Finder
  Distance Calculator
  Periodic Table
  Conversion Tool
  Perpetual Calendar
  Year by Year

Career Center
  Job Search
  Post Your Resume
  Continuing Ed.

College Center
  Scholarship Search
  Colleges &
  Universities
  College Resources



KOHL'S
about great things.

delightful
delicious
delovely

SHOP NOW ▶

MARKETPLACE
Florist in New Orleans

SPONSORED LINKS

Hurricane Katrina
FEMA is Rebuilding New Orleans. See how We're Rebuilding
New Orleans.
www.FloodSmart.Gov

Hurricane Katrina Relief
Hurricane Katrina information and pictures.
www.HurricaneKatrinaRelief.com

Case 1:07-cv-02231-RWR    Document 4-6    Filed 12/12/2007    Page 66 of 77

mining, processing, and transportation center for other minerals, principally sulfur. Service industries are playing a larger role, with health care and telecommunications leading the way. The New Orleans region is widely regarded as a leading center of medicine and health care in the South.

On Aug. 29, 2005, the Category 4 Hurricane Katrina hit New Orleans, flooding the city on Aug. 30 and disabling its pumps. This was followed by the breaching of the levees holding back Lake Pontchartrain, flooding 80% of the city. Federal and local officials were widely criticized for their slow and inadequate response. A year after the disaster, many evacuees had not returned to the city and the city population had dwindled to about half of its pre-Katrina numbers.

*See also* Encyclopedia: New Orleans .

## Selected famous natives and residents:

- **Louis Armstrong** *musician;*
- **Truman Capote** *author;*
- **Fats Domino** *musician;*
- **Louis Gottschalk** *pianist and composer;*
- **Bryant Gumbel** *TV personality;*
- **Lillian Hellman** *playwright and author;*
- **Al Hirt** *musician;*
- **Mahalia Jackson** *singer;*
- **Dorothy Lamour** *actress;*
- **Wynton Marsalis** *musician;*
- **Huey Newton** *activist;*
- **Marguerite Piazza** *soprano;*
- **Rusty Staub** *baseball player;*
- **Ben Turpin** *comedian;*
- **Shirley Verrett** *mezzo-soprano;*
- **Carl Weathers** *actor;*
- **Del Williams** *football player.*

Information Please® Database. © 2007 Pearson Education, Inc. All rights reserved.

| Nashville-Davidson, Tenn. | Profiles of the 50 Largest Cities of the United States | New York, N.Y. |
| --- | --- | --- |

CITE | PRINT | EMAIL | HOTWORDS | BOOKMARK

## More on New Orleans, La. from Infoplease

Top 50 Cities in the U.S. by Population and Rank

New York: History, Geography, Population, and State Facts

Population of the 20 Largest U.S. Cities, 1900–2005

Latitude and Longitude of U.S. and Canadian Cities

Powered by Calbrity

Premium Partner Content

**HighBeam** RESEARCH    Related content from HighBeam Research on: New Orleans, La.

Easy does it: the Orleans hotel blends the personality of its namesake city with the trappings of Las Vegas. (Destination: Las Vegas).(Orleans...... *(Travel Agent)*

Katrina, Bush y la historia: quizas merecidamente el nombre de George Bush sera citado en la historia junto a la tragedia de New Orleans,...... *(Mensaje)*

Big time in the Big Easy. (awards won in 1997 by the New Orleans' Times-



Picayune) (includes related article on Molly's at the Market....... *(American Journalism Review)*

Crescent City: more than just Mardi Gras.(Market Spotlight: New Orleans, La.) *(National Petroleum News)*

Riverwalk businesses sue tanker's owner. (New Orleans, LA) *(Business Insurance)*

New Orleans, LA. (Southeast).(Port of New Orleans, Louisiana)(Brief Article) (Statistical Data Included) *(Transportation & Distribution)*

The Big Sleazy, part II.(1996 election fraud in New Orleans, LA)(Capital Scene) (Cover Story) *(National Review)*

A tale of two schools.(unfair social differences between a public magnet school and a regular public school in New Orleans, LA ) *(National Catholic Reporter)*

Crescent City's spicy mix.(New Orleans, LA)(special section - National Association of Television Program Executives 1997 conference)... *(Variety)*

Imaginaire français et Amerique du Nord: genese d'un tourisme de distinction a Quebec et la Nouvelle-Orleans. *(Anthropologie et Societés)*

Search HighBeam Research for:  [New Orleans, La.]   **Research**

Additional search results provided by HighBeam Research, LLC. © Copyright 2005. All rights reserved.

© 2000–2007 Pearson Education, publishing as Infoplease. • **RSS** • About • Contact • Link to Us • Advertise with Infoplease • Terms of Use • Privacy • **Related sites:** Family Education • TeacherVision



☒ Stay Informed | 🔊 RSS Feeds | 🔍 Search Reports | 🛒 View Cart



# OBJECTIVE ANALYSIS. EFFECTIVE SOLUTIONS.

| About RAND | Research Areas | Reports & Bookstore | RAND Divisions | Graduate School | News & Events |

RAND > Newsroom > News Releases > March 15, 2006

## NEWS & EVENTS

News Releases

Commentary

Announcements

Calendar of Events

**Related Resources**

-  Latest Reports
- Hot Topics
- Featured Research
- Featured Projects
- RAND-Initiated Research
-  RAND in the Community
- Press Room

🔖 BOOKMARK 🔲 📧 📰

📧 SEND TO A FRIEND

# News Release

**FOR RELEASE**
Wednesday
March 15, 2006

## RAND STUDY ESTIMATES NEW ORLEANS POPULATION TO CLIMB TO ABOUT 272,000 IN 2008

The population of New Orleans will likely reach about 272,000 in September 2008 – amounting to 56 percent of the population of 485,000 before Hurricane Katrina struck in August, according to a study issued today by the RAND Corporation.

The report, produced by the RAND Gulf States Policy Institute, estimates the city's current population at about 155,000 and forecasts it will rise to about 198,000 in September. Only a few thousand people were living in New Orleans last September.

The new RAND study provides the most detailed estimates to date of the likely rate at which residents may return to New Orleans. It was prepared at the request of the Bring New Orleans Back Commission and is designed to help government officials plan the city's rebuilding.

The study says a key factor determining how quickly New Orleans can be repopulated is the availability of housing. The faster housing becomes available, the faster people can return to the city. Services, employment, federal funding and schools will be restored more rapidly as the population rises, the report says.

RAND researchers found that homes of about 55 percent of the city's population – 268,000 people – suffered severe damage after parts of New Orleans were inundated by floodwaters more than 4 feet deep when the hurricane hit and levees were breached. Rebuilding the most severely devastated areas of the city where these people lived will to a large extent determine the future of the city's population, the report says.

The study says policymakers can speed the repopulation rate of New Orleans by enacting policies and procedures to streamline the process for obtaining permits to repair and reconstruct housing, and this has begun.

Repopulation could also be accelerated if government officials provide clear and comprehensive information about progress and the ultimate goals for restoring essential city services and systems such as public transportation, levees, public safety, public education and hospitals, the report says.

"If officials give clear and complete information to the residents and

businesses of New Orleans, people can start to make solid plans, and this will encourage the reconstruction and rebuilding process," said Narayan Sastry, a RAND researcher and co-author of the report.

Other authors of the report – titled "The Repopulation of New Orleans after Hurricane Katrina" – are Kevin McCarthy, D.J. Peterson, and Michael Pollard, all of RAND.

Central to their analysis, the RAND researchers outlined the major factors shaping the migration decisions of the New Orleans population. The study says:

- While housing availability and employment opportunity are the factors that most limit the repopulation of New Orleans, the decisions and experiences – both positive and negative – of friends, family members, co-workers and neighbors have a tremendous impact upon the choices of others.

- Rebuilding New Orleans involves many interdependent processes, exemplified by the relationship between housing and employment. For example, many businesses are short of workers because there is not enough housing and the price of housing has increased. As a result, many workers are commuting from long distances. Others are unable to commute because they cannot afford cars, and because public transportation has been reduced.

- Uncertainties and delays in federal funding for repairing and upgrading the levees, underwriting flood insurance, and restoring essential services are likely to slow the repopulation process.

"The extent of the human and physical costs of Katrina on New Orleans is virtually unprecedented," McCarthy said. "But the uncertainties surrounding the recovery are probably the single most important factor in determining the pace and extent of the recovery. The more government at every level can do to reduce these uncertainties, the more rapid the conclusion of the recovery process is likely to be."

Using housing and population data for the city, in combination with federal floodwater depth data from last Sept. 10 – a day of near maximum flooding – the report provides a series of estimates about the rate at which New Orleans will be repopulated in the three years following Hurricane Katrina. The study does not examine population changes beyond September 2008.

The RAND report cautions that many currently unknown factors could influence the growth in the city's population, and that the population estimates it makes are based on limited data gathered in a short time period.

As a way to track the repopulation and rebuilding process, the study suggests that governmental agencies collect better data on a regular basis. For example, detailed information by age, household size, employment and socio-economic status of residents will help officials know how to best provide basic services – such as schooling, healthcare, infrastructure and public safety – and to gauge how well the recovery process is going.

The study also says that a significant number of the homes located in federally designated flood zones were not covered by insurance, suggesting a need to review federal programs and guidelines. In addition, many of those with insurance were inadequately covered, and so may find it difficult

to rebuild – particularly in light of rising construction costs and stricter new building codes.

RAND used charitable donations and funds earned on contracts to provide funding for the study. The nonprofit research organization created the RAND Gulf States Policy Institute in December with seven universities to develop a long-term vision and strategy to help build a better future for Louisiana, Mississippi and Alabama in the wake of Hurricanes Katrina and Rita. The universities working with the Institute are: Jackson State University and the University of Southern Mississippi in that state; Tulane University, the University of New Orleans and Xavier University in Louisiana; and Tuskegee University and the University of South Alabama in that state.

The analysis draws from an extensive array of sources, including: data gathered from officials at all levels of government; a local planning and consulting firm; research organizations; local and national news media reporting; and telephone interviews with professionals in fields such as insurance, planning, building and inspections, and employment, among others.

The study was conducted through RAND Labor and Population, which examines issues involving U.S. labor markets, the demographics of families and children, social welfare policy, the social and economic functioning of the elderly, and economic and social change in developing countries.

### About the RAND Corporation

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world.

▸ Read the Full Report

▸ Population and Aging Research Area

▸ E-mail sign up

---

RAND Home | About RAND | Research Areas | Reports & Bookstore | RAND Divisions | News & Events | Employment | Site Index | PRIVACY POLICY

RAND® is a registered trademark. Copyright © 1994-2007 RAND Corporation.  Site Feedback »

# EXHIBIT P

# LOUISIANA HOUSING FINANCE AGENCY

The following resolution was offered by Commissioner J. Mark Madderra and seconded by Vice-Chair Allison A. Jones:

## RESOLUTION

A resolution is hereby approved and provides that the Board of Commissioners of the Louisiana Housing Finance Agency ("Board") accepts the **Plan of Action regarding the revised timeline submitted by the Housing Authority of New Orleans** ("HANO") in conjunction with the St. Bernard I, B.W. Cooper, Lafitte, C.J. Peete I/III and Fisher tax credit properties.

**WHEREAS,** HANO submitted a revised timeline and benchmarks on October 9, 2007.

**WHEREAS,** Louisiana Housing Finance Agency ("Agency") Staff has reviewed the information provided by HANO regarding the total amount of allocated credits ($35,540,891), the total proposed units involved (1,929) and the projected impact that these units will have on the States' recovery and credit ceiling;

**NOW THEREFORE, BE IT RESOLVED,** the following Plan of Action is approved, and Staff or its agents be authorized to execute any forms and/or documents required to be executed on behalf of and in the name of the Agency, the terms of which are to be consistent with the provisions of this resolution as approved by the Agency's Counsel:

1) HANO shall provide written confirmation no later than Tuesday, December 18th that demolition on St. Bernard, BW Cooper, Lafitte, C.J. Peete, I and III and Fischer has begun;

2) HANO shall provide monthly progress updates from architect/engineer designated on each project that states the progress of the demolition and site preparation;

3) HANO shall provide written monthly updates on progress of the execution of construction contract for all sites to include information on the proposed contractor;

4) HANO shall notify the agency and provide a copy of the contractors "Notice to Proceed" for each development;

5) Agency shall directly receive copies, directly from an independent source, of the construction progress reports that HANO will provide to the investors/syndicators each month documenting percentage of construction completed;

6) The timeline presented by HANO in its October 9, 2007 e-mail and attached as Exhibit A will be provisionally accepted yet should HANO fail to meet any of the established, stated timelines, the credits shall be subject to immediate recapture.

7) HANO shall notify the Agency's staff in advance when inspections are being done, in correspondence with the stated benchmarks/construction completion dates, so that Agency staff will be present to make on site inspections;

Not withstanding the above, staff also recommends that the Agency, in conjunction with HANO and HUD work on parallel tracts to designate the credits allocated to HANO as a special set-aside with an extension of the PIS dates so that the credits will be protected should there be a delay in the timeline or for other unforeseen events.

This resolution having been submitted to a vote, the vote thereon was as following:

YEAS:    Wayne E. Woods, Allison A. Jones, Alice Washington obo
         John Kennedy, Robert Austin, J. Mark Madderra, Dr. Adell
         Brown, Jr., Merriell F. Lawson, Lisa Woodruff-White, Larry
         J. Broussard, and Guy T. Williams

NAYS:

ABSENT:  Danette O'Neal, Kevin J. Brown, and Carolyn B. Burris

And the resolution was declared adopted on this, the 14th day of November, 2007.

_____          _____
Chairman                         Secretary

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

I, the undersigned Secretary of the Board of Commissioners of the Louisiana Housing Finance Agency, do hereby certify that the foregoing two (2) pages constitutes a true and correct copy of a resolution adopted by said Board on November 14, 2007 providing approval of a resolution approving the Plan of Action regarding the revised timeline submitted by the Housing Authority of New Orleans ("HANO") in conjunction with the St. Bernard I, B.W. Cooper, Lafitte, C.J. Peete I/III and Fisher tax credit properties.

**IN FAITH WHEREOF**, witness my official signature and the impress of the official seal of the Agency on this, the 14th day of November, 2007.

_____
                Secretary

Exhibit A

## LHFA Project Schedules for HANO Projects

| Benchmarks | St.Bernard I | B.W. Cooper I | Lafitte | C.J. Peete III | C.J. Peete I | Fischer IV-3 |
|---|---|---|---|---|---|---|
| Environmental Clearance | 9/17/07 | 9/17/07 | 9/17/07 | 9/17/07 | 9/17/07 | 9/17/04 |
| TOTAL CARRYOVER EXPENDITURE | 9/26/07 | 9/26/07 | 9/26/07 | 9/26/07 | 9/30/06 | 9/30/06 |
| DEMOLITION START | 12/15/07 | 12/15/07 | 12/15/07 | 12/15/07 | 12/15/07 | 12/15/07 |
| FINAL ZONING APPROVAL | 10/17/06 | 10/17/06 | 10/12/06 | 10/11/06 | 4/6/06 | 4/6/06 |
| TRANSFER OF PROPERTY | 9/24/07 | 9/24/07 | 9/26/07 | 9/24/07 | 9/25/06 | 9/25/06 |
| Execution of Construction Contract | 5/15/08 | 6/1/08 | 6/1/08 | 7/30/08 | 7/30/08 | 5/13/08 |
| BUILDING PERMITS OBTAINED | 5/1/08 | 6/15/08 | 5/23/08 | 7/15/08 | 7/15/08 | 5/6/08 |
| CONSTRUCTION START | 6/15/08 | 7/15/08 | 6/30/08 | 8/15/08 | 8/15/08 | 5/27/08 |
| 10% CONSTRUCTION COMPLETED | 9/30/08 | 10/15/08 | 10/7/08 | 10/15/08 | 10/15/08 | 7/1/08 |
| 50% CONSTRUCTION COMPLETED | 4/30/09 | 10/15/09 | 6/19/09 | 6/15/09 | 6/15/09 | 12/1/08 |
| 90% CONSTRUCTION COMPLETED | 12/30/09 | 10/15/10 | 7/31/10 | 6/15/10 | 6/15/10 | 6/1/09 |
| CERTIFICATE OF OCCUPANCY/PIS | 3/30/10 | 12/31/10 | 9/30/10 | 4/15/10 | 4/15/10 | 5/1/09 |
| COST CERTIFICATIONS SUBMITTED | 3/30/11 | 3/31/11 | 12/31/10 | 10/30/10 | 10/30/10 | 11/1/09 |

Completed Task

# EXHIBIT Q

**Saul Schapiro**

**From:**     Leslie Strahan [lstrahan@lhfa.state.la.us]
**Sent:**     Friday, December 07, 2007 5:02 PM
**To:**       tracie@louisianajusticeinstitute.org
**Cc:**       Milton Bailey; Brenda Evans
**Subject:** Public Records Requested from LHFA concerning HANO

Dear Tracie:

I have some of the documents assembled for the Public Information Request you made earlier this week.  Other e-mails have been archived and the tapes they are on moved offsite so those are taking a little longer to assemble.  As other documents are retrieved, I will be in contract with you to determine the particulars of transmission of the document and payment of copying fees.

Milton wants to make it clear that the LHFA never required demolition by HANO by any specific date. The LHFA did not set the timeline for demolition or construction. As a matter of fact, the only deadline that LHFA mandated was the deadline for HANO to "meet carryover," a deadline required for all tax credit properties, which was accomplished by the execution of the ground lease.

The date slated for demolition was chosen by HUD/HANO. HANO set up its own schedule/timeline, which was approved by the LHFA Board so that the state's tax credits would not be at risk. The LHFA Board is requiring that HANO meet its own deadlines since if the housing units that are due to come online do not do so in a timely manner, the tax credits will be lost to the detriment of other housing developers who could have gotten their developments up and running and Louisiana's citizens waiting to return to safe, affordable homes.

If you wish to discuss your request further, please contact me at 225-763-8878 or by e-mail. Many thanks for your continued cooperation.

Leslie C. Strahan
Attorney, LHFA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, Inc.;<br>GLORIA IRVING;<br>STEPHANIE MINGO;<br>SHIRLEY MORRIS; and<br>CHANTEL YOUNG<br><br>Plaintiffs,<br><br>v.<br><br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT;<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, AS RECEIVER OF<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>ALPHONSO JACKSON, Secretary of the United<br>States Department of Housing and Urban<br>Development;<br>ORLANDO CABRERA, Assistant Secretary of the<br>United States Department of Housing and Urban<br>Development<br>C. DONALD BABERS, Board of Commissioners,<br>Housing Authority of New Orleans;<br>KAREN CATO-TURNER, Executive Administrator,<br>Housing Authority of New Orleans; and<br>And each individual defendant in his official capacity,<br><br>Defendants. | CIVIL ACTION NO.<br><br>_____ |

## **AFFIDAVIT OF SHIRLEY MORRIS**

I, Shirley Morris, having first been duly sworn, depose, and say as follows:

1.      My name is Shirley Morris.

2.      Immediately prior to Hurricane Katrina I resided at the St. Bernard public housing development (the "St. Bernard"). My mother had resided in the St. Bernard and I grew up there. In 1960 I had moved out when I got married and about 8 years later I moved back when I got divorced. After I came back I had my own apartment with my daughter.

3.      Prior to Hurricane Katrina, I had worked for food services at the Vorice Waters School and performed answering services for a local funeral parlor. I had also worked at the New Day Care Center taking care of the St. Bernard neighborhood children.

4.      When Hurricane Katrina was predicted to hit New Orleans local family members left their homes in subdivisions outside of the St. Bernard and came to stay with me and my daughter in the St. Bernard. They had expressed to me that because of the solid construction of the St. Bernard they believed they would be safe.

5.      After Hurricane Katrina hit, I was evacuated the next day.

6.      Upon my evacuation from the St. Bernard I was sent to a shelter in Houston. I stayed there for about 3 weeks but was told I had to leave because of Hurricane Rita.

7.      From there I went to a hotel in Euclid, Ohio. I stayed in Euclid for about 2 weeks until I learned that my daughter's father, who had had an extended hospitalization and had stayed in New Orleans throughout the storm and after, was dying.

8.      I moved to Plaquemine, Louisiana to stay with family and we brought my daughter's father there. He died after about 2-3 weeks there. I stayed there for about a total of a month.

9.      From Plaquemine I moved to Baton Rouge and stayed in a 2 bedroom place with

my daughter and extended family members.  We got the place in Baton Rouge through FEMA and I stayed there for about 18 months.

10.    Living in Baton Rouge was expensive for us because we had to pay our own utilities.  My daughter became very depressed and suffers from high blood pressure.  We both wanted to come home and missed our friends and family.

11.    My daughter learned that Iberville public housing development (the "Iberville") was open and got in touch with HANO.

12.    I currently live at the Iberville with my daughter.

13.    I don't like living at the Iberville.  I'm not comfortable there, I don't know the people, and there isn't enough room.  I want to get out of the inner city.  There is a lot of crime at the Iberville.

14.    I want to go home to the St. Bernard.

15.    I learned about HANO's plans to demolish and dispose of the St. Bernard from the news, newspapers, and by talking to people.  Friends and family would call even when I was in Baton Rouge.  HANO didn't send me any notices.

16.    I believe the residents of St. Bernard have been treated with disrespect since the storm – we have been barred from their homes, many have been kept from getting their belongings, and we have been deprived of any legitimate opportunity to participate in crucial decision making about the future of our community.

17.    I joined with other residents of the St. Bernard that formed the St. Bernard Housing Recovery & Development Corporation, Inc. (the "Corporation").

18.    I am a resident participant of the Corporation.

19.    The Corporation was formed to serve as a vehicle to organize all residents of the St. Bernard to work formally with other community groups and/or prospective developers interested in working to realize the goal of redevelopment and rehabilitation of the St. Bernard.

20.    The Corporation meets regularly and has actively solicited support and technical assistance from numerous groups and professionals who share common interests. Working with these groups, the Corporation has developed a comprehensive plan for the tenants, working with private partners, to rebuild our homes, maintain affordability, and preserve our community at the St. Bernard.

21.    The Corporation submitted a proposal for it to purchase and redevelop the St. Bernard. I am in favor of that proposal.

22.    I believe the Corporation's proposal provides HUD/HANO with the unique opportunity to prevent an injustice to our community. The proposal is a statement of what I want and how I believe it can be achieved.

Signed and sworn to under the pains and penalties of perjury this ___10___ day of December, 2007.

Shirley Morris

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, Inc.;<br>GLORIA IRVING;<br>STEPHANIE MINGO;<br>SHIRLEY MORRIS; and<br>CHANTEL YOUNG<br><br>Plaintiffs,<br><br>v.<br><br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT;<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>U.S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, AS RECEIVER OF<br>HOUSING AUTHORITY OF NEW ORLEANS;<br>ALPHONSO JACKSON, Secretary of the United<br>States Department of Housing and Urban<br>Development;<br>ORLANDO CABRERA, Assistant Secretary of the<br>United States Department of Housing and Urban<br>Development<br>C. DONALD BABERS, Board of Commissioners,<br>Housing Authority of New Orleans;<br>KAREN CATO-TURNER, Executive Administrator,<br>Housing Authority of New Orleans; and<br>And each individual defendant in his official capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br><br>_____ |

## AFFIDAVIT OF STEPHANIE MINGO

I, Stephanie Mingo, having first been duly sworn, depose, and say as follows:

1.      My name is Stephanie Mingo.

2.    Immediately prior to Hurricane Katrina I resided at the St. Bernard public housing development (the "St. Bernard"). My mother had resided in the St. Bernard and I was born and grew up there. I had my own apartment there for approximately 22 years prior to Hurricane Katrina.

3.    Prior to Hurricane Katrina, I had worked for HANO for almost 10 years as a laborer doing maintenance and repair of the St. Bernard. I currently work, and I have worked for the past 9 years, for the Orleans Parish School Board as a Food Service Technician. I also volunteer to feed the homeless of New Orleans.

4.    After Hurricane Katrina hit New Orleans, I was evacuated the next day.

5.    Upon my evacuation from the St. Bernard I was sent to a shelter in a gym in Homer, Louisiana. I stayed there for about 4 months. From there I went to live with my family one bedroom apartment in Houston Texas.

6.    I visited New Orleans, leaving my children in Texas, to find out how I could come back to New Orleans and to fight for my home.

7.    I moved back to New Orleans in about March, 2006 (about 7 months after the hurricane) and currently live at the Iberville public housing development (the "Iberville") with my family.

8.    I don't like living at Iberville. I'm not comfortable there, I don't know the people, there isn't enough room, and the children don't go out to play.

9     I regularly visit the St. Bernard area. The people from the St. Bernard get together a few days a week and meet at a lot across the street from the St. Bernard to let their children play together and try to learn what's going on with the St. Bernard and about other neighbors from the St. Bernard.

10.    We also get together, on that same lot, to celebrate holidays like the 4th of July, Labor Day, Halloween with residents from the St. Bernard and the surrounding community.

11.    I want to go home to the St. Bernard.

12.    I learned about HANO's plans to demolish and dispose of the St. Bernard by talking to people.  HANO didn't send me any notices.

13.    Lots of people went to hearings about the demolition and disposition of the St. Bernard but, in my opinion, HANO didn't listen to anything the tenants had to say.

14.    I believe the residents of St. Bernard have been treated with disrespect since the storm – we have been barred from their homes, many have been kept from getting their belongings, and we have been deprived of any legitimate opportunity to participate in crucial decision making about the future of our community.

14.    I joined with other residents of the St. Bernard and formed the St. Bernard Housing Recovery & Development Corporation, Inc. (the "Corporation").

15.    I am the Vice-President of the Corporation.

16.    The Corporation was formed to serve as a vehicle to organize all residents of the St. Bernard to work formally with other community groups and/or prospective developers interested in working to realize the goal of redevelopment and rehabilitation of the St. Bernard.

17.    The Corporation meets regularly and has actively solicited support and technical assistance from numerous groups and professionals who share common interests. Working with these groups, the Corporation has developed a comprehensive plan

for the tenants, working with private partners, to rebuild our homes, maintain affordability, and preserve our community at the St. Bernard.

18.    The Corporation submitted a proposal for it to purchase and redevelop the St. Bernard. I am in favor of that proposal.

19.    I believe the Corporation's proposal provides HUD/HANO with the unique opportunity to prevent an injustice to our community. The proposal is a statement of what I want and how I believe it can be achieved.

Signed and sworn to under the pains and penalties of perjury this _10_ day of December, 2007.

Stephanie Mingo

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. BERNARD HOUSING RECOVERY & DEVELOPMENT CORPORATION, Inc., et al., :<br><br>Plaintiffs, :<br><br>v. :<br><br>U. S DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., :<br><br>Defendants. : | Civil Action No.<br>1:07-CV-02231 |

**LOCAL RULE 65.1 CERTIFICATE**

Pursuant to Local Civil Rule 65.1, undersigned counsel for Plaintiffs certifies that subsequent to the filing of this action on December 11, 2007, the following contacts and activities took place to inform Defendants of Plaintiffs' intention to seek the issuance of a Temporary Restraining Order by this Court:

1.     Summonses issued to the United States Attorney for the District of Columbia, the United States Attorney General, the Secretary of the U.S. Department of Housing and Urban Development ("HUD"), and the Assistant Secretary of the U.S. Department of Housing and Urban Development, along with service copies of the Complaint, were placed in the hands of a private process server for delivery to appropriate officials.  Undersigned counsel was advised that the United States Attorney for the District of Columbia was served on December 11, 2007.

2.     At approximately 4:35 p.m. on December 11, 2007, undersigned counsel spoke on the telephone with Ms. Nancy Christopher, Associate General Counsel, Office of Litigation, U.S. Department of Housing and Urban Development and advised her that an injunction action had

been filed against HUD, the Secretary and Assistant Secretary of HUD, in their official capacities, and that TRO papers would be served and filed on December 12, 2007. The undersigned provided the style of the case and stated the nature of the proceeding. Ms. Christopher indicated she was aware of the underlying dispute, as she was at that very moment reading a letter from the undersigned's law firm dated December 11, 2007 requesting that HUD entertain a proposal by the former residents of St. Bernard housing project to rehabilitate their former housing units. Ms. Christopher provided her email address and a courtesy copy of the Complaint was emailed to her office prior to 5:00 p.m. on December 11, 2007. Courtesy copies of Plaintiffs' Motion for Temporary Restraining Or Preliminary Injunction, supporting memorandum, proposed Order, Affidavits and Exhibits ("TRO papers") were emailed to Ms. Christopher on December 12, 2007 at approximately 9:00 a.m.

3.      At approximately 4:45 p.m. on December 11, 2007, undersigned counsel placed a telephone call to the Legal Department of the Housing Authority of New Orleans ("HANO") and left a voice message advising that an injunction action had been filed against HANO and identifying the style and Civil Action No. of the case and the underlying dispute. The voice message also reported that TRO papers were going to be filed the next day and offered to email courtesy copies of all pleadings if an email address was provided. The message also included the undersigned's call back number.

4.      At approximately 4:50 p.m. on December 11, 2007, the undersigned sent an email to the U. S. Department of Justice through its web site, the receipt of which was acknowledged, advising that an injunction action had been filed and identifying the style and Civil Action No. of the case and the underlying controversy. The email asked for an email address so that courtesy copies of all pleadings could be sent. Subsequently, the undersigned spoke on the telephone with

-2-

a person in the Civil Division of the Department of Justice, who advised that the Department did not accept pleadings through email and that hard copies should be served at the Main Justice Building. On December 12, 2007 at approximately 10:30 a.m. copies of TRO papers will be dispatched via courier to the Main Justice Building, 950 Pennsylvania Avenue, N.W., Washington , DC.

5. From approximately 4:55 p.m. to 5:00 p.m. on December 11, 2007, the undersigned unsuccessfully tried to reach a person or a voice mailbox at the Office of the Untied States Attorney for the District of Columbia. At approximately 10:30 a.m. on December 12, 2007, copies of TRO papers will be dispatched via courier to the U.S. Attorney's Office, 455 Fourth Street, N.W., Washington, DC. At around 9:00 a.m. on December 12, 2007, my colleague Charles Carpenter spoke with Latisha Carroll, Civil Docket Clerk at the U.S. Attorney's Office. She confirmed receipt of a service copy of the Complaint. Mr. Carpenter informed her that we would be filing TRO papers and would be seeking an imminent hearing. She promised to inform the Deputy assigned to the case.

<div style="margin-left:40%">

_____/s/ Charles H. Carpenter_____
Charles H. Carpenter, Esq. (DC Bar #432004)
William J. Bethune, Esq. (DC Bar #66696)
PEPPER HAMILTON, LLP
600 Fourteenth Street, N.W.
Washington, DC 20005
Phone: (202) 220-1203
Fax: (202) 478-2118
bethunew@pepperlaw.com

*Local Counsel for Plaintiffs*

</div>

#9136284 v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. BERNARD HOUSING RECOVERY<br>& DEVELOPMENT CORPORATION, Inc., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U. S DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT, et al.,<br><br>    Defendants. | Civil Action No.<br><br>_____ |

**TEMPORARY RESTRAINING ORDER**

This cause came before the Court upon the Motion For Temporary Restraining Order filed by Plaintiffs, and upon consideration of the same and of Plaintiff's Verified Complaint, supporting Declaration and exhibits, and it appearing to the Court that Defendants have been given notice of the application for the Order and have had an opportunity to respond, and the Court having considered the arguments of counsel at the hearing on December ___, 2007, and it further appearing that there are good grounds for granting the Motion and that Plaintiffs would suffer immediate and irreparable injury as the result of Defendants' proceeding with their plan to demolish the St. Bernard public housing project in the City of New Orleans prior to consulting with and considering the proposal of Plaintiffs for the rehabilitation and redevelopment of the St. Bernard project, it is by the Court this ___ day of December, 2007

ORDERED that the Motion for Temporary Restraining Order be and the same is hereby GRANTED and that Defendants and each of them, and their respective officers, agents, servants, employees and attorneys, and other persons acting in concert with them, be and they are

restrained and stayed from commending or proceeding with the demolition of the St Bernard

housing project pending further Order of the Court; and it is

FURTHER ORDERED that the requirement that Plaintiffs give security to pay the costs

and damages sustained by any party found to have been wrongfully restrained is waived; and it is

FURTHER ORDERED that a hearing on Plaintiffs' motion for preliminary injunction

will be held on _____, _____, beginning at _____ in Court Room No.

_____, of the United States District Court for the District of Columbia and this Order

shall remain in full force and effect until dissolved by law or until further Order of the Court.


_____

United States District Judge