UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | * | |
| | * | |
| ST. BERNARD HOUSING RECOVERY & | * | |
| DEVELOPMENT CORPORATION, INC., | * | |
| GLORIA IRVING, STEPHANIE MINGO, | * | |
| SHIRLEY MORRIS, AND CHANTEL YOUNG | * | |
| | * | |
| Plaintiffs, | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 1:07-CV-02231 |
| | * | |
| U.S. DEPARTMENT OF HOUSING AND URBAN | * | |
| DEVELOPMENT, HOUSING AUTHORITY OF | * | |
| NEW ORLEANS, ALPHONSO JACKSON, | | |
| ORLANDO CABRERA, C. DONALD BABERS, | | |
| AND KAREN CATO-TURNER | | |
| | | |
| Defendants, | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION TO DISMISS FOR LACK OF
## PERSONAL JURISDICTION AND IMPROPER VENUE

Defendants, the Housing Authority of New Orleans, C. Donald Babers, and Karen

Cato-Turner (hereinafter collectively "HANO"), through undersigned counsel and pursuant to

Fed. R. Civ. P. 12(b)(2) and (b)(3), move the Court to dismiss the lawsuit of plaintiffs, the St.

Bernard Housing Recovery & Development Corporation, Gloria Irving, Stephanie Mingo,

Shirley Morris, and Chantel Young against HANO for lack of personal jurisdiction and improper venue. As more fully set forth in the memorandum in support filed herewith, HANO lacks the necessary minimum contacts with the District of Columbia to support the exercise of personal jurisdiction by the Court and plaintiffs have failed to satisfy the venue provisions of 28 U.S.C. § 1391(b). Accordingly, the Court should dismiss plaintiffs' lawsuit against HANO.

**WHEREFORE**, for the foregoing reasons, as well as for the reasons stated more fully in the memorandum in support of this motion, defendants, the Housing Authority of New Orleans, C. Donald Babers and Karen Cato-Turner, respectfully move to dismiss the claims against them for lack of personal jurisdiction and improper venue..

Dated: December 13, 2007.

Respectfully submitted,

Rachel W. Wisdom, La. Bar No. 21167,
T.A.
Ashlee M. Robinson, La. Bar No. 28743
Heather S. Lonian, La. Bar No. 29956
*(Motions for admission pro hac vice pending)*
Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Telephone: (504) 581-3200

Attorneys for Housing Authority of New Orleans, C. Donald Babers, and Karen Cato-Turner

- 2 -

903813v.1

## C E R T I F I C A T E

    I hereby certify that a copy of the above and foregoing Motion to Dismiss for Lack of Personal Jurisdiction has been served upon all counsel of record by electronic transmission and by placing same in the United States Mail, properly addressed and postage pre-paid, this 13th day of December, 2007.

<u>Rachel W. Wisdom /tacb</u>

903813v.1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ST. BERNARD HOUSING RECOVERY & DEVELOPMENT CORPORATION, INC., GLORIA IRVING, STEPHANIE MINGO, SHIRLEY MORRIS, AND CHANTEL YOUNG | * * CIVIL ACTION * * NO. 1:07-CV-02231 * * * |
| Plaintiffs, | * * |
| VERSUS | * * |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, HOUSING AUTHORITY OF NEW ORLEANS, ALPHONSO JACKSON, ORLANDO CABRERA, C. DONALD BABERS, AND KAREN CATO-TURNER | * * |
| Defendants, | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE
AND IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants, the Housing Authority of New Orleans, C. Donald Babers, and Karen

Cato-Turner (hereinafter collectively the "HANO defendants":), through undersigned counsel[1]

---

[1]     The emergency nature of these proceedings required the HANO defendants to retain local counsel on very short notice. The short deadline for the filing of this pleading prevented the HANO defendants' local counsel from reviewing this pleading prior to its filing. HANO's Louisiana counsel (who will be filing motions for admission pro hac vice simultaneously with the filing of this motion) has been actively involved in the ongoing, related litigation, *Anderson v. Jackson*, Civil Action No. 06-3298 (E.D. La.)(Lemelle, J.)

903814v.2

and with a full reservation of all rights and defenses, respectfully submit the following in support

of their Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue the lawsuit of

plaintiffs, the St. Bernard Housing Recovery & Development Corporation, Inc., Gloria Irving,

Stephanie Mingo, Shirley Morris, and Chantel Young.  This memorandum is further filed in

opposition to plaintiffs' Motion for Temporary Restraining Order.[2]

## I.    INTRODUCTION

The Housing Authority of New Orleans is the local public housing authority for

New Orleans, Louisiana.  C. Donald Babers serves as HANO's Board of Commissioners.  Karen

Cato-Turner is the Executive Administrator of HANO.  HANO has no contacts with the District

of Columbia.  HANO does not nor is alleged to own or rent property in the District of Columbia,

nor it licensed, authorized or qualified to do business in the District of Columbia.  HANO has

never had a registered agent for service of process in the District of Columbia.  Additionally,

HANO has never maintained an office in the District of Columbia, has never maintained a bank

account in the District of Columbia, and has no employees in the District of Columbia.

Plaintiffs' claims do not arise from any alleged actions committed within the District of

Columbia, and are not alleged to have suffered any injury within the District of Columbia.

Moreover, the housing development which plaintiffs seek to enjoin HANO from demolishing is

not located within the District of Columbia.  (Compl. at p. 3).  Thus, HANO does not have

---

since its initiation and are familiar with the facts and legal issues pertaining to the
demolition of the St. Bernard housing development.

[2]    HANO specifically reserves its right to object to the personal jurisdiction and venue of
this Court.

903814v.2

sufficient contacts with the District of Columbia to be subject to personal jurisdiction in this district or to make venue here proper.

Because this Court has no personal jurisdiction over the HANO defendants, plaintiffs' request for a temporary restraining order to prevent the demolition of property located in New Orleans, Louisiana should be denied.  Further, plaintiffs fail to meet any of the requirements necessary for the granting of a temporary restraining order as set forth more fully in the opposition filed today on behalf of the Department of Housing and Urban Development ("HUD"), Alphonso Jackson, and Orlando Cabrera (hereinafter collectively the "federal defendants"), which is adopted and incorporated herein by reference.

## II.    <u>STATEMENT OF THE FACTS</u>

This suit was filed on December 11, 2007 by plaintiffs, the St. Bernard Housing Recovery & Development Corporation, Gloria Irving, Stephanie Mingo, Shirley Morris and Chantel Young against defendants the U.S. Department of Housing and Urban Development ("HUD"); the Housing Authority of New Orleans ("HANO"); Alphonso Jackson, the Secretary of HUD; Orlando Cabrera, Assistant Secretary of HUD; C. Donald Babers, HANO's Board of Commissioners; and Karen Cato-Turner, HANO's Executive Administrator.  The filing of this suit comes after a substantially similar suit brought by substantially similar plaintiffs also seeking to prevent the demolition of the St. Bernard Housing Development due to alleged violations of 28 U.S.C. § 1437p was dismissed in the Eastern District of Louisiana.  Plaintiffs are seeking first and foremost a temporary restraining order to prevent HANO from going forward with the planned and approved demolition of the St. Bernard public housing development,

903814v.2

located in New Orleans, Louisiana. This request for injunctive relief comes after both the Eastern District of Louisiana and the United States Court of Appeals for the Fifth Circuit refused to enjoin demolition of St. Bernard and three other public housing projects in New Orleans. Plaintiffs have alleged claims relating to HANO's adherence to federal statutes and regulations regarding the application process for demolishing and redeveloping public housing.

In their Complaint, plaintiffs allege that HANO's principal place of business is located at 4100 Touro St., New Orleans, Louisiana (Comp. at ¶ 7). Mr. Babers, who serves as the Board of Commissioners of HANO, is alleged to work at 801 Cherry St., Burnett Plaza, 26th Floor, Forth Worth, Texas. (Compl. at ¶ 11). Ms.Cato-Turner, the Executive Administrator of HANO, is alleged to work at Bricknell Plaza Federal Building, 909 S.E. First Ave., Room 500, Miami, Florida (Compl. at ¶ 12). The Complaint does not allege that either Mr. Babers or Ms. Cato-Turner work or reside within the District of Columbia.

In their Complaint, plaintiffs Irving, Mingo, Morris, and Young allege that they previously resided at the St. Bernard public housing development in New Orleans, Louisiana (Comp. at ¶ ¶ 1- 4), that they continue to reside in New Orleans, Louisiana (Compl. at Caption), and that they are founders and members of a entity, plaintiff St. Bernard Housing Recovery & Development Corp. Inc. ("SBHR&DC"), that is alleged to be organized under the laws of the State of Louisiana (Compl. at ¶ 5) and is alleged to be located in Louisiana (Compl. at Caption). The Complaint does not allege that any plaintiff is domiciled in the District of Columbia or that any plaintiff suffered any alleged injury within the District of Columbia. In their Complaint and subsequent motion, plaintiffs residing in Louisiana seek to enjoin a Louisiana public housing

903814v.2

authority from demolishing a public housing development located in Louisiana.  There is no connection whatsoever between plaintiffs' claims against HANO and the District of Columbia.

## III.    LAW AND ARGUMENT

### A.    The HANO Defendants Lack The Required Minimum Contacts To Subject Them To Personal Jurisdiction In The District Of Columbia

The Court should dismiss plaintiffs' claims against the HANO defendants because the District of Columbia's long-arm statute does not provide a basis for the exercise of personal jurisdiction as to the HANO defendants, and the HANO defendants lack the required minimum contacts to subject them to personal jurisdiction in the District of Columbia under the Due Process Clauses of the Fifth and Fourteenth Amendments.[3]  In the Complaint, plaintiffs allege that HANO's principal place of business is located at 4100 Touro St., New Orleans, Louisiana.  As noted above, HANO does not and is not alleged to own any property or conduct any business within the District of Columbia.  Neither Mr. Babers, Ms. Cato-Turner nor any other HANO employee works or is alleged to work or reside within the District of Columbia.  It is clear,

---

[3]    Plaintiffs allege that the Court can exercise personal jurisdiction over the HANO defendants pursuant to 28 U.S.C. § 1331.  As the Court noted in *SEC. v. Lines Overseas Mgmt., Ltd.,* WL 581909 at *2 (D.D.C. Feb. 21, 2007), the constitutional limits of personal jurisdiction are imposed by the Fifth Amendment when, as here, the purported basis for jurisdiction arises from a federal statute.  "The Supreme Court has never squarely defined Fifth Amendment due process limits on personal jurisdiction.  However, with respect to the identically-phrased due process clause in the Fourteenth Amendment, the Supreme Court has required that persons, whether individuals or corporations, haled into court in a particular forum have 'certain minimum contacts with [the forum] such that the maintenance of the [judicial proceeding] does not offend traditional notions of fair play and substantial justice."  In this circuit, following the Supreme Court's Fourteenth Amendment personal jurisdiction jurisprudence, 'certain minimum contacts' must exist between the person and the jurisdiction to be consistent with the Due Process Clause of the Fifth Amendment."  *Id.* (internal citations omitted).

- 5 -

therefore, from the face of the Complaint that the HANO defendants are not residents of the District of Columbia.  See D.C. Code. § 13-422.

When determining whether personal jurisdiction exists as to a non-resident defendant, the Court engages is a two-part inquiry.  "First, the Court must determine whether jurisdiction may be exercised under the District's long-arm statute.  Second, the Court must determine whether the exercise of personal jurisdiction satisfies due process requirements." *Skinner v. United States*, 2007 WL 744737 at 2 (D.D.C. Mar. 6, 2007)(citing *GTE New Media Serv., Inc. v. Bell South Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000); *U.S. v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)).  The District of Columbia long-arm statute, set forth in D.C. Code § 13-423, states, in pertinent part, that a court within the District of Columbia may exercise personal jurisdiction over a person or entity when the claim for relief arises from (1) business conducted within the District of Columbia; (2) services contracted within the District of Columbia; (3) alleged tortious injury suffered within the District of Columbia as the result of alleged actions or inactions committed within the District of Columbia; (4) alleged tortious injury suffered within the District of Columbia as a result of actions or inactions committed outside the District of Columbia; and (5) having an interest in, using, or possessing real property in the District of Columbia.  Plaintiff bears the burden of establishing that jurisdiction exists pursuant to the long-arm statute, First *Chicago Int'l v.. United Exchange Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988), yet the Complaint is utterly devoid of any allegations that the HANO defendants satisfy any of these requirements.  HANO does not and is not alleged to own any property, conduct any business, or contract any services within the District of Columbia.  The

903814v.2

claims against the HANO defendants arise entirely from alleged conduct that occurred within Louisiana pertaining to a housing development located in Louisiana. Plaintiffs do not and cannot allege that they have suffered any injury within the District of Columbia. Thus, personal jurisdiction over the HANO defendants cannot be exercised under the District of Columbia's long-arm statute.

Because the District of Columbia's long-arm statute does not provide a basis for exercising personal jurisdiction over the HANO defendants, doing so would fail to satisfy the Due Process Clauses of the Fifth and Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a foreign defendant when (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Int'l. Shoe Co. v. Washington*, 236 U.S. 310, 316, 66 S. Ct. 154 (1945). In order for the exercise of personal jurisdiction to be proper, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239-40 (1958). In this case, the alleged conduct giving rise to the cause of action has not taken place in the District of Columbia, and the HANO defendants have done nothing to purposefully avail themselves of the privilege of conducting business in the District of Columbia. HANO has not directed any activities toward residents of the District of Columbia. Thus, the HANO defendants have no "reasonable anticipat[ion of] being haled into court" in the District of

903814v.2

Columbia." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980).[4]  Because the District of Columbia's long-arm statute does not provide a basis for the exercise of personal jurisdiction as to the HANO defendants, and the HANO defendants lack the required minimum contacts to subject them to personal jurisdiction in the District of Columbia under the Due Process Clauses of the Fifth and Fourteenth Amendments, the Court should dismiss the claims against the HANO defendants.[5]

**B.    Venue Is Not Proper In The District Of Columbia.**

Plaintiffs' Complaint alleges that venue is proper pursuant to 28 U.S.C. § 1331. However, this statute pertains to subject matter jurisdiction of the district courts; it does not provide for venue.  Rather, 28 U.S.C. § 1391 governs venue in federal district courts.  Pursuant to § 1391(b), in an action where subject matter jurisdiction is not based solely on diversity of citizenship, venue is proper in (1) a judicial district in which any defendant resides, if all defendants reside in the same state; (2) in a district where a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of

---

[4]    On the contrary, since, as noted more fully in the Federal defendants' memorandum, plaintiffs' counsel has already haled the HANO defendants into court in the United States District Court for the Eastern District of Louisiana and the United States Fifth Circuit Court of Appeals by asserting nearly identical claims and seeking identical relief in that forum, the HANO defendants had even less reason to anticipate being haled into a different federal court to defend itself from nearly identical claims and to re-argue motions that have already been denied by the Honorable Ivan L.R. Lemelle and the Fifth Circuit.

[5]    For the reasons discussed more fully below and in the federal defendants Opposition, plaintiffs' contention that actions by the HANO defendants can be attributed to HUD for purposes of exercising personal jurisdiction over HANO lacks merit.  Mr. Babers and Ms. Cato-Turner are sued in their official capacities as HANO officials and are not alleged to have performed any actions in their respective official capacities within the District of Columbia.

- 8 -

the action is situated; or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b). None of these conditions is satisfied in the instant case and plaintiffs' claims against the HANO defendants should be dismissed due to improper venue under Fed. R. Civ. P. 12(b).

Venue is not proper in the District of Columbia because, while it is a district where one or more defendants resides, not all defendants reside in the same state. HUD, Secretary Jackson and Assistant Secretary Cabrera may be deemed to reside in the District of Columbia. However, neither HANO, Mr. Babers, nor Ms. Cato-Turner can fairly be said to reside there for purposes of venue. HANO is an agency created pursuant to laws of the State of Louisiana with its headquarters and principal place of business in New Orleans, Louisiana. As discussed more fully above, HANO has no office in D.C., does not transact business in D.C., and, other than sending information to HUD as required by law, has absolutely no contact with D.C. HANO neither resides nor is subject to personal jurisdiction in D.C. and thus, whether HANO is treated as a corporation or an individual for venue purposes, venue is not proper in the District of Columbia. 28 U.S.C. § 1391(b), (c). Mr. Babers serves as HANO's Board of Commissioners and has been sued in this capacity. Pls.' Comp. at ¶11. His office is located in Fort Worth, Texas. *Id.* Ms. Cato-Turner has been sued in her official capacity as the Executive Director of HANO. *Id.* at ¶12. Her office is located in Miami, Florida. *Id.* A public official, when sued in an official capacity rather than as an individual, resides for venue purposes in the district of his or her official residence; that is, where he or she performs his or her official duties. *See Butterworth v. Hill*, 114 U.S. 128, 132 (1885). Mr. Babers performs his official duties as the

903814v.2

Board of Commissioners for HANO in New Orleans and in Texas. Ms. Cato-Turner performs her official duties in New Orleans and Florida. Neither resides in D.C. for venue purposes.

Plaintiffs appear to argue that HUD's receivership of HANO somehow makes all of HUD the alter ego of HANO and allows for suit to be brought against HANO anywhere that HUD resides. This is incorrect. HUD's receivership involved the appointment of Mr. Babers and Ms. Cato-Turner to their respective positions. In this capacity, Mr. Babers and Ms. Cato-Turner are deemed to be employees of HANO. 42 U.S.C. § 1437d(j)(3)(H). The day to day to operations of HANO are not controlled by HUD officials in D.C. Therefore, there can be no doubt that, for venue purposes, not all defendants reside in the same state and venue is not proper under § 1391(b)(1). Were this not the case, this Court would be a proper venue for all suits brought against a troubled public housing authority regardless of where the public housing authority was located.

Plaintiffs also cannot satisfy the venue requirements under § 1391(b)(2). Venue is proper in any district where a substantial part of the events or omissions giving rise to the claim occurred or where a substantial part of the property giving rise to the action is situated. HANO's actions and decisions giving rise to plaintiffs' claims all occurred in New Orleans. Moreover, the property that is at the heart of this litigation and which plaintiffs seek to enjoin demolition of is located in New Orleans. HANO did not take any action in D.C. nor does the St. Bernard public housing development have any connection to D.C. Thus, venue is not proper under this provision.

903814v.2

Lastly, plaintiffs cannot avail themselves of any other option for venue provided by § 1391. Under § 1391(b)(3) venue will be proper if the case is brought in "a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b). This provision does not apply here because there is a district in which the action may be brought. Indeed, there is another district in which the action *has* been brought. *See Anderson v. Jackson*, No. 06-3298 (Eastern District of Louisiana). In June 2006, seventeen named plaintiffs brought a proposed class action against HANO, its officials, HUD and HUD officials in the Eastern District of Louisiana seeking to prevent the demolition of the St. Bernard housing development, as well as three other public housing developments. Venue was proper in the Eastern District of Louisiana. A substantial part of the acts or omissions giving rise to the claim occurred within that district. The property giving rise to the action is situated in New Orleans. While HUD and its officials do not reside in the State of Louisiana, such is not necessary under 28 U.S.C. § 1391(e) for an otherwise proper venue.

Plaintiffs filing of suit in the District of Columbia against HANO is nothing more than blatant and impermissible forum shopping. Both the Eastern District of Louisiana and the United States Court of Appeals for the Fifth Circuit refused to enjoin the demolition of St. Bernard. Plaintiffs then filed the instant suit in the District of Columbia hoping for a different result. Plaintiffs' desire for a different result is not sufficient to make the District of Columbia a proper venue. Venue is not proper in this district and plaintiffs' claims should be dismissed. Alternatively, the case should be transferred pursuant to 42 U.S.C. § 1406(a) to the only district where venue is proper - the Eastern District of Louisiana.

903814v.2

**C.    A Temporary Restraining Order Should Not Be Issued.**

Reserving all objections to personal jurisdiction and venue, the HANO defendants oppose plaintiffs' motion for temporary restraining order to prevent the demolition of the St. Bernard housing project.  As noted above, this Court has no personal jurisdiction over HANO and proper venue does not lie in this district.  For these reasons alone, the Court should deny plaintiffs' motion.  Furthermore, the Court should deny plaintiffs' motion because plaintiffs' fail to meet even one, much less all four, of the prerequisites necessary to support to support such drastic relief.  First, and for all of the reason's set forth in the opposition filed by the federal defendants (which HANO expressly adopts and incorporates herein by reference), plaintiffs' claims are barred by the doctrine of *res judicata*.

Second, even if their claims were not *res judicata* and were filed in a court of proper venue with personal jurisdiction over HANO, their claims would be subject to dismissal under Federal Rule of Civil Procedure 12(b)(6).  As set forth in the Federal Defendants' opposition, plaintiffs simply did not submit an application to redevelop St. Bernard by January 5, 2007, when responses to the RFQ were due.  When a plaintiff altogether fails to submit an application by the deadline, there is no legal claim to relief.  Consequently, the Court should dismiss Count 1 of Plaintiffs' Complaint..  Furthermore and for the reasons fully set forth in the Federal Defendants' opposition, under 24 C.F.R. § 970.9(3)(ii) HANO was not required to provide the St. Bernard resident organization an opportunity to purchase the property.

Likewise, and as set forth fully in HANO's opposition to the motion for injunction pending appeal filed in the United States Court of Appeals for the Fifth Circuit, plaintiffs' have no private right of action against HANO under § 1437(p), no legally cognizable claims against

- 12 -

HANO under the APA for alleged violations of their claims that HANO did not engage in proper resident consultation or that sufficient comparable housing has not been provided are factually and legally baseless. *See* pages 13-18 of HANO's Opposition To Plaintiffs' Request for an Emergency Restraining Order and/or Injunction, together with its exhibits and record excerpts, attached as *in globo as* Exhibit A. Moreover, as demonstrated by the affidavit of Shelley Smith filed therewith, HANO had several consultation meetings with the Resident Advisory Board and plaintiffs' allegations to the contrary are also baseless. *Id.* at Record Excerpt No. 22 at 4-5, ¶¶ 17-19.

Finally, plaintiffs cannot show irreparable harm and the balance of equities weighs heavily in favor of denying any injunctive relief for all of the reasons noted in the Federal Defendants' opposition and in HANO's opposition to the parallel motion in the Fifth Circuit. Exhibit A, Opposition Memo at 18-25. Notably, Ms. Naomi Minor (who in contrast to plaintiffs' is a duly elected[6] representative of St. Bernard Residents) fully supports HANO's demolition and redevelopment plans, as do many other displaced St. Bernard Residents. Affidavit of Ms. Naomi Minor, attached as Exhibit B. Therefore, any injunction that would delay HANO's redevelopment and risk the permanent loss of the only funding that HANO has for rebuilding the site would be contrary to the expressed wishes of other St. Bernard residents and could irreparably harm all displaced St. Bernard residents, including plaintiffs. Exhibit B and Exhibit A, Opp. Memo at 21-25.

---

[6]     *See* 24 C.F.R. § 964.115 (providing for democratic election of resident council members by residents).

903814v.2

## IV.    **CONCLUSION**

For the foregoing reasons, the Court should dismiss plaintiffs' lawsuit against the

HANO defendants pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3).  The Court should further

deny plaintiffs' Motion for Temporary Restraining Order for those reasons set forth in HUD's

Opposition.

Dated:  December 13, 2007.

Respectfully submitted,

*Rachel W. Wisdom/tach*

Rachel W. Wisdom, La. Bar No. 21167,
T.A.
Ashlee M. Robinson, La. Bar No. 28743
Heather S. Lonian, La. Bar No. 29956
*(Motions for admission pro hac vice pending)*
Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Telephone: (504) 581-3200

Attorneys for Housing Authority of New
Orleans, C. Donald Babers, and Karen Cato-
Turner

903814v.2

# **CERTIFICATE**

I hereby certify that a copy of the above and foregoing Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue and Opposition to Motion for Temporary Restraining Order has been served upon all counsel of record by electronic transmission and/or by placing same in the United States Mail, properly addressed and postage pre-paid, this 13th day of December, 2007.

Radd W. Wisdom /tch

903814v.2

# EXHIBIT A

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### CASE NO. _____

YOLANDA ANDERSON, GILDA BURBANK, ALLEN HARRIS, DONNA JOHNIGAN, ODESSIA LEWIS, EMELDA MAY, SYLVIA MOTEN, EMELDA PAUL, HILDA JOHNSON, CYNTHIA BELL, LOLITA GIBSON, NICOLE BANKS, JUDITH WATSON, GLORIA WILLIAMS, MARY ANN WRIGHT, CATRICE DOUCET, LINDA DeGRUY, and KIM PAUL, in their own right and as representatives of all similarly situated displaced New Orleans, Louisiana public housing residents

Plaintiffs-Petitioners,

### VERSUS

ALPHONSO JACKSON, Secretary of the United States Department of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; HOUSING AUTHORITY OF NEW ORLEANS; C. DONALD BABERS, Board of Commissioners, Housing Authority of New Orleans; WILLIAM C. THORSON, Executive Administrator Appointing Authority Housing Authority of New Orleans; and each individual defendant in his official capacity,

Defendants-Respondents.

### On Appeal from the United States District Court
### for the Eastern District of Louisiana No. 06-3298

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' REQUEST FOR AN EMERGENCY RESTRAINING ORDER AND/OR INJUNCTION

Rachel W. Wisdom, 21167,
Walter F. Wolf, III, 21953
Ashlee M. Robinson, 28743
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Telephone: (504) 581-3200
Fax: (504) 581-3361
Attorneys for Housing Authority of New Orleans (HANO), C. Donald Babers, and William C. Thorson

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Plaintiffs-Petitioners**

1.    Yolanda Anderson

2.    Gilda Burbank

3.    Allen Harris

4.    Donna Johnigan

5.    Odessia Lewis

6.    Emelda May

7.    Sylvia Moten

8.    Hilda Johnson

9.    Cynthia Bell

10.    Lolita Gibson

11.    Nicole Banks

12.    Judith Watson

13.    Gloria Williams

14.    Mary Ann Wright

15.      Catrice Doucet

16.      Linda DeGruy

17.      Kim Paul

**B.     Counsel for Plaintiffs-Petitioners**

1.     Ross B. Bricker, John F. Ward, Jr., Adam Morse,
Jenner & Block, 330 N. Wabash Ave., Chicago, Illinois 60611.

2.     Judith A. Browne, Monique L. Dixon, Anita Sinha,
The Advancement Project, 1730 M St., Washington DC 20036

3.     Tracie L. Washington, 2606 Dryades St., New Orleans,
Louisiana 70118

4.     William P. Quiqley, Royal Judson Mitchell, Jr., Loyola
University Law School Clinic, 7214 St. Charles Ave., New
Orleans, Louisiana 70118

**C.     Defendant-Respondents**

1.     The Housing Authority of New Orleans

2.     William C. Thorson, Executive Administrator of the
Housing Authority of New Orleans

3.     C. Donald Babers, Chairman of the Housing Authority of
New Orleans

**D.     Counsel for Defendant-Respondents**

1.     Rachel W. Wisdom, Michael Q. Walshe, Jr., Walter F.
Wolf, III, Ashlee R. Robinson, Heather S. Lonian, Stone
Pigman Walther Wittmann L.L.C., 546 Carondelet St.,
New Orleans, Louisiana 70130

2.     Kim Variste, General Counsel for the Housing Authority
of New Orleans

**E.    Defendant-Respondents**

1.    U.S. Department of Housing and Urban Development

2.    Alphonso Jackson, Secretary of the U.S. Department of Housing and Urban Development

**F.    Counsel for Defendant-Respondents**

1.    Heather R. Phillips, Daniel M. Riess, Varu Chilakamarri, U. S. Department of Justice, Federal Programs Branch, Civil Division, 20 Massachusetts Ave., Washington D.C. 20530

Ashlee M. Robinson

## I.    FACTUAL AND PROCEDURAL BACKGROUND

For many years prior to Katrina, HANO planned for the eventual demolition of its oldest, most deteriorated, obsolete traditional barracks-style public housing projects. *See* Rec. Expt. 7.  These developments were recognized by HUD, as well as housing and urban studies groups and experts, as being among the worst in the nation, not only due to their physical condition but also due to the associated proliferation of concentrated poverty and related social ills within their boundaries and in the surrounding communities.  *Id.* at 7, and Rec. Expt. 8. Indeed, due to the markedly poor conditions at these sites prior to Katrina, several named plaintiffs and a large percentage of the putative plaintiff class support demolishing them and replacing them with new mixed-income developments. Rec. Expt. 9.  Therefore, HANO worked and continues to work to replace these buildings with new, less concentrated mixed-income communities.  These communities were built, and are being built, with amenities and services designed not only to improve housing opportunities for the very poor but also to revitalize the surrounding communities. Rec. Expt. 8 at 30-31.

At the time Katrina hit, HANO had completed or nearly completed such work at two of its large developments, had work well underway at two others, and was planning and/or beginning similar redevelopment projects for the four sites at issue in this case -- B.W. Cooper, C.J. Peete, St. Bernard and Lafitte

4

(referred to sometimes as the "Big Four"). In fact, HANO had engaged a demolition contractor to who was scheduled to start work at B.W. Cooper on August 29, 2005. Exhibit ("Ex.") 10.

However, that very day Hurricane Katrina made landfall on the Gulf Coast, prompting the mandatory evacuation of New Orleans and causing severe flooding and damage throughout the region. Nearly all residents of New Orleans (including most HANO employees) were displaced from their homes for an extended period, and many flooded areas of the city to this day have still not recovered. Rec. Expt. 11. As was the case with private housing in New Orleans, the vast majority of HANO's housing stock suffered moderate to severe flood damage as well as substantial wind and rain damage as a result of Katrina. Draper & Associates (an Atlanta based firm with extensive experience in building and repairing public housing), reviewing the numbers provided by ECM Consultants, Inc., estimates that it would cost in excess of $518 million[4] just to repair storm

---

[4] Even plaintiffs' own expert opined that it would cost over $60 million just to repair storm damage to these projects, without spending any dollars for many necessary items such as (1) mold and asbestos remediation; (2) deterioration/obsolescence existing at these projects prior to Katrina, (3) correction of code violations; (4) repair of the power distribution systems and the plumbing/sewerage and electrical systems, and (5) repair or replacement of many other items such as water heaters and refrigerators. Rec. Expts. 12 at 14, and 13 at 104: 20-105:1-10, 106:22-108:22, 111:16-20, 152:21-153:22, 159::6-

*(continued on next page)*

5

damage to the Big Four and bring them up to code. Pls.' Rec. Expt. D at 15-17. Even these most basic repairs would take at least 34 months to complete, even under ideal circumstances (which did not and do not exist). Rec. Expt. 14, at 44.

HANO, under-funded and troubled even before the Storm, was literally crippled by Katrina. Rec. Expt. 11. Because the costs for insuring subsidized housing are prohibitive, HANO's properties were massively under-insured. Ex. 15, at 105-106. Moreover, FEMA has denied almost all permanent repair assistance to HANO based on a misinterpretation of a FEMA "policy" that conflicts with the Stafford Act. Ex. 16. Faced with an enormous deficit in funding for rebuilding its housing stock, HANO has aggressively pursued other possible post-Katrina financial resources. Ex. 15 at 175:3-13, 213:4-25. Among the funding HANO has secured are Gulf Opportunity Zone ("GO Zone") low-income housing tax credits and Community Development Block Grant ("CDBG") monies, which produced over five hundred million dollars for HANO to use to rebuild the Big Four (B.W. Cooper, C.J. Peete, St. Bernard and Lafitte). Rec. Expt. 17 at ¶5. These funds are available only for the development of mixed income communities with decreased concentrations of poverty and are subject to a December 31, 2010

---

160:12, 274:1-10, 275:7-14, 287:1-12, 301:13-8, 298:11-300:20, 306:14307:8, 321:11-19.

On September 21, 2007, counsel for HUD informed the District Court and plaintiffs' counsel that HUD had approved HANO's demolition application and that HANO would begin demolition shortly. Petitioners' Rec. Expt. D. However, it was not until November 1, 2007 -- over 5 weeks later -- that petitioners moved for a temporary restraining order and/or preliminary injunction to prohibit HANO from proceeding with its plans to demolish and rebuild the Big Four developments. At the same time, petitioners sought leave to amend their Complaint to re-urge a claim that HANO and HUD violated § 1437p of the United States Housing Act of 1937, a provision that sets forth the conditions under which the Secretary of HUD may approve an application for demolition submitted by a public housing authority such as HANO. HANO and HUD opposed these motions. HANO further moved to dismiss plaintiffs' 1437p claim against it on the grounds that (1) § 1437p provides no private right of action against HANO and (2) in any case, plaintiffs could offer no colorable evidence to support their claim that HANO's application failed to meet the requirements set forth therein.

In a hearing on November 15, 2007, the District Court permitted plaintiffs to amend their pleading to re-assert their § 1437p claims against HANO and HUD. Rec. Expt. 21, at 1. At the same time, however, the District Court granted HANO's motion to dismiss plaintiffs § 1437p claims against it, finding that § 1437p provided no private right of action against HANO. *Id.* at 2. The District

8

Court also denied plaintiffs' renewed requests for a temporary restraining order and a preliminary injunction to prohibit HANO from pursuing its demolition and redevelopment plans. *Id.* After finding once again that plaintiffs' had "an adequate remedy at law," the District Court further explained that plaintiffs were not likely to succeed on the merits noting that "the record does not support [plaintiffs'] contentions." *Id.* at 3.

Even though petitioners were informed during the November 15, 2007 hearing that HANO planned to proceed with demolition of the Big Four starting in mid-December, they did not file their present application with this Court until December 10, 2007 -- almost a month later. Once again, petitioners' delay in pursuing relief they urge is necessary on an "emergency" basis belies both their true motivations and the weakness of their request. If they were truly concerned about affording this Court with more time to review their filings and make a correct determination regarding the propriety of enjoining demolition pending their appeal, petitioners could have (and should have) begun preparing their papers for this Court immediately after the District Court's ruling on November 15, 2007. *Mclaughlin v. Mississippi Power Co.*, 376 F.3d 344, 352 (5th Cir. 2004) (denial of preliminary injunction is "immediately appealable as of right under" 28 U.S.C. § 1292(a)(1)). However, that is not petitioners' intention.

901461v.2

Rather, through their delay petitioners have manufactured the urgency they claim requires an order to "maintain the status quo" hoping to rush this Court into a hasty decision that will not afford sufficient time to discern either the fatal weaknesses petitioners' claim or the fallacies of their arguments. In this way, petitioners hope to extract from the appellate process the very same relief that the District Court, with ample time for review and consideration, denied. Although petitioners impugn the ability and integrity of the District Court and claim they were unfairly denied an evidentiary hearing, petitioners did not request oral argument on their motion much less file a motion for evidentiary hearing.

HANO urges the Court to deny petitioners any temporary restraining order or injunction to halt demolition because, as explained below, the District Court's decision denying such relief was correct and any such order (even of brief duration) will likely cause devastating harm to HANO as well as to the future of public housing in New Orleans. If HANO cannot proceed apace with its work, it risks losing over five hundred million dollars of funding without which it will have no resources to rebuild most of its public housing stock. Rec. Expt. 17, at ¶¶ 3-4.

## II.    JURISDICTION

Petitioners are correct that this Court has jurisdiction over their appeal from the District Court's November 15, 2007 decision denying their request for preliminary injunction. However, the Court should not exercise jurisdiction over

901461v.2

the District Court's decision dismissing their claims under § 1437p of the United States Housing Act of 1937 because (1) the District Court has not certified the order for appeal and (2) plaintiffs have not demonstrated that the decision warrants discretionary appeal under 28 U.S.C. 1292(b) or otherwise.

The Court likewise should refuse to consider petitioners' motion for injunction pending appeal because (1) they admit that they failed to seek such an order from the District Court, (2) moving for such relief from the District Court was not impractical, and (3) the urgency asserted by petitioners was created by petitioners deliberate delay and could have been avoided had they promptly moved the District Court for an injunction, then an injunction pending appeal and promptly appealed.   Here, petitioners waited over 5 weeks after HUD approved HANO's plans to proceed with demolition before bothering to seek an injunction from the District Court and waited almost a month after the District Court's November 15, 2007 denial of injunctive relief before appealing to this Court. During that delay, petitioners could have and should have sought an injunction pending appeal from the District Court but deliberately failed to do so. *Chemical Weapons Working Groupv. Dept. of Defense,* 101 F.3d 1360, 1361 (10 Cir. 1996)(denying motion for Rule 8(a) injunction where petitioners' own delay created the supposed urgency that petitioners' argued obviated the need to seek relief from the District Court and required immediate action).   Moreover, as this

11

Court has noted, "[i]t does not follow from the refusal to grant a preliminary injunction pending a trial in the court below that the district court would refuse injunctive relief pending appeal." *Bayless v. Martine,* 430 F.2d 873, 879 n.4 (5 Cir. 1970).

## III.   LAW AND ARGUMENT

### A.   Standard Applicable to Issuance of Injunction Pending Appeal.

As this Court has noted, an "injunction is an extraordinary remedy, not normally available unless the plaintiff clearly carries his burden of proof as to [all of] its prerequisites." *Canal Auth. of Fl. v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974) The four prerequisites that an appellate court must find to support this "extraordinary and drastic remedy" pending appeal are: "(1) whether the party has made a strong showing of likelihood of success on the merits; (2) whether it has made a showing of irreparable injury if the court does not grant the [injunction]; (3) whether the [injunction] would substantially harm other parties; and (4) whether the [injunction] would serve the public interest." *Coastal States Gas Corp. v. Department of Energy,* 609 F.2d 736, 737 (5th Cir. 1979); *Belcher v. Birmingham Trust National Bank,* 395 F.2d 685, 686 (5th Cir. 1968). As is demonstrated more fully below, petitioners do not and cannot satisfy their burden as to any of these prerequisites. Therefore, this Court should refuse to enjoin HANO from proceeding with demolition and redevelopment pending appeal.

901461v.2

**B.    Petitioners Are Not Likely to Succeed on the Merits of Any Claim Relating to Their Request to Enjoin Demolition.**

At the time of the ruling from which petitioners appeal, the District Court had already dismissed all of petitioners' claims except for their purported "voucher" claim -- a claim that, as explained by the District Court, could not possibly support petitioners' request to enjoin HANO even if they were to prevail.[5] Therefore, petitioners argue that they are likely to succeed on the merits of their re-urged claim against HANO under § 1437p of the United States Housing Act of 1937. But a review of both the law and the facts shows that petitioners have no chance of succeeding on the merits of that claim against HANO.

Further, even if plaintiffs were to succeed on the merits of that claim, the result would not be the enjoining of demolition. The primary reason to grant an injunction is to "preserve the court's ability to render a meaningful decision on the merits" and to "prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Canal Auth.,* 489 F.2d at 573. An injunction is wholly unnecessary in this case. Even if plaintiffs were to prevail on their claim for violation of § 1437p (which the District Court correctly ruled that they cannot

---

[5]    As the Court stated, "the only issue I have left to try in this particular case would be the issue concerning the voucher program, not demolition, not rebuilding, not development..." Rec. Expt. 6 at 167:7-14.

901461v.2

do as a matter of law), it does not follow that HANO would be prevented from redeveloping the Big Four nor does compliance with § 1437p require that these buildings be maintained in the interim. Thus, plaintiffs' motion should be denied because they cannot succeed on the merits of their claim and, even if they could, an injunction is not necessary to preserve a meaningful adjudication of their claims.

1.   **Plaintiffs Have No Private Right of Action Against HANO To Enforce § 1437p.**

Congress clearly did not intend to create a private right of action through § 1437p. *Edwards v. District of Columbia*, 821 F.2d 651 (D.C. Cir. 1987); *Banks v. Dallas Housing Authority*, 271 F.3d 605 (5th Cir. 2001)(citing *Edwards* with approval). The statute, which is directed to the Secretary of Housing and regulates interactions between the Secretary of Housing and public housing authorities, contains no language indicating that Congress intended to create a private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002); *Cuvillier v. Sullivan*, 503 F.3d 397, 406 (5th Cir. 2007). In 1998, Congress dramatically revised § 1437p and deliberately removed language which earlier courts had interpreted as granting a private right of action to enforce § 1437p. (*See* the revisions to § 42 U.S.C § 1437 shown at www.hud.gov/offices/ogc/usha1937.pdf.) In doing so, Congress clearly intended that any alleged deficiencies regarding demolition applications should be reviewed by the Secretary of Housing, who has the discretion to deny any

14

901461v.2

application that HUD deems incomplete. As a result, all but one of the cases relied upon by plaintiffs are inapposite because they involve an earlier version of the statute that specifically (albeit temporarily) created a private right of action to enforce § 1437p. The only post-1998 case cited by plaintiffs[6] contains no finding that (or analysis regarding whether) there is a private right of action to enforce § 1437(p). Plaintiffs do not and cannot cite statutory text or cases holding that a private right of action exists under the current version of § 1437p. Because there is no textual basis for the creation of a right of action to enforce § 1437p, plaintiffs' claims fail as a matter of law.

## 2.    HANO Met All Requirements Set Forth in § 1437p.

Moreover, the evidence submitted to the District Court clearly shows that HANO met all requirements for HUD approval set forth in § 1437p in consulting with residents and resident council groups and securing tenant protection vouchers for displaced residents of the Big Four developments. For example, HANO engaged in extensive and proper resident consultation. Rec. Expt. 22. In addition, HANO adequately and accurately certified in its demolition

---

[6]    *English Woods Civic Ass'n/Resident Community Council v. Cincinnati Metropolitan Housing Authority,* 1004 WL 3019505 at *8 (S.D. Ohio 2004)

15

application that all displaced residents will be provided with comparable housing before demolition.

Plaintiffs' arguments to the contrary are baseless. Plaintiffs can produce no evidence of former residents who are not currently housed, either through the use of vouchers, provision of an alternate public housing unit, or residents' desire to choose other accommodations. Indeed, all but two of the named plaintiffs are now residing in New Orleans either in housing secured with a voucher or in public housing developments.

Further, plaintiffs present no law or evidence in support of their contention that "comparable" housing must be in New Orleans, other than the declaration of plaintiff Gilda Burbank. Though Ms. Burbank claims she has been unable to find a unit in New Orleans, she does not mention that she turned down an available unit at HANO's Iberville development in New Orleans. Rec. Expt. 23. Plaintiffs further ignore the large number of former HANO residents who have secured housing in New Orleans using a voucher as well as the many former HANO residents who do not wish to return to New Orleans. *See* Rec. Expt. 24. In fact, a large number of putative class members wish to remain in apartments located elsewhere that they have secured through housing vouchers issued by HANO and HUD after Katrina. Rec. Expt. 9.

16

There is nothing in the law that requires HANO to relocate residents within a particular geographic location if there are no available units within that location. The cases cited by plaintiffs in support of their position involve wholly different factual situations and legal claims than the ones presented here. Unlike *Arrington, Norwalk Core*, and *Garrett*, the plaintiffs in the instant case were displaced from New Orleans due to a hurricane and the resulting damage to the public housing developments. The plaintiffs in this case were transferred pursuant to lease provisions relating to the existence of hazardous conditions. Here, the public housing authority is actively working to bring displaced residents back to New Orleans and back to better housing conditions. Further, HANO and HUD have provided residents with vouchers to allow them to rent a market rate apartment in any city in the country. Thus, regardless of whether HUD's review of HANO's application was proper, HANO met the requisites of § 1437p and plaintiffs cannot succeed on the merits of their claim.

### 3.    Plaintiffs Have No Claim Against HANO Under the APA.

Plaintiffs as a matter of law cannot state any claims against HANO under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* (APA), because HANO is not a federal agency. *Resident Council of Allen Parkway Village v. United States Department of Housing and Urban Development*, 980 F.2d 1043, 1055 (5th Cir. 1993). In *Resident Council of Allen Parkway Village*, this Court

17

901461v.2

held that no APA claim can be brought against a local housing authority since it is not a federal entity. *Id.* Therefore, as recognized by the Fifth Circuit in that case, plaintiffs here cannot state a cause of action against HANO under the APA. Moreover, any claim plaintiffs may have against HUD under the APA as a matter of law does not support injunctive relief against HANO. *Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 456-457 (5th Cir. 1989). In *Vieux Carre*, this Court found that APA review of federal agency decisions does not provide a district court with jurisdiction to enjoin the actions of nonfederal entities. *Id.* Thus, the Fifth Circuit affirmed the dismissal of all claims, including those for injunctive relief, against the nonfederal defendants in a case against the Army Corps of Engineers for APA review of the Corps' decision to allow demolition and redevelopment of riverfront property. Similarly here, plaintiffs cannot use an APA claim against HUD to enjoin HANO's redevelopment activities.

## C.    **Plaintiffs Are Suffering No Irreparable Harm.**

Plaintiffs are suffering no irreparable harm because they have no cognizable property right in the particular public housing unit they occupied prior to Katrina but rather only a right to continued housing assistance, which they do not dispute they continue to receive. Through the disaster assistance voucher program, HANO has offered and/or is providing to plaintiffs vouchers, with values

18

up to $2,275[7] a month, through which they have and/or may obtain alternate units. The only plaintiffs not living in a voucher unit are currently residing in traditional public housing in New Orleans.[8]

Moreover, as a matter of law, plaintiffs do not have a "real property interest" in the particular HANO units they occupied prior to Katrina. *See Lindsey v. Normet,* 405 U.S. 56, 74, (1972) (there is no "constitutional guarantee of access to dwellings of a particular quality"); *Bosely v. Euclid,* 496 F.2d 193, 196 (6th Cir. 1974); *Acevedo v. Nassau County,* 500 F.2d 1078, 1080-1081 (2d Cir. 1974); *Hanrahan v. Housing and Redevelopment Authority of Duluth, Minnesota,* 912 F.Supp. 428, 435 (D. Minn. 1995) (finding that plaintiff had no property interest in a particular unit of public housing).

---

[7]     Voucher amounts range from $964 per month for a one bedroom apartment in New Orleans to $2,275 for a seven bedroom apartment. *See* payment standards at http://www.hano.org/Program%20Participants.htm.

[8]     Plaintiffs representation that HANO's actions are keeping them out of New Orleans is belied by the actual facts. As of September 15, 2007, almost 2,000 traditional public housing units in New Orleans were occupied or ready for occupancy. Rec. Expt. 25, at ¶ 6. Additionally, as of July 3, 2007, 1,112 vouchers were being used by former public housing residents to lease apartments in New Orleans. Rec. Expt. 26. Thus, approximately 3,000 of the 5,146 families who resided in public housing before Hurricane Katrina had returned to New Orleans by the summer of 2007. This rate of return is commensurate with the population numbers in the city as a whole. There is no plot by HANO to prevent residents from returning; rather, there is a city still reeling from the devastation wrought by Hurricane Katrina.

901461v.2

Courts have recognized a property interest in continued housing assistance. However, plaintiffs are all currently living in subsidized housing, either in public housing or in apartments secured through vouchers. And, to the extent any plaintiffs are living outside of New Orleans, they in fact have greater access to emergency and regular medical care, police protection, schools, jobs and public transportation than they would in New Orleans.[9]

Courts have declined to find irreparable injury when plaintiffs cannot show that demolition and redevelopment of public housing will deprive them of publicly subsidized housing. The court in *Reese v. Miami Dade County,* 242 F. Supp. 2d 1292 (S.D. Fla. 2002) rejected plaintiffs' request to preliminarily enjoin a housing authority from demolishing distressed, obsolete public housing because, among other things, plaintiffs failed to show irreparable harm because they did not present evidence that they would be prohibited from applying for the new redeveloped housing. *Id.* at 1309. There is no irreparable harm to plaintiffs simply because they are being housed in apartments secured by vouchers, rather than in

---

[9] Many New Orleans hospitals have not reopened. Charity Hospital, for example, has remained closed since Hurricane Katrina. According to a website sponsored by Bill Quigley, one of plaintiffs' own attorneys, medical services are inadequate in New Orleans even for persons with the means to pay for private medical services. *See* www.justiceforneworleans.org and http://www.truthout.org/docs_2006/082206R.shtml.

901461v.2

their pre-Katrina public housing units.  *See Darst-Webbe Tenant Ass'n v. St. Louis Housing Authority,* 339 F.3d 702, 714 (8th Cir. 2003)("[E]ven if Congress intended to require HOPE VI grant recipients to provide replacement housing to all displaced tenants, the [housing authority] has met this requirement by offering all displaced tenants Section 8 housing vouchers).  Because plaintiffs have not and cannot show that they will lose subsidized housing benefits or any other benefit to which they are legally entitled, they have failed to show irreparable harm.[10]

## D.    HANO and All Former and Future Public Housing Residents Will Suffer Irreparable Harm if Plaintiffs' Injunction is Granted.

Plaintiffs seek to enjoin HANO from taking any action to demolish or dismantle any units at the C.J. Peete, B.W. Cooper, Lafitte or St. Bernard public housing developments for an indefinite period while the Court considers their appeal.  Such a delay could be disastrous, not only for HANO but also for named plaintiffs Judith Watson and Donna Johnigan, as well as for the hundreds of other current and displaced HANO residents who support its redevelopment plans and are anxiously awaiting a modern, safe, decent, sanitary and redeveloped neighborhood. Rec. Expt.17, at ¶ 3.

---

[10]    Plaintiffs' argument that they may not be able to recover damages from HUD does not demonstrate irreparable harm.  Money damages are available from HANO and clearly provide plaintiffs with an adequate remedy at law as found by the District Court.

901461v.2

Any delay resulting from a TRO or injunction could cause tremendous financial harm to HANO by causing it to fail to meet deadlines it must meet in order to keep tax credits for redevelopment of these sites that were granted to it by the Louisiana Housing Finance Agency (LHFA). *Id.* at ¶ 4. If HANO fails to begin *construction of each of these projects* no later than summer of 2008, it risks not being able to place the projects in service by the end of 2010. *Id.* HANO needs to start demolition now to meet the deadlines for demolition imposed by the LHFA, as well as to assure it meets the other deadlines. Ex. 27. Should HANO miss these deadlines, the agency could lose more than $312 million dollars in tax credit equity. Rec. Expt. 17, at ¶ 4. Delays in project implementation could also cause the loss of $108 million dollars in CDBG funding awarded by the Louisiana Recovery Authority. *Id.* Losing these funds could result in the loss of more than $609 million in total investment dollars and the loss of over 2,000 low-income units that are critically needed to return families displaced by Hurricane Katrina to New Orleans. *Id.*

Moreover, without this funding, HANO will not be able to repair or redevelop B.W. Cooper, C.J. Peete, Lafitte or St. Bernard for many, many years, if ever. These funds are available solely for the implementation of HANO's redevelopment plans -- they cannot be allocated for the repair of existing buildings. Thus, plaintiffs' requested injunction could have the effect of severely diminishing

901461v.2

the availability of affordable housing in New Orleans, both now and for years to come. Such an effect irreparably harms not only HANO, but also all residents of public housing (including plaintiffs themselves), and the City of New Orleans. The risk of harm stemming from a grant of plaintiffs' injunction is clearly greater than any harm that will result to plaintiffs from the demolition and redevelopment of their pre-Katrina public housing units. Therefore, this Court should refuse to issue any order enjoining or restraining HANO's redevelopment of the Big Four and should affirm the District Court's denial of plaintiffs' motion for temporary restraining order and preliminary injunction. *Hull v. Quitman County Board of Education*, 1 F.3d 1450, 1453 (5th Cir. 1993)(affirming denial of preliminary injunction requiring school board to maintain school service because financial harm to school board would greatly outweigh benefit to plaintiffs).

E.    **Public Policy Favors Denial of Plaintiffs' Request for Injunctive Relief.**

In order to receive a temporary restraining order, plaintiffs must demonstrate that the injunctive relief they are seeking would not disserve the public interest. *Chisom v. Roemer*, 853 F.2d 1186, 1188 (5th Cir. 1988); *Hull v. Quitman County Board of Education*, 1 F.3d 1450, 1453 (5th Cir. 1993). In this instance, preventing HANO from moving forward with its redevelopment plans and causing it to lose funding to create modernized mixed-income developments disserves the public interest and plaintiffs' motion should be denied.

23

901461v.2

HANO is pursuing these plans because they advance fair housing objectives recognized by Congress in 1992 when it passed legislation creating the Homeownership and Opportunities for People Everywhere (HOPE VI) program and again in 1998 when it passed the "Quality Housing and Work Responsibility Act" (QHWRA). *See* Rec. Expt. 7. Any delay in HANO's progress could cause HANO to forfeit the rebuilding funds it has been awarded. Without such funds, the redevelopment proposed by HANO would take decades, if it could ever be completed at all. Plaintiffs cannot deny that using these funds and improving the housing developments to meet fair housing standards is in the public interest and that any action that would result in the forfeiture of these funds and hamper the redevelopment of public housing disserves the public interest.

Moreover, even under ideal circumstances that do not exist, it would take HANO 34 months to merely repair the storm damage and redress code deficiencies at these dilapidated, obsolete public housing developments. Ex.14, at 44. However, HANO does not have sufficient funds to undertake such work and the funding it has secured is only available for mixed income developments like those it plans to build. Ex 15, at 144:12- 145:15, 151:22- 155:23, 175:3-13, 213:4-25. On the other hand, if HANO is allowed to proceed apace it can make

24

901461v.2

thousands of new low-income units available by 2010.[11] Plaintiffs fail to articulate how retaining obsolete, unoccupied, uninhabited housing serves the public interest particularly in the face of the great public interest in seeing these devastated buildings redeveloped into modern, mixed-income housing.    Consequently, plaintiffs resort to unsupported accusations gleaned from newspaper articles, which have absolutely no relevance to HANO's demolition application and redevelopment plans.  To prevent or delay the redevelopment of HANO's obsolete housing stock as a result of these allegations would be the true disservice to the public interest.

## IV.   CONCLUSION

Plaintiffs cannot meet the standard of proof applicable to their request for injunctive relief pending appeal.  As demonstrated in the foregoing sections, plaintiffs have utterly failed to do so because (1) they are suffering no irreparable harm; (2) the potential harm to HANO resulting from the proposed order outweighs any arguable harm plaintiffs may incur should the order not issue; (3) the relief plaintiffs seek disserves the public interest; and (4) they cannot show a

---

[11]    Plaintiffs' Rec. Expt. D, at 18, 21-24.  Contrary to plaintiffs' assertions, over 2000 low income units will be built under HANO's redevelopment plans.  Added to the 3,000 units already opened or being readied for occupancy, this means that there will not be any large drop in the availability of government subsidized housing, let alone the 82% decline that plaintiffs posit.

901461v.2

likelihood of success on the merits of any claim that could support their request for injunctive relief.

Plaintiffs are not entitled to the remedy they seek from this Court and their emergency motion should be denied.

Respectfully submitted.

_Ashlee Robinson_

Rachel W. Wisdom, 21167,
Walter F. Wolf, III, 21953
Ashlee M. Robinson, 28743
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Fax:  (504) 581-3361

Attorneys for Housing Authority of New Orleans (HANO), C. Donald Babers, and William C. Thorson

901461v.2

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Preliminary Memorandum In Opposition to Plaintiffs' Request For An Emergency Restraining Order and/or Injunction has been served upon all counsel listed below by electronic transmission and by placing same in the United States mail, postage prepaid and properly addressed this 10th day of December, 2007.

William P. Quigley, Esq.
    duprestars@yahoo.com
Loyola University School of Law
7214 St. Charles Avenue
New Orleans, Louisiana  70118

Ross B. Bricker, Esq.
    rbricker@jenner.com
John F. Ward, Jr., Esq.
    jward@jenner.com
Lara E. Fitzsimmons, Esq.
    lfitzsimmons@jenner.com
Jenner & Block LLP
One IBM Plaza
330 N. Wabash Avenue
Chicago, Illinois  60611-7603

Judith A. Browne-Dianis, Esq.
    jbrowne@advancementproject.org
Monique L. Dixon, Esq.
    mdixon@advancementproject.org
Advancement Project
1730 M Street, NW #910
Washington, D.C.  20036

Tracie L. Washington, Esq.
    tlwesq@cox.net
Post Office Box 15107
New Orleans, Louisiana  70175-5107

Michael Sitcov, Esq.
    Michael.sitcov@usdoj.gov
Heather Phillips, Esq.
    Heather.phillips@usdoj.gov
Daniel Reiss, Esq.
    Daniel.riess@usdoj.gov
United States Dept. of Justice
20 Massachusetts Avenue
Washington D.C. , 20530

901461v.2

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### CASE NO. _____

YOLANDA ANDERSON, GILD BURBANK, ALLEN HARRIS, DONNA JOHNIGAN, ODESSIA LEWIS, EMELDA MAY, SYLVIA MOTEN, EMELDA PAUL, HILDA JOHNSON, CYNTHIA BELL, LOLITA GIBSON, NICOLE BANKS, JUDITH WATSON, GLORIA WILLIAMS, MARY ANN WRIGHT, CATRICE DOUCET, LINDA DeGRUY, and KIM PAUL, in their own right and as representatives of all similarly situated displaced New Orleans, Louisiana public housing residents

Plaintiffs-Appellees,

### VERSUS

ALPHONSO JACKSON, Secretary of the United States Department of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; HOUSING AUTHORITY OF NEW ORLEANS; C. DONALD BABERS, Board of Commissioners, Housing Authority of New Orleans; WILLIAM C. THORSON, Executive Administrator Appointing Authority Housing Authority of New Orleans; and each individual defendant in his official capacity,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Louisiana, No. 06-3298

## EXHIBITS AND RECORD EXCERPTS TO HANO'S
## OPPOSITION TO PLAINTIFFS' REQUEST FOR
## AN EMERGENCY RESTRAINING ORDER AND/OR INJUNCTION

Rachel W. Wisdom, 21167,
Walter F. Wolf, III, 21953
Ashlee M. Robinson, 28743
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Attorneys for Housing Authority of New Orleans (HANO), C. Donald Babers, and William C. Thorson

**Exhibits and Record Excerpts**

**Table of Contents**

1.   Affidavit of Emelda Paul

2.   Excerpts from Deposition of Nadine Jarmon

3.   Excerpts from Deposition of Judith Watson

4.   Excerpts from Deposition of Donna Johnigan

5.   April 17, 2007 letter from B.W. Cooper Resident Management Corporation to HANO

6.   Excerpts from September 17, 2007 Transcript of Hearing in District Court

7.   Affidavit of William Thorson

8.   Excerpt from *New Orleans After the Storm: Lessons from the Past, a Plan for the Future*, Brookings Institute (October 2005)

9.   Declaration of Ann Lott

10.  Affidavit of Judith Moran

11.  Affidavit of Raymond Allen

12.  Excerpts from Report of John Fernandez

13.  Excerpts from Deposition of John Fernandez

14.  Excerpts from Report of Draper & Associates

15.  Excerpts from Deposition of Elias Castellanos

16.  July 6, 2006 and October 31, 2006 Letters from Rachel Wisdom to FEMA

17.  November 12, 2007 Affidavit of Judith Moran

18.  September 7, 2006 District Court Order

19.  November 21, 2006 District Court Order Denying Request for Temporary Restraining Order.

## <u>Table of Contents</u>
### (continued)

20.    February 6, 2007 District Court Order

21.    November 16, 2007 District Court Order

22.    Affidavit of Shelley Smith

23.    Letters from HANO to Plaintiff Gilda Burbank

24.    HANO's Opposition to Plaintiffs' Amended Motion for Class Certification

25.    Affidavit of Dorian Rawles

26.    Declaration of David Vargas

27.    Louisiana Housing Finance Authority Project Schedules for HANO Projects

903157v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| YOLANDA ANDERSON, *Et al.* . | * CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * |
| VERSUS | * SECTION "B" |
|  | * |
| ALPHONSO JACKSON, SECRETARY OF THE | * JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * |
| AND URBAN DEVELOPMENT; *Et al.* | * MAGISTRATE ALMA CHASEZ |
|  | * |
| Defendants. | * |

* * * * * * * * * * * * * * * * * * * * * * * * *   *

STATE OF LOUISIANA

PARISH OF ORLEANS

## AFFIDAVIT OF EMELDA PAUL

**BEFORE ME,** the undersigned authority, a notary public duly commissioned and

qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared:

**EMELDA PAUL**

who, after being duly sworn, deposed and stated:

1.

I am a person of the full age of majority and a citizen of the State of Louisiana. I

am competent to execute this Affidavit, and I make the statements in this Affidavit based on my

own personal knowledge.

- 1 -

EXHIBIT

2.

I currently reside at 1872 Thayer Street, New Orleans, Louisiana 70114 in HANO's Fischer Senior Village.

3.

Prior to August 29, 2005, I resided at 609 N. Roman St., Apt. E, New Orleans, Louisiana, 70112 in the Lafitte housing complex.

4.

From _2003_ to _2007_, I served as President of the Lafitte Resident Council.

5.

I support the Housing Authority of New Orleans' ("HANO") plans for the redevelopment of Lafitte, which includes eventual demolition and rebuilding of the entire site in collaboration with Providence Community Housing and Enterprise Community Partners, Inc as developer.

6.

Based on communications I have had with them, many other displaced Lafitte Development residents also support these plans.

_Emelda Paul_
Emelda Paul

Sworn to and subscribed before me
this ___ day of September, 2007.

_Rachel Wisner_
NOTARY PUBLIC

Print Name _Rachel Wisdom_
Bar No. _21167_
Rachel Wendt Wisdom
State of Louisiana - Bar No. 21167
My commission is issued for life

- 2 -

891626v.1

Page 1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
4    YOLANDA ANDERSON, et al.,     CIVIL ACTION NO. 06-3298
          Plaintiffs,
5
     VERSUS                        SECTION "B"
6                                  JUDGE LEMELLE
7    ALPHONSO JACKSON, et al.,     MAGISTRATE 5
          Defendants.              MAG. CHASEZ
8
9
10
11
12
13         Videotaped Deposition of NADINE JARMON,
14   PH.D., taken at U.S. District Court, 500 Poydras
15   Street, New Orleans, Louisiana 70130, on Monday,
16   July 16, 2007, at 10:30 a.m.
17
18
19
20
21
22   By:  Ashlee B. Ancalade
23        Registered Professional Reporter
24
25

EXHIBIT

Page 182

1  EXAMINATION BY MS. WISDOM:

2      Q    I'll try to be as quick as I can.  I

3  have a few questions.

4      A    Okay.

5      Q    You testified earlier about your

6  involvement with Providence and communications

7  with Lafitte residents?

8      A    Uh-huh (positive response).

9      Q    Based on the communications that you

10 were involved with when you were working for

11 Providence, what percentage of the residents

12 that were contacted support the current plans

13 for redevelopment of the site?

14     A    I would say -- I would say that

15 number is probably 70 percent.

16     Q    Okay.

17     A    Base on -- about 70 percent.

18     Q    Do you know Ms. Emelda Paul?

19     A    Yes.

20     Q    Who is she?

21     A    She is the resident leader of

22 Lafitte.  She was the dually elected president

23 of when Katrina hit of the Lafitte

24 development.

25     Q    Have you had communications with her

1    about the redevelopment plans for Lafitte?

2        A    Oh, yeah, every day.  All of the

3    time when I was there.

4        Q    Has she told her -- told you what

5    her position with regard to the redevelopment

6    plan is?

7        A    Yes.

8        Q    What is it?

9        A    She wants to be one of the ones that

10   wait until the new stuff.  She don't want --

11   she says -- she has a term that she uses.  She

12   says I want to wait for the New Jerusalem.

13   She's been on record as saying that.  She

14   really wants to wait for the new stuff.  She

15   will say I don't want to go back to the way it

16   was.

17       Q    Okay.  So she also supports the

18   redevelopment plans now?

19       A    Definitely, yeah.  She's very much

20   in support of it.

21       Q    Okay.  If you look back at Exhibit

22   No. 7 which is the case study that you --

23       A    Uh-huh (positive response).

24       Q    -- co-authored?

25       A    Uh-huh (positive response).

Page 184

1  Q    Please turn to page 24 of that

2  exhibit.

3  A    Okay.  Okay.

4  Q    The title of this table is

5  "Likelihood of returning to New Orleans."  Do

6  you see that?

7  A    Uh-huh (positive response), uh-huh

8  (positive response).

9  Q    What do the percentages on this

10  table reflect?

11  A    Well, you can see it's almost --

12  it's not quite -- not even close to being a

13  bell shape.  In fact, it's highly skewed

14  toward the top where it says "Likelihood of

15  returning to New Orleans."  It says 43 percent

16  of the people responding said they are very

17  likely to return to New Orleans.  And then 25

18  percent, somewhat likely; 11 percent, somewhat

19  unlikely; and then 20 percent, very unlikely.

20        And all the -- you know, the

21  questions were pretty straight forward.  We

22  didn't -- there was nothing -- no hidden

23  meaning in them.  And it is what it is.  That

24  a lot of them even though they, again, said

25  that the conditions were what they were, when

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF LOUISIANA
 3
 4    YOLANDA ANDERSON, et al.      * CIVIL ACTION
                    Plaintiffs,     *
 5                                  * NO. 06-3298
      VERSUS                        *
 6                                  * SECTION "B"
      ALPHONSO JACKSON,             *
 7    SECRETARY OF THE UNITED       * JUDGE
      STATES DEPARTMENT OF          * IVAN LEMELLE
 8    HOUSING AND URBAN             *
      DEVELOPMENT; et al            * MAGISTRATE
 9                    Defendants.   * ALMA CHASEZ
                                    *
10    *  *  *  *  *  *  *  *  *     *
11
12                 Videotaped deposition of JUDITH ANN
      WATSON, 3200 Earhart Boulevard, New Orleans,
13    Louisiana  70125, taken in the Law Offices of
      Stone Pigman Walther Wittmann, 546 Carondelet
14    Street, New Orleans, Louisiana  70130-3588, on
      Friday, the 6th day of July 2007, commencing at
15    10:09 a.m.
16    APPEARANCES:
17            JENNER & BLOCK
              (By:  Abby J. Clark, Esquire)
18            One IBM Plaza
              Chicago, Illinois  60611-7605
19                (Attorneys for the Plaintiffs)
20            U.S. DEPARTMENT OF JUSTICE
              (By:  Varu Chilakamarri, Esquire)
21            Room 7119
              20 Massachusetts Avenue
22            Washington, D.C.  20001
                  (Attorney for the Defendant,
23                Department of Housing &
                  Urban Development)
24
25
```

EXHIBIT

1  testify as follows:
2  EXAMINATION BY MS. WISDOM:
3       Q.   Would you please go ahead and state
4  your name -- your full name again, and your
5  address, for the record?
6       A.   Judith Ann Watson.  I reside at 3200
7  Earhart Boulevard, New Orleans, Louisiana 70125.
8       Q.   Have you moved back into your unit
9  at that address?
10      A.   Not yet.  I'm on my way.
11      Q.   Okay.  When is your expected move-in
12  date, ma'am?
13      A.   The 22nd.
14      Q.   The 22nd of --
15      A.   July 22nd.
16      Q.   Where are you residing until you
17  move back in, ma'am?
18      A.   I'm in Baton Rouge, Louisiana.
19      Q.   Okay.  Have you ever had your
20  deposition taken before?
21      A.   Yeah.
22      Q.   Why?
23      A.   For an accident.
24      Q.   Okay.  Were you a plaintiff in the
25  lawsuit, ma'am?

1       A.   Yes.
2       Q.   Okay.  Do you recall, approximately,
3  what year that was?
4       A.   I think, it was in '89.
5       Q.   Okay.  So you -- you understand that
6  I'll be asking you a series of questions today?
7       A.   Yes.  I do.
8       Q.   Okay.  And, for the court reporter,
9  it is better if, when you respond, you respond
10  verbally, rather than the shake of a head or a
11  gesture.
12      A.   Okay.
13      Q.   And it's also better if I wait for
14  you to finish answering before I start asking my
15  next question, and that you do the same, wait for
16  me to finish the question before you begin to
17  answer it, okay?
18      A.   Okay.
19      Q.   Thank you.  Did you talk to anyone,
20  other than your lawyers, about your deposition?
21      A.   No.
22      Q.   Have you talked with any of the
23  other plaintiffs -- Ms. Johnigan, for example --
24  about their depositions in this case?
25      A.   No.

1       Q.   Did you review any documents before
2  your deposition to prepare for it?
3       A.   Any documents?
4       Q.   Yes, ma'am.
5       A.   No.  That's -- no.  No.  No.
6       Q.   Are you currently on -- on any
7  medications that might affect your ability to
8  answer questions accurately today?
9       A.   It's a possibility; yes.  I am on
10  medications.
11      Q.   Okay.
12      A.   Yes.  Well, I'm on -- well, I'm on
13  medications, I know I'm on medications.
14      Q.   Okay.
15      A.   Yes.
16      Q.   And how might they affect your
17  ability to respond to questions, ma'am?
18      A.   Well, I take pressure medicine, so I
19  notice it -- it has a tendency to relax you.
20      Q.   Okay.
21      A.   And I might start ducking.
22      Q.   Okay.
23      A.   Yes.
24      Q.   Well, if you ever need to take a
25  break or, you know, just to walk around, or if

1  you would like coffee or anything like that, just
2  let me know.
3       A.   I sure will.
4       Q.   Okay.  Other than that medication,
5  is there any other reason why you're not -- why
6  you may not be able to answer my questions
7  accurately today?
8       A.   No.
9       Q.   Okay.  Other than the lawsuit, for
10  which your deposition was taken before involved
11  in an accident, have you been a plaintiff in any
12  other lawsuits?
13      A.   No.
14      Q.   Did that case, for which your
15  deposition was taken, did that go to trial?
16      A.   No.
17      Q.   Okay.  So it was settled?
18      A.   Yes.
19      Q.   What is the highest level of
20  education you've attained, ma'am?
21      A.   A year and a half of college.
22      Q.   And what did you study in college,
23  ma'am?
24      A.   Child care.
25      Q.   Other than that year and a half in

Page 54

1   that is referenced there?
2       A.   Yes.
3       Q.   Okay.  And do you wish to withdraw
4   from this case?
5       A.   Yes.
6       Q.   Okay.  Do you want to be involved in
7   this case in any capacity, at all?
8       A.   Basically, what -- what do you mean
9   by that?
10      Q.   Do you want -- do you want to
11  withdraw as a plaintiff from this matter?
12      A.   Uh-huh.  Yes.
13      Q.   And do you want to withdraw any
14  claims that you have to recover any money damages
15  in this case?
16      A.   Yes.
17      Q.   Did you attend a meeting in November
18  2006 at John McDonogh High School in New Orleans?
19      A.   Yes.  I did.
20      Q.   Okay.  How did you find out about
21  that meeting?
22      A.   I was called by my board and, I
23  think -- I'm not sure how -- I think, the
24  residents was saying there was a meeting at John
25  McDonogh.  I was -- I was in New Orleans at that

Page 55

1   time --
2       Q.   Okay --
3       A.   -- and I said I -- I was going to
4   it.
5       Q.   Okay.  What were you doing in New
6   Orleans at that time?
7       A.   Coming to check on my property.
8   And, I think, I had a board meeting that week.
9       Q.   Do you recall receiving a letter
10  from Housing Authority about the meeting before
11  it occurred?
12      A.   No.  I didn't.
13      Q.   Have you visited your apartment on
14  Earhart since Katrina?
15      A.   Yes.
16      Q.   When was the first time that you
17  visited the apartment after Katrina?
18      A.   It must have been about two or three
19  months after Katrina.
20      Q.   Okay.  Did you see any damage to
21  your apartment at that time?
22      A.   No more than a -- a little mildew on
23  the wall, and carpet.  My carpet was kind of
24  messed up.  My son's computer was waterlogged,
25  you know, the water got to it.  But that was just

Page 56

1   about all.  It was -- my apartment wasn't damaged
2   to the extent that water got into it all the way
3   up; no.
4       Q.   Okay.  But water got in in --
5       A.   Yes.  A little water got in.
6       Q.   And that's why the carpet was
7   ruined?
8       A.   Uh-huh.
9       Q.   And is that why the computer was
10  ruined, as well?
11      A.   Uh-huh.
12      Q.   Did you notice whether there was any
13  damage to windows?
14      A.   No windows.
15      Q.   Okay.  Do you know whether the roof
16  on the building in which your apartment was
17  located was damaged?
18      A.   I don't know if it was damaged on my
19  end, but I know in that particular four
20  apartments where I live at, on the other end by
21  my neighbor, her -- the roof had a hole in it.
22  You could actually see it if you driving, if you
23  in a car, if you look up, you can see the hole.
24  But they repaired it now, though.
25      Q.   When you returned to your apartment,

Page 57

1   were all of your belongings still in your
2   apartment at that time?
3       A.   Yes.
4       Q.   Were you able to take with you what
5   you wanted to remove?
6       A.   Uh-huh.  Yes.
7       Q.   What happened to the items of your
8   personal property that you left behind?
9       A.   At the apartment?
10      Q.   Uh-huh.
11      A.   The freezer was thrown away, the
12  refrigerator, a couple of other things were out,
13  they had to get rid of, that's about all.
14      Q.   In your apartment in Baton Rouge,
15  what kind of appliances do you have there?
16      A.   I have -- what they got -- I have
17  the regular refrigerator, which is not mine.
18      Q.   Okay.
19      A.   That's for the complex.  They have
20  the dishwasher, they have the stove -- regular,
21  you know, the stove --
22      Q.   Okay.
23      A.   -- counters and -- basic, that's it.
24      Q.   Did you have a dishwasher at B. W.
25  Cooper?

15 (Pages 54 to 57)

Case 3:06-cv-02231-ALC   Document 307-2-5   Filed 06/14/2007   Page 17 of 40

Page 90

1  up, you know, getting -- moving -- moving debris
2  and stuff.
3      Q.   And did you say that you went to C.
4  J. Peete after Katrina?
5      A.   No.  I didn't go to C. J. Peete.
6      Q.   Did you go to Florida?
7      A.   No.
8      Q.   Florida, the development, not the
9  State.
10          Did you go to St. Bernard?
11     A.   I think, I passed St. -- no.  No.
12  St. Bernard is way out there.  No.  That wasn't
13  St. Bernard.
14     Q.   Okay.
15     A.   I think, it was in Lafitte I passed.
16  Yeah.  That was Lafitte.  And, I think, they were
17  cleaning up, picking up debris, too.  And, I
18  think, I saw them boarding up some windows and
19  doors.
20     Q.   Do you know whether the other
21  members of the Resident Council, how many of
22  them are coming back to B. W. Cooper?
23     A.   The board members, you're talking
24  about?
25     Q.   Yes.

Page 91

1      A.   All our -- all the B. W. Cooper
2  board members are back -- there's five women.
3      Q.   Okay.
4      A.   And -- well, four, and then myself,
5  because there's five of us.  And all four of them
6  are back.  They all made it to Houston.  I didn't
7  make it to Houston.
8      Q.   They're all -- they're all back in
9  B. W. Cooper right now or --
10     A.   Yes.  They are; yes.  They are.
11     Q.   As a -- being on the Resident
12  Council, did you speak to residents about whether
13  they wanted to come back to B. W. Cooper after?
14     A.   I spoke to -- to some of them, yes,
15  and some of them said they were coming, and some
16  of them said they didn't think they wanted to
17  come back.
18     Q.   Do you remember who you spoke to?
19     A.   I don't remember all the people I
20  spoke to, I really don't.
21     Q.   Was it several people, I mean, ten
22  people, or more?
23     A.   Something like that.
24     Q.   Okay.  And do you remember about how
25  many of them wanted to come back?

Page 92

1      A.   The majority of them wanted to come
2  back.  I think, maybe one or two said they
3  weren't coming back.
4      Q.   Do you happen to remember who those
5  people are?
6      A.   I don't.  I think, I spoke to one
7  lady, Ms. Geraldine Garrett, and she said she
8  wasn't coming back.
9      Q.   Do you know where she lived at the
10  time Houston?
11     A.   I think, she was in Fort Worth,
12  Texas.
13     Q.   Okay.
14     A.   And I spoke to another lady,
15  Terry -- Terry Thomas -- that was my neighbor --
16  and she's not come back, she said she wasn't
17  coming back.
18     Q.   Do you know where she lives now?
19     A.   She's in -- she's outside of Fort
20  Worth.
21     Q.   In Texas, she's in Texas still?
22     A.   Yes.  She's in Texas.
23     Q.   Do you know -- the first woman you
24  named, Geraldine Garrett; is that right?
25     A.   Yes.

Page 93

1      Q.   Do you know why she's not -- she
2  doesn't want to come back?
3      MS. CLARK:
4          Objection.
5          Speculation.
6      THE WITNESS:
7          I don't know.  I guess -- I don't
8      know.
9  EXAMINATION BY MS. CHILAKAMARRI:
10     Q.   And then the second one, Terry
11  Thomas --
12     A.   Uh-huh.
13     Q.   -- did she say why she didn't want
14  to come back?
15     A.   Well, Terry's son is -- is -- was --
16  was going blind, and she said she was -- he was
17  doing better in the school that he was in, so
18  it -- it was benefitting him to stay where he
19  was, and she had more help there.
20     Q.   And by "help," you mean financial
21  assistance or --
22     A.   Financial assistance and the -- the
23  opportunity at the school he was going to.  It
24  was for the blind.
25     Q.   Okay.  Do you know if there was a

Page 94

1    school like that in New Orleans that she -- that
2    he was going to when she --
3        A.   It was a school here in New Orleans
4    that he was going to, but he was -- he wasn't
5    getting the -- the help that he really needed
6    here in New Orleans. It -- it was -- she said it
7    was a better program out there. He just
8    graduated, she said.
9        Q.   Great.
10       A.   And he's going to be going to a
11   college out there now.
12       Q.   That's wonderful.
13           Do you know whether there was any
14   vandalism at B. W. Cooper before Katrina?
15       A.   A what?
16       Q.   Any vandalism.
17       A.   Vandalism? I don't know.
18       Q.   What about after Katrina, do you
19   know whether there was any vandalism?
20       A.   I heard there was some vandalism,
21   but I don't know where it was -- I'm -- I'm not
22   sure.
23       Q.   Did you hear this from just other
24   residents or --
25       A.   I heard it from other residents.

Page 95

1        Q.   Do you know what type of vandalism
2    it was?
3        A.   They said it was breaking the door,
4    getting furniture and stuff out of the
5    apartments.
6        Q.   Do you know whether -- I -- I
7    forget -- did you -- do you know Imelda Paul, did
8    you say?
9        A.   Imelda Paul? Yes. Ms. Paul; yes.
10       Q.   Okay. And do you know whether she
11   supports HANO's redevelopment plan?
12   MS. CLARK:
13           Objection.
14           Speculation.
15   THE WITNESS:
16       I don't know. I -- I don't -- I
17       can't answer that. I don't know.
18   EXAMINATION BY MS. CHILAKAMARRI:
19       Q.   Ms. Wisdom already asked you about
20   the voucher, and how you attempted to get the
21   voucher while you were in Kings Court, and I just
22   wanted to clarify it.
23           So you went to the -- you went to
24   Baton Rouge to get the voucher first, and then
25   there was nobody there; is that right?

Page 96

1    MS. CLARK:
2        Objection.
3        This has all been asked and
4    answered.
5    THE WITNESS:
6        The -- the -- I was already in Baton
7    Rouge. I didn't know about a voucher, as
8    I spoke, when I went to Baton Rouge, and
9    didn't know where to go, til we got a
10   phone call and somebody -- one of the
11   residents was saying, did you get the
12   voucher, did you see about getting the
13   voucher, and that is it.
14   EXAMINATION BY MS. CHILAKAMARRI:
15       Q.   Okay. And then you went to the
16   office in New Orleans twice; right?
17   MS. CLARK:
18       Objection.
19       Same -- continuing objection.
20   THE WITNESS:
21       Yeah. I went -- I went over the
22   river; yeah. But there was no success
23   with that.
24   EXAMINATION BY MS. CHILAKAMARRI:
25       Q.   Okay. And you -- and then you said

Page 97

1    you fell sick, and that's why you didn't make any
2    further attempts?
3        A.   Yes.
4        Q.   Okay. Now, you said that you -- you
5    do support -- or you don't oppose the
6    redevelopment plan; is that right?
7        A.   That's what I said; yes.
8        Q.   Do you support it?
9        A.   I support it.
10       Q.   And why do you support it?
11       A.   If it -- that's what some residents
12   want, and if that's what they want, and they
13   think they can handle that, so be it, I have no
14   problem with that.
15       Q.   And that includes both the
16   redevelopment plan at B. W. Cooper, but then also
17   all of the --
18       A.   The other developments; yes.
19       Q.   -- the other developments. Okay.
20           When you were told about your unit
21   coming back on line in B. W. Cooper, were you
22   told of who else would be returning to B. W.
23   Cooper?
24       A.   What other residents?
25       Q.   Yes.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF LOUISIANA
 3

 4    YOLANDA ANDERSON, et al.      *  CIVIL ACTION
                    Plaintiffs,     *
 5                                  *  NO. 06-3298
      VERSUS                        *
 6                                  *  SECTION "B"
      ALPHONSO JACKSON,             *
 7    SECRETARY OF THE UNITED       *  JUDGE
      STATES DEPARTMENT OF          *  IVAN LEMELLE
 8    HOUSING AND URBAN             *
      DEVELOPMENT; et al            *  MAGISTRATE
 9                    Defendants.   *  ALMA CHASEZ
                                    *
10    *  *  *  *  *  *  *  *  *     *
11
12              Videotaped deposition of DONNA MARIE
      LABAT JOHNIGAN, 1221 South Galvez Street, New
13    Orleans, Louisiana 70125, taken at the United
      States District Court, Magistrate Chasez'
14    Chambers, 3rd Floor, 500 Poydras Street, New
      Orleans, Louisiana, on Monday, the 2nd day of
15    July 2007, commencing at 12:17 p.m.
16    APPEARANCES:
17         TRACIE L. WASHINGTON, ESQUIRE
           Suite 1400
18         650 Poydras Street
           Post Office Box 15107 (70175-5107)
19         New Orleans, Louisiana  70130
                (Attorneys for the Plaintiffs)
20
           U.S. DEPARTMENT OF JUSTICE
21         (By:  Lesley R. Farby, Esquire)
           Room 7119
22         20 Massachusetts Avenue
           Washington, D.C.  20001
23              (Attorney for the Defendant,
                 Department of Housing &
24               Urban Development)
25
```

EXHIBIT

1    So like I say, the old plan is not
2  what we want to look at -- we're going to look at
3  it, we have to revisit it, but because of
4  Hurricane Katrina, we may have to look at doing
5  it a different way.
6        But, no, we have not yet came back
7  to sit at the table with them, or HANO, to give
8  us our next move.
9        And I don't know if it's due to --
10  to what's going on around us, you know, with the
11  courts, or whatever.  But I do know that we're
12  just waiting on them to get back to us, or HANO
13  to get to us or them, I can say that.
14    Q.    You mentioned the town hall meetings
15  with the residents.
16    A.    Uh-huh.
17    Q.    Do the residents support you going
18  forward with redeveloping the sites?
19    A.    Yeah.  You know, they still had
20  their -- their comments, and their unassurance of
21  how many people can come back, and who's really
22  eligible to come back and things, the regular
23  questions.
24        But the town hall meetings and the
25  blessings have to come, too, you know, from

1  residents for any change that you're making.
2        But so far, we've been -- they've
3  been supportive of us.  You know, I can't speak
4  for everybody, because everybody has their own
5  opinion.  But so far, in the meetings, we have
6  really full meetings with the people that are
7  back, and then sometimes we send out papers that
8  people able to come back, we'd love to have some
9  people maybe come back, still come look at the
10  site, and do that, so we offer them that we -- we
11  always tell them when there's a meeting, you
12  know, but, financial and some things, people
13  can't come back, so we listen on the phones and
14  Ruth and them take comments and stuff that's
15  given to the board -- and if the board can't
16  answer it, we bring it to the Housing Authority.
17    Q.    Okay.  Turning back to your
18  apartment, after Katrina.
19    A.    Uh-huh.
20    Q.    Do you recall the first time that
21  you went back inside your apartment after being
22  evacuated?
23    A.    Yeah.  That's the first time I came
24  back with Darrell.
25    Q.    Is that the one you were talking

1  about where you saw Dr. Jarmon?
2    A.    No.  When I came back on the site.
3    Q.    Okay.
4    A.    When -- when we came back, after Mr.
5  West and them called and say they were back, and
6  -- and Darrell called Yvonne and told her that he
7  was going back to look at it, because we had
8  people on site.
9        And Mr. West and them were walking
10  around, doing an assessment, and we needed, you
11  know, to talk to him, because we needed to see
12  what resources they need from us.  And the first
13  time I went back was then.  That wasn't no
14  meeting.  That was to come back to Cooper with
15  Darrell to meet with the maintenance staff that
16  was already on site.
17    Q.    Okay.  Was that in October of 2005?
18    A.    It was the -- no.  It was -- I told
19  you I didn't leave there until almost, when I got
20  in my apartment, almost the first of November --
21    Q.    Okay.
22    A.    -- that we actually went back.
23        I was just getting settled in
24  October --
25    Q.    Okay.

1    A.    -- in -- in Las Brisas.
2    Q.    Okay.  What did your apartment look
3  like when you got back into it?
4    A.    It was in an uproar.  You know, I
5  had a -- I had some things -- some things missing
6  and stuff, a couple of TVs and things, but,
7  otherwise -- you know, drawers and stuff pulled
8  out, you know, and my air conditions were gone,
9  you know, things like that.
10        In the two bedrooms, and on the
11  front, but it was -- it -- the ceiling, as I told
12  you before, had done burst, so it had water and
13  stuff in it.  My refrigerator and deep freezer
14  was pulled out because of the workers.  And,
15  otherwise, it was just like a ram -- you know,
16  like a ram shack, you know.  And one of my
17  windows on the side -- because my apartment sits
18  on an end and I'm by a tree, so one of my windows
19  was broke with the tree limb in, you know, kind
20  of -- not all the way in, but, you know, where
21  the tree had fallen from.
22    Q.    Was there flood damage to the floor
23  in your apartment?
24    A.    Yeah.  Only one floor, if you come
25  in my apartment, was really badly damaged, that

Page 238

1  don't pay zero rent. Everybody's not on 25. The
2  majority of us, 98 percent of us, in Cooper paid
3  rent.
4          And, to us -- and to some people,
5  that's not a lot, but to me, that amount -- and
6  you say that's 30 percent of my income, I'm still
7  at a mixed income -- because I can't get mad when
8  I lived in Guste and paid 418 in a four, and my
9  neighbor paid 35 because she didn't work and she
10 received public assistance. It was my choice to
11 stay there and pay that type of rent.
12         So, to me, everybody got to give me
13 a definition of real mixed income, as we look at
14 it --
15   Q.   Okay.
16   A.   -- in -- in America, in an urban
17 development.
18   Q.   Does the -- does the RMC support the
19 concept of having market rate rental units within
20 the development, or near the development?
21   A.   Yeah. And, again, when you talk
22 about market rate, when you redevelop these
23 apartments, you got to make them look market
24 rent. You can't come back in and redevelop me
25 and I still -- you could pass through there and

Page 239

1  say, oh, that's B. W. Cooper, the public housing
2  apartment. If we going to spend as much money as
3  we spend, make my house look like the surrounding
4  community, that some people who have never seen
5  it could come through and won't believe that was
6  public housing on that ground.
7          So when you give me market rent, my
8  apartment has to not only look like market -- I
9  mean, say it's market rent, look like market
10 rent, that when I walk in it, I have all the
11 sufficient things that market renter pays -- not
12 just come back and rebuild me and make my one
13 bedroom where I have to stand in the door and
14 jump in my bed. You know, if you going to make
15 me look different, if you want me to be market
16 rent, then make my apartment look market
17 rentable.
18   Q.   Okay. So, when you're saying that,
19 are you referring to, for example, the number of
20 bathrooms that are in a unit?
21   A.   Yeah.
22 MS. WASHINGTON:
23         Hold -- hold on -- well, go on ahead
24 and answer it.
25         When I do this, I'm going to stop

Page 240

1  you (indicating).
2  THE WITNESS:
3          Okay. I think -- I think, that's
4  what I -- I didn't want to just come out
5  and say it, but when we were in different
6  cities, like we are now, and we look at
7  Section 8 houses, we would -- went to some
8  apartments that had one bedroom, and had
9  two bathrooms, because even if it was a
10 disability apartment, that bathroom that
11 was in that bedroom, that meant that was
12 that -- that handicap or senior person to
13 go straight from her bedroom in her
14 bathroom, and the one that was outside for
15 if she had company, yes, I would love
16 that.
17         They had two bedrooms in Houston
18 that had three bedrooms (sic), one when
19 you walk in it, so when you go upstairs,
20 nobody have to come in your bathroom from
21 your bedrooms, yes, and one that was
22 downstairs where somebody could come in
23 your house and still be in your living
24 room and kitchen, and use the bathroom,
25 without going up the stairs, yes, that's

Page 241

1  what -- that's what we're talking about.
2  EXAMINATION BY MS. WISDOM:
3    Q.   Okay. Have you seen any of the new
4  apartments at the senior Fisher Village?
5    A.   And as many times as I've been in
6  Guste -- I think, I've been in one, but I didn't
7  walk through Ms. -- Ms. -- the lady's house --
8  and I forget the name -- but one of the resident
9  leaders; no. I only went in to speak to her --
10 and being nosey, as I am sometimes, I really
11 didn't walk through her house.
12         I went through the ones at Guste.
13   Q.   Okay.
14   A.   And I real --
15   Q.   Did you like it?
16   A.   They are gorgeous.
17   Q.   Okay.
18   A.   And the only thing, they're too flat
19 for me, on the ground.
20         But -- and St. Thomas River --
21   Q.   River Gardens?
22   A.   River Gardens --
23   Q.   You like that?
24   A.   -- I like -- I like the concept of
25 it, I really do.



# B. W. Cooper
## Resident Management Corporation

**Executive Office**
3400 Earhart Blvd.
(504) 822-2767

New Orleans, LA 70125
Fax: (504) 822-0766

RECEIVED
APR 3 0 2007
EXECUTIVE, DEPT.

April 17, 2007

Mr. C. Donald Babers
Board of Commissioners
Housing Authority for the City of New Orleans
4100 Touro Street
New Orleans, LA 70122

Dear Mr. Babers:

B.W. Cooper Resident Management Corporation (RMC), in partnership with Keith B. Key Enterprises (KBK), wishes to thank HANO for the selection of KBK as Master Developer for the redevelopment of the B.W. Cooper Housing Community. In addition, we are anxiously looking forward to a productive relationship with HANO, and are very excited about the opportunity to be a part of the plan for redevelopment of this mixed income community.

In addition to our thanks to HANO for the selection of KBK, we would like this letter to serve as a statement of our position as it relates to the future redevelopment of our housing community.

The Board of B.W. Cooper RMC have discussed the issues that surround HANO/HUD in regards to the federal lawsuit scheduled to be heard in November 2007, and all other matters that could lead to this project not reaching its full potential.

B.W. Cooper RMC Board and KBK are on one accord regarding our interest and intent to move forward with HANO in the redevelopment of B.W. Cooper. The board readily acknowledges that B.W. Cooper is not a party to the federal lawsuit or any other litigation concerns and thus do not want the pending litigation to impede the boards unanimous desire to proceed. In a further effort to avoid any perceived association with B.W. Cooper's redevelopment efforts, both board officials involved in the lawsuit have committed to withdraw themselves from the litigation.

We maintain an unbridled interest in moving forward with KBK and HANO in the redevelopment of B.W. Cooper. It is to be made unequivocally clear by our board that we are completely satisfied with your selection of KBK as our developer, and in partnership with HANO, we seek to continue the planning stages to rebuild our community.

Based on the aforementioned, and in summary, we are committed to move the development of B.W. Cooper forward and therefore, our position is to be removed from any and all issues that could result in slowing down our development efforts including, but not limited to the federal lawsuit filed by the



EXHIBIT

NAACP. We welcome the opportunity to have a meeting with HANO representatives in order to take the next steps towards the continued planning process, including but not limited to the drafting of a Master Development agreement.

Please feel free to contact me at your earliest convenience if you have any questions regarding this letter or our moving forward. Thank you in advance for your attention to this matter and we look forward to working with KBK Enterprises, our developer, and with HANO to achieve our expected results.

Sincerely,

Yvonne Marrero
President
B.W. Cooper RMC


cc:     *Jeffrey Riddell, Deputy Executive Administrator, HANO*
        *Stacy Head, New Orleans City Council Member, District B*
        *Keith B. Key, President/CEO KBK Enterprises*
        *John F. Wooldridge, V.P. of Business Development, KBK Enterprises*

HANO 035269

```
 1                         UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
 2

 3    YOLANDA ANDERSON, ET AL.* Civil Action No. 06-3298-"B"
                               *
 4         Plaintiffs,         * New Orleans, Louisiana
                               *
 5         v.                  * Monday, September 17, 2007
                               *
 6    ALPHONSO JACKSON, ET AL,* 9:30 a.m.
                               *
 7         Defendant.          *
      *   *   *   *   *   *   *   *   *   *
 8
                          CLASS CERTIFICATION HEARING
 9            BEFORE THE HONORABLE IVAN L.R. LEMELLE
                     UNITED STATES DISTRICT JUDGE
10

11    APPEARANCES:

12    For the Plaintiffs:   Jenner & Block
                            BY:  JOHN LEE WARD, JR.
13                               and
                            ADAM H. MORSE
14                          330 North Wabash Avenue
                            Chicago, IL  60611
15                          312-840-8627

16
                            Loyola Law School Clinic
17                          BY:  WILLIAM PATRICK QUIGLEY
                            7214 St. Charles Avenue
18                          New Orleans, LA  70118
                            504-861-5590
19

20                          Advancement Project
                            BY:  ANITA SINHA
21                          1730 M. Street NW
                            Suite 901
22                          Washington, D.C.  20036
                            202-728-9557
23
                                 -- and --
24

25
```



```
1   APPEARANCES (continued):

2

                        Louisiana Justice Institute
3                       BY:   TRACIE L. WASHINGTON
                        1631 Elysian Fields Avenue
4                       New Orleans, LA   70117
                        504-304-7947
5

6   For Housing Authority Stone Pigman Walther Wittmann, LLC
     of New Orleans:     BY:   RACHEL WENDT WISDOM
7                                  and
                              HEATHER LONIAN
8                       546 Carondelet Street
                        New Orleans, LA   70130
9                       504-581-3200

10                          -- and --

11

    For U.S. Department    BY: VARU CHILAKAMARRI
12   of Housing and Urban          and
     Development:          HEATHER RENEE PHILLIPS
13                                 and
                              NATHAN CATCHPOLE
14                      20 Massachusetts Avenue NW
                        Room 7214
15                      Washington, D.C.   20530
                        202-616-0679
16

17  Reported by:        David A. Zarek, CCR, RPR, CP
                        500 Poydras Street
18                      Room 406
                        New Orleans, LA   70130
19                      504-523-6062

20

21

              Proceedings recorded by mechanical stenography;
22  transcript produced from dictation.

23

24

25
```

1    deprivation notice that he was going not to be allowed back

2    in, number one.  And number two, he was deprived of a       .

3    hearing, which is required under the due process clause.

4         THE COURT:  Didn't you all tell me that HUD or HANO

5    did these hearings later?

6         MR. WARD:  We did not, Your Honor.  There wasn't any,

7    there wasn't a deprivation hearing.  There has been no such

8    thing.

9         THE COURT:  By the way, it goes for counsel, too.  If

10   you are talking when I'm talking to one lawyer, I will

11   excuse you from the courtroom.  If you have a problem with

12   that, you can leave now.

13        MR. WARD:  Thank you, Your Honor.

14        THE COURT:  This is one of the things that I have a

15   problem with.  I don't know who getting this version from

16   the version from the client and got this complaint, but I

17   didn't raise this but I raise it now -- glaring disparities

18   between what clients are saying in depositions and what is

19   in this complaint.  I could do all sorts of things with

20   that including Rule 11, but I have not raised that ugly

21   monster.  I don't think that is as important as what we are

22   dealing with here.

23        MR. WARD:  Well, Your Honor --

24        THE COURT:  But let's move on.

25        MR. WARD:  I just only want to say that we will review

1   stuck in my mind that there is this viable claim of

2   disparity in terms of how this voucher, various voucher

3   programs are administered.  That does not say that those

4   disparities are, in fact, constitutional violations or

5   statutory violations.  But certainly on the face of it, and

6   that is all the plaintiffs have to present is some basis to

7   say that the way these programs are administered there is

8   some constitutional due process as well as statutory issues

9   that call into question the disparity of these vouchers and

10  their impact upon the displaced tenants.  The extent that

11  those issues to me are issues that would merit class-wide

12  discovery and would predominate in terms of injunctive and

13  declaratory issues over any monetary issues to me are quite

14  obvious and quite easy to reach if, indeed, the plaintiff

15  can prevail on the merits and that is there is only one

16  question presented: Was there a constitutional or federal

17  law, statute violation on the present claim for the way

18  these voucher programs are administered?  And that does not

19  require an individualized look at every, every lease but

20  certainly those that are in a fashion and detailed class

21  can be determined.  And the class that I find very quite

22  easily here is defining the class would be all African-

23  American citizens.  And I would even say all if, indeed 100

24  percent of the putative class members are African-American

25  so be it.  That is all African-American citizens of the

1  United States who resided in public housing developments in

2  New Orleans, Louisiana, as of August 29, 2005, pursuant to

3  a lease with the defendant Housing Authority of New Orleans

4  who are involuntary displaced as a result of this Hurricane

5  Katrina who received vouchers or other forms of rental

6  assistance from HUD or HANO and/or HANO's pursuant to HUD's

7  regulations and which rental assistance did not provide for

8  utility assistance leading to a disparity on how they were

9  treated before Katrina as well as post-Katrina would be the

10  identifiable specific class.

11  Very, very I think at least focused class of tenants

12  here.  The problem obviously is that in fashioning such a

13  class certainly you can't accept as members of the class

14  every tenant who was affected by Hurricane Katrina but only

15  those who were disparately affected and treated through the

16  voucher system and how it is administered and processed.

17  And I would even say that as a sub-class there would be an

18  identifiable class of citizens under the same conditions

19  that I have said before who might have paid for utilities

20  before Katrina but who are not paying more utilities after

21  Katrina only as a sub-class, that this general class that I

22  said who did not have to pay before.

23  While that may be a factor, I don't think it is a

24  controlling factor that one might be better off because you

25  are receiving more money for rent but if you are not

1   realize that plaintiffs' theory in this case has always

2   been their claims, their theory of constitutional and

3   federal rights to return to their home sooner than some did

4   or perhaps now on the basis of either the conditions of

5   their development or the alleged failure to make

6   improvement or allow them access as well as other things.

7   I have sufficient information here in reconsidering the

8   summary judgment that I had before and in connection with

9   what I have enough to say to you all that the only issue

10  that I have left to try in this particular case would be

11  the issue concerning the voucher program, not demolition,

12  not rebuilding, not redevelopment nor the timing of one's

13  return to the City, whether that is after January,

14  February, March or what you.  It all leads to one

15  inevitable conclusion, that factually and legally the four

16  requirements for maintaining this claim fall under Rule 23

17  concerning the numerosity, concerning commonality,

18  concerning typicality, adequacy of representation.  The

19  requested relief in all such instances except the voucher

20  issue is where I don't find any real disputed facts, now

21  material dispute of facts concerning those issues in the

22  record that I have now before me.

23      The parties have done an excellent job since our last

24  hearing to further develop the record both on the class

25  certification issue but also on merit discovery issues that

1  considering everything that everyone has given to me and

2  things that were the subject of motions.  And as I said

3  before, I have treated expert opinion reports and

4  submissions and all point to the fact that there is no

5  constitutional violation, there is no federal statutory

6  violation of the tenants' rights insofar as it respects the

7  timing of or the condition of or the demolition or

8  redevelopment of the various developments at issue here.

9        As I stated before, the issue of due process whether

10  or not there was proper notice, whether there was proper

11  opportunity given to tenants to contest the failures, to

12  get them back into their homes sooner or later or even now

13  all have been based upon what I consider to be more of an

14  individualized issue concerning their lease, their contract

15  with HUD, I mean with HANO, not on the more common question

16  of due process.  Because as I have already noticed, there

17  has been some process, although late in terms of getting

18  people's input on some of these questions.

19        I have no reason in the record before me to believe

20  that the process that was allowed was nothing other than

21  reasonable.  Was it perfect?  No.  Was it highly charged?

22  It was.  Did some of it result as it seems to result due to

23  Court directives and requiring that there be some public

24  notice and some public meeting in that regard?  Yes.  So,

25  yes, to some extent the plaintiffs have prevailed in

1  getting certain things done that would not have otherwise

2  been done.  Just because I find on the merits that

3  ultimately they would fail on the merits as regard to, say,

4  demolition and redevelopment, that does not mean, however,

5  that they would lack some remedy for at least achieving the

6  process that I have just mentioned.

7      I know that at the same time, too, there is a lot more

8  to be done in this particular case.  I note, too, that the

9  decision to certify the case as a class action given the

10  Court's discretion and that considering the various factors

11  that I have, which I have done, would then allow the

12  parties to seek certification of our rules to the Circuit

13  Court of Appeal on the class issues.

14      I would also, however, because I have made some

15  rulings in summary judgment, I have made some rulings here

16  today that deal with claims that would have in my view a

17  basis for entering final judgment, allow the parties then

18  to seek interlocutory appeal on those rulings as well.

19      Before doing that, before entertaining a motion for

20  interlocutory appeal, I am going to direct the parties to

21  do this: So that the record is complete to the extent that

22  either side wishes to pursue further discovery on the issue

23  of the voucher system particularly now the third proposed

24  voucher program that we are about to hear about or may be

25  implemented if these plans for redevelopment are approved

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| YOLANDA ANDERSON, Et al. . | * | CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * | |
| VERSUS | * | SECTION "B" |
| | * | |
| ALPHONSO JACKSON, SECRETARY OF THE | * | JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * | |
| AND URBAN DEVELOPMENT; Et al. | * | MAGISTRATE ALMA CHASEZ |
| | * | |
| Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

### AFFIDAVIT OF WILLIAM C. THORSON

**BEFORE ME,** a Notary Public duly qualified in and for the State of Louisiana

and Parish of Orleans, personally came and appeared:

### WILLIAM C. THORSON

who, being duly sworn, did depose and state as follows:

1.

I have worked for United States Department of Housing and Urban Development

("HUD") for approximately 30 years. My position with HUD immediately prior to coming to

New Orleans in April 2006 was Director of the Office of Capital Improvements at HUD

headquarters in Washington D.C. That office manages approximately $2.3 billion in capital

improvement funding to more than 3,100 public housing authorities nationwide. Before that, I

- 1 -

**Attachment 2**

EXHIBIT

held numerous management positions in HUD, and in those positions performed duties that included oversight of public housing development, maintenance, procurement and energy conservation, as well as physical inspections by HUD of public housing developments such as those at issue in this case.

2.

In connection with my various positions at HUD over the last 30 years, I have worked on numerous matters involving the management and/or replacement of distressed public housing including work relating to developments in New Orleans such as C.J. Peete, Lafitte, St. Bernard and B.W. Cooper. In performing such work, I have also gained knowledge regarding the condition of and plans for HANO's public housing properties in New Orleans, the fair housing policies pursued by HUD over the years, as well as the public interest objectives that HUD (and the public housing authorities ("PHAs")) it regulates have sought and seek to advance.

3.

On April 20, 2006 United States Department of Housing and Urban Development ("HUD") Assistant Secretary Orlando J. Cabrera, appointed me the Executive Administrator of the Housing Authority of New Orleans ("HANO").

4.

In my capacity as the HUD-appointed Executive Administrator, I manage and oversee the day to day business operations of HANO and oversee the implementation of Board directives, rules, policies and decisions, among other things.

- 2 -

5.

I make the statements set forth herein based on my personal knowledge of the facts, which I derived in the performance of my duties previously at HUD and currently at HANO.

6.

Like other old public housing developments around the country, large, densely populated HANO developments such as St. Bernard, Lafitte, C.J. Peete and B.W. Cooper sustained tremendous wear and tear over time, deteriorated and/or became obsolete, such that prior to Hurricane Katrina virtually every aspect of the infrastructure at these developments needed major renovation if not out-right replacement. In fact, the vast majority of HANO's housing stock has continuously failed to pass HUD's Public Housing Assessment System (PHAS) physical inspections since its inception in the late 1990s. Thus, the conditions of these properties warranted demolition and redevelopment even prior to Katrina and HANO therefore had already received approval for demolition of parts of C.J. Peete, B.W. Cooper and St. Bernard well in advance of the Hurricane Katrina.

7.

Since Hurricane Katrina, the HUD Real Estate Assessment Center (REAC), which administers PHAS inspections, has inspected 100% of HANO's over 6,000 housing units to assess the post-storm condition of the properties. Attached hereto as Exhibit 1 is a disc of photographs taken by REAC during its inspection. REAC assigned very low, failing scores (between 0-50) to the vast majority of HANO's units, even many that sustained minimal storm damage. REAC furthermore identified approximately 67% of HANO units as "unlivable," meaning that those units could not be made habitable without substantial work. The other 33% were classified as livable, meaning that those particular units (disregarding the conditions of the

- 3 -

buildings or developments within which they are located) could be restored to habitable condition with moderate work. However, many of those "livable" units were not and are not habitable due to damages to the building or infrastructure damage to the development within which they are located. For example, power lines were damaged at most of HANO's developments including C.J. Peete, B.W. Cooper, St. Bernard and Lafitte. Therefore, even the units at those sites that may have sustained minimal interior damage were and/or are not habitable due to lack of power, among other things.

### 8.

In addition to the physical deterioration and obsolescence existing even before Hurricane Katrina, high concentrations of poverty in these densely populated developments together with rising crime and vandalism had contributed to growing social distress within the developments and surrounding communities.

### 9.

Based upon consideration of many factors, including the conditions at these properties, available funding sources and its fair housing goals, HANO is currently pursuing rebuilding plans that include the future demolition and redevelopment of the C.J. Peete, B.W. Cooper, St. Bernard and Lafitte developments. In choosing to pursue these plans over spending the approximate $130 million that would be required to repair just the storm damage at these sites without addressing the pre-existing deterioration and problems, HANO seeks to advance the fair housing objectives recognized by Congress in 1992 when it passed legislation creating the Homeownership and Opportunities for People Everywhere (HOPE VI) program and again in 1998 when it passed the "Quality Housing and Work Responsibility Act" (QHWRA).

- 4 -

833719v.1

10.

Through its rebuilding plan, for example, HANO seeks (1) to "improv[e] the living environment for public housing residents of severely distressed public housing projects through the demolition . . . [and] replacement of obsolete public housing projects, (2) to provide "housing that will avoid or decrease the concentration of very-low income families," as well as to (3) build "sustainable communities," as is set forth in Section 24 of the U.S. Housing Act. 42 U.S.C. 1437v(a)(1)through(4).  HANO further seeks to curtail "the isolation of public housing developments and residents, by blending public housing units into more diverse and mixed income communities.," and to "leverage" HUD funding and "use other private or governmental funds in order to create additional affordable and/or market rate housing in which the [public housing and/or low-income] units may be blended."  See Exhibit 2, which is an excerpt from HUD's 1995 Notice PIH 95-10, at page 1(last full paragraph. 3rd to last line) and paragraph starting on the bottom of page 4, and which sets forth some of the public policies and goals of HOPE VI and other similar revitalization programs managed by HUD.

William C. Thorson

Sworn to and subscribed before me
this 3rd day of November, 2006.

NOTARY PUBLIC

Print Name_____

Bar No._____

**Rachel Wendt Wisdom
State of Louisiana - Bar No. 21167
My commission is issued for life**

- 5 -

837719v.1

**The Brookings Institution**
METROPOLITIAN POLICY PROGRAM

# New Orleans After the Storm:
## Lessons from the Past, a Plan for the Future

### I. Introduction: New Orleans and the Storm

Before dawn on the morning of Monday, August 29, 2005, Tropical Storm Katrina—a Category 4 hurricane with winds up to 145 miles per hour—shifted slightly to the east and roared into the central Gulf Coast just east of the city of New Orleans.[1]

What followed—after an illusory day of relief that New Orleans had been spared a direct hit—was a nightmare that shook the nation.

First broke reports that floodwalls protecting New Orleans' Lower 9th Ward and running along 17th Street and London Avenue had breached, flooding vast swaths of the city.

Then came the television images—pictures that for a week transfixed a horrified nation with a hellish glimpse of a humanitarian disaster.

Tens of thousands of mostly black New Orleanians who had remained in the city were climbing to their rooftops as the floodwaters rose, notwithstanding massive pre-storm evacuations.

Thousands and thousands of modest houses in low-lying urban neighborhoods and others in white and black suburbs were inundated while the higher-value French Quarter and downtown remained dry. And all the while more than 20,000 people—again mostly poor African Americans—waited, sweltering, in grim conditions in the New Orleans Superdome, begging for relief.[2]

What went wrong in New Orleans, and how should the nation respond? Clearly, it will take years to sort through the chaos of August and September 2005 to fully answer those questions. But for all that, it is possible—even in the near aftermath of the hurricane—to draw some initial conclusions about why Katrina wreaked such havoc, as well as to derive from New Orleans' past some lessons for the future and use them to inform a plan for rebuilding a better New Orleans.

This report draws such conclusions, proposes such lessons, outlines such a plan.

Informed by an analysis of New Orleans' recent development history, *New Orleans after the Storm: Lessons from the Past, A Plan for the Future* shows how the region's past development trends exacerbated the catastrophe, and suggests how the region might rise again on a better footing by transcending the mistakes of the past.

*Also* Plantiff(s)
Exhibit HHH

October 2005 • The Brookings Institution • Special Analysis **1**

**ATTACHMENT 5**

EXHIBIT

## Federal housing policies financed and maintained enclaves of poverty and exacerbated racial disparities in the city of New Orleans

The first major way federal policy exacerbated how the storm affected New Orleans is through its low-income housing policies. Over 60 years, these policies catered to the very poor by concentrating many of them in special enclaves that in New Orleans lay almost exclusively in the lower-lying, more flood-vulnerable sections of the city.

This outcome is tragic and ironic, given New Orleans' initial mingling of races and classes.[47] But at any rate, this history of relative residential integration did not last, and the federal government played a significant role in replacing it—in two ways.

### Public housing projects increased the city's concentrations of poverty

Most glaringly, the nationwide federal effort to supply what was intended to be high-quality, inexpensive public housing bears significant responsibility for concentrating poverty in dense clusters in low-lying neighborhoods.

As it happens, the Housing Authority of New Orleans—created by state law in 1937—was the first such agency in the United States to receive federal funds for slum clearance and publicly subsidized housing.[48] What resulted, as the money flowed for 30 years, was the creation in collaboration with the housing authority of 10 big public housing projects—all now almost entirely black, and all sited in what would become some of Katrina's most dire flood zones.

The first six projects opened in the early 1940s, and included four developments for blacks (Magnolia, Calliope, Lafitte, and St. Bernard) and two for whites (St. Thomas and Iberville).[49] Legal scholar Martha Mahoney notes explicitly that the all-black Laffite replaced a historically mixed neighborhood of whites, blacks, and Creoles, and that several others increased racial concentration in the city.[50]

Similarly, when the 1949 Housing Act funded 5,000 new dwelling units for New Orleans, the local housing authority located the new developments adjacent to existing ones, nearly doubling the size of several projects and so enlarging the federal enclaves. The Magnolia extension, for example, displaced the homes of black doctors and ministers near the Flint-Goodridge Hospital as well as the remnants of an old slum area.[51]

Additional isolation followed the construction of three more new projects between 1956 and 1964. The huge Desire project (where Desire Street crosses Abundance), for instance, placed 262 buildings containing 1,860 apartments on a geographically isolated tract, cut off from the rest of New Orleans by two canals and two sets of railroad tracks. Comments Mahoney: "Due to its size and isolation, Desire deserves the label 'federal ghetto' more so than any of the other New Orleans projects."[52] Similarly isolated was the Fischer development, which lay on a point of land across the Mississippi River from the rest of New Orleans. Fischer imposed a large, concentrated project on a small, less-populated black community, according to Mahoney.[53]

The isolation of black citizens only deepened as whites began to leave town for the suburbs in the years following World War II.[54] With whites leaving, the black presence in many formerly white or mixed neighborhoods increased, the gaps between black areas began to fill in, and, as Mahoney writes, "the outlines of large concentrations of black residents...began to take shape." By 1985, Mayor Ernest Morial estimated that city housing projects population contained



no less than 50,000 New Orleanians—or 9 percent of the city population.[55]

In this way, step by step, federal housing relief really did have the perverse outcome of increasing racial and geographical divisions in the region by creating large, highly segregated enclaves of poverty in the city of New Orleans

where they had not existed before.

Nor has the heavy recent use of the U.S. Department of Housing and Urban Development's HOPE VI program to dismantle old housing blocks, build new communities, and provide thousands of Section 8 housing vouchers to low-income residents completely broken up the



**Public housing was primarily sited in very poor neighborhoods**

Source: Brookings analysis of U.S. Census data, the Greater New Orleans Community Data Center, and the Housing Authority of New Orleans.

Poverty Rate by Census Tract
- Under 10 Percent
- 10 Percent to 19.9 Percent
- 20 Percent to 29.9 Percent
- 30 Percent to 39.9 Percent
- 40 Percent or Higher
- Neighborhood Boundaries

Public Housing
- 32 to 400 Units
- 401 to 700 Units
- 701 to 1,000 Units
- 1,001 to 1,300 Units
- 1,301 to 1,462 Units

city's heavy racial concentrations.[56]  Even on the eve of Katrina's landfall, the areas in which the 10 federally funded projects were located—the B.W. Cooper neighborhood, the Desire area, the Iberville area—retained some of the area's greatest concentrations of black residents. All but one of the neighborhoods has an overall census tract poverty rate greater than 40 percent. All but one of these often-lower-lying African American neighborhoods were flooded.

## Federal highway spending promoted sprawl into wetlands susceptible to flooding along lakefront Orleans and Jefferson Parishes

Federally funded highway construction, meanwhile, played its own key role—also in partnership with local and state road-builders—in distorting the development of the metropolitan area in unsustainable ways.  Over time, these massive building projects made huge new swaths of swampland in northern Orleans and Jefferson parishes accessible in the 1950s, 1960s, and 1970s and paved the way for their suburbanization..

No longer, once the road building took off, did development roll outwards slowly or contiguously from established neighborhoods, or along street car lines. Instead, roadways such as U.S. 61 facilitated "apparently random" development west beyond the Orleans Parish line—development by which the metropolitan area "simply exploded into the swamps," as Lewis described the years after World War II.[57]

Right off, east bank Jefferson Parish boomed, emerging as a middle- and upper-class white enclave light years different from old New Orleans (Much of the area was flooded by Hurricane Katrina).[58]

Next, the completion in 1956 of the Lake Pontchartrain Causeway—at 24 miles long the longest overwater bridge in the world—enabled the development of additional new white suburbs in St. Tammany Parish on the north shore of the lake.

And then, with the completion of I-10 in the early 1970s, even vaster sprawl proliferated. First, the whole area west from Orleans Parish to the St. Charles protection levee took off, and quickly resembled "one gigantic ill-planned subdivision," in Lewis' phrase—much of it built in former marshland. Soon, the same interstate opened up huge new areas of swampland to the east along the lakefront as it rolled through New Orleans East beyond the Industrial Canal and on toward Rigolets Bayou and the gigantic I-10 twin span bridge across the east end of Lake Pontchartrain.

In these ways, then, highways to and through former swamps contributed heavily to the unsustainable development patterns plaguing the New Orleans metropolis in the years prior to Katrina. All at once, these federal investments helped make dangerous low-lying swamplands more accessible, facilitated sprawl and white flight, and further isolated poor black populations in the urban core.

## Federal policies and investments on flood protection facilitated development in dangerous locations

Federal policies and investment on flood protection also bear a measure of responsibility for what happened when Hurricane Katrina hit.

Highway spending may have made the swamps accessible, but billions of dollars of flood-control spending both in core areas and around the periphery enabled more and more New Orleanians—both black and white—to occupy danger-

## Replace neighborhoods of poverty with neighborhoods of choice and connection

The second priority of reconstruction must be to confront what President Bush called the "deep, persistent poverty" exposed by Katrina. Poverty, and its companion concentrated poverty, simply cannot be tolerated as the nation rebuilds New Orleans.

But to strike at poverty, to strike at deprivation, the federal government will need to rebuild New Orleans' shattered neighborhoods, and do it in a way that knits together a divided city.

Unfortunately, the president's main proposal on this front—his Urban Homestead Initiative to transfer federally owned land to low-income families—falls short in meeting the scale of the New Orleans' housing challenge and, worse, may actually recreate the concentrated poverty that predated Katrina.

Happily, though, a better way to respond—based on proven past successes—exists.

With its state, local, and private-sector partners, the federal government must move energetically now to remake New Orleans' dozens of neighborhoods of deprivation and isolation as vibrant new *neighborhoods of choice and connection*.[72]

What are neighborhoods of choice and connection?

*Neighborhoods of choice* are desirable communities that families of all income levels seek out for their quality, distinctiveness, sociability, location, and amenities. Such neighborhoods are above all mixed-income neighborhoods.

*Neighborhoods of connection* are neighborhoods that link families to opportunity, rather than isolate their residents. These neighborhoods offer their residents good schools and timely services. These communities provide to their citizens easy access to nearby or distant job markets, as well as connection to the mainstream life of the region.

Neighborhoods of choice and connection, to that extent, reject the residential segregation and concentrated poverty of pre-Katrina New Orleans, and hold out a vision of a reborn New Orleans region vibrant with mixed-income communities attractive to all classes, schools on track to succeed, measurably better public transportation, and stronger links to the world of work. In this fashion, neighborhoods of choice and connection are the true basis for solving many of the New Orleans region's problems, creating, if done right, better schools, functioning real estate markets, and greater business investment.

And so the federal government—with its partners—should make the most of reconstruction by helping the region replace its neighborhoods of poverty with neighborhoods of choice and connection.

To do this, Washington should embrace the proven successes of an array of available partners and recent efforts to transform the nation's worst public housing and expand the opportunities for low-income families beyond high-poverty neighborhoods.[73]

Most importantly, federal leaders should keep in mind the achievements of the HOPE VI program, which over the past 10 years catalyzed the transformation of many of the nation's most distressed projects into well-designed, mixed-income neighborhoods. Likewise, they should draw on the success of programs like the Moving to Opportunity (MTO) demonstra-

tion, which helped families in select cities move from distressed public housing to low-poverty suburbs, and others that use tax credits or other funding streams to produce affordable housing, especially in low-poverty areas.

Likewise, Washington should draw on the expertise of the most sophisticated housing finance and development system in the world—America's broad array of public-and private-sector financial institutions, builders, community development corporations (CDCs), faith-based groups, and intermediaries like the Local Initiatives Support Corp.(LISC) and the Enterprise Foundation.

Put it all together, and the federal government must play a bold new role now to stimulate and reshape the New Orleans area housing market, both on the demand side to promote social mobility and on the supply side to rebuild neighborhoods in the right way. Five interventions will help:

### Provide housing vouchers to displaced families to increase choice and mobility

Wide, long-term access to renewable federal housing vouchers ought to be the starting point, and a core element, of the drive to create neighborhoods of choice and connection in New Orleans.

Housing Choice Vouchers represent one of the most humane, dignified options for providing near-term shelter to the displaced—wherever they may be. But housing vouchers are also critical to the longer-term recovery of the region. All in one they have the power to re-animate housing markets and foster the emergence of more diverse, healthy mixed-income neighborhoods.

Vouchers, in the first place, will be essential to stimulate local market demand. But beyond

that studies have also shown that families who use vouchers often use them to live in lower-poverty neighborhoods, near better employment and educational opportunities. That means that in helping returnees repopulate their city, vouchers will also help New Orleanians move to better, less-segregated, higher-ground neighborhoods as they resettle. And the architects of rebirth should note that housing vouchers can be applied not just to rent but to mortgage payments. That means that vouchers are good for both former renters and homeowners, and can inject a powerful spur to homeownership.

### Deploy increased CDBG and HOME funds to speed clean up and land assembly

To jumpstart the cleanup and renewal process, Congress and the administration should also greatly increase the streams of funding available to the devastated area under the Community Development Block Grant (CDBG) and HOME Investment Partnerships Program, the two main sources of federal support for state and local urban revitalization and affordable housing initiatives.

CDBG and HOME will be crucial to the creation of neighborhoods of choice and connection, in part because they are flexible. CDBG money is specifically available for such critical needs in rebuilding New Orleans' neighborhoods as debris clearance; demolition, clearance, and reconstruction of damaged property; and emergency reconstruction of essential utilities. For its part, HOME remains the largest federal block grant to state and local governments designed exclusively to create affordable housing for low-income households—a huge need in coming years in New Orleans. For each, local discretion of use maximizes effectiveness.

Yet, the programs' flexibility should not be allowed to let local lawmakers fund the repetition

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, et al.,        )
    Plaintiffs                     )
                          )
      v.                         )        Civil Action No. 06-3298
                           )        SECT. B MAG 5
                           )        JUDGE LEMELLE
ALPHONSO JACKSON, et al.,        )
    Defendants                    )

### DECLARATION OF ANN LOTT

I, Ann Lott, hereby declare:

1. I am of majority age and otherwise competent to testify as to the matters
herein, based on my personal knowledge.

2. I am the President and Chief Executive Officer of the Dallas Housing
Authority (DHA). I have served in this capacity for six years and oversee the
administration and professional work involved in the planning, directing and
coordination of low-income housing assistance programs that consist of approximately
23,000 public housing and Section 8 families.

3. My tenure with the housing authority began in 1985 as a management clerk in
the George Loving Place public housing development. Over the past 21 years, I have
had the opportunity to work in eight positions, all of which required direct interaction
with the low-income families served by the Dallas Housing Authority.

4. During my tenure, DHA has demolished or disposed of eight properties to
include: George Loving Place, Edgar Ward Place, Elmer Scott Place, Frazier Courts,

EXHIBIT

9

Frazier Courts Addition, Roseland Homes, Oakland Apartments and Simpson Place. The disposition and demolition of these properties required the relocation of approximately 3,000 assisted families to other DHA sites or rental housing through the Section 8 program.

5.  Regulations established by the U.S. Department of Housing and Urban Development (HUD), require housing authorities to meet and consult with residents impacted by the disposition and demolition of assisted housing units. During such meetings, I have had the opportunity to speak with hundreds of families to gauge their housing and relocation preferences. My experience suggests there are always families who do not want to move out of public housing. Such individuals have generally lived in public housing for over ten years – many of them 20 to 30 years – and have strong ties to the community. Such residents often wield influence in the development and surrounding community and are very vocal about their desire to remain in public housing.

6.  However, while such families are generally vociferous, they do not represent the sentiment of all their neighbors. Rather, the majority of families, when given the choice, choose to move out of public housing with the assistance of Section 8 vouchers. The applicants' and residents' preference for Section 8 assistance is widespread and generally accepted by housing professionals, and was acknowledged by a federal district court in *Walker, et al. v. HUD, et al.*, CA3-85-2710 in the United States District Court for the Northern District of Texas, Dallas Division.

2

7. In 1987, DHA entered into the *Walker Consent Decree*, which called for the demolition of 3,500 units at George Loving Place, Edgar Ward Place and Elmer Scott Place, collectively referred to as West Dallas. Once considered to contain one of the largest concentrations of low-rise public housing in the nation, West Dallas was the poster child for how not to build public housing. Constructed in part to solve what was referred to at the time as the "Negro Housing Problem" in Dallas, the dense community was a city within a city. A federal district court ordered all of the units – most of which were vacant and boarded up - to be demolished and replaced with Section 8 certificates and vouchers as a remedy in a class action discrimination lawsuit.

8. There were approximately 60 families that vehemently objected to the consent decree. They believed a conspiracy was evolving to move them out of West Dallas so "rich, white developers" could benefit from valuable land located minutes from downtown. These residents threatened to throw themselves in front of the bull dozer to block the demolition of the sites. The individuals in question were long term residents and very influential within the community – so influential they convinced U.S. Representative Martin Frost to introduce legislation to block the demolition of all public housing in West Dallas. While these residents were passionate in their fight, they did not represent the overwhelming majority of residents in the community. I was a counselor at the time the decree was signed and part of the team that assisted 900 displaced families in locating private market housing with their Section 8 certificates and vouchers. Counseling and briefing sessions with hundreds of families revealed a

3

## Families Impacted by Hurricanes Katrina or Rita
## Outreach for HUD Meeting

| Last Name | First Name | Property | In the Process of Applying | Will be Applying |
|---|---|---|---|---|
| Williams | Don | Cedar Springs | x | |
| Williams | Joann | Rosemont | | |
| Landry | Dawan | Lakeview | x | |
| Hubbard | Jahnien | Rosemont-Lakeview | | |
| Jackson | Bernadine | Lakeview | x | |
| Oates | Chaquita | Lakeview | | |
| Robinson | Jacqueline | Roseland Estates | x | |
| Desmond | Darcy | Little Mexico | | |
| Bailey | Miriam | Cedar Springs | Undecided | |
| Jones | Lawrence | Hidden Ridge | | |
| Sandovar | William | Carroll | Undecided | |
| Ruebles | Richa | Hidden Ridge | | |
| Conner | Cristy | Hidden Ridge | | x |
| Bender | Daniel | Hidden Ridge | | |
| Sentino | Kate | Hidden Ridge | x | |
| Stewart | Brenda | Kingbridge | | |
| Brown | Rhonda | Villa Creek | x | |
| Singleton | Charlotte | Cedar Glenn | | |
| Every | Devon | Turner Courts | x | |
| Green | Renna | Hidden Ridge | | |
| McDermott | Michael | Hidden Ridge | x | |
| Henderson | Gerald | Oak Manor | | |
| Caroline | Ann | Frankford | x | |
| Taylor | Joan | Cedar Springs | x | |
| Wilson | Jeanne | Cedar Springs | x | |
| Smith | Regina | Cedar Springs | x | |
| Parks | Jeff | Forest Manor | x | |
| Aikens | Rosemary | Forest Manor | | x |
| Alexander | Juanita | Section 8 | x | |
| Harold | Natasha | Section 8 | | |
| Jemison | Kimberly | Section 8 | x | |

## Families Impacted by Hurricanes Katrina or Rita
## Outreach for HUD Meeting

| Last Name | First Name | Program | Willing to Relocate Stay | Undecided |
|---|---|---|---|---|
| Johnson | Mamie | Section 8 | x | |
| Jackson | Neshell | Section 8 | x | |
| Turner | Edith | Section 8 | x | |
| Hardy | Sandra | Section 8 | x | |
| James | Latoya | Section 8 | x | |
| Robertson | Jacqueline | Section 8 | x | |
| Miller | Cleveland | Section 8 | | Undecided |
| Morgan | Debra | Section 8 | | x |
| Williams | Cheryl | Section 8 | | Undecided |
| Wicker | Artray | Section 8 | | Undecided |
| Ward | Rosalie | Section 8 | | |
| Billizson | Lynn | Section 8 | | Undecided |
| Billizson | | Section 8 | | Undecided |
| Augustine | Angelina | Section 8 | x | |
| Nix | Alease | Section 8 | x | |
| Jackson | Mary | Section 8 | x | |
| Perry | Tina | Section 8 | | |
| Lambert | Janice | Section 8 | | Undecided |
| Lewis | Dorothy | Section 8 | | Undecided |
| Thompson | Geraldine | Section 8 | | x |
| Roberts | Vanessa | Section 8 | | |
| Ellis | Omega | Section 8 | | Undecided |

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, *Et al.* .　　　　　* CIVIL ACTION NO. 06-3298
　　　　　　　　　Plaintiffs,　　　　　*
　　　　VERSUS　　　　　　　　　　* SECTION "B"
　　　　　　　　　　　　　　　　*
ALPHONSO JACKSON, SECRETARY OF THE　* JUDGE IVAN LEMELLE
UNITED STATES DEPARTMENT OF HOUSING　*
AND URBAN DEVELOPMENT; *Et al.*　　　* MAGISTRATE ALMA CHASEZ
　　　　　　　　　　　　　　　　*
　　　　　　　　Defendants.　　　　*
* * * * * * * * * * * * * * * * * * * * * * * * *　*

## AFFIDAVIT OF JUDITH MORAN

**BEFORE ME,** a Notary Public duly qualified in and for the State of Louisiana

and Parish of Orleans, personally came and appeared:

### JUDITH JONES MORAN

who, being duly sworn, did depose and state as follows:

　　　　　1.　　　I am the Director of Real Estate Planning and Development for the

Housing Authority of New Orleans ("HANO"). In that capacity, I am in charge of, among other

things, overseeing, administering and managing development plans, funding for development,

and development projects for HANO.



- 1 -

on August 29, 2005. However, as a result of the Hurricane and related difficulties, the demolition work did not proceed as scheduled.

6.     In 1996, HUD approved demolition of the following 5 buildings at the St. Bernard Development:

| ST. BERNARD LA1-8 | 5 BUILDINGS | |
|---|---|---|
| ST. BERNARD LA1-8 | 81020 | 1432 - 1440 SENATE ST |
| ST. BERNARD LA1-8 | 81021 | 1422 - 1430 SENATE ST |
| ST. BERNARD LA1-8 | 81072 | 1411 - 1419 ST DENIS ST |
| ST. BERNARD LA1-8 | 81073 | 1421 - 1437 ST DENIS ST |
| ST. BERNARD LA1-8 | 81074 | 1441 - 1449 ST DENIS ST |

7.     In addition, in 1997 HUD had approved demolition of the following 14 buildings at C.J. Peete:

| C. J. PEETE LA1-2 | 14 BUILDINGS | |
|---|---|---|
| C. J. PEETE LA1-2 | 21007 | 2801 - 2809 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21008 | 2811 - 2839 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21009 | 2841 - 2849 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21011 | 2840 - 2848 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21012 | 2810 - 2838 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21013 | 2800 - 2808 S ROBERTSON ST |
| C. J. PEETE LA1-2 | 21023 | 2420 - 2430 WASHINGTON AVE |
| C. J. PEETE LA1-2 | 21029 | 2401 - 2431 SIXTH ST |
| C. J. PEETE LA1-2 | 21033 | 2400 - 2430 SIXTH ST |
| C. J. PEETE LA1-2 | 21039 | 2401 - 2431 TOLEDANO ST |
| C. J. PEETE LA1-2 | 21044 | 2501 - 2515 TOLEDANO ST |
| C. J. PEETE LA1-2 | 21045 | 2500 - 2530 TOLEDANO ST |
| C. J. PEETE LA1-2 | 21052 | 2601 - 2615 TOLEDANO ST |
| C. J. PEETE LA1-2 | 21053 | 2600 - 2630 TOLEDANO ST |

8.     Because they were already approved for demolition, none of the buildings listed above are included in the application submitted by HANO and approved by HUD in September 2007. Since prior to August 2005, many if not most of the buildings listed above were either uninhabitable and/or unoccupied, long-term vacant buildings.

- 3 -

900900v.1

9.    The first demolition work that HANO will undertake in the next 8 weeks will likely be demolition of the 14 B.W. Cooper LA 1-12 buildings listed in paragraph 4. All of these building were approved for demolition in 2003 -- well prior to Katrina -- and are therefore neither a part of HANO's 2007 disposition/demolition application or at issue in this case. This work, which had been scheduled to start on August 29, 2005, will likely begin before mid-December 2007.

10.    HANO does not plan to begin demolition of any buildings included in its 2007 disposition/demolition application until mid-December 2007.

11.    As explained in my previous affidavit, even a brief delay in demolition work may cause HANO to lose over $700 Million dollars in funding for rebuilding New Orleans public housing by causing HANO to be unable to meet deadlines associated with the corresponding funding grants.

_____
Judith Jones Moran

Sworn to and subscribed before me
this _20th_ day of November, 2007

_____
NOTARY PUBLIC

Laetitia Black 28497
_____
Print Name & Bar No.

- 4 -

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, *Et al.* .                    \* CIVIL ACTION NO. 06-3298
                   Plaintiffs,                    \*
    VERSUS                                        \* SECTION "B"
                                 \*
ALPHONSO JACKSON, SECRETARY OF THE             \* JUDGE IVAN LEMELLE
UNITED STATES DEPARTMENT OF HOUSING            \*
AND URBAN DEVELOPMENT; *Et al.* ·              \* MAGISTRATE ALMA CHASEZ
                                 \*
                Defendants.                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF RAYMOND ALLEN

    **BEFORE ME,** the undersigned authority, a notary public duly commissioned and

qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared:

               **RAYMOND ALLEN**

who, after being duly sworn, deposed and stated that:

    1.    I am the Director of Management and Maintenance for the Housing

Authority of New Orleans (HANO) and I make the statements set forth below on the basis of my

first-hand experiences in the performance of my duties for HANO and my resulting knowledge

regarding the facts I relate.

## Attachment 1

- 1 -

EXHIBIT

2.    Together with other HANO staff and a member of the HUD receiver team, I did not evacuate from New Orleans prior to Katrina but instead stayed at HANO Headquarters ("4100 Touro") so as to be present in the City to perform my job, assist HANO residents and safeguard HANO property in the immediate aftermath of Hurricane Katrina. However, due to the unanticipated breach of the levees/floodwalls and the resulting flooding throughout the City, the HANO personnel that stayed behind for this purpose was not able to assist or work as planned.

3.    After being stranded for four days at 4100 Touro, we refused helicopter rescue because we had two elderly people (diabetics) and a pregnant woman with a one year old infant child in the building with us. We felt compelled to remain with them and ensure their safe rescue rather than abandoning them for the sake of our own rescue. We attempted to drive them to the 610 freeway overpass in a HANO truck. However, due to the approximate 10 feet of water as you approached the overpass on Elysian Fields, the truck stalled halfway there. We were able to commandeer a small motor boat and loaded them in it and transported them the rest of the way to the gathering point on the 610 freeway overpass. We then decided to take the same motor boat and rescue ourselves. We were then boarded on a bus to Houston, Texas.

4.    Immediately after the storm, HANO set up a Texas command center with employees from some of its departments located in Houston and Dallas to provide its displaced residents with alternate housing assistance and other benefits.

5.    Along with other HANO personnel and consultants, I returned to New Orleans as soon as possible to survey the damage to HANO facilities.

6.    In our initial survey of damage at HANO properties, we observed that the St. Bernard development had sustained 4 to 5 feet of flooding, as well as roof and chimney

B37684v.2

damage, fire damage, fallen trees, numerous broken windows, and damage from rain, numerous abandoned automobiles, boats and various other storm debris. There was 2 to 4 feet of flooding at C.J. Peete and 4 to 6 feet of flooding at B.W. Cooper, as well as roof damage, numerous broken windows, fallen trees, and damage from rain at both sites, numerous abandoned automobiles and boats. The Lafitte development had 3 to 5 feet of flooding, as well as extensive roof damage, broken windows, and damage from rain, numerous abandoned automobiles, boats and various other storm debris. The level of flooding at such HANO properties as Florida, and especially those scattered sites located across the canal and in the 9th ward, was so deep that we could not even consider surveying these sites until weeks later when the water receded. In most cases, the interiors of most of the first floor units were significantly damaged with evident mold growth. The electrical systems for each development were compromised by the flood waters and high winds.

7.      Due to the small number of HANO employees who were initially able to return to work in New Orleans and the conditions in the City (such as the absence of fresh water, available food, gasoline for vehicles, utilities and the absence of scarcity of contract labor), HANO was unable to start work at the vast majority of its properties for months after Hurricane Katrina. We sustained our small group of first responders by transporting minor living accommodations (food, water, bedding etc.) from Houston once or twice a week.

8.      Attached hereto as Exhibit "A," is a procurement memorandum I submitted on or about October 7, 2005, in support of a procurement request from my department for property security systems we believed would enable HANO to secure it sites for the protection of the safety of those who might enter, as well as for the protection of the property of HANO and its residents. The memo accurately describes the conditions that existed at that time.

- 3 -

9.     As is recited in that memorandum, in October 2005 HANO was unable to conduct damage assessment and repair work to the vast majority of its properties (including the St. Bernard, B.W. Cooper, Lafitte and C.J. Peete developments), due to (1) the displacement and continued absence of the vast majority of its employees; (2) the lack of available labor force for maintenance and security in or around New Orleans, (3) the scarcity of materials and equipment (most of HANO's existing inventory was destroyed by the Storm).

10.    As of October 2005, there was still nowhere in the local vicinity for most HANO staff to live, hotel space was extremely difficult to obtain for up to 300 miles from New Orleans, and even if construction materials for work could have been be found, HANO's material storage warehouse had been destroyed by Hurricane Katrina.

11.    At that time, all HANO was able to do with its limited resources was to formally open approximately 94 of its more than 6,000 apartment units. These 94 units were constructed within the last two years, were located in an approved reoccupancy zone on the West Bank of New Orleans, and suffered minimal damage from the hurricane. A limited number of HANO staff was able to find temporary living facilities in order to manage and operate those 94 units. We determined that the remainder of HANO's 6,000 plus units could not be reoccupied until damage assessments and repairs could be made; management, maintenance, and security staff were in place; and utility services restored.

12.    After meeting its goals to provide assistance to displaced residents in Texas and elsewhere, HANO began a phased return of all operations to New Orleans, but was not able to lease adequate temporary office space, leaving many employees to work from their cars or from community centers at the least damaged HANO sites. Similarly, for many months

- 4 -

after the Storm, HANO scrambled to find temporary housing (including on-board a cruise ship provided by FEMA) for its displaced employees so that it could operate.

13.    As it was able to resume limited operations in New Orleans, HANO focused its efforts on repairing and reoccupying those housing facilities with the least amount of damage and on restoring basic maintenance and management services to those properties.  As of September 2006 HANO had repaired and reoccupied over 1,000 units, and HANO continues to work on restoring others.

14.    HANO maintenance staff did and does not possess the expertise and/or skills necessary to perform most of the work that would be necessary to repair storm damage at the significantly damaged HANO properties (including the St. Bernard, B.W. Cooper, Lafitte and C.J. Peete developments).  For example, HANO maintenance staff is not qualified to repair the substantial damage to the overhead power lines at the St. Bernard, B.W. Cooper, Lafitte and C.J. Peete developments.  But because Entergy does not maintain power lines inside the property line at HANO developments, HANO must repair these lines if power is to be restored to these sites.  Likewise, HANO maintenance staff is and was not qualified and/or equipped to handle the removal of downed trees and tree limbs, primary power line poles and wires within its property lines, removal of abandoned automobiles, removal and disposal of the massive trash and debris left behind by the storm, the clearance testing and cleaning of any contaminants i.e. toxic mold, lead dust, and lead paint, and/or roofing repair and replacement.

15.    Notwithstanding its own losses and the losses of its employees, HANO, through its staff, has worked diligently with the available resources.  Despite difficulties in locating contractors and other service providers and vendors, it removed massive amounts of storm debris, fallen and damaged trees, and flooded vehicles from almost all of its properties by

B37684v.2

January 2006. Meanwhile, HANO has also repaired and reoccupied some of its administrative/management facilities, as well as over a thousand units at a number of its large developments (including Fischer, Guste, Iberville and Hendee Homes) and smaller scattered-site facilities. HANO furthermore has worked diligently to restore basic maintenance and management services to its now re-occupied properties.

All the foregoing is based on my personal knowledge and is true and correct to the best of my knowledge and belief.

Raymond Allen

Sworn to and subscribed before me
this ___ day of November, 2006.

_____
NOTARY PUBLIC

_____
Print Name & Bar No.

Rachel Wendt Wisdom
State of Louisiana – Bar No. 21167
My commission is issued for life

- 6 -

837684v.2



**Housing Authority of New Orleans**

October 7, 2005

To:    Mary Alexander
       Director of Procurement and Contracts

From:  Raymond Allen
       Director of Maintenance

Subject: Property Security System
         Procurement of Vacant Property Security, Inc

<u>Background</u>

On 9-24-05, the Mayor of New Orleans issued a mandatory evacuation order to the citizens of New Orleans due to a concern over Hurricane Katrina which was a category 5 hurricane in the Gulf of Mexico. As projected, Hurricane Katrina struck New Orleans on the morning of 9-26-05. Katrina arrived as a category 4 hurricane and caused wind and flooding damage to New Orleans at a level never seen before in any urban area in the history of the United States.

The amount of the devastation inflicted by Hurricane Katrina on the entire New Orleans metropolitan area was completely overwhelming. The City was emptied of all citizens over the days/weeks following the hurricane. The emergency services of fire and police protection, and emergency medical care could not be provided by the City, State, or Federal agencies due to the wind and flood damage inflicted by Katrina.

The Housing Authority of New Orleans (HANO) operates over 6,000 rental apartments in the City of New Orleans for those residents at the low end of the economic spectrum. Each of those citizens with the least amount of resources and income earning potential, and ability to recover from the havoc brought by Hurricane Katrina, were displaced from their homes leaving behind all of their material possessions in their apartments.

In late September, only days before the Mayor of New Orleans issued yet a second mandatory evacuation order due to Hurricane Rita, the Mayor announced a re-occupancy plan. The re-occupancy plan included the authorization for the permanent return of citizens and businesses to areas with basic services restored. Those basic services include police protection, fire protection, electrical service, and water service. The Mayor has more recently invited citizens not in the re-occupancy zones to return to New Orleans to view the damage to their properties and recover their possessions.



The employees of HANO, like all other residents of New Orleans, evacuated to safe areas throughout the United States. As such, the employees are not available to perform basic property management and maintenance tasks required to operate an active rental apartment complex. In the weeks following the Katrina devastation, HANO employees had virtually no access to the City to assess damage, no access to a labor force for maintenance and security, and no access to construction materials for physical security and maintenance needs. HANO has no alternative in this emergency condition never before faced by any urban area in the history of the United States, but to declare the majority of its properties off-limits until damage can be assessed and adequate services can be restored to provide a safe and decent living environment for the return of the HANO residents.

This endeavor to recover the more than 6,000 apartments to a safe and decent condition is a tremendous and daunting task in the environment of southern Louisiana and the southern gulf coast struck by two major hurricanes within a one-month period. To date, there is still no where in the local vicinity for HANO staff to live, hotel space is near impossible to acquire for up to 300 miles from new Orleans, and even if construction materials could be found, HANO's material storage warehouse was destroyed by Hurricane Katrina.

HANO has been able to formally open approximately 94 of its more than 6,000 apartment units. The 94 units constructed within the last two years are located in a re-occupancy zone on the West Bank of New Orleans and suffered relatively no damage from the hurricane. A limited number of HANO staff has been able to find temporary living facilities in order to manage and operate the 94 units. The remainder of the 6,000 units cannot be reoccupied until damage assessment and repair can be made; management, maintenance, and security staff are in place; and utility services restored.

Statement of Need

The HANO properties must be secured until repairs can be made and basic services restored that can provide a safe, decent, and sanitary living condition for the returning families. Currently, the apartments are unsafe for entry. The following partial list of unsafe conditions is prevalent throughout the HANO portfolio of apartments:

- Downed electric lines in and around the apartments
- Construction debris in and around the apartments – broken glass, materials with exposed nails, busted wood, roofing materials, etc.
- No or limited emergency medical services in the area
- Completely devastated first floor areas from violent flooding
- Unsafe stairways
- No or limited police protection
- No or limited fire protection
- No water or electricity
- Mold growth
- Wet and slippery floors from plumbing malfunctions/damage

HANO 000131

- Destroyed automobiles throughout the site – in and out of traditional parking areas
- Destroyed kitchen appliances, washers, and dryers
- Downed trees
- Holes in roofs and walls

A system of physical security must be put in place to protect HANO residents, citizens at large, and HANO itself from potential of personal injury lawsuits. HANO currently does not have sufficient staff capacity to control access to its properties. With literally tens of thousands of homes destroyed in New Orleans, it is impossible to predict when the housing situation in New Orleans will be sufficient for full return of the staff. Additionally, New Orleans' schools are not open and are not projected to open until January 2006 making it impossible for some employees to return even if housing were available.

As citizens do return to New Orleans to stay, or to gather their possessions and leave, there are many opportunities for concern over unsecured HANO properties. For those law abiding HANO residents, the apartments are unsafe to enter in an uncontrolled fashion. For the neighboring community, unsecured HANO properties pose a risk to the local citizens as well as to HANO over small children or curious passers-by. Finally, open HANO apartments provide an unfortunate opportunity for those individuals interested in criminal activity including theft of HANO residents' possessions, and hideouts from law enforcement officials.

The properties requiring such security are Fischer; Iberville; Lafitte; C.J. Peete; B.W. Cooper; St. Bernard; Florida; and scattered sites including Hendee, Press Park, and Christopher Homes.

<u>Alternatives for Security</u>

There were several methods of physical security considered to meet the following requirements:

- Must be flexible to allow for recovery of properties
- Must provide certain security – cannot be breached
- Must require little-to-no maintenance
- Must be timely

The alternatives considered for physical security of the HANO properties were:

- Traditional boarding-up with plywood
- Fencing the perimeter of the properties
- Employing a human security force
- Leasing the Vacant Property Security System

HANO 000132

A. Traditional boarding-up with plywood. This method of physical security for the HANO properties was considered and rejected for the following reasons. Under the current situation in New Orleans, the plywood system would have to be contracted out and could not be implemented by in-house maintenance staff, thereby negating a traditional advantage of this security method. Additionally, as the apartment units have not been thoroughly assessed for damage and a majority of the HANO residents have not returned to collect their possessions, the plywood system would pose an authorized re-entry difficulty of frequent removing and installing the boards requiring a workload for unavailable maintenance staff. Initial installation would cause damage to windows, window frames, and door frames and additional re-entry would cause additional damage to door frames. Finally, the plywood method can be easily breached.

B. Perimeter Fencing. Perimeter fencing was evaluated as a possible physical security method. However, it was rejected primarily due to the fact that the fencing can be easily breached. Additionally, the fencing was viewed as impractical because it would have to be installed along city blocks and lot-lines, and would interfere with the City's hurricane recovery efforts to remove downed trees and destroyed structures and to recover utility lines/systems in the public right-of-way.

C. Human Security Force. A method of employing a sufficient human security force to provide 24-hour security at each of the HANO properties, including over 200 scattered sites is not practical. There would be nowhere in the New Orleans vicinity for the security officers to have adequate lodging.

D. Vacant Property Security (VPS) System. The Vacant Property Security system is the only alternative for physical security the meets the HANO requirements for security in this extraordinary post-hurricane recovery period. The VPS system provides the flexibility required to quickly install the system at any selected property, to remove the system at any property, or to relocate the system to another property. A master-keying alternative is provided that will afford ease of re-entry for damage assessment, recovery of possessions, and maintenance/repair. The VPS system can be installed at openings on ground-level areas that will prevent access to entire multi-story buildings. The opening covers are made of metal with a locking system that cannot be easily breached, and that will not damage door and window frames. Once the VPS system is installed, the limited HANO maintenance and security staff can focus on recovery of properties and not be burdened with frequent inspections and maintenance to the physical security system. Recovery of properties to re-open the apartments for occupancy is the critical mission at hand for the HANO staff – such that the displaced New Orleans residents can return home. A final advantage of the VPS system is that it is stored and manufactured outside of the hurricane damage area and is readily available for immediate installation.

Conclusion

After careful consideration of several alternatives, the Vacant Property Security system is recommended as the most feasible and beneficial method to secure the HANO properties in the post-Katrina environment. The VPS will provide the necessary security and allow the limited number of HANO staff to focus on recovery and re-opening of safe, decent, and sanitary apartment units.

HANO 000134

# EXHIBIT 2
## Excerpts of Supplemental Report of John Fernandez



EXHIBIT

12

# Supplemental
# Part 2: Cost Estimates

## Summary

The following cost estimates are based on the overall damage assessments to the development infrastructure, buildings and residential units of the five housing projects under consideration.

The total cost for the rehabilitation of the LaFitte, C.J. Peete, B.W. Cooper, St. Bernard and Florida Housing Developments amounts to $68,772,084.

The total cost for modernization of LaFitte, C.J. Peete, B.W. Cooper, and St. Bernard amounts to $33,524,000.

The total cost for new construction that replaces the units contained within LaFitte, C.J. Peete, B.W. Cooper, and St. Bernard amounts to $528,745,000.

Rehabilitation costs include all items required to return the buildings and units to their pre-Katrina conditions. Modernization costs include all items required to bring the housing developments to comply with building code and accessibility requirements (UFAS). New construction costs include demolition of existing housing developments and the construction of all infrastructure, site work and building space required to replace 4,071 residential units.

## Probable Construction Costs for Rehabilitation, Modernization and New Construction of Housing Projects

The following tables summarize conclusions regarding the cost of the complete rehabilitation of the five housing projects. The categories used here reflect the methodology of the inspections.

Items included under Development Infrastructure include:
1. delivery elements for all building services not within residential units including gas, electricity, and water,
2. any elements of these systems that are not directly contained within or by an individual residential unit.

Items included under Building Exterior include:
1. foundation
2. exterior walls, windows, doors and porches,
3. roof, gutters, downspouts, flashing and other elements of the building water drainage system.

Items included under Residential Unit include:
1. all interior finishes; floors, walls, ceilings,
2. delivery elements of all building services within the unit,
3. all fixed appliances and other fixtures such as sinks, bath tubs, toilets.

Items included under Landscape include:
1. paved walks and drives, including curbs,
2. drainage elements, including surface storm drain elements,
3. planted areas including trees, grass and shrubs.

Table 1: Overall Totals (in US dollars)

| Housing Development | Apts | Rehabilitation Totals | Modernization Totals | New Construction Totals |
|---|---|---|---|---|
| Lafitte | 896 | $9,161,448 | $7,616,000 | $119,980,000 |
| C. J. Peete | 521 | $10,326,713 | $4,428,500 | $71,080,000 |
| B. W. Cooper | 1,136 | $28,186,930 | $9,656,000 | $151,705,000 |
| St. Bernard | 1,391 | $19,889,899 | $11,823,500 | $185,980,000 |
| Florida | 127 | $1,207,094 | — | — |
| TOTALS | 4,071 | $68,772,084 | $33,524,000 | $528,745,000 |

a: Costs include all materials, labor, overhead and profit of installed assemblies.

14

Table 2: Detailed Cost Estimate for Rehabilitation – LaFitte: 896 apartment units

| Assemblyª | Unitsᵇ | Unit cost (US dollars) | Quantityᵈ | Total cost (US dollars)ᵉ |
|---|---|---|---|---|
| **I. Development infrastructure** | | | | |
| 1. gas distribution | lf, ea | 22,000 /ea per building | 5 | 110,000 |
| 2. building electrical distribution (panelboard, ground,metersocket,service entrance cable, weather cap) | lf, ea | 15,000 /ea per building | 8 | 120,000 |
| 3. water distribution | per bldg | 15,000 /ea per building | 5 | 75,000 |
| 4. storm drain system | per bldg | 5,000 /ea per building | 8 | 40,000 |
| 5. sanitary utility sewerage piping | per bldg | 7,500 /ea per building | 6 | 45,000 |
| 6. other | | | | |
| | | | Subtotal | 390,000 |
| **II. Building Exterior** | | | | |
| 7. foundation (footing + wall) | lf, cy, sfca, lb, ea | 33.57 /lf | 124 | 4,162 |
| 8. exterior wall (brick) | sf | 12.66 /sf | 1200 | 15,192 |
| 9. windows (plastic clad) | ea., lf, face, set | 608.00 /ea. | 24 | 14,592 |
| 10. doors (mtl dr, wd frame) | lf, pr, set, ea | 907.84 /ea | 20 | 18,156 |
| 11. general flashing (aluminum, mill finish) | sf | 4.50 /sf | 1000 | 4,500 |
| 12. rain water drainage (alum. gutters and downspouts) | lf | 2.30 /lf | 240 | 552 |
| 13. roofing (asphalt, class A, bldg paper,trim,fascia,drip edge) | lf, sf | 3.00 /sf | 3,400 | 10,200 |
| 14. other | | | | |
| | | | Subtotal | 67,356 |
| **III. Residential apartment** | | | | |
| 15. floors (vinyl tile flooring over concrete) | sf | 4.00 /sf | 239,294 | 957,176 |
| 16. walls (plaster, metal lath) | sf, lf | 7.50 /sf | 220,273 | 1,652,047 |
| 17. ceilings (thincoat, gypsum) | sf, lf | 2.09 /sf | 140,000 | 292,600 |
| 18. painting (primer + 2 coats) | sf | 2.00 /lf | 875,000 | 1,750,000 |
| 19. gas distribution (piping and valves, steel) | lf | 15.40 /lf | 1,500 | 23,100 |
| 20. electrical distribution (with sockets, switches etc.) | lf | 500 /lf | 2,000 | 1,000,000 |
| 21. water closet and plumbing | per apt. | 1,529.96 /ea | 224 | 342,711 |
| 22. other plumbing (PVC) | lf | 15.00 /lf | 1,000 | 15,000 |
| 23. appliances (cooking range, oven) | per apt | 1,600.00 /ea | 450 | 720,000 |
| 24. other | | | | |
| | | | Subtotal | 6,752,635 |
| **IV. Landscape** | | | | |
| 25. paved walks | sf | 8.66 /sf | 1200 | 10,392 |
| 26. driveway system (concrete) | lf, sf, cy | 6.00 /sf | 2000 | 12,000 |
| 27. grading, fill and site work | bcy | 7.25 /bcy | 1500 | 10,875 |
| 28. trees | per tree | 850 /tree | 100 | 85,000 |
| 29. grass and other ground cover | msf | 60.00 /msf | 15 | 900 |
| 30. other | | | | |
| | | | Subtotal | 119,167 |
| | | | Project Subtotal | 7,329,158 |
| 31. A/E Consulting Services (10%) | | | | 732,916 |
| 32. Contingency (15%) | | | | 1,099,374 |
| | | | **TOTAL** | **$9,161,448** |

a. All assemblies include all elements required of the particular system, b, units are often composite values including linear, area, volumetric, and per item measures, c, unit cost assumes best approach – repair or replacement, d, number of units, e, represents total cost of assembly for the entire development – all costs rounded to the nearest dollar.

Table 2a: Cost Estimate for Modernization – LaFitte: 896 apartment units

| Item | Cost per unit x 896 units | Cost |
|---|---|---|
| Modernization of building systems and units to meet building code and UFAS requirements. | $8,500 x 896 units | 7,616,000 |
| | **TOTAL** | **$7,616,000** |

Table 2b: Cost Estimate for New Construction Including Infrastructure – LaFitte: 896 apartment units

| Item | Cost per unit or area | Cost |
|---|---|---|
| Demolition per unit | $5,000 x 896 units | 4,480,000 |
| Total construction cost per area of residential space | $165 x 700,000 sf | 115,500,000 |
| | **TOTAL** | **$119,980,000** |

15

Table 3: Detailed Cost Estimate for Rehabilitation– C. J. Peete: 521 apartment units

| Assembly[a] | Units[b] | Unit cost (US dollars)[c] | Quantity[d] | Total cost (US dollars)[e] |
|---|---|---|---|---|
| **I. Development Infrastructure** | | | | |
| 1. gas distribution | lf, ea | 22,000 /ea per building | 15 | 330,000 |
| 2. building electrical distribution (panelboard, ground,metersocket,service entrance cable, weather cap) | lf, ea | 15,000 /ea per building | 55 | 825,000 |
| 3. water distribution | per bldg | 15,000 /ea per building | 15 | 225,000 |
| 4. storm drain system | per bldg | 5,000 /ea per building | 15 | 75000 |
| 5. sanitary utility sewerage piping | per bldg | 7,500 /ea per building | 15 | 112,500 |
| 6. other | | | | |
| | | | Subtotal | 1,567,500 |
| **II. Building Exterior** | | | | |
| 7. foundation (footing + wall) | lf, cy, sfca, lb, ea | 33.57 /lf | 360 | 12,085 |
| 8. exterior wall (brick) | sf | 12.66 /sf | 1800 | 22,788 |
| 9. windows (plastic clad) | ea., lf, face, set | 608.00 /ea. | 180 | 109,440 |
| 10. doors (mtl dr, wd frame) | lf, pr, set, ea | 907.84 /ea | 145 | 131,637 |
| 11. general flashing (aluminum, mill finish) | sf | 4.50 /sf | 25,200 | 113,400 |
| 12. rain water drainage (alum. gutters and downspouts) | lf | 2.30 /lf | 14,400 | 33,120 |
| 13. roofing (asphalt, class A, bldg paper,trim,fascia,drip edge) | lf, sf | 3.00 /sf | 54,000 | 162,000 |
| 14. other | | | | |
| | | | Subtotal | 584,470 |
| **III. Residential apartment** | | | | |
| 15. floors (vinyl tile flooring over concrete) | sf | 4.00 /sf | 160,000 | 640,000 |
| 16. walls (plaster, metal lath) | sf, lf | 7.50 /sf | 75,000 | 562,500 |
| 17. ceilings (thincoat, gypsum) | sf, lf | 2.09 /sf | 72,000 | 150,480 |
| 18. painting (primer + 2 coats) | sf | 2.00 /lf | 356,400 | 712,800 |
| 19. gas distribution (piping and valves, steel) | lf | 15.40 /lf | 2,500 | 38,500 |
| 20. electrical distribution (with sockets, switches etc.) | lf | 1000 /lf | 2000 | 2,000,000 |
| 21. water closet and plumbing | per apt | 1,529.96 /ea | 600 | 917,976 |
| 22. other plumbing (PVC) | lf | 15.00 /lf | 4,000 | 60,000 |
| 23. appliances (cooking range, oven) | per apt | 1,600.00 /ea | 600 | 960,000 |
| 24. other | | | | |
| | | | Subtotal | 6,042,256 |
| **IV. Landscape** | | | | |
| 25. paved walks | sf | 8.66 /sf | 900 | 7,794 |
| 26. driveway system (concrete) | lf, sf, cy | 6.00 /sf | 1500 | 9,000 |
| 27. grading, fill and site work | bcy | 7.25 /bcy | 1000 | 7,250 |
| 28. trees | per tree | 850 /tree | 50 | 42,500 |
| 29. grass and other ground cover | msf | 60.00 /msf | 10 | 600 |
| 30. other | | | | |
| | | | Subtotal | 67,144 |
| | | | Project Subtotal | 8,261,370 |
| 31. A/E Consulting Services (10%) | | | | 826,137 |
| 32. Contingency (15%) | | | | 1,239,206 |
| | | | TOTAL | $10,326,713 |

a, All assembles include all elements required of the particular system,  b, units are often composite values including linear, area, volumetric, and per item measures, c, unit cost assumes best approach – repair or replacement, d, number of units, e, represents total cost of assembly for the entire development – all costs rounded to the nearest dollar.

Table 3a: Cost Estimate for Modernization – C. J. Peete: 521 apartment units

| Item | Cost per unit x 521 units | Cost |
|---|---|---|
| Modernization of building systems and units to meet building code and UFAS requirements. | $8,500 x 521 units | 4,428,500 |
| | TOTAL | $4,428,500 |

Table 3b: Cost Estimate for New Construction Including Infrastructure – C. J. Peete: 521 apartment units

| Item | Cost per unit or area | Cost |
|---|---|---|
| Demolition per unit | $5,000 x 521 units | 2,605,000 |
| Construction per area | $165 x 415,000 sf | 68,475,000 |
| | TOTAL | $71,080,000 |

16

Table 4: Detailed Cost Estimate for Rehabilitation– B. W. Cooper: 1,136 apartment units

| Assembly[a] | Units[b] | Unit cost (US dollars) | Quantity[d] | Total cost (US dollars)[e] |
|---|---|---|---|---|
| **I. Development infrastructure** | | | | |
| 1. gas distribution | lf, ea | 22,000 /ea per building | 35 | 770,000 |
| 2. building electrical distribution (panelboard, ground,metersocket,service entrance cable, weather cap) | lf, ea | 15,000 /ea per building | 52 | 780,000 |
| 3. water distribution | per bldg | 15,000 /ea per building | 27 | 405,000 |
| 4. storm drain system | per bldg | 5,000 /ea per building | 20 | 100,000 |
| 5. sanitary utility sewerage piping | per bldg | 7,500 /ea per building | 20 | 150,000 |
| 6. other | | | | |
| | | | Subtotal | 2,205,000 |
| **II. Building Exterior** | | | | |
| 7. foundation (footing + wall) | lf, cy, sfca, lb, ea | 33.57 /lf | 289 | 9,702 |
| 8. exterior wall (brick) | sf | 12.66 /sf | 2,945 | 37,284 |
| 9. windows (plastic clad) | ea., lf, face, set | 608.00 /ea. | 350 | 212,800 |
| 10. doors (mtl dr, wd frame) | lf, pr, set, ea | 907.84 /ea | 208 | 188,831 |
| 11. general flashing (aluminum, mill finish) | sf | 4.50 /sf | 2,800 | 12,600 |
| 12. rain water drainage (alum. gutters and downspouts) | lf | 2.30 /lf | 645 | 1,484 |
| 13. roofing (asphalt, class A, bldg.paper,trim,fascia,drip edge) | lf, sf | 3.00 /sf | 680,000 | 2,040,000 |
| 14. other | | | | |
| | | | Subtotal | 2,502,701 |
| **III. Residential apartment** | | | | |
| 15. floors (vinyl tile flooring over concrete) | sf | 4.00 /sf | 1,039500 | 4,158,000 |
| 16. walls (plaster, metal lath) | sf, lf | 7.50 /sf | 519,750 | 3,898,125 |
| 17. ceilings (thincoat, gypsum) | sf, lf | 2.09 /sf | 346,500 | 724,185 |
| 18. painting (primer + 2 coats) | sf | 2.00 /sf | 2,252,250 | 4,504,500 |
| 19. gas distribution (piping and valves, steel) | lf | 15.40 /lf | 3,465 | 53,361 |
| 20. electrical distribution (with sockets, switches etc.) | lf | 500 /lf | 2,945 | 1,472,500 |
| 21. water closet and plumbing | per apt. | 1,529.96 /ea | 953 | 1,458,052 |
| 22. other plumbing (PVC) | lf | 15.00 /lf | 2,426 | 36,390 |
| 23. appliances (cooking range, oven) | per apt. | 1,600.00 /ea | 924 | 1,478,400 |
| 24. other | | | | |
| | | | Subtotal | 17,783,513 |
| **IV. Landscape** | | | | |
| 25. paved walks | sf | 8.66 /sf | 500 | 4,330 |
| 26. driveway system (concrete) | lf, sf, cy | 6.00 /sf | 850 | 5,100 |
| 27. grading, fill and site work | bcy | 7.25 /bcy | 800 | 5,800 |
| 28. trees | per tree | 850 /tree | 50 | 42,500 |
| 29. grass and other ground cover | msf | 60.00 /msf | 10 | 600 |
| 30. other | | | | |
| | | | Subtotal | 58,330 |
| | | | Project Subtotal | 22,549,544 |
| 31. A/E Consulting Services (10%) | | | | 2,254,954 |
| 32. Contingency (15%) | | | | 3,382,432 |
| | | | **TOTAL** | **$28,186,930** |

a, All assemblies include all elements required of the particular system,　b, units are often composite values including linear, area, volumetric, and per item measures, c, unit cost assumes best approach – repair or replacement, d, number of units, e, represents total cost of assembly for the entire development – all costs rounded to the nearest dollar.

Table 4a: Cost Estimate for Modernization – B. W. Cooper: 1,136 apartment units

| Item | Cost per unit x 1,136 units | Cost |
|---|---|---|
| Modernization of building systems and units to meet building code and UFAS requirements. | $8,500 x 1,136 units | 9,656,000 |
| | **TOTAL** | **$9,656,000** |

Table 4b: Cost Estimate for New Construction Including Infrastructure – B. W. Cooper: 1,136 apartment units

| Item | Cost per unit or area | Cost |
|---|---|---|
| Demolition per unit | $5,000 x 1,136 units | 5,680,000 |
| Construction per area | $165 x 885,000 sf | 146,025,000 |
| | **TOTAL** | **$151,705,000** |

17

Table 5: Detailed Cost Estimate for Rehabilitation– St. Bernard: 1,391 apartment units

| Assembly[a] | Units[b] | Unit cost (US dollars)[c] | Quantity[d] | Total cost (US dollars)[e] |
|---|---|---|---|---|
| I. Development Infrastructure | | | | |
| 1. gas distribution | lf, ea | 22,000 /ea per building | 40 | 880,000 |
| 2. building electrical distribution (panelboard, ground,metersocket,service entrance cable, weather cap) | lf, ea | 15,000 /ea per building | 30 | 450,000 |
| 3. water distribution | per bldg | 15,000 /ea per building | 20 | 300,000 |
| 4. storm drain system | per bldg | 5,000 /ea per building | 16 | 80,000 |
| 5. sanitary utility sewerage piping | per bldg | 7,500 /ea per building | 16 | 120,000 |
| 6. other | | | | |
| | | | Subtotal | 1,830,000 |
| II. Building Exterior | | | | |
| 7. foundation (footing + wall) | lf, cy, sfca, lb, ea | 33.57 /lf | 400 | 13,428 |
| 8. exterior wall (brick) | sf | 12.66 /sf | 4000 | 50,640 |
| 9. windows (plastic clad) | ea., lf, face, set | 608.00 /ea. | 600 | 364,800 |
| 10. doors (mtl dr, wd frame) | lf, pr, set, ea | 907.84 /ea | 448 | 406,712 |
| 11. general flashing (aluminum, mill finish) | sf | 4.50 /sf | 5000 | 22,500 |
| 12. rain water drainage (alum. gutters and downspouts) | lf | 2.30 /lf | 800 | 1,840 |
| 13. roofing (asphalt, class A, bldg paper,trim,fascia,drip edge) | lf, sf | 3.00 /sf | 300,000 | 900,000 |
| 14. other | | | | |
| | | | Subtotal | 1,759,920 |
| III. Residential apartment | | | | |
| 15. floors (vinyl tile flooring over concrete) | sf | 4.00 /sf | 425,000 | 1,700,000 |
| 16. walls (plaster, metal lath) | sf, lf | 7.50 /sf | 242,500 | 1,818,750 |
| 17. ceilings (thincoat, gypsum) | sf, lf | 2.09 /sf | 582,000 | 1,216,380 |
| 18. painting (primer + 2 coats) | sf | 2.00 /lf | 1,690,000 | 3,380,000 |
| 19. gas distribution (piping and valves, steel) | lf | 15.40 /lf | 4,400 | 67,760 |
| 20. electrical distribution (with sockets, switches etc.) | lf | 500 /lf | 800 | 400,000 |
| 21. water closet and plumbing | per apt. | 1,529.96 /ea | 1100 | 1,682,956 |
| 22. other plumbing (PVC) | lf | 15.00 /lf | 3,000 | 45,000 |
| 23. appliances (cooking range, oven) | per apt. | 1,600.00 /ea | 1,200 | 1,920,000 |
| 24. other | | | | |
| | | | Subtotal | 12,230,846 |
| IV. Landscape | | | | |
| 25. paved walks | sf | 8.66 /sf | 800 | 6,928 |
| 26. driveway system (concrete) | lf, sf, cy | 6.00 /sf | 1,400 | 8,400 |
| 27. grading, fill and site work | bcy | 7.25 /bcy | 1500 | 10,875 |
| 28. trees | per tree | 850 /tree | 75 | 63,750 |
| 29. grass and other ground cover | msf | 60.00 /msf | 20 | 1,200 |
| 30. other | | | | |
| | | | Subtotal | 91,153 |
| | | | Project Subtotal | 15,911,919 |
| 31. A/E Consulting Services (10%) | | | | 1,591,192 |
| 32. Contingency (15%) | | | | 2,386,788 |
| | | | TOTAL | $19,889,899 |

a, All assemblies include all elements required of the particular system,  b, units are often composite values including linear, area, volumetric, and per item measures, c, unit cost assumes best approach – repair or replacement, d, number of units, e, represents total cost of assembly for the entire development – all costs rounded to the nearest dollar.

Table 5a: Cost Estimate for Modernization – St. Bernard: 1,391 apartment units

| Item | Cost per unit x 1,391 units | Cost |
|---|---|---|
| Modernization of building systems and units to meet building code and UFAS requirements. | $8,500 x 1,391 units | 11,823,500 |
| | TOTAL | $11,823,500 |

Table 5b: Cost Estimate for New Construction including Infrastructure – St. Bernard: 1,391 apartment units

| Item | Cost per unit or area | Cost |
|---|---|---|
| Demolition per unit | $5,000 x 1,391 units | 6,955,000 |
| Construction per area | $165 x 1,085,000 sf | 179,025,000 |
| | TOTAL | $185,980,000 |

18

Table 6: Detailed Cost Estimate for Rehabilitation– Florida: 127 apartment units

| Assembly[a] | Units[b] | Unit cost (US dollars)[c] | Quantity[d] | Total cost (US dollars)[e] |
|---|---|---|---|---|
| **I. Development infrastructure** | | | | |
| 1. gas distribution | lf, ea | 22,000 /ea per building | 0 | 0 |
| 2. building electrical distribution (panelboard, ground,metersocket,service entrance cable, weather cap) | lf, ea | 15,000 /ea per building | 4 | 60,000 |
| 3. water distribution | per bldg | 15,000 /ea per building | 4 | 60,000 |
| 4. storm drain system | per bldg | 5,000 /ea per building | 2 | 10,000 |
| 5. sanitary utility sewerage piping | per bldg | 7,500 /ea per building | 2 | 15,000 |
| 6. other | | | | |
| | | | Subtotal | 145,000 |
| **II. Building Exterior** | | | | |
| 7. foundation (footing + wall) | lf, cy, sfca, lb, ea | 33.57 /lf | 100 | 3,357 |
| 8. exterior wall (cement/fiber board) | sf | 9.00 /sf | 500 | 4,500 |
| 9. windows (plastic clad) | ea., lf, face, set | 608.00 /ea. | 10 | 6,080 |
| 10. doors (mtl dr, wd frame) | lf, pr, set, ea | 907.84 /ea | 20 | 18,157 |
| 11. general flashing (aluminum, mill finish) | sf | 4.50 /sf | 100 | 450 |
| 12. rain water drainage (alum. gutters and downspouts) | lf | 2.30 /lf | 50 | 115 |
| 13. roofing (metal, standing seam) | lf, sf | 15.00 /sf | 50 | 750 |
| 14. other | | | | |
| | | | Subtotal | 33,409 |
| **III. Residential apartment** | | | | |
| 15. floors (vinyl tile flooring over concrete) | sf | 4.00 /sf | 36,000 | 144,000 |
| 16. walls (1/2" drywall, taped and finished) | sf, lf | 2.45 /sf | 120,000 | 294,000 |
| 17. ceilings (thincoat, gypsum) | sf, lf | 2.09 /sf | 52,380 | 109,474 |
| 19. gas distribution (piping and valves, steel) | lf | 15.40 /lf | 500 | 7,700 |
| 20. electrical distribution (with sockets, switches etc.) | lf | 500 /lf | 100 | 50,000 |
| 21. water closet and plumbing | per apt | 1,529.96 /ea | 15 | 22,949 |
| 22. other plumbing (PVC) | lf | 15.00 /lf | 100 | 1,500 |
| 23. appliances (cooking range, oven) | per apt. | 1,600.00 /ea | 80 | 128,000 |
| 24. other | | | | |
| | | | Subtotal | 757,623 |
| **IV. Landscape** | | | | |
| 25. paved walks | sf | 8.66 /sf | 500 | 4,330 |
| 26. driveway system (concrete) | lf, sf, cy | 6.00 /sf | 100 | 600 |
| 27. grading, fill and site work | bcy | 7.25 /bcy | 650 | 4,713 |
| 28. trees | per tree | 850 /tree | 20 | 17,000 |
| 29. grass and other ground cover | msf | 60.00 /msf | 50 | 3,000 |
| 30. other | | | | |
| | | | Subtotal | 29,643 |
| | | | Project Subtotal | 965,675 |
| 31. A/E Consulting Services (10%) | | | | 96,568 |
| 32. Contingency (15%) | | | | 144,851 |
| | | | TOTAL | $1,207,094 |

a, All assemblies include all elements required of the particular system,  b, units are often composite values including linear, area, volumetric, and per item measures, c, unit cost assumes best approach – repair or replacement, d, number of units, e, represents total cost of assembly for the entire development – all costs rounded to the nearest dollar.

19

## References

Balboni, B. 2006. *RSMeans Assemblies Cost Data, 32nd Annual Edition*. Reed Construction Data, Inc., Kingston, MA.
Balboni, B. 2006. *RSMeans Interior Cost Data, 24th Annual Edition*. Reed Construction Data, Inc., Kingston, MA.
Mewis, R.W. 2006. *RSMeans Residential Cost Data, 26th Annual Edition*. Reed Construction Data, Inc., Kingston, MA.
Mossman, M.J. 2006. *RSMeans Mechanical Cost Data, 30th Annual Edition*. Reed Construction Data, Inc., Kingston, MA.
Spencer, E.R. 2006. *RSMeans Site Work & Landscape Cost Data, 26th Annual Edition*. Reed Construction Data, Inc., Kingston, MA.

Numerous demolition application documents and inspection reports contained within the digital file:
Riddell – complete demolition application: AND007–0066 to AND007–0846: provided by plaintiff lawyers.

## Abbreviations

bcy: bank cubic yard
cy: cubic yard
lf: linear foot
msf: thousand square feet
pr: pair
sf: square foot
sfca: square feet contact



Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, et al.,          *

                                   *   Civil Action No:
                    Plaintiffs,        06-3298

vs.                                *

ALPHONSO JACKSON, et al.,          *

                    Defendants.    *   Pages 1 - 340

Videotaped Deposition of John Emmanuel Fernandez

Washington, D.C.

August 13, 2007

Reported by: Carla J. Briggs, RPR-RMR-CRR

Job No. 182664

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4
d5ec7e0c-dab7-469...

JOHN EMMANUEL FERNANDEZ, AUGUST 13, 2007

### Page 102

1   Q  Do you know why it was limited to
2 assessment of hurricane damage?
3   A  No, besides the fact that there was a need
4 to -- to know what happened to these units because
5 of the hurricanes.
6   Q  Okay. And I take it from your use of the
7 word "first phase" that there were other phases?
8   A  Well, the conversation did then introduce
9 the idea of doing more than physical assessment. In
10 particular, it involved producing a cost estimate.
11   Q  Okay. When did the scope of your work
12 evolve to include a cost estimate?
13   A  I'm going to give you my best answer here.
14 I believe it's somewhere around -- the second -- the
15 second survey was done April 30th through May 4th,
16 2007.
17   Q  Uh-huh.
18   A  Some number of weeks before then.
19   Q  Do you know why you weren't asked to do a
20 cost estimate the first time?
21   A  No.
22   Q  Have you ever done an estimate of costs

### Page 103

1 for the repair of large multifamily developments
2 before your involvement in this case?
3   A  Yes.
4   Q  Okay. What did -- tell me -- well, when
5 was that?
6   A  So the -- the projects would have been the
7 various housing projects that I've been involved in
8 during my professional practice including the
9 Indonesia project and possibly others, the cost
10 estimate and working with cost estimators and
11 deriving, you know, detailed or broad -- or
12 whatever's needed at the time -- cost ideas of
13 designs that are ongoing for those housing projects
14 would have been part of the process. We would have
15 been doing them, you know.
16   Q  Okay. Other than the Indonesia project
17 that we've discussed, can you recall another --
18 another one -- specifically recall another one that
19 was for a large multifamily development?
20   A  I can't, but I could provide you more
21 information on that.
22   Q  Okay. Do you know if you were involved in

### Page 104

1 cost estimates for such projects more than ten
2 times?
3   A  I'll jump to the probably five or so
4 times. Five and more.
5   Q  Okay. Other than expanding the scope of
6 your work to include a cost estimate, has the scope
7 of your work changed in any other respect?
8   A  There -- yeah. To clarify, the emphasis
9 in the first discussions were on the residential
10 units themselves. In the next several weeks after
11 that initial discussion and on around the time of
12 the first inspection April 30th to May 4th, 2007 --
13 sorry -- October 17th through 21st, 2006, that first
14 inspection, it was clear that an inspection of the
15 building overall was very important. That's not to
16 say that we weren't discussing that all along, but
17 it just became clearly a priority to specifically
18 break that out as a separate section of the
19 reporting.
20   Q  Okay. Were you asked to evaluate
21 potential environmental hazards at these projects?
22   A  No.

### Page 105

1   Q  Did you?
2   A  No.
3   Q  Do you know why you were not asked to
4 determine potential environmental hazards at these
5 projects?
6   A  No.
7   Q  Were you asked to determine the
8 suitability of these units for residential life in
9 the 21st century?
10   A  For reoccupation. It wasn't phrased that
11 way, but for, yeah, reoccupation.
12   Q  And in your mind, that would include being
13 suitable for residential life in the 21st century?
14   A  Yeah. We're in the 21st century --
15   Q  Okay.
16   A  -- so that would by default --
17   Q  When you were conducting your inspections,
18 did you note the ratio of bathrooms to bedrooms in
19 these units?
20   A  No, I did not.
21   Q  Are you aware that there are four- or
22 five-bedroom units in these buildings with one

27 (Pages 102 to 105)

JOHN EMMANUEL FERNANDEZ,    AUGUST 13, 2007

Page 106

1  bathroom?
2      A  Yes.
3      Q  Do you believe that is suitable for life
4  in the 21st century -- for residential life in the
5  21st century?
6      A  I think if --
7      Q  In the United States of America.
8      A  As opposed to sleeping on the street, yes.
9      Q  It's better than being homeless?
10     A  Absolutely.
11     Q  Were you asked to determine whether or not
12  these projects complied with HUD standards?
13     A  I wasn't asked specifically to -- to do
14  that.
15     Q  Did you?
16     A  Yes, but with clarification.  On the
17  intent of the -- of HUD housing to be -- to satisfy
18  the -- the priorities of housing to provide decent,
19  safe, sanitary housing in good repair, I used that
20  as the framework for my assessment of whether these
21  units were satisfied -- were satisfactory.
22     Q  Were you asked to evaluate the structure's

Page 107

1  conformance with current building codes?
2      A  I was not specifically asked to do that.
3      Q  Did you?
4      A  In some cases, I noted for myself, though
5  I did not produce documentation.
6      Q  Okay.  What did you note for yourself?
7      A  I noted that as mentioned in the report --
8  the other report -- the report for your -- for the
9  defendants that the ECM and Draper both identify
10  fire egress concerns for the width of the stairs as
11  they exist now in many of the developments.  And in
12  addition then -- again egress -- is the width of
13  doors from -- from units into that egress path, and
14  in addition to that, the UFAS -- the Uniform Federal
15  Accessibility Standards -- for -- for -- from what I
16  recall five percent of the units of any development
17  having to comply with UFAS requirements as I
18  understand it.  So I -- I -- along with those
19  reports and what I saw, I believe that's correct.
20  All this.
21     Q  Do you know whether those projects are in
22  compliance with the UFAS requirement that five

Page 108

1  percent or more of the units be accessible?
2      A  I didn't do a survey, but it doesn't look
3  like they are.
4      Q  In your professional opinion, would you
5  say that the units that you inspected, assuming
6  they're pre-Katrina condition without the storm
7  damage, fulfill the majority of the needs of today's
8  residents?
9      A  Long-term residents?
10     Q  Yes.
11     A  Pre-Katrina -- or right before Katrina --
12  no.
13     Q  Okay.  Why not?
14     A  Because in my opinion, there has been a
15  lack of attention to these housing units -- both the
16  buildings and the residential units themselves --
17  that would have resulted in a pre-Katrina condition
18  that -- that would have seen much more incremental
19  renovation and modernization than I saw.  And in
20  that sense, yeah, they could have been in better
21  condition.
22     Q  I think you just answered my next question

Page 109

1  which was in your professional opinion, would you
2  assume that buildings of this age would have
3  undergone a system modernization?
4      A  What do you mean by "system
5  modernization"?  I mean, there are lots of different
6  kinds of modernization.  Some don't involve the
7  whole system, some involve just individual
8  components.  It was my assumption that -- well, it
9  is best practice for buildings of this age to be
10  incrementally modernized so that they are within
11  some ball park acceptance of code and health and
12  safety issues owing an acknowledgment of the need
13  for housing.
14     Q  Okay.  But based on your inspection, you
15  concluded that that did not happen with these
16  projects, correct?
17     A  It seemed not, although I was not there
18  pre-Katrina inspecting these units.
19     Q  Okay.  Would you have any idea why it
20  didn't happen --
21     A  No.
22     Q  -- assuming it did not?

28  (Pages 106 to 109)

d5ec7e0c-dab7-4699-b629-26a9a65b13e4

JOHN EMMANUEL FERNANDEZ, AUGUST 13, 2007

Page 110

```
 1    A   No.
 2        I should clarify that. I've read in the
 3    Draper report some rationale for why that is, but --
 4    Q   Other than that?
 5    A   No.
 6    Q   No.
 7        You are not an engineer, right?
 8    A   That's right.
 9    Q   Okay. I think you mentioned some work
10    that involved engineering. What was that? I can't
11    remember what it was. Maybe it was at MIT.
12    Undergraduate work?
13    A   Most of my coursework was in the
14    Department of Civil Engineering at MIT.
15    Q   But you didn't get a degree in civil
16    engineering?
17    A   No, because I decided to be an architect.
18    Q   Why? Why didn't you want to be a civil
19    engineer?
20    A   Because civil engineers do what architects
21    tell them in this country basically. In Europe,
22    it's slightly different. The engineers are a little
```

Page 111

```
 1    bit -- and there's a renaissance in engineering
 2    right now, but not to go into it. Civil engineers
 3    basically provide a service to the architects.
 4    Q   What services does civil engineers provide
 5    to architects?
 6    A   There are many different areas of
 7    engineering: Water, transportation, structures,
 8    environmental now, and civil has taken on
 9    environmental. There are even, you know,
10    specialists in those areas. Civil engineers for
11    buildings and structures generally provide the
12    analysis, calculations and design -- that's material
13    specification and sizing -- of all of the structural
14    elements to a design that the architect's already
15    handed to that person.
16    Q   Okay. Do you know, based on your
17    inspections, whether these projects -- the old
18    ones -- with the St. Bernard, B.W. Cooper, C.J.
19    Peete -- are ADA compliant, Americans with
20    Disabilities Act?
21    A   I did not do that survey.
22    Q   Can you describe to me what you consider
```

Page 112

```
 1    when you design a new residence as an architect?
 2    A   Just very generally?
 3    Q   Uh-huh.
 4    A   The -- to design a residential space by
 5    the architect involves the specification of the
 6    habitable space, the amount of space, and the type
 7    of space that -- that -- that person/family will
 8    live in, the -- the materials and the devices and
 9    the components of all of the systems that reliably
10    and safely and in a healthy way deliver the -- the
11    needs of those occupants, and generally, that's
12    broken down into four systems: The structure of the
13    exterior wall; the building services which include
14    electricity, water and any -- whatever fields for
15    heating, whatever cooling there might be and
16    sanitary -- sanitary in the system, and then the
17    fourth being all of the -- the definition of the
18    interior space: The materials, the size -- as I
19    mentioned already, the size of the rooms, so the
20    complete definition of that habitat.
21    Q   Would you consider applicable building
22    codes?
```

Page 113

```
 1    A   Absolutely.
 2    Q   Okay. Available utility infrastructure?
 3    A   Yes.
 4    Q   The weather or climate?
 5    A   Yes.
 6    Q   Do you consider something known as local
 7    design vernacular?
 8    A   It may or may not.
 9    Q   Okay.
10    A   Yeah. I mean, generally, yes, if there is
11    one.
12    Q   What is that?
13    A   Well, vernacular refers to some general
14    design, general architectural look -- that's very
15    broad -- but essentially meaning that New Orleans
16    has a certain look to it and everyone knows what
17    that is and that for New Orleans, that would be the
18    local architectural vernacular.
19    Q   In your professional opinion, are the
20    projects compatible with the local vernacular?
21    A   Yeah.
22    Q   They are?
```

29 (Pages 110 to 113)

JOHN EMMANUEL FERNANDEZ,    AUGUST 13, 2007

## Page 150

1    Q    Are you aware that there was a building at
2    St. Bernard that had been gutted by fire right after
3    Katrina?
4    A    Yes.
5    Q    You saw that building?
6    A    Absolutely.
7    Q    Did that inform your cost estimates for
8    repair to the site?
9    A    That building, no, it did not.
10   Q    Why not?
11   A    To be honest, it wasn't clear to me
12   whether that building was part of the scope of
13   the -- of the project.
14   Q    Where is it located in terms of on the
15   site?
16   A    I would have to look.
17   Q    Isn't it right in the middle of the
18   project? It's --
19   A    It may be.
20   Q    It's not located at an isolated place,
21   right?
22   A    Oh, I'm sorry. I know which you're

## Page 151

1    talking about. Yes. Okay. I was thinking of
2    another one. Yes, I did include that building as
3    part of my cost estimate. That was four apartments
4    on a corner. Yes, I remember that. It might have
5    been three apartments, but -- three or four
6    apartments.
7         MS. WISDOM: I guess we can break for
8    lunch.
9         MS. DIXON: Please.
10        THE VIDEOGRAPHER: We are going off the
11   record, and this will end tape No. 2 in the
12   deposition of John Fernandez, 1:42 p.m.
13        (Thereupon, a luncheon recess was taken at
14   1:42 p.m.)
15
16
17
18
19
20
21
22

## Page 152

1         AFTERNOON SESSION
2              2:22 p.m.
3         THE VIDEOGRAPHER: This begins tape No. 3
4    in the deposition of John Fernandez, 2:22 p.m.
5         BY MS. WISDOM:
6    Q    Okay. I think that you have said that you
7    are aware that HUD imposes minimum quality standards
8    on public housing inventory?
9    A    Yes.
10   Q    Can -- can you identify some of the
11   standards that HUD imposes on public housing
12   inventory?
13   A    I would like to refer to notes, but no, I
14   wouldn't.
15   Q    Okay.
16   A    Not off the top of my head.
17   Q    Okay. When you performed your
18   inspections, you did not use, did you, any form or
19   checklist that is issued by HUD?
20   A    No.
21   Q    Okay. During your inspections, did you do
22   anything to ascertain whether there was lead-based

## Page 153

1    paint present at these projects?
2    A    No, I did not.
3    Q    Okay. Did you do anything to ascertain
4    whether there were asbestos materials at these
5    projects?
6    A    No.
7    Q    Did you make any evaluation as to any
8    hazard mitigation measures that might be associated
9    with lead-based paint at these projects?
10   A    Did I make any assessments of hazardous --
11   hazard mitigation?
12   Q    Hazard mitigation, yeah.
13   A    In -- in relation -- not in terms of --
14   not in relation to asbestos, not in relation to
15   mold. Asbestos, because the extent of asbestos was
16   not clear to me, visual inspection sometimes it can
17   be a little difficult, I think, to -- to know
18   exactly where it is and what the extent is. For
19   mold, that was outside of the scope of my report. I
20   wasn't -- I was asked not to address mold issues
21   because there was another expert. In terms of
22   lead-based paint, the -- the procedure for

39 (Pages 150 to 153)

JOHN EMMANUEL FERNANDEZ,   AUGUST 13, 2007

---

### Page 154

1  encapsulation was included in the cost estimate as
2  a -- as the cost item for repainting essentially all
3  the apartments in all the -- all the projects, so
4  encapsulation, that was -- that was included.
5  That's -- that's the process that I believed -- that
6  I believe would work to encapsulate that, so that
7  would be the mitigation of that hazard.
8  Q   Okay. In your cost estimates, did you
9  include any work for mitigation aside from
10  encapsulation?
11  A   Yes. There is a significant uncertainty
12  in my mind as to what the -- how -- how -- what the
13  procedures -- what the best procedures would be in
14  each case, so what I did was there's a line item in
15  the budget which is a contingency, and a contingency
16  is a 15 percent contingency, and the contingency in
17  this -- in the use of this budget was to do two
18  things. One, to encapsulate -- well, I'll use
19  another word -- to encompass some of the procedure
20  that I may not have thought were necessary or know
21  about just because I didn't do a survey on the
22  extent of lead paint. My assumption is that there

### Page 155

1  is probably a good bit of lead paint in buildings
2  this old. I think it's reasonable to think that.
3      The other use of that contingency was on
4  the building services. Because -- because I
5  followed the methodology of a visual inspection --
6  non-intrusive visual inspection, the testing would
7  reveal exactly how much -- to what extent the
8  building services were not operable -- especially
9  the electrical, water, sanitary -- and that
10  contingency is meant to -- to address that
11  uncertainty. The contingency -- that's the purpose
12  of contingency line items in budgets.
13  Q   I thought contingency generally was used
14  to provide a buffer for costs that could not be
15  anticipated; isn't that right?
16  A   That's what exactly I described.
17  Q   But could you not anticipate the need for
18  some hazard mitigation in these units?
19  A   I cannot anticipate the scope of the --
20  the cost of mitigating these hazards because I was
21  not explicitly doing a survey for the extent of lead
22  paint or asbestos and mold as well. Now, mold is

### Page 156

1  not part of this budget, so separate that out, so
2  that's -- and contingencies are used in budgets to
3  deal with uncertainty.
4  Q   Okay. But if you had been charged with
5  making cost estimates for the mitigation of these
6  hazards, you could have estimated the cost
7  associated with that work, couldn't you?
8  A   I could have estimated the cost associated
9  with that work and the contingency likely would have
10  gone down because of that. 15 percent contingency
11  on a budget is a very hefty contingency.
12  Q   But as you stated before, this contingency
13  is also present to absorb costs for building systems
14  that you were not able to fully evaluate; is that
15  right?
16  A   Yes. That's the use of a contingency, to
17  deal with uncertainty.
18      Now, when you say "evaluate," what I said
19  was for building systems that I didn't test, because
20  the methodology I'm using does not involve testing
21  of the systems. It's a visual inspection.
22  Q   Okay. But as you testified before, you

### Page 157

1  did not make an effort to inspect system elements
2  that might be present in the crawlspaces of the
3  buildings, correct?
4  A   Following the methodology of the American
5  Society of Home Inspectors, if the crawlspaces were
6  difficult to access or dangerous to access or not
7  easily able to evaluate what's inside the crawlspace
8  which I determined that was the case, then I did not
9  go into the crawlspaces, yes. For that reason, I
10  didn't go into the crawlspace I should say.
11  Q   Okay. To handle the lead-based paint, you
12  said you've included money for the cost of
13  encapsulation?
14  A   Yes.
15  Q   Is that a line item on your estimate?
16  A   It's the painting item primer and two
17  coats.
18  Q   Is primary and two coats --
19  A   Primer. Primer.
20  Q   Primer and two coats, is that -- would
21  that be done without regard to encapsulation, a
22  primer and two coats of paint?

40 (Pages 154 to 157)

JOHN EMMANUEL FERNANDEZ,    AUGUST 13, 2007

Page 158

1    A   For an apartment that needed a paint job,
2  yes.
3    Q   What method do you -- assume that there is
4  on a wood door frame paint that is bubbled or
5  peeling because of the humid environment.  What do
6  you -- what work do you have in your cost estimates
7  for handling the peeling or the bubbling of that
8  paint?
9    A   The work that I have would be covered
10  under the contingency apart from the -- from the
11  primer and two coats of paint, so for that sort of
12  condition, which again is a condition of
13  uncertainty -- if it's bubbling, is there lead
14  paint -- maybe, maybe not -- the contingency would
15  be applied to that.
16    Q   Are you aware that there is a specific HUD
17  regulation that prohibits certain kinds of methods
18  for the removal of lead-based paint?
19    A   I'm not aware of it, but I can imagine
20  that there certainly is one.
21    Q   Okay.
22    A   Yeah.  There are best practice and not

Page 159

1  best practice.
2    Q   Okay.  And you say that that would be
3  costs that would be -- that would be absorbed by
4  your contingency -- ten percent contingency?
5    A   15 percent contingency, yes.
6    Q   Do you have -- do you have any idea why
7  the scope of your cost estimate did not include
8  making specific estimates for, you know, asbestos
9  abatement, lead-based paint abatement or mold
10  abatement?
11    A   I answered before that the mold was not
12  part of the scope of my work.  It was clear that
13  that was someone else's scope.  On lead and
14  asbestos, I don't know why I wasn't asked to do
15  those.
16    Q   I think you've testified to this, but I
17  just want to make sure I understand.  In your cost
18  estimates, any costs associated with asbestos
19  remediation would be in the 15 percent contingency,
20  right, not any other line item?  There's no other
21  line item?
22    A   Yes, that's correct.

Page 160

1    Q   Okay.  And the same with the lead-based
2  paint other than the encapsulation you've described?
3    A   Yes, that's correct.
4    Q   Okay.  And is it your understanding that
5  Mr. Martinez did a cost estimate for mold
6  remediation?
7    A   I have no idea what Mr. Martinez did.
8    Q   Okay.  But your budget -- I mean your cost
9  estimate doesn't include any line item that would
10  deal with remediating the mold present in these
11  units?
12    A   It does not.
13    Q   Okay.  If you'd look at Page 3 Paragraph
14  No. 10 of your original report.  And I need my
15  reading glasses for this.
16    A   "Original report" meaning?
17    Q   The first one that you did.
18    MS. DIXON:  Which exhibit number?
19    A   Yeah.  Which exhibit number?
20    Q   It's the document you have before you.  Is
21  that No. 3?
22    A   No. 3.  Okay.

Page 161

1    Q   Okay.  In this paragraph you mention the
2  regulations which you --
3    A   I'm sorry.  I did not -- what paragraph?
4    Q   Paragraph No. 10, Page No. 3.  In this
5  paragraph you refer to 24CFR Section 5.703.  Do you
6  see that?
7    A   Yes.
8    Q   Subpart G.  And you state in the second
9  sentence that -- and I quote -- "In addition, this
10  report provides information regarding the work
11  necessary to repair and renovate buildings and
12  individual units to comply with the HUD standards --
13  standard such that the buildings are 'structurally
14  sound, secure, habitable, and in good repair,' and
15  all building systems are free of health and safety
16  hazards, functionally adequate, operable and in good
17  repair, and all dwelling units are considered
18  decent, safe, sanitary and in good repair."  Do you
19  see that?
20    A   Yes.
21    Q   Without providing for remediation work to
22  reduce environmental hazards, how can -- how does

41  (Pages 158 to 161)

JOHN EMMANUEL FERNANDEZ, AUGUST 13, 2007

Page 274

1  with food inside of it for an extended period of
2  time?
3     A  Have I?  No.
4     Q  No?  Okay.
5        Do you know if a refrigerator like that
6  could be restored to functioning condition?
7     A  No.  I believe that it could not.
8     Q  Okay.  Did you include replacement of the
9  refrigerators in your --
10    A  No, I did not.
11    Q  Did you include replacement of first floor
12 appliances in the scope -- in your cost estimate?
13    A  Yes.  First floor appliances -- okay.
14 Appliances meaning line item -- appliances 23,
15 cooking range and oven.  Restricted to that.
16    Q  Okay.  You didn't include replacement
17 costs for the refrigerators?
18    A  No, I did not.
19    Q  Why not?
20    A  It wasn't clear to me whether those were
21 owner owned or HANO provided.
22    Q  Is what you just said true for all the

Page 275

1  sites?  You included the cost of replacement for the
2  stove and the -- what was the other one?
3     A  Stove and oven.
4     Q  Oven?
5     A  Yes.  Let me just check Florida just to
6  make sure.  Yes.
7     Q  How about the water heaters?  Did you
8  include that?
9     A  No, I did not include water heaters.
10    Q  Why not?
11    A  A decision.  Just a decision I made.
12    Q  Don't they need to be replaced?
13    A  Yes, you would have to provide some --
14 some heating of the water for these apartments.
15    Q  Okay.  Let's talk about C.J. Peete.
16 Paragraph 37 of your original report, you state
17 that -- it's toward the center.  I don't know
18 exactly how many sentences in -- "However, repairs
19 and wholesale replacement of a significant
20 percentage of windows in the project will be
21 required."
22    A  Yes.

Page 276

1     Q  You also state "Theft of -- theft of metal
2  from this project poses a real challenge to the
3  continued durability of these buildings."
4     A  Correct.
5     Q  And that's because, as you note here,
6  copper roof vents, louvers and masonry wall flashing
7  has been systematically ripped from the buildings?
8     A  Yes.
9     Q  And then the copper wiring and piping has
10 also been removed?
11    A  Yeah.  I mean, in all of those statements,
12 some of it has, yes.  A good part of it has, yes.
13    Q  Did you include replacement repair for
14 those items in your cost estimates?
15    A  Yes.
16    Q  Okay.
17    A  The items are line item 11, line item 12,
18 line item 13.
19    Q  Okay.
20    A  Line item 9.
21    Q  Okay.  So you did not exclude things
22 simply because they were the result of vandalism or

Page 277

1  looting and not hurricane damage?
2     A  At C.J. Peete, I included vandalism and
3  looting.
4     Q  At the other sites?
5     A  There wasn't enough of it for me to
6  make -- I felt there wasn't enough of it to make
7  separate line items that would -- that I needed to
8  really focus on.
9     Q  Okay.
10    A  At C.J. Peete, the conditions were such
11 that looting and vandalism was very obvious and very
12 clear and widespread in the project.
13    Q  Do you know whether any of that occurred
14 prior to Katrina, any of the looting or vandalism
15 that you observed?
16    A  Do I know if any of the looting or
17 vandalism occurred --
18    Q  Yes, of copper from the site.
19    A  No.
20    Q  Okay.  I'm going to show you another
21 photograph, and I'm going to ask you to assume again
22 that it's one of yours, and this is from Peete.  I'm

70 (Pages 274 to 277)

JOHN EMMANUEL FERNANDEZ,   AUGUST 13, 2007

---

Page 286

1  envelope including the roof, interior finishes, and
2  gas and electrical services -- did not result." Do
3  you see that?
4      A   That should be clarified because I do
5  believe that what I'm referring to is the damage
6  that would have occurred if flooding had occurred in
7  those units on the ground floor, so it's correctly
8  you note that that's an ambiguous statement.
9      Q   Okay. And did you consider when you made
10  this report damage that was possibly sustained by
11  the services originally located in the crawlspace at
12  the site?
13      A   In this report, did I consider that?
14      Q   Uh-huh.
15      A   In the report, I don't think I mentioned
16  it purely because I did not get the chance to
17  inspect any of those crawlspaces.
18      Q   Are those -- are costs for work to repair
19  components of the building services in the
20  crawlspace included in your cost estimates?
21      A   Not explicitly, no. It's -- that's one
22  element that's uncertain.

---

Page 287

1      Q   In making your estimate of the costs
2  necessary to repair C.J. Peete, did you consider
3  electrical service panels that exist below the floor
4  level?
5      A   No, I did not, because I didn't see them,
6  so I didn't consider them.
7      Q   And so they would not be in your cost
8  estimates?
9      A   Again, they would be included in the
10  contingency of which the elements that I wasn't able
11  to see but still elements that needed to be repaired
12  would be -- would be considered.
13      Q   Okay. B.W. Cooper page --
14      A   Can we take a short break?
15      Q   Sure.
16      THE VIDEOGRAPHER: We are going off the
17  record, 5:24 p.m.
18      (Brief Recess.)
19      THE VIDEOGRAPHER: We are back on the
20  record, 5:27 p.m.
21      BY MS. WISDOM:
22      Q   Paragraph 41 Page 11 of your original

---

Page 288

1  report, a sentence midway reads "Structural damage
2  in the buildings in B.W. Cooper was rare though two
3  instances were found." Why do you say it was rare?
4      A   Because I only found two instances.
5      Q   Okay. And did you -- I think you told me
6  before you examined every building at the site?
7      A   Every building from the exterior, yeah.
8      Q   Okay. Is it possible that there are signs
9  on the interior of the buildings that would indicate
10  structural damage you could not observe from the
11  outside?
12      A   Yes.
13      Q   Okay. You state there "Each" -- and
14  you're talking about the instances of structural
15  damage, I believe -- "Each was indicated by the
16  presence of rust staining resulting from steel
17  reinforcing bar or other structural steel corroding
18  and leaching through the concrete matrix. Both
19  instances were found in common stairwells. It is
20  (sic) not possible to conclusively determine this
21  was -- that this damage was Katrina-related. It is
22  likely that pre-Katrina cracks in the concrete were

---

Page 289

1  invaded by wind-driven rain and kept moist by roof
2  damage."
3      Whether or not it was Katrina-related, did
4  you include in your cost estimates money sufficient
5  to repair the structural damage you observed?
6      A   Yes. Those two, yes.
7      Q   Okay. Did you, as you did in other
8  instances, extrapolate from these two instances --
9  make conclusions regarding the condition of the site
10  as a whole?
11      A   No. From not -- not only that, but also
12  from all of the inspections of the apartments, so
13  viewing the -- the condition of the exterior walls
14  and looking for cracks and looking for settlement
15  and looking at the foundation for settlement,
16  looking for differential settlement, so many, many
17  other things contributed to that conclusion.
18      Q   Okay. So for the purposes of your cost
19  estimate, you assumed that these were the only two
20  instances of structural damage at B.W. Cooper?
21      A   Yes. Let me qualify that though because
22  the point that I make is that was rare and was rare

---

73 (Pages 286 to 289)

JOHN EMMANUEL FERNANDEZ,     AUGUST 13, 2007

Page 298

1  conclusions are based solely on your visual
2  inspections of the sites?
3     A   Yes, correct.
4     Q   So you haven't examined any information
5  regarding, for example, what resources have been
6  available to HANO managing public housing in New
7  Orleans --
8     A   Yes, that's --
9     Q   -- for the past 60 years?
10    A   Yes, that's correct.
11    Q   In the last paragraph, Paragraph 55, you
12 state -- and I guess that's the reason I wouldn't
13 want to -- "Yet this is" -- ECM -- okay. Begin with
14 "yet." "Yet this is despite the fact that the costs
15 associated with building code issues, such as egress
16 conditions, accessibility deficiencies -- under
17 UFAS -- handrails, etcetera, as well as health and
18 safety concerns, such as the possible presence of
19 lead paint beyond those locations already
20 identified, are simply not the result of the events
21 of Katrina or Rita. Addressing these concerns is
22 the responsibility of the authority responsible for

Page 299

1  maintaining updated, safe and healthy housing
2  properties. These costs should not (sic) be
3  considered as part of the ongoing costs of
4  responsibly and effectively maintaining and updating
5  the properties under their control. Therefore, the
6  inclusion of these costs -- the inclusions of costs
7  associated with these items and other
8  nonstorm-related items as the basis for comparison
9  with new construction is highly questionable." Do
10 you see that?
11    A   Yes.
12    Q   Did you exclude from your cost estimates
13 costs that would remedy those deficiencies?
14    A   Okay. To be clear, we're talking about
15 the expert report that was issued several weeks
16 before the final report and the cost estimate.
17    Q   Sure.
18    A   In the cost estimate, I changed my
19 position. I did feel that it was useful to add
20 modernization costs for ease of comparison with the
21 ECM budget and with, you know, the general
22 discussion of the future of these housing projects,

Page 300

1  so the -- the -- the portion of the ECM report that
2  I actually -- and this is a bit in clarification --
3  that I strongly disagree with is the idea that the
4  modernization costs require complete gut renovation
5  of these buildings, and that number for ECM is huge.
6  I don't remember what it is, but it's in the tens of
7  millions of dollars. And for that, my reaction to
8  the ECM cost estimate what I got which actually
9  happened very, very soon before I had -- before I
10 issued this was that that was completely
11 unreasonable to -- to suggest that all these
12 buildings needed to be gut renovated. For that, I
13 decided that this was not part of the scope of the
14 work that had been defined to me, and as I had
15 thought about it, that changed after I got the
16 extension to produce the supplement.
17     Let me be clear what changed. It
18 changed -- what changed was what I stated before
19 which was to produce a cost estimate that included a
20 budget for modernization. I still maintain -- I
21 maintain that the issuance of the supplemental
22 report and today that the complete gut renovation of

Page 301

1  these buildings is close to absurd to achieve the
2  needs to satisfy the general priorities to provide
3  decent, safe, sanitary housing in good repair with
4  modernization included within that.
5     Q   Are you assuming in forming your opinion
6  that HANO does nothing to deconcentrate the
7  populations at these sites?
8     A   I don't know what you mean.
9     Q   You don't know what deconcentrate means?
10    A   I'm assuming that it means to reduce the
11 concentration of, but I don't know what you're
12 referring to.
13    Q   Are you assuming that the work on these
14 sites will include merely repair to the units
15 existing at the sites now?
16    A   Yes. I did not change the room counts,
17 unit sizes or the layout in the preparation of the
18 cost estimate.
19    Q   Okay. Those deficiencies that you list in
20 Paragraph 55 of your original report, I take it that
21 it is not your position that work to address those
22 deficiencies need not be done before these units are

76  (Pages 298 to 301)

JOHN  EMMANUEL  FERNANDEZ,    AUGUST  13,  2007

Page 302

1  reoccupied?

2    A    It's not my position that that work need

3  not be done.

4    Q    Okay.  Should -- should that work be done

5  before these units are reoccupied?

6    A    Selectively.  I don't think all the work

7  needs to be done.  In other words, the intent of

8  building code accessibility, health and safety

9  regulations are to provide housing in a safe,

10  regulated way.  There are variances and there are

11  exceptions to the imposition of those building codes

12  to address a greater need.  It seems to me that the

13  great need in New Orleans is to provide public

14  housing, and a number of these units are livable and

15  should be reoccupied in the way that they were

16  occupied pre-Katrina, and that could be done.

17  Others should be modernized and safety concerns

18  should be taken care of.

19    Q    Okay.  Is it your understanding that in

20  order to do the work that you've identified in your

21  cost estimates to these sites and not cure all of

22  the deficiencies that are described in that

Page 303

1  paragraph, that HANO would have to get a variance?

2    A    I don't know what process they would have

3  to go through to allow that to happen.

4    Q    Okay.  Is it your understanding that when

5  there is major renovation work done at a property,

6  that you have to bring that property up to code?

7    A    Well, it's my understanding generally --

8  and I think this applies to New Orleans -- that a

9  renovation project that exceeds 50 percent of the

10  value of the building, I believe, then trips the

11  requirement to bring the entire building up to -- to

12  the -- to code.  I think that -- and that's

13  a gen- -- generally a pretty good rule.  I think in

14  certain instances here that there might be a reason

15  to push beyond that 50 percent and not necessarily

16  kick in all of the modernization needs of these

17  buildings.  I think the Draper report and the ECM

18  report correctly identified what those things were,

19  but they are diverse and there are a number of them

20  and some are clearly more critical than others, so I

21  think a reasonable process would be to categorize

22  the need of -- to categorize the criticality of

Page 304

1  modernization that needs to be done right away as

2  opposed to short-term, mid-term and long-term.

3    Q    Would there be any cost savings produced

4  by putting off making these buildings code compliant

5  now?

6    A    Cost savings --

7    Q    Why would you want to put work off that

8  you can do now while there's no one at the site and

9  it's -- you know, there's -- you could be doing a

10  lot of work?

11    A    Yeah, absolutely.  I think what you're

12  saying and what I agree with is that generally, in

13  any construction project, the more that you bundle

14  into the project that you need to do because you're

15  mobilizing a contractor, the lower the cost will be.

16  That's kind of a general rule, and I think it's

17  borne out by a lot of experience.  In this case, the

18  other factor to take into account is how long will

19  people be ready to return.  They're -- clearly,

20  there are thresholds that people are going to cross

21  in the next few months, six months, a year or

22  whatever or whether they're going to decide not to

Page 305

1  return.  So I think weighing that against the

2  priority of providing housing for those residents

3  eligible to live in public housing in New Orleans

4  should also weigh in.

5    Q    Okay.  Have you made any effort to

6  determine how long it would take to complete the

7  repairs that you've identified as necessary?

8    A    No.  That was not part of my work.

9    Q    Okay.  Are you familiar with HUD

10  regulations dealing with total development cost?

11    A    I can't say that I am, no.

12    Q    Okay.  I may come back to St. Bernard, but

13  I'm going to go to the supplemental report first.

14  If you would look at your supplemental report which

15  is the big stack.

16    A    Yes.

17    Q    For the purposes of your cost estimates in

18  that report, how did you determine the quantities of

19  materials that require replacement?

20    A    Partly from calculations on my computer to

21  arrive at the overall areas, so for a unit, one

22  would be the raw area and then multiplying that by

77  (Pages 302 to 305)

JOHN EMMANUEL FERNANDEZ,    AUGUST 13, 2007

| Page 318 |
| --- |

BY MS. WISDOM:

1   BY MS. WISDOM:

2    Q   Is there other deficiencies that you can
3   tell me about sitting here right now?
4    A   No. I will have a list of those soon.
5    Q   I'm sure they'll be ready before Friday.
6    A   I don't -- what -- what does that refer
7   to?
8       MS. DIXON:  Nothing.
9       MS. WISDOM:  Okay.  Would you like to ask
10  your question?
11      MS. FARBY:  I would like to ask a few
12  questions.
13      MS. DIXON:  Well, I'd like to consult with
14  him to see if he has the time to do it today.
15      MS. FARBY:  Okay.
16      THE VIDEOGRAPHER:  We are going off the
17  record, 6:06 p.m.
18      (Brief Recess.)
19      THE VIDEOGRAPHER:  We are back on the
20  record, 6:10 p.m.
21      BY MS. WISDOM:
22    Q   In your costs, did you include monies for

| Page 319 |
| --- |

1   the entry door beyond the metal door and wood frame?
2    A   Yes.
3    Q   Okay.  Did you include new door hardware,
4   dead bolt, peephole hinges and weather stripping?
5    A   Yes, I did.
6    Q   Where did you include that?
7    A   In the door budget.
8    Q   Okay.
9    A   Metal door with wood frame.  Excuse me.
10    Q   Did you find that none of the interior
11  door or interior door frames were damaged?
12    A   No.
13    Q   Did you include work for interior door and
14  interior door frames?
15    A   I would have included that in the line
16  item 16:  Walls, plaster and metal lath.  Just
17  generally part of the wall system as the baseboards
18  are included.
19    Q   Okay.
20    A   There was my -- it was my notice that many
21  interior door frames were not damaged from
22  storm-related issues.

| Page 320 |
| --- |

1    Q   Did you notice peeling paint?
2    A   Anywhere?
3    Q   Door frames.
4    A   Peeling paint on door frames?
5    Q   Yeah.
6    A   Yes.
7    Q   Okay.  How do you plan to replace the
8   vinyl flooring without replacing the wall base
9   material?
10    A   I wasn't planning on doing it.
11    Q   Okay.  So you have included replacement of
12  wall base material in your cost estimates?
13    A   In the walls, yes.
14    Q   That's in the line item for walls?
15    A   That's right.
16    Q   Okay.  Can you describe for me the
17  quantities you used in the interior electrical
18  distribution heading?
19    A   Can you refer to a line item or -- an
20  interior electrical distribution, I don't -- I mean,
21  line item -- line item 20 is electrical distribution
22  with socket switches.

| Page 321 |
| --- |

1    Q   Okay.
2    A   And, for example, Lafitte, I've got 2,000
3   linear feet of that at $500 per linear foot at a
4   million dollars.
5    Q   Okay.  Did you include costs for new
6   furnaces for first floor units?
7    A   No.  That would be under appliances.
8   Well, sorry.  No, but I'm assuming that that would
9   be under appliances and would be under the
10  contingency as well.
11    Q   Okay.  Did you include costs for new
12  kitchen cabinets for first floor units?
13    A   No, I did not.
14    Q   Why not?
15    A   It wasn't clear to me in what budget the
16  cabinets would come out of.
17    Q   Okay.  So the cost for replacing them is
18  not included in your cost estimates?
19    A   No, it's not.
20    Q   Did you include costs -- well, this
21  is all mold remediation.  You included no costs for
22  mold remediation, right?

81 (Pages 318 to 321)

# Report for
# Housing Authority of New Orleans

Physical Condition Assessment of Lafitte, St. Bernard,
C.J. Peete and B.W. Cooper

Including

Rebuttal of expert testimony by John Fernandez,
Rebuttal of expert testimony of David Martinez

Report by:
Jeffrey Paris, AIA
Draper & Associates
Atlanta, Georgia

July 12, 2007

EXHIBIT
14

## Report: Housing Authority of New Orleans

### F. Rebuttal of the Fernandez Report

As detailed in the paragraphs above, Draper examined the condition of the developments well beyond the appearance of the exterior shell and brief glimpses inside the units. The inspection team consisted of experienced consultants, knowledgeable in HUD inspection methodologies. Draper used customized inspection spreadsheet programs and tablet PCs to approximate a HUD REAC inspection. Only by using HUD-defined review processes can one accurately assess the true condition of the units and buildings. HANO must conform to HUD's specific requirements and does not have the flexibility to run its housing developments in the manner of unregulated private property landowners.

The purpose of Draper's inspections was two-fold. The first objective was to confirm the contents of various HANO-supplied reports, such as the 2006 REAC inspection and others by independent consulting inspection firms. The second purpose was to compare the conditions to those contended by Fernandez. In doing so, Draper reviewed, measured, photographed, and compared the various building components with HUD and other government regulations.

The Fernandez report is based upon incomplete inspections and unsubstantiated assumptions. Fernandez failed to account for long-standing and new laws, regulations, and government mandates in his analysis of the appropriate remedies for the Big Four Developments. The inevitable result is a report filled with flawed and unreliable conclusions.

Fernandez appears to have reached his conclusions based only upon analysis of damage caused by hurricanes Katrina and Rita. Fernandez ignored both old and new environmental hazards. He disregarded HUD regulations and discounted obsolete infrastructure and utility service conditions. Fernandez did not take into account the long-term management of lead paint hazards and the increased potential lead exposure to residents and workers. Moreover, he failed to concede the truth that, as built today, the Big Four Developments do not provide accessible units for disabled residents as required by UFAS. Fernandez significantly underestimated the amount of effort, manpower, materials, and funds needed to make these units comply with these and numerous other applicable laws and regulations.

Furthermore, Fernandez fails to mention in his report the fact that there is no insulating material within the exterior wall construction of the Big Four Developments to buffer the residents from temperature extremes. The energy efficiency of these structures does not meet modern standards. The calculated R-factor for a solid masonry, eleven-inch thick exterior wall, similar to St. Bernard, is equivalent to R-3.6. The current Department of Energy recommended R-factor for the New Orleans area is R-13 for units with gas-fired heating systems and R-18 for units served by electrical heating systems. The Big Four's heavy masonry walls lack even the most basic insulation value and serve to keep the Authority's natural gas costs inflated. Additionally, the vapor barriers are not continuous or, in many cases, are not in functional condition. This means that air and radiant barriers, which Fernandez acknowledges are necessary, are non-existent in the Big Four Developments. (Money wasted to pay utility bills cannot be used elsewhere in the development for other services or assets.)

Paragraph 18.1 of his report provides another example of a faulty assumption that Fernandez relies upon to support his conclusions. Here Fernandez incorrectly assumes that the future

# Report: Housing Authority of New Orleans

construction methodology of the new housing developments will be substandard. To the contrary, however, building codes now mandate stronger materials, stronger joints, and stronger hold-down connections. (See, for example, the IBC 2000, Section 1609, Wind Loads, including Figure 1609, Basic Wind Speed, Western Gulf of Mexico Hurricane Coastline.) Furthermore, HANO has incorporated these construction methodologies in its construction of Florida, demonstrating HANO's commitment to provide safer environments in its new construction and to comply with the new building code mandates.

Further, in paragraphs 37-40 of the report, Fernandez professes that damage to the systems at C.J. Peete did not occur because the floodwaters failed to meet the first floor unit floor surfaces. While his cursory visual inspection might have allowed him to reach this conclusion, Fernandez failed to consider services originally located in crawlspaces and the building electrical service panels, which exist below the floor level and which were exposed to lengthy submersion. He discusses the significant damage to the buildings and to some units (post-Katrina and Rita) due to vandals and general neglect, but fails to consider the time, effort, and costs to replace or repair the pilfered building systems. In 2006 HUD scored this development with their lowest possible score, contradicting his view that "C.J. Peete weathered Katrina very well."

The shaky facts and inaccurate assumptions on which Fernandez bases his conclusions do not support his assertions that repairing the Big Four Developments is a viable option to meet family requirements, current building codes, and government mandates.

DRAPER & ASSOCIATES
ATLANTA – BIRMINGHAM – FT. LAUDERDALE

## Report: Housing Authority of New Orleans

### G. Ideal Repair Timeline

If HANO wanted to repair these housing developments, how long would it have taken?
This is a very difficult problem to assess accurately. There are many intangibles that cannot be quantified. It appears that the Plaintiffs want to ignore the region-wide devastation and pretend that HANO can develop a plan, assemble qualified contractors, accumulate funding, hire design and engineering support, locate appropriate building materials, and immediately remedy the storm damage at the Big Four Developments. One can only undertake the exercise to produce an ideal repair timeline if they:

- Assume a fully staffed HANO facility management and construction department that experienced none of the personal tragedies, relocation, or loss of information necessary to complete their work.
- Assume unlimited funding sources, which do not exist as of this date.
- Assume readily available building material sources.
- Assume that HANO material warehouses were not washed away and that 100 percent of the maintenance staff is available to assist in leading the repair crews around the housing developments.
- Assume available tradesmen trained and experienced to work in these environments: masons, plasterers, roofers, tile roofers, HVAC repair/replacement technicians, plumbers, and electricians ready and willing to work.
- Assume that there is housing available for these workers and HANO staff.

The HANO proposed cost of a basic remediation of these units (which will be examined later in this report) is about $135.2 million.

Previously, HANO staff were managing $3-4 million/month worth of work at Florida, Desire and miscellaneous other projects in the three months before Katrina. If the same effort were exerted to immediately repair the Big Four Developments and produce no other work at other housing developments, the remediation effort alone would take approximately 34 months, with work concluding on or about May 2009. A sample schedule of events is provided in **Exhibit VII.H.**

*DRAPER & ASSOCIATES*
ATLANTA – BIRMINGHAM – FT. LAUDERDALE

Page 1

1               UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4   YOLANDA ANDERSON, et. al.,      )

                                    )

5            Plaintiffs,            )  CIVIL ACTION NO.

                                    )  06-3298

6   VS.                             )  SECTION "B"

                                    )  JUDGE LEMELLE

7   ALPHONSO JACKSON, et. al.       )  MAGISTRATE 5

                                    )  MAG. CHASEZ

8            Defendants.            )

9

10

11

12

13       Videotaped deposition of ELIAS

14   CASTELLANOS, taken on Friday, June 22, 2007,

15   in the office of Stone Pigman Walther

16   Wittmann, 546 Carondelet Street, New

17   Orleans, Louisiana, commencing at 9:16.

18

19

20

21

22

23

    Reported By:

24       BRENDA R. BREAUX

         CERTIFIED COURT REPORTER

25       REGISTERED PROFESSIONAL REPORTER

EXHIBIT

ELIAS CASTELLANOS, JUNE 22, 2007

Page 11

```
 1    HANO Exhibit 23.  We believe that is the

 2    correct exhibit number.

 3                 Sir, what is your current job

 4    title at HANO?

 5       A.    I am the CFO for HANO.

 6       Q.    How long have you been in that

 7    position?

 8       A.    Since approximately October of

 9    2006.

10       Q.    Do you serve in that capacity as

11    an independent contractor?

12       A.    Yes.

13       Q.    And who is your contract with

14    HANO between?

15       A.    It is between my firm, Caballero

16    and Castellanos, and the Housing Authority.

17       Q.    I'm sorry?

18       A.    Caballero and Castellanos.

19       Q.    Could you spell that?

20       A.    C-A-B-A-L-L-E-R-O and

21    Castellanos.

22       Q.    So are there other members of

23    your firm that are being used to identify

24    financial resources for HANO other than

25    yourself?
```

ELIAS CASTELLANOS, JUNE 22, 2007

Page 105

```
 1              would provide advice.  But they
 2              don't make, you know, they don't
 3              have the decision-making power.
 4   BY MS. FITZSIMMONS:
 5         Q.    Was any of the insurance proceeds
 6   spent on repairs for existing units?
 7         A.    For existing public housing
 8   units?
 9         Q.    Correct.
10         A.    No.  Like I said, most of the
11   money that came in was tied to those,
12   because we had higher insurance limits on
13   those properties because of the bonds and
14   the investors.  Therefore, most of the money
15   that came in was tied to those new
16   developments.  Very little money came in on
17   the public housing properties, because it's
18   difficult to insure those properties.
19         Q.    What do you mean by that?
20         A.    It's very difficult to find
21   insurance on those properties because of the
22   risk.  I know a number of Housing
23   Authorities, not just here, but in Florida,
24   where they cannot find insurance for the
25   public housing units.
```

ELIAS CASTELLANOS, JUNE 22, 2007

Page 144

```
 1    The Go Zone credits are the 2007 credits.
 2         Q.    Okay.
 3         A.    And what they did was they
 4    extended.  They went back and even the 2006,
 5    they -- they gave some -- some flexibility
 6    in placed-in-service dates for the Housing
 7    Authorities -- not Housing Authorities, I'm
 8    sorry, for all applicants of tax credits,
 9    because they want to, you know, based on
10    what they published facilitate the housing
11    in this region.
12         Q.    So the placed-in-service date for
13    the 2006 tax credits is now December 2010?
14         A.    Yes.
15         Q.    Is that the same
16    placed-in-service date for the 2007 credits?
17         A.    Gosh, I don't remember off the
18    top of my head.
19         Q.    Okay.
20               And what does placed in service
21    mean?
22         A.    Placed in service means that you
23    have substantially completed the
24    construction of the property and it's
25    basically in service and ready for
```

Page 145

```
 1    habitation, and you're actually leasing the

 2    property; you've met, you know, the -- the

 3    local law requirements for occupancy.  The

 4    property is pretty much ready for housing.

 5          Q.    Does it require the tenants or

 6    public housing residents, whoever is going

 7    to be living in these properties, to

 8    actually be living in the unit as of that

 9    day or that --

10          A.    No.

11          Q.    -- just that the unit is ready

12    for occupancy?

13          A.    No, it's ready for occupancy.

14    You have to have started at least some

15    occupancy measures.

16          Q.    What do you mean by "occupancy

17    measures"?

18          A.    Waiting lists, advertising.

19          Q.    Do you know what the

20    placed-in-service date is for the 2005 tax

21    credits?

22          A.    2005?  I'm not sure.  Do we even

23    have 2005?  I don't know.  I mean, I -- I

24    believe that the ones that we had up were

25    River Garden started back in 2003.  And
```

Page 151

1    who sat next to you on your flight here.

2         Q.    I don't know.

3         A.    Huh?  You don't know, exactly.

4         Q.    Okay.  So for the 2007 tax

5    credits, did CSG, to your knowledge, put

6    together those?

7         A.    Yes, they did.  They supported

8    it.

9         Q.    Okay.  And, again, but they were

10   submitted by HANO?

11        A.    They were submitted by HANO.

12        Q.    And do you know how much HANO was

13   awarded for 2007 or has it been awarded?

14        A.    2007, the tax credits have been

15   awarded on the four major properties, which

16   are St. Bernard, CJ Peete, Lafitte, and BW

17   Cooper.

18        Q.    But again, you don't know how

19   much was awarded?

20        A.    No, not off the top of my head.

21   I do, you know, I received information on it

22   on the applications.  I had those.  I looked

23   at them several times, but I did not

24   memorize those numbers.

25        Q.    Okay.  And are there use

ELIAS CASTELLANOS, JUNE 22, 2007

Page 152

1    restrictions on these tax credits?

2        A.    Oh, yeah.

3        Q.    Okay.  What are those?

4        A.    Whatever is in the application.

5    When you submit the application, you outline

6    how you're going to use all the resources.

7    And that application is not only submitted

8    to Louisiana Housing Finance Authority, it's

9    also submitted to the IRS and HUD.

10       Q.    Are there use restrictions

11   imposed on the applicants by the state?

12            MS. WISDOM:

13                Object to the form of the

14            question.

15                Go ahead.

16            THE WITNESS:

17                "By the state," what do you

18            mean?

19   BY MS. FITZSIMMONS:

20       Q.    Well, these applications are

21   being submitted to the state?

22       A.    Yes.

23       Q.    So you said that there are use

24   restrictions based on how the applicant has

25   indicated that it's going to use the funds?

Page 153

```
 1        A.     Well, yes.  I mean, you know,
 2   there are following IRS guidelines.  Because
 3   the IRS is a final-determining party.
 4   Because if the IRS deems us to be in
 5   default, then all of the -- all the tax
 6   credits are issued to be recaptured.  So the
 7   state is responsible for monitoring
 8   compliance on an annual basis at their
 9   review of the properties.  But they're
10   following, you know, guidelines that they
11   put in place based on IRS regulations or
12   requirements.
13        Q.     But the state itself does not
14   require the applicant to use the funds for
15   mixed income tax developments --
16              MS. WISDOM:
17                   Object to the form of the
18              question.
19                   Go ahead.
20   BY MS. FITZSIMMONS:
21        Q.     -- is that correct?
22        A.     I don't understand the question.
23        Q.     Well, let's say a developer
24   applies for a tax credit.
25        A.     Uh-huh.  Yes.
```

ELIAS CASTELLANOS, JUNE 22, 2007

Page 154

1      Q.    And has indicated that it's going

2   to build a mixed income development --

3      A.    Yes.

4      Q.    -- with some market rate housing.

5      A.    Yes.

6      Q.    That does -- that is their

7   decision to do so, correct?

8            MS. WISDOM:

9                 Object to the form of the

10                question.

11           THE WITNESS:

12                The application is -- is

13                based on two things; the decision

14                of the developer, but also on the

15                nature of the credits that are

16                available.  But the decision of

17                the developer still has to tie

18                back to the proforma budgets that

19                are put together, because

20                conducive to an application, you

21                have to put together a proforma

22                that will show how the property

23                will exist.  So the mix of units

24                is conditionally conditioned on

25                that budget.  You have to make

Page 155

1              sure that property will survive.

2              If it can't, then it will not be

3              approved.  So what you have to do

4              is you have to look at the

5              requirements outlined by the

6              LHFA, which are a direct link to

7              the IRS rules and guidelines.

8              And you have to find an

9              appropriate mix of affordable and

10             market rate units that will

11             support it.

12                 The whole intent of the

13             market rate units is to help

14             subsidize affordable units.  So

15             the mix is really for all intent

16             and purposes, not at the

17             discretion of the developer.

18   BY MS. FITZSIMMONS:

19        Q.    They basically need those to make

20   budgets; is that what you are saying?

21        A.    They need those to keep the

22   property alive.  To even make it pass the

23   application process, they need them.

24        Q.    Okay.

25                 Is there an expiration for the

ELIAS CASTELLANOS, JUNE 22, 2007

Page 175

1      Q.    But not operating fund, not for

2   this purpose?

3      A.    No.  It goes back to my previous

4   answer.  You could use operating fund for

5   housing-related purposes.  We don't have

6   it.

7      Q.    Right, right, right.

8      A.    It' that simple.  You know, if

9   the question is could we use it, the answer

10   is yes.  But going back to HANO, the funds

11   are not available.  Therefore, it doesn't

12   matter what we can use it for, because we

13   just don't have available funds.

14      Q.    And next one is "CDBG funds"?

15      A.    We made a request for CDBG funds,

16   and to date it has not been honored.

17      Q.    Now, is this related to the tax

18   credits or is this a separate -- a separate

19   fund?

20      A.    Well, part -- the way you're

21   looking at it here is, since this document

22   you provided me was put together, there was

23   nothing on piggyback, there's nothing on the

24   extensions.  You have to understand that

25   things have changed.  So to go back and ask

ELIAS CASTELLANOS, JUNE 22, 2007

Page 211

```
 1              funding and operations.
 2                   And funding is key.  You
 3              have to understand funding is key
 4              and critical.  Because if -- if
 5              we delay tax credits, then that
 6              means we have to take out other
 7              conventional financing, and
 8              what's tied to that is initiation
 9              fees and interest, which is not
10              budgeted for.  And when we're
11              talking about that level of
12              dollars that we're talking about
13              for these properties, you know,
14              you factor in six, seven percent
15              on a $50 million loan that was
16              not budgeted, it creates a huge
17              deficit, across your budget.
18     BY MS. FITZSIMMONS:
19          Q.    The last sentence of that
20     paragraph says:  THE HUD subsidy is already
21     maxed at the Big 4 development projects.
22          A.    Yes.  What that means, what -- I
23     believe what that means, based on analysis
24     of, you know, the performance, again, to go
25     back when we discussed on why we have to
```

ELIAS CASTELLANOS, JUNE 22, 2007

Page 212

1    have market rate, based on the mix of units

2    that we had, we try to maximize revenues by

3    unit in order to show how it can cover

4    operating expenses.  And based on

5    assumptions, because we have so many

6    affordable units that we have to maximize

7    the subsidy that we can earn per those units

8    so that the market rate units have to cover

9    less of the cross costs.  We call it cross

10   subsidization.

11        Q.    Cross utilization?

12        A.    Subsidization.  And if there's

13   less market rate units, there's less extra

14   money to cover the deficits or the -- the

15   shortages created by the affordable units.

16        Q.    Could you repeat that.

17        A.    Okay.  If you have less market

18   rate units, then you're saying you have less

19   units at a higher tier of rent.  And because

20   the affordable  units on their own cannot

21   support the cost of maintaining those

22   properties, when you have a lower level of

23   market rate units, there's less money, extra

24   money, by those higher rents available to

25   cover those -- those costs, the deficits

Page 213

1    generated by the affordable units.  So we

2    have to maximize the subsidy in order to try

3    to cover that shortfall.

4           And the problem we have is with

5    the appropriations for this year, Congress

6    is only funding 79 percent of need -- 78

7    percent of need, which means if you needed

8    $1,000 to pay your bills, if you needed to

9    make $1,000 to pay your bills, Congress

10   would only give $780.  And that's what we're

11   facing this year already.  And indications

12   are that it's not going to get any better,

13   but it likely could get worse next year.

14       Q.    Is the reduction in congressional

15   funding part of the reason that HANO is

16   moving to this mixed income formula?

17       A.    HANO is moving in this direction

18   in light of every other agency having to

19   find another viable resource.  The decreased

20   funding is impacting housing across the

21   country.  But, you know, we have to use what

22   we can.  And indirectly you could say so.  I

23   mean, if the money is not there to redevelop

24   the units, then we have to find another

25   source.  So indirectly the answer would have

# STONE PIGMAN WALTHER WITTMANN L.L.C.

### COUNSELLORS AT LAW

546 CARONDELET STREET
NEW ORLEANS, LOUISIANA 70130-3588
(504) 581-3200
FAX (504) 581-3361
www.stonepigman.com

OUR FILE NUMBER

RACHEL W. WISDOM
DIRECT DIAL: (504) 593-0911
DIRECT FAX: (504) 596-0911
E-Mail: rwisdom@stonepigman.com

62,220

July 6, 2006

**Tracking # 7919 8845 2119**
**VIA FEDEX**

Colonel Perry J. Smith
Acting Assistant Secretary
Louisiana Department of Security
7667 Independence Boulevard
Baton Rouge, Louisiana 70806

> Re:    Housing Authority of New Orleans
>          Public Assistance I.D. No. 071-U8M7N-00
>          Appeals of FEMA determinations PW 5004, PW 5161, PW 5449, and
>          PW 7869

Dear Colonel Smith:

I am the designated agent for Public Assistance for the Housing Authority of New Orleans ("HANO") and send this letter and enclosures on HANO's behalf to appeal from denials or partial denials of reimbursement requests set forth in four HANO project worksheets (PW 5004, PW 5161, PW 5449, and PW 7869), as is more fully set forth below.

## I.    BACKGROUND

HANO is a local public authority established under state law to provide low-income housing and other related essential community services to qualified, low-income persons residing in Orleans Parish. Prior to the storm, HANO was the single largest landlord in New Orleans: Its properties, which exceed 400 acres in area, are the sites of more than 7,000 residential units that formerly housed approximately 35,000 low-income people. A large majority of HANO's 7,000 public housing units were severely damaged by the storm. Currently, HANO estimates that its properties sustained in excess of Two Hundred Million Dollars ($200,000,000.00) in damages from the storm.

Due to FEMA's interpretation of FEMA policy no. 9523.7 and a related memorandum, HANO currently has no disaster assistance funding for about One Hundred Eighty Million Dollars of these damages. According to FEMA's interpretation, HANO does not receive any Section 406 Category E permanent repair assistance. FEMA's position is that it may only reimburse HANO for Section 403 essential assistance, Categories A and B work (debris removal and emergency protective measures).



EXHIBIT

7664v.1

HANO 033633

STONE PIGMAN WALTHER WITTMANN L.L.C.

PAGE

2

July 6, 2006

While denying HANO any assistance with Section 406 permanent repair and restoration, FEMA now seeks to further reduce the small funding it makes available to HANO by arbitrarily assuming that the relatively small amount of insurance monies that HANO may receive will NOT be applied to the estimated $180,000,000.00 in permanent repair costs for which HANO has no disaster assistance available. Rather, with no support, FEMA has applied all of the insurance monies it anticipates HANO may receive to reduce the small amount of emergency work funding FEMA makes available to HANO under Section 403. The end result is that rather than preventing "duplication of benefits" to HANO, FEMA is eliminating or severely reducing the disaster assistance to HANO, and is specifically reducing and eliminating benefits that are not duplicated by any other source. Such a result is contrary to both the intent and express provisions of the Stafford Act.

## II. FEMA'S DENIAL OF SECTION 406 PERMANENT REPAIR ASSISTANCE TO HANO IS CONTRARY TO LAW

First, FEMA's denial to HANO of all section 406 permanent repair assistance contradicts the express language of the Stafford Act and frustrates the purpose of the public assistance program established by Congress there under. Congress's declared purpose in establishing the disaster assistance scheme outlined in the Stafford Act is to assist local governments and disaster-affected citizens in prevention of and recovery from losses caused by presidentially declared disasters. *See* 42 U.S.C. § 5121.[1] To avoid the possibility of disaster assistance recipients having a "double recovery" by virtue of other assistance programs and benefits such as insurance, Congress included section 312,[2] which prohibits "duplication of benefits." Section 312 declares in pertinent part that no public assistance applicant may receive disaster assistance "with respect to any part of such loss as to which [it] has received financial assistance under any other program or from insurance or any other source." 42 U.S.C. § 5155(a).

However, section 312 of the Stafford act also specifically declares that its prohibition against duplication of benefits SHALL NOT be applied to deny assistance for which a disaster recipient has no funding from any alternate program or source. It states: "Receipt of partial benefits for a major disaster or emergency *shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided.*" 42 U.S.C. § 5155(b)(3)(*emphasis added*). In contradiction of this express command, FEMA has denied all permanent repair assistance to HANO even though it is not disputable that HANO has

---

[1]    The public assistance program was established by Congress through the Stafford Act to provide federal disaster relief assistance to local governmental entities and private non-profits. Public housing authorities ("PHAs") such as HANO are among those local governments the program was instituted to assist. 42 U.S.C. § 5122(6)(A). (HANO is a "local public authority.").

[2]    Section 311 of the Stafford Act requires disaster assistance recipients to insure facilities for which they receive section 406 funding and is therefore not applicable here.

817664v.1

HANO 033634

STONE PIGMAN WALTHER WITTMANN L.L.C.

PAGE
   3

July 6, 2006

no funding from any other source for about $150 Million Dollars of damages it sustained to its facilities.[3] The Stafford Act's disaster assistance program was designed to provide assistance to local government in exactly the circumstances that HANO faces now — where it cannot recover from disaster-caused losses because of a deficit in financial resources. Therefore, FEMA's blanket denial of section 406 relief to HANO is contrary to law.

It also appears that the denial may arguably violate the Stafford Act's anti-discrimination provision set forth in 42 U.S.C. § 5151(a). HANO is unique among local governmental bodies in New Orleans because it provides housing and services to the poorest people in the City. However, unlike all of the other public entities in the City, precisely because HANO is a public housing authority ("PHA"), FEMA is denying to HANO the vast majority of possible disaster assistance available, based upon FEMA's interpretation of FEMA policy number 9523-7.[4] Thus, FEMA's interpretation or application of policy number 9523-7 arguably discriminates against low-income persons by denying recovery monies to the agency charged with proving low-income housing to them.

Finally, FEMA's interpretation and application of policy number 9523-7 in this disaster is incorrect. At the outset, it should be noted that for previous disasters FEMA has covered the short-fall in HUD disaster assistance and other funding available to PHAs, such as the PHA in Brownsville, North Carolina.[5] Indeed, in this disaster, FEMA originally obligated permanent repair work for other PHAs in the area (Westwego and Kenner), but after HANO complained that it too should receive such assistance, FEMA de-obligated permanent repair work funding for those PHAs. Thus, it is clear that on other occasions, FEMA has not interpreted or applied the policy to disallow assistance to cover PHA losses for which no HUD disaster funds are available. Nonetheless, FEMA has refused to do that for HANO for this disaster where the need is dire.

---

[3]      HANO's damages exceed $200 million. It has less than $21 million in HUD Disaster funds for permanent repairs, has received a total of about $17 Million insurance monies for wind and flood damage and expects to receive about $12 Million additional insurance monies for wind damage. It also should be noted that most of the insurance monies paid to HANO are from policies covering the newer mixed financed developments such as Abundance Square, which FEMA has deemed ineligible for other reasons. Thus, HANO will have no insurance or HUD funding for the overwhelming majority of its losses — leaving approximately $150 Million dollars in permanent repair and emergency costs unfunded from any source.

[4]      A copy of policy number 9523-7 and the related memorandum are appended hereto as "Attachment 1."

[5]      *See also* the copy of the April 28, 2003 FEMA "Memorandum for Regional Public Assistance Personnel" appended hereto as "Attachment 2," which states in the paragraph numbered "1" that "[w]hen disaster assistance is denied by HUD, PHAs may apply directly to FEMA for disaster assistance in all categories of work."

817664v.1

HANO 033635

STONE PIGMAN WALTHER WITTMANN LLC.

PAGE
4

July 6, 2006

Moreover, the words of the policy and the related memorandum issued by FEMA show that the policy was not originally intended to eliminate public assistance for permanent repair where HUD disaster funding is not available. Section 6, paragraph 2, of policy number 9523.7 specifically states, "[i]t was not the intent of the MOU or this Policy to deny disaster assistance to otherwise eligible publicly-subsidized housing facilities." Paragraph 1 of Section 6 similarly declares that the policy is intended "to ensure that all publicly-subsidized housing facilities have access to appropriate Federal assistance following major disasters. This policy does not result in a significant reduction in assistance for publicly-subsidized housing facilities." Furthermore, the related Memorandum, attached to Policy No. 9523.7, was intended to "coordinate" FEMA and HUD relief so as to "ensure access by our Nation's PHAs to appropriate Federal assistance following major disasters to help with immediate and long term recovery."[6]

In sum, FEMA's interpretation or application of Policy no. 9523.7 and the attached Memorandum is inconsistent with its previous interpretations or applications of these same documents and contradicts the documents' expressly stated purpose and intent. In addition, FEMA's current interpretation and the resulting denial to HANO violate the Stafford Act's command that "[r]eceipt of partial benefits for a major disaster or emergency *shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided.*" 42 U.S.C. § 5155(b)(3)(*emphasis added*). Therefore, FEMA's denial of permanent repair assistance to HANO is in error and should be reversed.

III.  **FEMA'S REDUCTION OR ELIMINATION OF SECTION 403 EMERGENCY WORK FUNDING FOR "ANTICIPATED INSURANCE PROCEEDS" IS ARBITRARY AND CONTRARY TO LAW**

PWs 5161 & 5449 request reimbursement for Emergency Protective Work ("Category B"), as authorized by § 403 of the Stafford Act. 42 U.S.C. § 5170b. PW 5004 requests reimbursement for Emergency Demolition Work that is likewise authorized by § 403 of the Stafford Act. 42 U.S.C. § 5170b.

Although it is not clear from the information provided to HANO, it appears that FEMA denied these requests by HANO due to an unspecified amount of "anticipated insurance proceeds" and/or "Mandatory insurance reductions.[7]"  However, such denial of HANO's Category B Emergency Protective Work reimbursement requests is not supported by either Section 403 Stafford Act (the section authorizing reimbursement for Emergency Protective Measures), or the corresponding regulations. Indeed, as set forth in more detail below, these denials are contrary to both the intent and the express language of the applicable Stafford Act provisions. Therefore, these denials were improper and should be reversed.

---

[6]    See the last paragraph on page 2 of the Memorandum which follows the copy of policy 9523-7 appended hereto as Attachment 1.

[7]    See "Attachment 2" -- email notices from the State of Louisiana regarding the denials and/or reduction of the reimbursement requests by HANO in Project Worksheet numbers 5004, 5161, and 5449.

817664v.1

HANO 033636

Section 406 of the Stafford Act (42 U.S.C. § 5172) and its provisions regarding insurance by their express terms do not apply to HANO's request for reimbursement for § 403 emergency protective work. Section 406 addresses only permanent "repair, restoration, reconstruction, or replacement of . . . public facilit[ies]" 42 U.S.C. § 5172(a)(1)(A).

In contrast, section 403 of the Stafford Act [42 U.S.C. § 5170b] sets forth the requirements for reimbursement of essential assistance or emergency protective work. It says nothing about reduction or elimination of assistance for such work due to "anticipated insurance proceeds." Likewise, except for those that may mirror Section 312's requirement that there be no duplication of benefits, the regulations relied upon by FEMA by their express terms apply only to Section 406 permanent repair work. For example, 44 C.F.R. 206. 250(a) clearly states, "[t]he requirements of this subpart apply to all assistance provided pursuant to section 406 of the Stafford Act" and 44 C.F.R. 206.252 states, "assistance pursuant to section 406 of the Stafford Act shall be reduced." No statute or regulation authorizes such requirements with regard to essential assistance funded under section 403 of the Stafford Act.

Instead, the only provision of the Stafford Act or the corresponding regulations that apply to HANO's emergency protective work is Section 312 of the Stafford Act. However, section 312 of the Stafford Act specifically states that "[r]eceipt of partial benefits for a major disaster or emergency shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided." Its only requirement is that the monies granted for public assistance **not duplicate other benefits received by the applicant.** Here, because FEMA has denied HANO all permanent repair work reimbursement, the small funds received by HANO for insurance monies is being credited by HANO against the huge amount it must pay for the unfunded permanent repair work. As noted above, HANO will nonetheless receive no insurance monies or HUD disaster assistance for about $150 Million of its damages.

Notwithstanding these facts, FEMA is arbitrarily assuming that HANO's emergency protective measure work is or will be paid for from the smalls sums HANO may receive in insurance. However, since HANO is crediting its insurance proceeds against permanent repair work, the costs associated with HANO's emergency protective work are instead among the vast majority of HANO's damages that are not only beyond policy limits but for which HANO has no Federal disaster assistance or funding from any source. For FEMA to arbitrarily assume otherwise to reduce the already small amount of funding available to HANO is not only unfair, but is directly contrary to the Stafford Act's command that, "Receipt of partial benefits for a major disaster or emergency shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided."

## IV.    PW 5004 (DEM 06) DEMOLITION PROJECT WORKSHEET

FEMA denied HANO's reimbursement request for emergency demolition of the HANO properties at 410 A-M Pleasant Street and 1866, 1868, 1870, and 1872 N. Miro Street on the grounds that the work is "ineligible due to anticipated insurance."

HANO 033637

# ATTACHMENT 1

HANO 033639

 FEMA

## 9523.7 Public Housing Authorities (PHAs)

1. Date Published: April 14, 2003

2. Recovery Division Policy Number: 9523.7

3. Title: Public Housing Authorities (PHAs)

4. Purpose: The attached memorandum of understanding (MOU) is being numbered as part of the Federal Emergency Management Agency (FEMA) Public Assistance Program policy publication system. It states the policy that FEMA and the Department of Housing and Urban Development (HUD) have agreed to with regard to funding the repair of PHA facilities that are damaged by a major disaster, as declared by the President.

5. Scope and Audience: This policy is applicable to PHA facilities that were developed or modernized with funds provided under Section 9(k) of the Housing Act of 1937, as amended, and is applicable to all major disasters declared after January 8, 2001. It is for use by FEMA personnel making public assistance eligibility determinations for the Public Assistance Program.

6. Background: Although HUD has specific authority under Section 9(k) of the U.S. Housing Act of 1937, as amended, to provide funds for the repair of disaster damaged PHA facilities, FEMA has generally funded these costs in the past. FEMA and HUD developed the attached agreement to eliminate confusion among the respective agencies and applicants and to ensure that all publicly-subsidized housing facilities have access to appropriate Federal assistance following major disasters. This policy does not result in a significant reduction in assistance for publicly-subsidized housing facilities.

   Since issuing this policy in March 2001, FEMA has learned that not all publicly-subsidized housing facilities are eligible for disaster assistance funding from HUD. Specifically, HUD is only authorized to provide disaster assistance to publicly-subsidized housing facilities that were developed or modernized using funds provided under Section 9(k) of the U.S. Housing Act of 1937, as amended. Publicly-subsidized housing facilities that were developed and financed from other sources, such as other HUD programs (e.g., Section 8, FHA Mortgage Insurance, etc.) or funds provided by cities, do not qualify for HUD disaster assistance. It was not the intent of the MOU or this Policy to deny disaster assistance to otherwise eligible publicly-subsidized housing facilities. Therefore, publicly-subsidized housing facilities that do not qualify for disaster assistance from HUD may apply directly to FEMA for public assistance grants under any category of work, including Section 406 permanent repairs.

   Furthermore, American Indian and Alaskan Native Tribal organizations that own and/or operate public housing facilities are not eligible for HUD disaster assistance. These groups do not fall under the authority of the Housing Act of 1937, but are subject to separate legislation addressing their special circumstances. Since the Federal law governing Indian housing has no provisions for emergency or disaster-related funding, American Indian and Alaskan Native PHAs may apply directly to FEMA for disaster assistance.

HANO 033640

FEMA approves as eligible, FEMA generally provides 75 percent of the cost of the work. For work FEMA does not approve, the PHA may appeal FEMA's decision in accordance with 44 CFR 206.206.

For PHAs' disaster recovery costs not covered by insurance and essential assistance from FEMA, HUD will provide funding from the capital public housing reserve authorized by section 9(k) of the United States Housing Act of 1937, authority, as amended (42 U.S.C. 1437g(k)), or similar statutory authority, subject to the availability of appropriations. Each PHA that incurs damage in excess of insurance coverage and essential assistance from FEMA from a Presidentially declared disaster is responsible for submitting a funding request to HUD.

- The PHA must submit its request to the local HUD field office (FO) after determining the amount of funds to be provided from insurance and other sources.
- To substantiate the extent of the damage and its request for funds, the PHA may include pictures, a videocassette, engineering surveys, etc.
- The HUD field office at its option, may conduct an on-site inspection or issue a task order to the Corps of Engineers (COE), with whom HUD has an interagency agreement, for such an inspection to verify the PHA's request for funds, e.g., need and cost.
- Within 14 calendar days of receipt of the PHA's request, the FO must complete its review and forward its recommendation for approval, with the PHA's request, to HUD headquarters for review and final decision.
- If the request is approved, HUD headquarters will notify the FO when funds have been assigned for the PHA and the FO will process the PHA's application, reserve the funds and execute an Annual Contributions Contract Amendment.
- If the FO does not recommend approval of the PHA's request the FO shall disapprove the request and notify the PHA in writing, including the reasons for disapproval.
- The PHA may appeal a FO's disapproval to HUD headquarters for a review and final determination.
- Funds received for damages resulting from a disaster do not require repayment.

We are pleased to announce this new public housing disaster assistance policy. It should ensure access by our Nation's PHAs to appropriate Federal assistance following major disasters to help with immediate and long-term recovery. If you have any questions, please call Patricia Stahlschmidt, Director, Infrastructure Division, FEMA, at (202) 646-4066 or William Flood, Director, Office of Capital Investments, HUD, at (202) 708-1640.

HANO 033643



HANO 033644



HANO 033646

McCreary, Jackie

---

From:          support@louisianapa.com
Sent:          Wednesday, May 10, 2006 12:25 PM
To:            McCreary, Jackie
Subject:       LouisianaPA.com: Project Note

Dear Jackie McCreary,

A note for PW 5449 (EB248) for 1603 - Housing Authority of New Orleans has been recorded
in LouisianaPA.com by a State official:

-- Gail Rhines - May 10, 2006 on 12:23 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance,
please feel free to contact me Gail Rhines @ 225-376-5415 or
gail.rhines@associates.dhs.gov


=== Note History ========================

-- Gail Rhines - May 10, 2006 on 12:23 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance,
please feel free to contact me Gail Rhines @ 225-376-5415 or
gail.rhines@associates.dhs.gov


=========================================

Please contact your State Public Assistance Coordinator with any questions:
    Name: Bill Patrigo
    Phone: N/A
    Email: wpatrigo@wittassociates.com


Louisiana Office of Homeland Security and Emergency Preparedness http://louisianapa.com

1

HANO 033647

·McShan, Deborah L.

| | |
|---|---|
| **From:** | support@louisianapa.com |
| **Sent:** | Wednesday, May 10, 2006 12:31 PM |
| **To:** | McCreary, Jackie |
| **Subject:** | LouisianaPA.com: Project Note |

Dear Jackie McCreary,

A note for PW 5161 (EB-213) for 1603 - Housing Authority of New Orleans has been recorded in LouisianaPA.com by a State official:

-- Gail Rhines - May 10, 2006 on 12:29 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance, please feel free to contact me Gail Rhines @ 225-376-5415 or gail.rhines@associates.dhs.gov

=== Note History ========================

-- Gail Rhines - May 10, 2006 on 12:29 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance, please feel free to contact me Gail Rhines @ 225-376-5415 or gail.rhines@associates.dhs.gov

====================================================

Please contact your State Public Assistance Coordinator with any questions:
    Name: Bill Patrigo
    Phone: N/A
    Email: wpatrigo@wittassociates.com

Louisiana Office of Homeland Security and Emergency Preparedness http://louisianapa.com

1

HANO 033648

**McShan, Deborah L.**

| | |
|---|---|
| **From:** | support@louisianapa.com |
| **Sent:** | Wednesday, May 10, 2006 12:27 PM |
| **To:** | McCreary, Jackie |
| **Subject:** | LouisianaPA.com: Project Note |

Dear Jackie McCreary,

A note for PW 5004 (ODEM006) for 1603 - Housing Authority of New Orleans has been recorded in LouisianaPA.com by a State official:

-- Gail Rhines - May 10, 2006 on 12:25 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance, please feel free to contact me Gail Rhines @ 225-376-5415 or gail.rhines@associates.dhs.gov

=== Note History ==========================

-- Gail Rhines - May 10, 2006 on 12:25 PM --

Due to anticipated insurance, your PW is ineligible. If you need further assistance, please feel free to contact me Gail Rhines @ 225-376-5415 or gail.rhines@associates.dhs.gov

==================================================

Please contact your State Public Assistance Coordinator with any questions:
    Name: Bill Patrigo
    Phone: N/A
    Email: wpatrigo@wittassociates.com

Louisiana Office of Homeland Security and Emergency Preparedness http://louisianapa.com

1

HANO 033649

# STONE PIGMAN WALTHER WITTMANN L.L.C.

## COUNSELLORS AT LAW

546 CARONDELET STREET
NEW ORLEANS, LOUISIANA 70130-3588
(504) 581-3200
FAX (504) 581-3361
www.stonepigman.com

OUR FILE NUMBER

RACHEL W. WISDOM
DIRECT DIAL: (504) 593-0911
DIRECT FAX: (504) 596-0911
E-Mail: rwisdom@stonepigman.com

62,220

October 31, 2006

<u>Tracking # 792875193787</u>
<u>VIA FEDEX</u>

Colonel Perry J. Smith
Acting Assistant Secretary
Louisiana Department of Security
7667 Independence Boulevard
Baton Rouge, Louisiana 70806

   Re: Housing Authority of New Orleans
     Public Assistance I.D. No. 071-U8M7N-00
     <u>Appeal of FEMA determination PW 9358</u>

Dear Colonel Smith:

   I am the designated agent for Public Assistance for the Housing Authority of New Orleans ("HANO") and send this letter and enclosures on HANO's behalf to appeal from a denial of the reimbursement request set forth in HANO Project Worksheet 9358, as is more fully set forth below.

## I. BACKGROUND

   HANO is a local public authority established under state law to provide low-income housing and other related essential community services to qualified, low-income persons residing in Orleans Parish. Prior to the storm, HANO was the single largest landlord in New Orleans. Its properties, which exceed 400 acres in area, are the sites of more than 7,000 residential units that formerly housed approximately 35,000 low-income people. A large majority of HANO's 7,000 public housing units were severely damaged by the storm. Currently, HANO estimates that its properties sustained in excess of Two Hundred Million Dollars ($200,000,000.00) in damages from the storm.

   Due to FEMA's interpretation of FEMA policy number 9523.7 and a related memorandum, HANO currently has no disaster assistance funding or insurance benefits for about One Hundred Fifty Million Dollars of these damages. According to FEMA's interpretation, HANO does not receive any Section 406 Category E permanent repair assistance. FEMA's position is that it may only reimburse HANO for Section 403 essential assistance, Categories A and B work (debris removal and emergency protective measures).

837246v.1

HANO 033650

STONE PIGMAN WALTHER WITTMANN L.L.C.

PAGE

2

October 31, 2006

## II.    FEMA'S DENIAL OF SECTION 406 PERMANENT REPAIR ASSISTANCE TO HANO IS CONTRARY TO LAW

FEMA's denial to HANO of all section 406 permanent repair assistance including that set forth in HANO PW 9358 contradicts the express language of the Stafford Act and frustrates the purpose of the public assistance program established by Congress thereunder. Congress's declared purpose in establishing the disaster assistance scheme outlined in the Stafford Act is to assist local governments and disaster-affected citizens in prevention of and recovery from losses caused by presidentially declared disasters. *See* 42 U.S.C. § 5121.[1]  To avoid the possibility of disaster assistance recipients having a "double recovery" by virtue of other assistance programs and benefits such as insurance, Congress included section 312,[2] which prohibits "duplication of benefits."   Section 312 declares in pertinent part that no public assistance applicant may receive disaster assistance "with respect to any part of such loss as to which [it] has received financial assistance under any other program or from insurance or any other source." 42 U.S.C. § 5155(a).

However, section 312 of the Stafford act also specifically declares that its prohibition against duplication of benefits SHALL NOT be applied to deny assistance for which a disaster recipient has no funding from any alternate program or source.  It states: "Receipt of partial benefits for a major disaster or emergency *shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided."* 42 U.S.C. § 5155(b)(3)(*emphasis added*).  In contradiction of this express command, FEMA has denied all permanent repair assistance to HANO even though it is not disputable that HANO has no funding from any other source for about $150 Million Dollars of damages it sustained to its facilities.[3]  The Stafford Act's disaster assistance program was designed to provide assistance to

---

[1]    The public assistance program was established by Congress through the Stafford Act to provide federal disaster relief assistance to local governmental entities and private non-profits.   Public housing authorities ("PHAs") such as HANO are among those local governments the program was instituted to assist. 42 U.S.C. § 5122(6)(A).  (HANO is a "local public authority.")

[2]    Section 311 of the Stafford Act requires disaster assistance recipients to insure facilities for which they receive section 406 funding and is therefore not applicable here.

[3]    HANO's damages exceed $200 million.  It has less than $21 million in HUD Disaster funds for permanent repairs, has received a total of about $17 Million insurance monies for wind and flood damage and expects to receive about $12 Million additional insurance monies for wind damage.  It also should be noted that most of the insurance monies paid to HANO are from policies covering the newer mixed financed developments such as Abundance Square, which FEMA deemed ineligible for other reasons.  Thus, HANO will have no insurance or HUD funding for the overwhelming majority of its losses — leaving approximately $150 Million dollars in permanent repair and emergency costs unfunded from any source.

837246v.1

HANO 033651

local government in exactly the circumstances that HANO faces now -- where it cannot recover from disaster-caused losses because of a deficit in financial resources. Therefore, FEMA's blanket denial of section 406 relief to HANO is contrary to law.

It also appears that the denial may arguably violate the Stafford Act's anti-discrimination provision set forth in 42 U.S.C. § 5151(a). HANO is unique among local governmental bodies in New Orleans because it provides housing and services to the poorest people in the City. However, unlike all of the other public entities in the City, precisely because HANO is a public housing authority ("PHA"), FEMA is denying to HANO the vast majority of possible disaster assistance available, based upon FEMA's interpretation of FEMA policy number 9523.7.[4] Thus, FEMA's interpretation or application of policy number 9523.7 arguably discriminates against low-income persons by denying recovery monies to the agency charged with proving low-income housing to them.

Finally, FEMA's interpretation and application of policy number 9523.7 in this disaster is incorrect. At the outset, it should be noted that for previous disasters FEMA has covered the short-fall in HUD disaster assistance and other funding available to PHAs, such as the PHA in Brownsville, North Carolina.[5] Indeed, in this disaster, FEMA originally obligated permanent repair work for other PHAs in the area (Westwego and Kenner), but after HANO complained that it too should receive such assistance, FEMA de-obligated permanent repair work funding for those PHAs. Thus, it is clear that on other occasions, FEMA has not interpreted or applied the policy to disallow assistance to cover PHA losses for which no HUD disaster funds are available. Nonetheless, FEMA has refused to do that for HANO for this disaster where the need is dire.

Moreover, the words of the policy and the related memorandum issued by FEMA show that the policy was not originally intended to eliminate public assistance for permanent repair where HUD disaster funding is not available. Section 6, paragraph 2, of policy number 9523.7 specifically states, "[i]t was not the intent of the MOU or this Policy to deny disaster assistance to otherwise eligible publicly-subsidized housing facilities." Paragraph 1 of Section 6 similarly declares that the policy is intended "to ensure that all publicly-subsidized housing facilities have access to appropriate Federal assistance following major disasters. This policy does not result in a significant reduction in assistance for publicly-subsidized housing facilities." Furthermore, the related Memorandum, attached to policy number 9523.7, was intended to

---

[4]    A copy of policy number 9523.7 and the related memorandum are appended hereto as "Attachment 1."

[5]    *See also* the copy of the April 28, 2003 FEMA "Memorandum for Regional Public Assistance Personnel" appended hereto as "Attachment 2," which states in the paragraph numbered "1" that "[w]hen disaster assistance is denied by HUD, PHAs may apply directly to FEMA for disaster assistance in all categories of work."

HANO 033652

STONE PIGMAN WALTHER WITTMANN LLC.

PAGE

    4

October 31, 2006

"coordinate" FEMA and HUD relief so as to "ensure access by our Nation's PHAs to appropriate Federal assistance following major disasters to help with immediate and long term recovery."[6]

In sum, FEMA's interpretation or application of policy number 9523.7 and the attached Memorandum is inconsistent with its previous interpretations or applications of these same documents and contradicts the documents' expressly stated purpose and intent. In addition, FEMA's current interpretation and the resulting denial to HANO violate the Stafford Act's command that "[r]eceipt of partial benefits for a major disaster or emergency *shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided."* 42 U.S.C. § 5155(b)(3)(*emphasis added).* Therefore, FEMA's denial of permanent repair assistance to HANO set forth in PW 9358[7] is in error and should be reversed.

HANO awaits a decision on this appeal (PW 9358) in accordance with 42 U.S.C. 5189 and 44 C.F.R. 206.206. Please let me know if any additional information is required from HANO.

Very truly yours,

Rachel Wisdom
Attorney for the Housing Authority of New
Orleans/ HANO designated agent for RPA to
FEMA

RWW/jmm

---

6    See the last paragraph on page 2 of the Memorandum which follows the copy of policy number 9523.7 appended hereto as Attachment 1.

7    See "Attachment 3" - email notice from the State of Louisiana regarding the denial of the reimbursement request by HANO in Project Worksheet 9358.

837246v.1

HANO 033653

# ATTACHMENT 1

HANO 033654

 FEMA

# 9523.7 Public Housing Authorities (PHAs)

1. Date Published: April 14, 2003

2. Recovery Division Policy Number: 9523.7

3. Title: Public Housing Authorities (PHAs)

4. Purpose: The attached memorandum of understanding (MOU) is being numbered as part of the Federal Emergency Management Agency (FEMA) Public Assistance Program policy publication system. It states the policy that FEMA and the Department of Housing and Urban Development (HUD) have agreed to with regard to funding the repair of PHA facilities that are damaged by a major disaster, as declared by the President.

5. Scope and Audience: This policy is applicable to PHA facilities that were developed or modernized with funds provided under Section 9(k) of the Housing Act of 1937, as amended, and is applicable to all major disasters declared after January 8, 2001. It is for use by FEMA personnel making public assistance eligibility determinations for the Public Assistance Program.

6. Background: Although HUD has specific authority under Section 9(k) of the U.S. Housing Act of 1937, as amended, to provide funds for the repair of disaster damaged PHA facilities, FEMA has generally funded these costs in the past. FEMA and HUD developed the attached agreement to eliminate confusion among the respective agencies and applicants and to ensure that all publicly-subsidized housing facilities have access to appropriate Federal assistance following major disasters. This policy does not result in a significant reduction in assistance for publicly-subsidized housing facilities.

Since issuing this policy in March 2001, FEMA has learned that not all publicly-subsidized housing facilities are eligible for disaster assistance funding from HUD. Specifically, HUD is only authorized to provide disaster assistance to publicly-subsidized housing facilities that were developed or modernized using funds provided under Section 9(k) of the U.S. Housing Act of 1937, as amended. Publicly-subsidized housing facilities that were developed and financed from other sources, such as other HUD programs (e.g., Section 8, FHA Mortgage Insurance, etc.) or funds provided by cities, do not qualify for HUD disaster assistance. It was not the intent of the MOU or this Policy to deny disaster assistance to otherwise eligible publicly-subsidized housing facilities. Therefore, publicly-subsidized housing facilities that do not qualify for disaster assistance from HUD may apply directly to FEMA for public assistance grants under any category of work, including Section 406 permanent repairs.

Furthermore, American Indian and Alaskan Native Tribal organizations that own and/or operate public housing facilities are not eligible for HUD disaster assistance. These groups do not fall under the authority of the Housing Act of 1937, but are subject to separate legislation addressing their special circumstances. Since the Federal law governing Indian housing has no provisions for emergency or disaster-related funding, American Indian and Alaskan Native PHAs may apply directly to FEMA for disaster assistance.

HANO 033655

7.  Policy: The policy is attached.

8.  Supersession: RR Policy #9523.7, dated March 19, 2001.

9.  Authorities: Section 403, Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended [42 U.S.C. § 5170b(3)]; Section 9(k), United States Housing Act of 1937, authority, as amended [42 U.S.C. § 1437g(k)], The Native American Housing Assistance and Self Determination Act of 1996, as amended (25 U.S.C 4101).

10.  Originating Office: Recovery Division, Emergency Preparedness and Response Directorate.

11.  Review Date: Three years from date of publication.

12.  Signature:
        *signed*
     Laurence W. Zensinger
     Acting Director
     Recovery Division
     Emergency Preparedness and Response Directorate

HANO 033656



## Coordination of HUD and FEMA Disaster Assistance to Public Housing Authorities (PHAs)

MEMORANDUM FOR:

> HUD Secretary's Representatives
> HUD State Coordinators
> HUD Public Housing Directors
> FEMA Regional Directors
> FEMA Regional Response and Recovery Division Directors
> FEMA FCO Cadre Members
> Public Housing Authority Directors

FROM:

> Harold Lucas
> Assistant Secretary for Public and Indian Housing
> Department of Housing and Urban Development
>
> Lacy Suiter
> Executive Associate Director
> Response and Recovery Directorate
> Federal Emergency Management Agency

SUBJECT:

> Coordination of HUD and FEMA Disaster Assistance to Public Housing Authorities (PHAs)

This is to inform you that the Department of Housing and Urban Development (HUD) and the Federal Emergency Management Agency (FEMA) have agreed on a new policy for coordination of disaster assistance to PHAs for properties damaged by major disasters declared by the President. This policy is effective for disasters declared after the date of this memorandum.

HUD and FEMA have agreed that with respect to public housing authorities FEMA will, in its discretion, provide for essential assistance authorized under section 403 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (at 42 U.S.C. 5170b(3)). This assistance may include debris removal, demolition of unsafe structures, and any actions necessary to reduce an immediate threat to life, property, and public health and safety.

This essential assistance is generally provided immediately following a disaster. To receive essential assistance from FEMA, PHAs should submit a *Request For Public Assistance* to the State Public Assistance Officer within 30 days of the disaster designation for that area. The State will forward it to FEMA who will assign a Public Assistance Coordinator to work with the PHA to identify eligible assistance. For work

HANO 033657

FEMA approves as eligible, FEMA generally provides 75 percent of the cost of the work. For work FEMA does not approve, the PHA may appeal FEMA's decision in accordance with 44 CFR 206.206.

For PHAs' disaster recovery costs not covered by insurance and essential assistance from FEMA, HUD will provide funding from the capital public housing reserve authorized by section 9(k) of the United States Housing Act of 1937, authority, as amended (42 U.S.C. 1437g(k)), or similar statutory authority, subject to the availability of appropriations. Each PHA that incurs damage in excess of insurance coverage and essential assistance from FEMA from a Presidentially declared disaster is responsible for submitting a funding request to HUD.

- The PHA must submit its request to the local HUD field office (FO) after determining the amount of funds to be provided from insurance and other sources.
- To substantiate the extent of the damage and its request for funds, the PHA may include pictures, a videocassette, engineering surveys, etc.
- The HUD field office at its option, may conduct an on-site inspection or issue a task order to the Corps of Engineers (COE), with whom HUD has an interagency agreement, for such an inspection to verify the PHA's request for funds, e.g., need and cost.
- Within 14 calendar days of receipt of the PHA's request, the FO must complete its review and forward its recommendation for approval, with the PHA's request, to HUD headquarters for review and final decision.
- If the request is approved, HUD headquarters will notify the FO when funds have been assigned for the PHA and the FO will process the PHA's application, reserve the funds and execute an Annual Contributions Contract Amendment.
- If the FO does not recommend approval of the PHA's request the FO shall disapprove the request and notify the PHA in writing, including the reasons for disapproval.
- The PHA may appeal a FO's disapproval to HUD headquarters for a review and final determination.
- Funds received for damages resulting from a disaster do not require repayment.

We are pleased to announce this new public housing disaster assistance policy. It should ensure access by our Nation's PHAs to appropriate Federal assistance following major disasters to help with immediate and long-term recovery. If you have any questions, please call Patricia Stahlschmidt, Director, Infrastructure Division, FEMA, at (202) 646-4066 or William Flood, Director, Office of Capital Investments, HUD, at (202) 708-1640.

HANO 033658

# ATTACHMENT 2

HANO 033659

DATE:                    April 28, 2003

MEMORANDUM FOR:          Regional Public Assistance Personnel

FROM:                    Bob McGill
                         HQ PA Branch, Policies

SUBJECT:                 Public Housing Authorities

It has come to my attention that the Department of Housing and Urban Development (HUD) is presently not approving disaster aid requests from PHAs. It's important to know that HUD's disaster assistance grants are discretionary and, therefore, may not be available to PHA's in all circumstances.

Please be aware of the following:

1.  When disaster assistance is denied by HUD, PHAs may apply directly to FEMA for disaster assistance for all categories of work.

2.  PHAs may apply directly to FEMA (without first applying to HUD) for Category B, Emergency Protective Measures, which includes snow removal.

3.  Not all publicly-subsidized housing is eligible for HUD assistance. Guidance on this subject may be found in the current revision of Recovery Policy No 9523.7, dated April 14, 2003. Publicly-subsidized housing facilities that *are not eligible for disaster assistance from HUD*, may apply to FEMA for public assistance as a result of Presidentially-declared emergencies and major disasters.

If you have any questions please call me at (202) 646-3029.

HANO 033660



# ATTACHMENT 3



HANO 033661

**McCreary, Jackie**

---

From:        support@louisianapa.com
Sent:        Tuesday, September 26, 2006 11:33 AM
To:          McCreary, Jackie
Subject:     LouisianaPA.com: Project Note

Dear Jackie McCreary,

A note for PW 9358 (E-38) for 1603 - Housing Authority of New Orleans has been recorded in
LouisianaPA.com by a State official:

-- Martha  Mayronne - Sep 26, 2006 on 9:02 AM --

This letter is to inform you that the reference Project Worksheet (PW) has been deemed
"zero obligated" from $16,996.14 by FEMA due to the responsible party being HUD.


=== Note History ========================

-- Martha  Mayronne - Sep 26, 2006 on 9:02 AM --

This letter is to inform you that the reference Project Worksheet (PW) has been deemed
"zero obligated" from $16,996.14 by FEMA due to the responsible party being HUD.


=======================================

Please contact your State Public Assistance Coordinator with any questions:
    Name:
    Phone: N/A
    Email: N/A


Louisiana Office of Homeland Security and Emergency Preparedness http://louisianapa.com

1

HANO 033662

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| YOLANDA ANDERSON, *Et al.* . | * CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * |
| **VERSUS** | * SECTION "B" |
| | * |
| ALPHONSO JACKSON, SECRETARY OF THE | * JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * |
| AND URBAN DEVELOPMENT; *Et al.* | * MAGISTRATE ALMA CHASEZ |
| | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* *

<u>**AFFIDAVIT OF JUDITH MORAN**</u>

**BEFORE ME,** a Notary Public duly qualified in and for the State of Louisiana

and Parish of Orleans, personally came and appeared:

**Judith Jones Moran**

who, being duly sworn, did depose and state as follows:

      1.    I am the Director of Real Estate Planning and Development for the

Housing Authority of New Orleans ("HANO"). In that capacity, I am in charge of, among other

things, overseeing, administering and managing development plans, funding for development,

and development projects for HANO.

EXHIBIT

17

-1-

2.    I make the statements set forth in paragraphs 3 to 8 below based on my personal knowledge of the facts set forth therein, which I derived in the performance of my duties as a Director at HANO.

3.    Any delay, even a slight one, resulting from a temporary restraining order or injunction prohibiting HANO from moving forward with its redevelopment/demolition plans for all HANO sites could prove to be detrimental to HANO's redevelopment programs which are designed to make safe, decent and sanitary housing available for residents of New Orleans.

4.    Any delay resulting from a TRO or injunction prohibiting work at C.J. Peete, Lafitte, B.W. Cooper, and St. Bernard would cause tremendous financial harm to HANO by causing it to fail to meet deadlines that it must meet to keep tax credits for redevelopment of these sites that were granted to it by the Louisiana Housing Finance Agency (LHFA). If HANO fails to begin construction of these projects no later than summer of 2008 it risks not being able to place the projects in service by the end of 2010. Should HANO miss these place in service deadlines, the agency could lose more than $312 million dollars in tax credit equity. Moreover, the Louisiana Recovery Authority awarded these projects $108 million dollars in CDBG funding that could be loss with delays in project implementation. The loss of these funds would result in the loss of more than $609 million in total investment dollars and the loss of 2,000 units that are critically needed to return families displaced by Hurricane Katrina to the City.

5.    HANO's HOPE VI funding for Fischer could also be jeopardized by demolition delays as the units proposed cannot be developed until existing units are demolished and new infrastructure is constructed. If the Fischer HOPE VI program is not completed in 2009 HANO could be at risk of losing $8 million in HOPE VI Revitalization funds as well as leveraged funding and any potential future HOPE VI funding. The Fischer HOPE VI project

898681v.1

includes the development of 76 affordable homeownership units for a total investment of $19 million.

6.      Projects still in planning which are dependent upon the demolition of existing units include future phases of development at St. Bernard and B. W. Cooper as well as final phases of rental housing at Guste and Fischer. These projects include the development of approximately 598 units which collectively have a total development cost of approximately $200 million, including an estimated $88 million in tax credit equity. If HANO does not use already awarded tax credit equity, this could result in HANO's inability to secure additional tax credits and investors for projects in planning.

7.      In addition to all of the specific losses set forth above, HANO has in excess of $10 Million dollars expended in consultant costs and staff time which would be lost if these delays occurred.

8.      Finally, in addition to producing a total of over $700 million in losses of tax credits, other expected funding and funds already invested by HANO, if any restraining order or injunction is issued it could drastically impact the potential of HANO to bring in development, investor and financial partners for these projects. An injunction would speak volumes to potential participants as to the level of risk involved in doing development work in New Orleans.

Judith Jones Moran

Sworn to and subscribed before me
this _2nd_ day of November, 2007.

NOTARY PUBLIC

_____
Print Name & Bar No.

KIM M. RUSSELL
NOTARY PUBLIC
Bar Number 26494
State of Louisiana
My Commission is Issued for Life.

- 3 -

898681v.1



JS10(035:00)

MINUTE ENTRY
LEMELLE, J.
**September 7, 2006**

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF LOUISIANA**

YOLANDA ANDERSON, GILDA BURBANK,
ET AL., IN THEIR OWN RIGHT AND AS
REPRESENTATIVES OF ALL SIMILARLY       *   CIVIL ACTION
SITUATED DISPLACED NEW ORLEANS,
LOUISIANA PUBLIC HOUSING RESIDENTS

VERSUS                                  *   NO. 06-3298

ALPHONSO JACKSON, ET AL.                *   SECTION "B" (5)

<u>ORDER</u>

A telephone conference was held today with Heather Phillips for the United States
Department of Housing and Urban Development ("HUD") and Alphonso Jackson, Secretary of
HUD (collectively "Federal Defendants"); Rachael Wisdom, for the Housing Authority of New
Orleans ("HANO"), C. Donald Babers, and William Thurston; and Ross Bricker and John Ward
for the Plaintiffs.

Pursuant to the teleconference, **IT IS ORDERED:**

(1) The evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction (Rec. Doc.
No. 21) and Plaintiffs' Motion for Class Certification (Rec. Doc. Nos. 43 & 47) is continued to a
date to be determined by the Court after conferring with all parties' counsel;

(2) Federal Defendants' Motion to Expedite (Rec. Doc. Nos. 42 & 51) hearing on its

Motion to Compel Plaintiffs' Compliance with the Court's Order and for Extension of Time to Notify Plaintiffs of Defendants' Witnesses and Exhibits (Rec. Doc. No. 42); and Motion to Expedite (Rec. Doc. No. 53) hearing on its Motion to Stay (Rec. Doc. No. 52), along with the underlying motions, are **DENIED** as moot;

(3) The Court will hear oral arguments on the federal Defendants' Motion to Reconsider (Rec. Doc. No. 27) and Motion to Dismiss (Rec. Doc. No. 45) on **Thursday, October 5, 2006 at 9:00 a.m.;**

(4) Immediately following the October 5, 2006 hearing, parties' counsel shall meet and propose to the Court a joint schedule for the exchange of expert reports; expert and fact witnesses; exhibit lists; and dates for a preliminary injunction hearing;

(5) The Court directs all parties' counsel to explore settlement options with their respective clients. Thereafter, all counsel shall discuss the viability of alternative dispute resolution of this action, including the possibility of a court appointed mediator;

(6) Counsel for HANO advises that she will file a dispositive motion in sufficient time to be heard on October 5, 2006 contemporaneously with all other pending motions set for hearing on that date. If said motion is timely filed, it will be heard on October 5, 2006 at 9:00 a.m. along with all other pending motions.

IVAN L.R. LEMELLE
UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, ET AL                    CIVIL ACTION

VERSUS                                     NO. 06-3298

ALPHONSO JACKSON, ET AL                    SEC. "B"(5)

## ORDER AND REASONS

Plaintiff's *Ex Parte* Motion for Temporary Restraining Order is **DENIED WITHOUT PREJUDICE** as duplicative of matters heard during the preliminary injunction proceedings. Further, with the acknowledged availability of expense vouchers, there is no showing, at present, of irreparable harm. Parties were directed at the hearing on injunctive relief to pursue public administrative hearings mandated by HUD with HANO and public housing tenants. This was done to encourage good faith negotiations, designed to afford displaced residents an opportunity to present their grievances, etc. to the pertinent administrative body. As stated during the latter proceedings, should this attempt to mediate differences fail, we will reconsider all claims and defenses in another expedited hearing with all parties.

New Orleans, Louisiana, this 21st day of November, 2006.

UNITED STATES DISTRICT JUDGE



EXHIBIT
19

YOLANDA ANDERSON, et al.,                *         CIVIL ACTION

VERSUS                                   *         NO. 06-3298

ALPHONSO JACKSON, ET AL.                 *         SECTION "B" (5)

### ORDER AND REASONS

Before the Court are the following motions: (1) HUD's Motion to Dismiss (Rec. Doc. No. 45); (2) HANO's Motion to Dismiss or Alternatively for Summary Judgment (Rec. Doc. No. 60); (3) HUD's Motion for Reconsideration (Rec. Doc. No. 27); (4) Plaintiffs' Cross-motion for Partial Summary Judgment (Rec. Doc. Nos. 87 & 90); (5) Plaintiffs' Motion for Preliminary Injunction (Rec. Doc. No. 21). For the following reasons,

**IT IS ORDERED** that:

(1)    HUD's Motion to Dismiss (Rec. Doc. No. 45) is **DENIED** in part and **GRANTED** in part.

(2)    HANO's Motion to Dismiss or Alternatively for Summary Judgment (Rec. Doc. No. 60) is **DENIED** in part and **GRANTED** in part.

(3)    HUD's Motion for Reconsideration (Rec. Doc. No. 27) is **DENIED** as moot.

(4)    Plaintiffs' Cross-Motion for Partial Summary Judgment (Rec. Doc. Nos. 87 & 90) is **DENIED**.

(5)    Plaintiffs' Motion for Preliminary Injunction (Rec. Doc. No. 21) is **DENIED.**

### Background

Plaintiffs lived in public housing developments in New Orleans that were damaged by Hurricane Katrina. Since Katrina hit, most of the plaintiffs have lived elsewhere. In June 2006 Plaintiffs filed this suit, contending that the Department of Housing and Urban Development ("HUD") and its Secretary have approved, in violation of the U.S. Housing Act of 1937, a request

EXHIBIT
20

by the Housing Authority of New Orleans ("HANO") to demolish the developments in which they formerly lived. In the alternative, Plaintiffs contend that by not performing the minor repairs they claim are all that is necessary to make their housing developments habitable again, the defendants have constructively demolished the developments. According to plaintiffs, by these acts the defendants have (1) violated the U.S. Housing Act, Title VIII of the Civil Rights Act of 1964, international law, and the $5_{th}$ and $14_{th}$ Amendments to the Constitution; and (2) breached contracts with Plaintiffs. Six weeks later Plaintiffs filed a motion for a preliminary injunction, and the following week, on August 17, 2006, Plaintiffs moved for an evidentiary hearing on the PI motion, as well as for expedited discovery. The Court later issued an order setting an evidentiary hearing for October 5, 2006. The hearing and oral argument on the contested motions was continued to October 25, 2006, at 9:00 am.

Following oral argument, the Court ordered the parties to submit supplemental memoranda addressing the Supreme Court decision in *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268 (U.S. 2002). A teleconference was held with this Court on Thursday, November 2, at 3:30 p.m. Subsequently, the Court ordered the parties to submit a joint report to the Court immediately following the public hearings scheduled to be held on November 29, 2006 and December 7, 2006. Thereafter, the Court held several settlement conferences with counsel of record, parties, and party representatives.

**Law and Analysis**

I.   HUD's Motion to Dismiss 12(b)(1) and 12(b)(6) (Rec. Doc. No. 45) and HANO's Motion to Dismiss or, Alternatively, for Summary Judgement (Rec. Doc. No. 60)

A. STANDARD OF REVIEW

2

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, [i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . . Fed. R. Civ. P. 12(c).[1]  Summary judgment is proper if the pleadings, depositions, interrogatory answers and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2554-55 (1986).  A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the non-moving party, the non-movant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Associates of North Texas,* 139 F.3d 532, 536 (5th Cir. 1998).  The non-movant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.* Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter.,* Inc., 7 F.3d 1203, 1207 (5th Cir. 1993).

B. FAIR HOUSING ACT § 3608 and U.S. HOUSING ACT § 1437p (COUNTS 3&4)

1. § 3608 of the Fair Housing Act

a. Claims against HUD

§ 3608 of the FHA, provides that HUD "*shall*" administer "programs and activities relating

---

[1]In the present case, numerous affidavits have been presented to the Court concerning matters outside of the pleadings; therefore, all pending motions to dismiss will be treated as motions for summary judgment and viewed under the appropriate standard.

to housing and urban development in a manner affirmatively to further the policies" of the FHA. 42 U.S.C. § 3608(e)(5). HUD asserts that Plaintiffs' claims under § 3608 are not subject to judicial review under the APA because the APA does not permit review of agency actions that are "'committed to agency discretion by law.'" *See* Rec. Doc. No. 45 at 22 citing 5 U.S.C. § 701(a). However, numerous courts have exercised subject matter jurisdiction over claims brought against HUD under § 3608. *See, e.g., Dean v. Martinez*, 336 F. Supp. 2d 477, 487 (D. Md. 2004); *Jaimes v. Toledo Metro. Hous. Auth.*, 715 F. Supp. 835, 839 (N.D. Ohio 1989); *Suffolk Hous. Servs. v. Town of Islip*, No. 82-2882, 1987 WL 14131, at * 2-4 (E.D.N.Y. July 14, 1987).

The cases upon which HUD relies to claim that § 3608 does not provide for judicial review are factually dissimilar from the present action. For example, in *Americans Disabled For Attendant Programs Today v. HUD*, 170 F.3d 381 (3d Cir. 1999), the Third Circuit held that the APA precluded judicial review of the plaintiff's § 3608 claim, because the claims would require the court to undertake a broad based review of *general agency policies regarding investigation and enforcement, rather than a focused review of specific agency decisions. Id.* at 388-89 (emphasis added). *ADAPT* recognized that the First Circuit's decision in *NAACP* supported the availability of judicial review when claims challenge "specific examples of HUD's failure to enforce Title VII requirements." *Id.* at 388 (citing *NAACP*, 817 F.2d at 154-55). In this case, Plaintiffs challenge the propriety of specific examples of conduct, namely HUD's plan to demolish the units and its failure to repair and reopen the units. Therefore, judicial review is proper.[2]

b. Claims Against HANO

---

[2]HUD does not raise any jurisdictional challenges under § 3608 relating to *Gonzaga* in its supplemental memorandum (Rec. Doc. 111) or memorandum in response to Plaintiffs' October 27, 2006 supplemental memorandum (Rec. Doc. No. 117). However, as discussed below, any such challenges would fail.

4

A federal statute creates a private right of action enforceable through § 1983 only when that law "manifests an 'unambiguous' intent to confer individual rights." *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002). Prior to *Gonzaga,* courts examined three factors to determine whether Congress intended to create rights enforceable by private parties: "First, Congress must have intended that the provision in question benefit the plaintiff. Second, . . . the right is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States [or other state actor]." *Banks v. Dallas Housing Authority,* 271 F.3d 605, 609 (5th Cir. 2001) (citing *Blessing v. Freestone,* 520 U.S. 329, 340-41, 117 S. Ct. 1353, 1359 (U.S. 1997). Since *Gonzaga,* the Fifth Circuit continues to apply the *Blessing* test to determine whether or not Congress intended to confer a private right of action to enforce a particular statute, but now recognizes that *Gonzaga* has severely limited the finding of private rights of action under most federal statutes. *Johnson v. Housing Authority of Jefferson Parish,* 442 F.3d 356, 360 (5th Cir. 2006) (citing *Blessing,* 520 U.S. at 329). In addition, following the lead of *Gonzaga,* the Fifth Circuit applies a fourth factor: "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.* at 365-66 (citing *Middlesex County Sewage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S. Ct. 2615, 69 L.Ed.2d 435 (1981).

Prior to *Gonzaga,* numerous courts held that § 3608 meets the first prong of the *Blessing* test. *See, e.g., Langlois,* 234 F. Supp. 2d at 72 (finding that "this provision was intended to benefit . . . people in desperate need of access to fair housing, minorities and the poor"). In addition, courts held that § 3608 fulfills the second prong. *See id.* (noting that the duty to affirmatively further fair housing is not "too vague and amorphous for the courts to enforce"); *NAACP,* 817 F.2d at 154

5

(commenting that "a statute that instructs an agency 'affirmatively to further' a national policy of

nondiscrimination would seem to impose an obligation to do more than simply not discriminate

itself"). Finally, several courts held that § 3608 imposes binding obligations on state agencies and,

therefore, meets the third prong of the *Banks* test. *See, e.g., Otero v New York City Hous. Auth.*, 484

F.2d 1122, 1133-34 (2d Cir. 1973) (finding that "the affirmative duty placed on . . . HUD by §

3608[e](5)" extends also to "other agencies administering federally assisted housing programs");

*Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33, 73 (D. Mass. 2002) (declining to "construe

the boundary of the duty to affirmatively further fair housing as ending with [HUD]"); *Reese v.*

*Miami-Dade County*, 210 F. Supp.2d 1324, 1329 (S.D. Fla. 2002) (finding that "the duty to

'affirmatively' further fair housing imposes a binding obligation upon the states").

Since *Gonzaga*, at least one court holds that § 3608 fulfills all prongs of the *Blessing* test,

thereby creating a private right of action, and cites pre-*Gonzaga* cases with approval. For example,

in *Wallace v. Chicago Housing Authority*, the court held that a class of public housing residents

could maintain suit under § 1983 to combat a violation of § 3608(e)(5) of the FHA. 298 F.Supp.2d

710, 719 (N.D. Ill. 2003). The court distinguished *Gonzaga*, reasoning that "the [FERPA] statute

at issue in *Gonzaga* was enacted pursuant to Congress's spending power, whereas the [FHA] is a

civil rights statute concerned with remedying past housing discrimination." *Id.* at 718. The court

noted that the difference "is significant . . . because there is far less reason to infer a private remedy

in favor of individual persons if Congress . . . had written [the statute] simply as a ban on

discriminatory conduct by recipients of federal funds or as a disbursement of public funds to

educational institutions engaged in discriminatory practices." *Id.* Further, the court reasoned that

while the FERPA provisions at issue in *Gonzaga* "only speak in terms of 'institutional policy and

practice,'" the FHA's clear aim is to "'confer individual rights upon a class of beneficiaries.'" *Id.* at 718-19.

In addition, *Wallace* relies on *Otero* in holding that § 3608 is equally enforceable against local housing authorities as it is against HUD. *Id.* at 719. Moreover, *Wallace* relies on *Langlois* in holding that § 3608 easily passes the *Blessing* test. The court reasoned that "there is little dispute that the language of the act is mandatory; nor can . . . a claim under the [FHA] strain[] judicial competence." *Id.* Finally, with respect to the first prong, the court noted that "'[i]t could not be clearer from the statute, the legislative history, and the case law construing it, that § 3608(e)(5) was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor.'" *Id.* at 719 (citing *Langlois*, 324 F.Supp.2d at 72). Therefore, because Plaintiffs' § 3608 claims are enforceable against HUD <u>and</u> HANO, they can maintain a private right of action.[3] In addition, genuine issues of material fact remain disputed as to whether Defendants failed to affirmatively further fair housing. Thus, summary judgment is improper.

> 2. § 1437p of the U.S. Housing Act

> > (1) Constructive Demolition

In *Gonzaga University v. Doe*, the Supreme Court held that a student could not maintain a suit for damages under 42 U.S.C. § 1983 to enforce provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA") because the relevant provisions did not create personal rights that were enforceable against state actors under § 1983. 536 U.S. 273, 276 (2002). The Court mandated that a federal statute must unambiguously confer rights to support a cause of action brought under

---

[3] Plaintiffs' § 3608 claims against HANO <u>and</u> HUD are much more viable than their *constructive demolition* claims under § 1437p, which rest entirely upon statutory interpretation. This is evidenced somewhat by the fact that HUD does not even address the § 3608 claims in their supplemental memorandum (Rec. Doc. 111) or memorandum in response to Plaintiffs' October 27, 2006 supplemental memorandum (Rec. Doc. No. 117).

§ 1983. *Id.* "[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of that section." *Id.* at 283. Because *Gonzaga* involved a claim under § 1983, its holding does not directly relate to Plaintiffs' claims against Defendants Alphonso Jackson, Secretary of HUD, and HUD itself. Nevertheless, *Gonzaga* is relevant as to Plaintiffs claims brought directly against HUD under § 1437p because the Court explained that the inquiry as to whether a statutory violation can be enforced under § 1983 and the inquiry involved in determining whether a private right of action can be implied from a particular statute "overlap in one meaningful respect—in either case we must "first determine whether Congress *intended to create a federal right*." *Id.* at 283. However, in addition, "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'[4] *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).

Plaintiffs' argue that § 1437p(d) implies a private cause of action for their constructive demolition claims. However, the cases upon which Plaintiffs rely (Rec. Doc. No. 78 at 28-31) interpreted a section of the statute that has since been removed by a 1998 amendment.[5] Since 1998, the 5th Circuit has rejected a plaintiff's ability to bring a private cause of action under similar sections of § 1437. For example, in *Banks v. Dallas Housing Authority*, the Fifth Circuit held that a separate provision of the Housing Act, 42 U.S.C. § 1437f(e), did not include a private right of

---

[4]In cases where a plaintiff is suing under § 1983, a private remedy is presumed. *Gonzaga*, 536 U.S. at 284.

[5]Prior to the 1998 amendment removing § 1437p(d), it read as follows: "A public housing agency shall not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining the approval of the Secretary and satisfying the conditions specified in subsections (a) and (b) of this section."

action. *Banks*, 271 F.3d. at 610 n.3. The court cited approvingly to *Edwards v. District of Columbia*, 821 F.2d 651 (D.C. Cir. 1987), which held that § 1437p does not create an enforceable right against constructive demolition where the public housing authority has arguably failed to "maintain the project in a decent, safe, and sanitary condition." The *Edwards* court reasoned that, at most, § 1437p(d) "created only the right to a lease, the terms of which would be enforceable under general principles of contract and property law."

In addition, in *Morial v. HUD*, the court noted that "[b]ased on the recent Fifth Circuit opinion in [*Banks*], the individual tenants . . . [did] not have standing to sue under 42 U.S.C. § 1437 because there is no implied right of action for tenants under the sections of 42 U.S.C. § 1437 that impose conditions upon the receipt of government monies for housing purposes." 2002 WL 246334, at *2 (E.D. La. 2002).[6]

In contrast, in March 2006, the Fifth Circuit in *Johnson v. Housing Authority of Jefferson Parish* applied *Gonzaga* to § 1437(o)(2) of the U.S. Housing Act and held that Congress intended to grant to voucher program recipients, federal *rights* enforceable under § 1983.[7] 442 F.3d at 367. In *Johnson*, the court relied heavily on *Wright v. City of Roanoke Redevelopment & Housing*

---

[6]As further evidence that tenants do not have an implied right of action to sue under the sections of 42 U.S.C. § 1437, the Court notes the recent publication in the Federal Register of revised demolition regulations implementing § 1437p of the U.S. Housing Act. The revision states:

> Former section 18(d) of the 1937 Act was removed. That section provided that a PHA could not "take any action" to demolish a public housing project, or portion of a project, without HUD approval. Similar language in 24 CFR 970.7(a) and 970.25(a) is designed to make certain that HUD can track units being phased out for funding purposes. That language is not intended to create any private right of action.

Demolition or Disposition of Public Housing Projects, 71 Fed. reg. 62354 (October 24, 2006).

[7]§ 1437(o)(2) reads as follows: Any excess housing costs above a limit referred to as the "payment standard," which is established by HUD and based on fair market value, are borne by the participant. In that situation the family's contribution would be greater than 30 percent of adjusted income, which the voucher program permits at the participant's option. § 1437f(o)(2)(B).

9

*Authority,* a pre-*Gonzaga* Supreme Court case, to reach its conclusion. In *Wright,* the Court held

that a provision of the U.S. Housing Act, which was virtually identical to the one at issue in

*Johnson,* clearly "gave low-income tenants an enforceable right" and that the "intent to benefit

tenants is undeniable." 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). Although *Wright*

predates *Gonzaga,* the *Johnson* court noted that "*Gonzaga* expressly relied on *Wright,* pointing to

it as a paradigmatic example of an appropriate case for finding the presence of a private right of

action under § 1983 and leaving no doubt that *Wright* survives as good law." *Johnson,* 442 F.3d at

360. Moreover, the court noted that because "*Wright* predated *Blessing* by a decade the Court could

not have applied the '*Blessing* test' under that name, yet the Court's analysis in *Wright* is wholly

consistent with that employed in more recent cases, and indeed constitutes an indispensable element

of the current methodology." *Id.*

In addition, the court distinguished its prior decision in *Banks,* in which the court held that

§ 1437f(e)[8] did not create a right enforceable under § 1983. *Id.* at 366-67 (citing *Banks,* 271 F.3d

at 605). The court noted that "*Banks* is helpful . . . only as a reference point along the continuum

of decisions concerning § 1983 enforcement of asserted federal statutory rights." *Id.* at 367 ("The

obvious differences between the statutory provision considered in *Banks* and the one at issue here

plainly put *Banks* at the opposite end of the spectrum, indeed very near *Gonzaga*."). The court

reasoned that the *Banks* statute, requiring owners to maintain their properties "as a condition of their

receipt of funds, is easily distinguishable" from a statute providing "'monthly assistance payment

for the family.'" *Id.*

_____

[8] § 1437f(e) authorized HUD to "make assistance payments . . . pursuant to a contract with owners . . . who agree to upgrade housing so as to make and keep such housing *decent, safe, and sanitary* . . . . 42 U.S.C. § 1437f(e) (1990).

Ultimately, to resolve whether § 1437p creates *rights* enforceable via a private cause of action requires the Court to examine the statutory text and determine if it reads more like rights/benefits-granting language (as Plaintiffs claim) or more like "institutional policy and practice" language (as Defendants claim).[9] Upon review, the Court finds the statute at issue to be more akin to the statutory text presented to the Fifth Circuit Court in *Banks* and to the Supreme Court in *Gonzaga*. Like the statutes at issue in *Banks* and *Gonzaga*, § 1437p concerns itself primarily with addressing general principles of housing policy and regulating the agencies that implement those principles.[10]

The Court recognizes that § 1437p contains a multitude of provisions that, when read standing alone, could reasonably be interpreted as rights/benefits-granting language because they are "phrased in terms of persons benefitted."[11] However, when read in context, it is clear that these provisions are intended to regulate the public housing agency and ensure that it has fulfilled basic requirements before HUD is authorized to approve any demolition application. Unlike the statutes at issue in *Wright* and *Johnson*, § 1437p does not focus on the rights of individual residents and families.[12] Therefore, § 1437p does not unambiguously confer rights on the plaintiffs, and they cannot maintain a private cause of action under that particular law. Defendants motions for

---

[9]Rec. Doc. Nos. 113 at 2-3, 116 at 2.

[10]Unlike the statutes at issue in *Banks* and *Gonzaga*, § 1437p does not primarily concern itself with the distribution of funds. However, neither case suggests that, upon reviewing the text of a particular statutory provision, this is a prerequisite for finding that the Congress did not intend to create a private right of action.

[11]For example, § 1437p creates tenants "rights" in conjunction with the demolition of public housing, including: the right to notice, the right to relocation, the right to comparable housing which may include tenant-based assistance, the right to receive payment for relocation expenses, and the right to counseling for displaced residents.

[12]It does not create a "'monthly assistance payment *for the family*,' including a reasonable utility allowance, [which is] obviously a tangible government benefit that is directly focused on the family and its income." *Johnson*, 442 F.3d at 367.

11

42 U.S.C. §§ 3604(a), (b).  To show discriminatory intent, a plaintiff must show that "race was a consideration and played some role in the decision at issue."  *Hanson v. The Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir. 1986).  A plaintiff may prove such intent with either direct or indirect evidence.  *Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 728 (S.D. Tex. 2000).

Simply put, Plaintiffs claim that Defendants planned to demolish four of New Orleans' largest public housing developments and refused to repair or reopen reparable units with the intent to rid New Orleans of some of its poor, African-American residents.  Complaint at ¶¶ 85, 88, 105. The only piece of direct evidence of discriminatory intent offered by Plaintiffs is Defendant Secretary Alphonso Jackson's remark that New Orleans "is not going to be as black as it was for a long time, if ever again."  Cmplt. at ¶¶ 6, 7, 70.  This statement, in another plausible context, could be a simple observation of the effects that Hurricane Katrina had on the entire African-American population of New Orleans.

In addition, Plaintiffs offer statements of other public officials, who are not in any way related to the present litigation, as circumstantial evidence of intent.  For example, New Orleans City Council President Oliver Thomas stated that "[w]e don't need soap opera watchers all day." *See* Cmplt., at ¶¶ 8, 71.  Similarly, Louisiana Congressman Richard Baker remarked that "[w]e finally cleaned up public housing in New Orleans.  We couldn't do it, but God did."  *See* Cmplt., at ¶¶ 8, 71. Although these comments may reveal the true feelings of their speakers, non-parties to this action, they do not evidence any racial motivation attributable to HUD or HANO in deciding to demolish the various units.  Plaintiffs have not offered sufficient facts to "create[] a reasonable inference that [race] was a determinative factor" in HUD or HANO's decision-making process.

15

*Sims*, 83 F.3d at 1556.

However, a violation of section 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent. *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). A party may state a *prima facie* case of disparate impact by establishing either: (1) that the immediate effect of the housing decision had "a greater adverse impact on one racial group than on another," or (2) that the ultimate effect of the housing decision may be racially discriminatory because it tends to exclude minorities. *Id.* In the present case, Plaintiffs have proved neither.

"Ordinarily, a prima facie disparate impact case requires a showing of a substantial statistical disparity between protected and non-protected [individuals]." *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002). The basis of this cause of action is that a single policy "has different effects upon protected and unprotected classes." *Bryant Woods Inn v. Howard County*, 911 F. Supp. 918, 939 (D. Md. 1996). "[W]here only one group or class of persons is affected by a particular decision, there is no disparity in treatment between groups and no 'disparate impact.'" *Id.*

Plaintiffs have failed to offer any evidence that the proposed plan to demolish certain developments has caused any statistical disparity between the African-American residents and non-protected individuals.[14] Instead, Plaintiffs assert that because <u>100%</u> of the residents are African-American, the decision to demolish necessarily has a discriminatory effect, as the adverse impact

---

[14]Plaintiffs offer evidence that residents of the Biloxi, Mississippi public housing developments, roughly half of which are caucasian, "have received markedly better treatment, with HUD guaranteeing replacement" on a "'one-to-one basis.'" (Rec. Doc. No. 87 at 19). However, the decision to return Biloxi tenants to their units is separate from the decision to demolish certain developments in New Orleans. The focus must be on how a single policy, rule, or decision adversely affects protected individuals. The Court cannot rely upon comparisons between the Biloxi recovery effort and the situation in New Orleans when these two cities experienced different forms of devastation, and the expedited return of Biloxi tenants may be more feasible for numerous reasons not addressed by Plaintiffs.

16

of Defendants' actions falls more heavily on minorities than on non-minorities. (Rec. Doc. No. 78 at 8). This, however, is not the law based on present assertions by Plaintiffs here.

In other cases, however, plaintiffs can sustain a claim for disparate impact under the FHA if the decision "perpetuates segregation and thereby prevents interracial association." *Metropolitan Housing Dev. Corp.*, 558 F.2d at 1290. In the present case, Plaintiffs offer no evidence to support their claim that the proposed demolition plans perpetuate segregation. HANO claims that its redevelopment plans include "the replacement of obsolete and distressed public housing with new mixed-income developments in order to revitalize and foster socio-economic integration . . . ." (Rec. Doc. No. 60 at 24). Ironically, it appears that Plaintiffs' efforts to return to developments that were populated entirely with African-Americans pre-Katrina may actually perpetuate segregation more so than HANO's plans for demolitions and redevelopment.

Plaintiffs have not offered relevant or material evidence to sustain a claim for disparate treatment or disparate impact under section 3604(a) of the FHA. Therefore, these claims are dismissed as to both defendants and their motions for summary judgment are granted.

D. CONSTRUCTIVE EVICTION (Count 5- HANO only)

Constructive eviction occurs when the leased premises are rendered uninhabitable because of an act or omission by the lessor. *Regency Motors of Metairie, L.L.C., et al. v. Hibernia-Rosenthal Ins. Agency, L.L.C.*, 868 So.2d 905, 909 (La. Ct. App. 5 Cir. 2004). A breach of a covenant to repair can constitute constructive eviction. *See Sewell v. Hukill*, 356 P.2d 39, 41-42 (Mont.1960). In this situation, the lessee can either dissolve the lease and sue for damages or make the necessary repairs and deduct the cost from the rent. *New Hope Gardens, Ltd. v. Lattin*, 530 So. 2d 1207, 1210 (La. App. 2 Cir. 1988).

17

HANO contends that Plaintiffs' constructive eviction claims must fail because the premises at issue were rendered uninhabitable by a fortuitous event, Hurricane Katrina, and not through any fault of the lessor. (Rec. Doc. No. 82 at 18-19). In contrast, Plaintiffs claim "that HANO's failure to repair their units following Katrina, and HANO's further actions in boarding and locking units thereby preventing Plaintiffs from making their own repairs, constitutes constructive eviction." (Rec. Doc. No. 78 at 37).

Whether Hurricane Katrina or HANO is ultimately responsible for the current state of disrepair is an issue to be decided by the trier of fact; therefore, summary judgment is premature. However, if Plaintiffs prevail on their constructive eviction claim, the appropriate remedy is to dissolve the lease and seek damages because making the repairs themselves is likely not feasible. In any event, a preliminary injunction is *not* the appropriate remedy.

E. BREACH OF CONTRACT (Count 6- HANO only)

The lease at issue provides that:

> HANO shall be responsible for repair of the unit within a reasonable period of time after receiving notice from Tenant. . . . HANO shall offer Tenant a replacement dwelling unit, if available, *if necessary repairs cannot be made within a reasonable time.* . . . Tenant shall accept any replacement unit offered by HANO.
> *Lease § X(a)-©).*

Plaintiffs allege that *if* the units can be readily repaired, HANO must repair and permit Plaintiffs to return. In contrast, HANO argues that, given the condition of New Orleans following Katrina, it could not make all necessary repairs within a period of time that it considered "reasonable."

Although Plaintiffs do not propose a definition of what is "a reasonable time" under the lease, their complaint alleges sufficient facts to state a claim for relief under the lease. The issue of what is a reasonable time is one that must be decided by the trier of fact and cannot be resolved in

18

motion for summary judgment. Because HUD is not a party to the contracts entered into between

Plaintiffs and HANO, and Plaintiffs' breach of lease and constructive eviction claims rely on the

Court's interpretation of the leases at issue, these claims are dismissed and summary judgment is

granted as to HUD only.

### F. CONSTITUTIONAL CLAIMS (COUNT 7)

#### 1. Equal Protection

As explained above, Plaintiffs have failed to allege sufficient facts to sustain their claims that

HUD and HANO's acts have had a discriminatory effect, and that their decisions to demolish and

redevelop were made with a discriminatory intent. Therefore, Plaintiffs' claims of equal protection

violations are dismissed and summary judgment is granted as to both defendants.

#### 2. Due Process

HUD asserts that sovereign immunity prevents Plaintiffs from suing it for Constitutional

violations. However, 5 U.S.C. § 702 waives sovereign immunity in most suits seeking injunctive

relief.[15] In addition, although § 702 is codified as part of the APA, this waiver is not limited to suits

under the APA, but applies to any suit, including Constitutional claims. *See Simmat v. U.S. Bureau*

*of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005) (holding that sovereign immunity did not bar a

claim under the Eighth Amendment); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C.

Cir. 1996) (noting that "[t]he APA's waiver of sovereign immunity applies to any suit whether under

---

[15] 5 U.S.C. § 702 provides, in relevant part, that:
> [a]n action . . . seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

5 U.S.C. § 702 (2007).

the APA or not"). Plaintiffs do not seek monetary damages from HUD, but are suing for injunctive relief. Therefore, Plaintiffs can sue HUD for violations of due process.

HUD also asserts that Plaintiffs' due process claims must be dismissed for failure to state a cause of action. To prevail on a procedural due process claim, Plaintiffs must prove that they have "asserted a recognized liberty or property interest" and were "intentionally or recklessly deprived of that interest, even temporarily," through Defendants' action without due process. *See Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005). The Supreme Court holds that public housing tenants have "a significant interest in property," namely in their "right to continued residence in their homes." *Greene v. Lindsey*, 456 U.S. 444, 451 (1982). In addition, mere lack of possession does not terminate a tenant's property interest in their leasehold. *See Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994). Thus, the Court recognizes that Plaintiffs do "have a recognized property interest in continued public housing assistance." (Rec. Doc. No. 60 at 32). But to determine the extant of Plaintiffs' entitlement, requires an examination of the terms of their leases with HANO.

HANO alleges that, according to the terms of the lease, it can transfer tenants to alternative housing with or without notice for variety of reasons. For example, it may transfer tenants if the unit becomes hazardous to the health or safety of the tenant, or if it is necessary to demolish or rehabilitate the unit. *See Rec. Doc. No. 60 at Exh. A, Section X; see also Id.* at Section VII©)(2). Specifically, HANO asserts that, in the event of an emergency transfer such as the evacuation for Hurricane Katrina, tenants are not entitled to a hearing prior to or after the transfer. *Id.* at Exh. B, p. 102. However, it is unclear whether the units at issue still "pose an immediate threat to resident life, health, or safety" and, thus, whether it is necessary for the units to remain unoccupied for more than sixteen months following Hurricane Katrina. *Id.* Plaintiffs claim that a simple, cost-effective

"bio-wipe" is all that is needed to render many units habitable. In contrast, Defendants claim that Plaintiffs far underestimate the extent of the damage, and that substantial time, effort, and money is required to render the affected units safe for occupancy.

Moreover, HANO asserts that Plaintiffs have not been deprived of their basic right to continued residence in public housing because they have received disaster assistance vouchers, which provide them with housing assistance indefinitely. However, the Court takes judicial notice of the fact that, in post-Katrina New Orleans, rents have risen and affordable, habitable housing is scarce. Plaintiffs argue that, as a result of this ongoing rise in rental prices, the vouchers provided are inadequate to provide for continued subsidized housing. The vouchers, as explained to the Court by all parties, do not cover non-rental costs such as utilities, whereas such costs are covered if tenants are residing in public housing developments.

Therefore, viewing the facts in a light most favorable to the Plaintiffs, they have stated a claim upon which relief can be granted. Moreover, the disputed factual issues presented before the Court preclude the granting of summary judgment. Specifically, the Court requires further factual development on: (1) the number of units, if any, that are presently habitable; (2) the extent of the repairs required to render non-habitable units habitable; (3) the number of tenants who presently wish to return and are able to return; (4) the inadequacies of the current voucher program.

G. INTERNATIONAL LAW CLAIMS (COUNT 8)

The Guiding Principles on Internal Displacement (GDIP) are not a treaty and "do not constitute a binding instrument." *Francis Deng*, OCHA Online, GDIP, introductory comments ¶ 2. The creators simply hoped "that they will be widely circulated and given practical application in the field." *Id.* at ¶ 6. As a result, the GDIP are not customary international law because states do

21

not "universally abide by it." *Flores v. Southern Peru Copper Corporation*, 414 F.3d 233, 248 (2nd Cir. 2003). To be customary international law "the principle[s] must be more than merely professed or aspirational." *Id.*

Plaintiffs assert that HUD and HANO have violated international law, specifically, Principle 28 of the GDIP. However, Plaintiffs do not have standing to assert their claims for violations of international law against HUD or HANO under the GDIP because the GDIP does not have the force of "law." Therefore, construing the facts in the light most favorable to the Plaintiffs, they have failed to state a claim upon which relief can be granted under the GDIP. Defendants' motions for summary judgment are granted.

II.    Plaintiffs' Cross-Motion for Summary Judgment (Rec. Doc. No. 90)

Plaintiffs move this Court to enter partial summary judgment as to liability in Plaintiffs' favor and against defendants C. Donald Babers, William C. Thorson, and the HANO with respect to the following claims: (1) violation of § 3604 of the Fair Housing Act for disparate impact (Count I); (2) violation of § 3608 of the Fair Housing Act (Count III); (3) violation of § 1437p of the U.S. Housing Act (Count IV); (4) constructive eviction (Count V); (5) breach of lease (Count VI); and (6) violation of Plaintiffs' due process rights (Count VII). As previously discussed, and as it pertains to Plaintiffs' disparate impact claim, found in Count 1, Plaintiffs' motion is **DENIED** as moot. As previously discussed, and as it pertains Plaintiffs' actual demolition *and* constructive demolition claims, found in Count 4, Plaintiffs' motion is **DENIED** as moot. As it pertains to all other counts listed in Plaintiffs' motion, numerous issues of disputed fact exist that preclude the granting of summary judgement. Therefore, Plaintiffs' motion is **DENIED**.

III.    HUD's Motion for Reconsideration (Rec. Doc. No. 27)

22

For the following reasons, Defendant's Motion to Reconsider the Court's August 21, 2006

Order granting Plaintiffs' Motion for an Evidentiary Hearing on their Motion for a Preliminary

Injunction is **DENIED** as moot. The Court held oral argument on Plaintiffs' Preliminary Injunction

Motion on October 25, 2006.

IV.    Plaintiffs' Motion for Preliminary Injunction (Rec. Doc. No. 21)

For the reasons previously stated in open court at oral argument and for the foregoing

reasons, Plaintiffs' motion is **DENIED**. As per this order, the Court recognizes the need for further

factual development, particularly as it relates to: (1) the number of units, if any, that are presently

habitable; (2) the extent of the repairs required to render non-habitable units habitable; (3) the

number of tenants who presently wish to return and are able to return; (4) and the inadequacies of

the current voucher program. Moreover, there exists an adequate remedy at law through which

Plaintiffs' can pursue their claims.

For the foregoing reasons,

**IT IS ORDERED** that:

(1)    HUD's Motion to Dismiss (Rec. Doc. No. 45) is **DENIED** in part and **GRANTED**

in part. HUD's motion, as it pertains to Plaintiffs' disparate treatment *and* disparate

impact claims, found in Counts 1, 2 and 7, is **GRANTED** because Plaintiffs have

failed to introduce pertinent evidence of discriminatory treatment or impact. As

discussed above, and as it pertains to Plaintiffs' actual *and* constructive demolition

claims found in Count 4 and Plaintiffs' international law claims found in Count 8,

HUD's motion is **GRANTED**. Additionally, HUD's motion, as it pertains

Plaintiffs' constructive eviction and breach of lease claims found in Counts 5 and 6,

respectively, is **GRANTED.** Finally, as discussed above, and as it pertains to all other counts not previously dismissed, HUD's motion is **DENIED** because genuine issues of material fact remain that must be decided at trial.

(2)    HANO's Motion to Dismiss or Alternatively for Summary Judgment (Rec. Doc. No. 60) is **DENIED** in part and **GRANTED** in part. HANO's motion, as it pertains to Plaintiffs' disparate treatment *and* disparate impact claims, found in Counts 1, 2 and 7, is **GRANTED** because Plaintiffs have failed to introduce pertinent evidence of discriminatory treatment or impact. As discussed above, and as it pertains to Plaintiffs' actual *and* constructive demolition claims found in Count 4 and Plaintiffs' international law claims found in Count 8, HANO's motion is **GRANTED.** Finally, as discussed above, and as it pertains to all other counts not previously dismissed, HANO's motion is **DENIED** because genuine issues of material fact remain that must be decided at trial.

(3)    HUD's Motion for Reconsideration (Rec. Doc. No. 27) is **DENIED** as moot.

(4)    Plaintiffs' Cross-Motion for Partial Summary Judgment (Rec. Doc. Nos. 87 & 90) is **DENIED**.

(5)    Plaintiffs' Motion for Preliminary Injunction (Rec. Doc. No. 21) is **DENIED.**

New Orleans, Louisiana, this 6th day of February, 2007.

IVAN L.R. LEMELLE
UNITED STATES DISTRICT JUDGE

24

MINUTE ENTRY
LEMELLE, J.                                      JS10(00:45)
November, 15, 2007

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, *et al.*                 CIVIL ACTION

**VERSUS**                                 NO. 06-3298

ALPHONSO JACKSON, SECRETARY OF THE         SEC. "B" (5)
UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, *et al.*

On Thursday, November 15, 2007, this Court held a telephone status conference with all counsel representing Plaintiffs, HANO and HUD to discuss pending motions before this Court. Considering Plaintiffs' Motion to Reinstate Claim or In the Alternative for Leave to File Supplemental Pleading (Rec. Doc. No. 500); Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction (Rec. Doc. No. 502); HANO's Third Motion to Dismiss, or Alternatively, for Summary Judgment (Rec. Doc. No. 504); and Federal Defendants' Second Motion to Dismiss (Rec. Doc. No. 520);

**IT IS ORDERED** that Plaintiff's Motion to Reinstate Claim is **DENIED** and the alternative Motion for Leave to File Supplemental Pleading is **GRANTED**. However, said supplemental claims are dismissed for the same reasons given in our prior rulings on this


EXHIBIT
21

related issue. There is no absolute or unfettered private right of action regarding demolition. Due process has been given by HANO and HUD. A review of HUD's approval letter (Ex. A to Rec. Doc. No. 525), shows no material deficiencies that would otherwise warrant a finding of arbitrary or capricious conduct or a violation of equal protection. As found during the September 17, 2007 hearing, this Court again finds that resident consultations by HANO afforded due process, albeit imperfect. Plaintiffs' reliance on the time it took for the issuance of HUD's approval letter or the absence of proper agency consideration of opposing views are insufficient to overcome the strong presumption of regularity that attaches here, especially in view of the scope and detail provided in the approval decision letter/memorandum at issue. Redevelopment of public housing was ongoing prior to the onslaught of Hurricane Katrina. In post-Katrina New Orleans, legal and reasonable efforts, as imperfect and time-consuming they might be, should be allowed to revitalize public housing in this City. Everyone should join in those efforts.

   IT IS FURTHER ORDERED that Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction is DENIED. Based on our prior rulings and findings again, there is adequate remedy at law. We view Plaintiffs' claims here as premised on alleged insufficient public housing units if demolition and reconstruction are allowed to proceed. Further, Plaintiffs' contend Defendants have not met procedural requirements prior to approval of plans at

issue.  However, the record does not support those contentions.
Even if HUD's conduct was procedurally flawed, Plaintiffs' post-
deprivation remedies at law could adequately address Plaintiffs'
concerns.  Further, HUD is directed to provide Plaintiffs' counsel
within **10 days**, the underlying materials for the Secretary of HUD
approval letter of HANO's demolition/reconstruction application,
including other comments to said application.

   **IT IS FURTHER ORDERED** that HANO's Third Motion to Dismiss, or
Alternatively, for Summary Judgment is **DENIED**.  Additional
discovery should be allowed prior to any summary consideration of
matters raised here.

   **IT IS FURTHER ORDERED** that Federal Defendants' Second Motion
to Dismiss is **DENIED**.  The voucher program is premised on federal
regulations promulgated by HUD.  Plaintiffs' contend those
regulations cause disparate treatment or have disparate impact on
the residents.  Therefore, Plaintiffs' claims against HUD survive
this motion.

   **IT IS FURTHER ORDERED** that all parties are allowed time to
conduct additional discovery on the claims certified.  Parties must
submit to this Court a plan for discovery by **November 28, 2007**.

   **IT IS FURTHER ORDERED** that Plaintiffs' Ex Parte Motion to
Expedite Hearing on Motion to Reinstate Claim or In the Alternative
for Leave to File Supplemental Pleading (Rec. Doc. No. 501);
Plaintiffs' Ex Parte Motion to Expedite Hearing on Motion for a

Temporary Restraining Order and a Preliminary Injunction (Rec. Doc. 503); and HANO's Request of Oral Argument on HANO's Third Motion to Dismiss, or Alternatively, for Summary Judgment (Rec. Doc. No. 505) are all **DISMISSED as MOOT** in light of the rulings on the related motions.

    New Orleans, Louisiana, this 16th day of November, 2007.

                        IVAN L.R. LEMELLE
               UNITED STATES DISTRICT JUDGE

4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, *Et al.* .          *  CIVIL ACTION NO. 06-3298
              Plaintiffs,          *
     VERSUS          *  SECTION "B"
                 *
ALPHONSO JACKSON, SECRETARY OF THE*  JUDGE IVAN LEMELLE
UNITED STATES DEPARTMENT OF HOUSING*
AND URBAN DEVELOPMENT; *Et al.*          *  MAGISTRATE ALMA CHASEZ
                 *
          Defendants.          *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF SHELLEY SMITH

     **BEFORE ME,** the undersigned authority, a notary public duly commissioned and

qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared:

### SHELLEY SMITH

who, after being duly sworn, deposed and stated that:

     1.    I am the Director of Strategic Planning for the Housing Authority of New

Orleans (HANO). I have served in that capacity for ten years.

- 1 -

EXHIBIT

2.    In my capacity as Director of Strategic Planning, I provide planning, administrative, and technical support for HANO's operational and development initiatives, coordinate the Public Housing Agency (PHA) Plan process, and facilitate the preparation of various special applications, reports, and grant proposals.

3.    In the course and scope of my employment with HANO, I worked on planning for, as well as preparation and drafting of the disposition/demolition application completed and submitted to the United States Department of Housing and Urban Development (HUD), Office Of Public and Indian Housing, Special Applications Department (SAC) in September 2007.

4.    I also worked on the planning for and preparation of meetings, activities and communications required to support that application.

5.    Due both to the importance of the application and the fact that current HANO personnel do not have extensive experience with such applications, HANO worked closely with SAC personnel to assure that HANO's application was prepared in accordance with HUD regulation and policy.

6.    To that end, HANO submitted different pieces of the application to the SAC at different points even though other required portions of the application were not then ready such that the application therefore could not be completed or formally submitted for approval. HANO's purpose in submitting parts of its application in this piece-meal fashion was to assure as much as possible that once the application was completed, finalized and formally submitted, the time necessary for review by the SAC could be minimized.

7.    HANO submitted the first preliminary portions of its application on October 16, 2006. However, HANO's application was not completed until the week of

- 2 -

September 17, 2007, when it was finalized and formally submitted.

8.     As HANO prepared for submission of its application, it completed the steps necessary to complete the application in compliance with HUD regulations. For example, HANO held a formal resident consultation meeting in November 2006.

9.     HANO began planning for its application to the SAC and for related activities such as resident consultation in the summer of 2006 before this lawsuit was filed.

10.     Although HANO had previously planned to hold its formal, public resident consultation and its subsequent Board of Commissioners meeting during the week of November 15, 2006, it postponed both meetings due to problems completing related paperwork and in order to provide more time for HANO staff to process and consider resident input after the formal resident meeting.

11.     In contrast to the previous schedule, HANO's revised schedule allowed HANO staff more than a week to consider and process comments made by residents during the consultation meeting. The short delay furthermore allowed a lengthier period of time within which displaced HANO residents could transmit written comments to HANO regarding the proposed demolition.

12.     Finally, HANO viewed the November 29, 2006 date as preferable based on its expectations (1) that this date (which fell several days from the Thanksgiving holiday and the Bayou Classic game) would be a more convenient date for displaced residents who were already visiting New Orleans during that time-period and (2) that a meeting on that date therefore would attract greater displaced resident participation.

13.     After fixing the new date and securing a meeting place, HANO conducted a mass-mailing to all affected residents. HANO sent two notice letters to each displaced

- 3 -

resident, one to the pre-Katrina address for that resident as well as one to the most recent post-Katrina address HANO has for that resident.

14.     As shown by the attached sample letter with attachments [HANO Exhibit "A"], these letters advised of the time and place of the meeting, and attached a list of affected properties.  In addition, the letter invited displaced residents who could or could not attend the meeting to (1) visit the HANO website for more detailed information; (2) complete and return to HANO the comment form enclosed with the notice letter; and/or (3) send comments to HANO electronically through an email link on its website.

15.     In addition to the letters and the information posted on its website [*see e.g.,* copy of HANO website page with resident notification attached as HANO Exhibit "B"], HANO ran newspaper ads on three different dates in (1) the Dallas Observer; (2) the Houston Chronicle; (3) the New Orleans Times-Picayune, and (4) the Baton Rouge Advocate. The text of these ads appears on HANO Exhibit "C" hereto.

16.     Finally, in an abundance of caution, HANO also requested that plaintiffs' counsel notify plaintiffs as well as any other affected residents for whom they had contact information.

17.     HANO had also involved current and former resident organizations for each development and the former Parish-wide resident advisory council ("RAB") in its planning process.  For example, HANO distributed its draft fiscal year 2007 PHA plan to members of these organizations on October 17, 2006 and invited them to participate in meetings regarding its provisions (including those addressing demolition) after its October 18 Board meeting and on October 19, 2006.  HANO believed that this would be more convenient for out-of-town resident leaders.  They declined, however, requesting a rescheduled date because they wanted to meet and

- 4 -

confer amongst themselves regarding the draft 2007 PHA plan and the demolition plans in advance of any meeting with HANO staff.

18.    HANO honored this request and reset the meeting to November 8 and 9, 2006. HANO staff met with members of these resident organizations to discuss the plan on November 8, 2006. One RAB member, who was unable to meet on November 8 and 9, 2006, at her request met separately with HANO staff on October 26, 2006 and related her comments and questions.

19.    Other RAB members attended the meeting on November 8, 2006. However, that meeting concluded early when RAB members walked out after HANO staff refused to answer a few confrontational questions about issues raised in this case, explaining that HANO could not address those matters due to the lawsuit. HANO staff further explained that the purpose of the meeting was not for HANO to address the litigation, but for residents to express their comments or suggestions for consideration in the planning process and urged RAB members to stay and participate. No one appeared for the meeting scheduled on November 9, 2007.

20.    HANO subsequently held a pre-board resident leaders meeting on December 6, 2006. After December 6, 2006 to date, HANO has continued to communicate with present and former resident organizations regarding its plans. For example, HANO compiled a list of issues raised by the RAB with HANO responses, which was then provided to RAB members with a revised plan. HANO also invited representatives of resident organizations to attend a meeting on November 28, 2006 regarding proposed HUD policies regarding re-occupancy.

21.    At its formal resident consultation meeting on November 29, 2006, HANO

- 5 -

allowed all residents and non-resident participants attending the meeting to sign in and invited all who attended to provide comments. Not only did HANO invite oral comments at the meeting, HANO had resident comment sheets available for those who chose not to or were not able to speak at this meeting. HANO also made available to residents at this meeting a list of affected properties and a sheet setting forth frequently asked questions and answers.

22.     Over two hundred people attended the meeting, including at least 3 plaintiffs' counsel, several politicians, and over 70 interested persons from the community including representatives of political, advocacy and community groups and other organizations. At least 116 displaced and/or current HANO residents were present, and 35 signed up to speak.[1]

23.     HANO used its best efforts to briefly inform the residents about its plans, to provide answers to frequently asked questions, and then to leave the maximum amount of time for resident comments. However, certain persons from political groups and/or purported community action groups yelled out provocative and divisive statements that agitated the crowd and led portions of the crowd to disrupt the meeting, eating into time allotted on the agenda for resident comment.

24.     Nonetheless, the overwhelming majority of HANO displaced and current residents in attendance who signed up to speak were invited and permitted to do so. HANO believes that some residents in attendance were intimidated by other persons present because many residents did not come forward to speak after being called to the microphone by HANO.

25.     As shown from the written comments from residents attached in HANO Exhibit E, many residents express no objection to demolition and a significant number actually

---

[1]     34 indicated in writing that they did not want to speak.

- 6 -

support HANO's proposed plans.  *See e.g.*,  HANO Exhibit E at pages bates-numbered 017737-17741, 017767, 017781, 017814, 017816, 017829, 017818-017820, 017823, 017839, 017844-45, 017865-66,  017870,  017877-81,  017798,  017743-46,  017748-50,  017753-55,  017761-62, 017765,  017769,  017772-4,  017782-84,  017789-90,  017797,  017805-06,  017809,  017811, 017815,  017817,  017824-26,  017832,  017834-35,  017838,  017841,  017847-50,  017857-63, 017868-69, 017876-77, 017882.

26.     In response to its mailings and other efforts to solicit resident and community input, HANO received approximately 242 written comments regarding its proposed demolition/disposition application to HUD.  In addition, HANO reviewed numerous comments made at its 11/29/06 resident consultation meeting as well as those made at the resident advisory board meetings.  HANO also considered reports from HANO agents regarding their meetings with residents and comments they received from residents and community members.

27.     HANO fully evaluated and considered all of the resident comments it received and posted responses thereto on its website for their review, as was communicated to them at the November 29, 2006 meeting.

28.     As a result of the resident comments, HANO made significant revisions to its plans and worked with HUD to address other resident comments it received.  For example, in response to comments expressing the desire for more "phasing" and requests that more units be repaired for interim occupancy, HANO is now repairing some units at the Lafitte development for interim occupancy although it had previously planned only to do so at the B.W. Cooper development.

29.     HANO had already submitted the bulk of its disposition and demolition

- 7 -

828189v.1

898701v.1

application to the SAC prior to September 17, 2007 and had diligently worked with staff at the SAC to assure that its application was in compliance with HUD regulations and in proper order. During the week of September 17, 2007, HANO submitted the last, and relatively very small, part of its application that was necessary to complete it and therefore made it a final, formal submission at that time.

30.     During the week of September 17, 2007, the SAC made follow-up inquiries to HANO, to which HANO responded immediately. As a result, HANO received formal approval of the application from the SAC on September 21, 2007.

31.     HANO continues to work with residents, both current and displaced, to address the concerns they have regarding HANO's demolition and redevelopment plans and will continue to do so throughout the redevelopment process.

32.     HANO will not commence demolition in connection with its 2007 application prior to December 2007.

_____
Shelley Smith

Sworn to and subscribed before me
this 6th day of November , 2007.

Laetitia Black   _____
Notary No. 81064     NOTARY PUBLIC

Laetitia Black   28497
Print Name & Bar No.

- 8 -

# HANO A

**HANO**

Housing Authority of New Orleans

Re: Resident Consultation Meeting

Dear

The Housing Authority of New Orleans (HANO) invites all affected HANO residents, Resident Organizations, and the Resident Advisory Board to attend a consultation meeting on the proposed demolition and disposition of certain HANO public housing properties. The resident consultation meeting will take place on Wednesday, November 29, 2006 at 6:00 p.m. in the John McDonogh High School Auditorium at 2426 Esplanade Avenue, New Orleans, LA 70119.

A listing of the affected developments and scattered site units is enclosed as a part of this mailing. Also, HANO's draft Fiscal Year 2007 PHA Plan contains descriptions of the proposed demolition and disposition activity, starting on page 30.

The draft HANO Fiscal Year 2007 PHA Plan is posted for your review on HANO's website at www.hano.org and is available for inspection Monday through Friday from October 17th – December 1st during the hours of 8:30 am – 5:00 pm at the following locations:

> Iberville Development
> 401 Treme Street
> New Orleans, LA 70112
>
> Christopher Homes Community Center
> 2000 Murl Street
> New Orleans, LA 70114

The demolition of buildings in which affected residents still reside will not commence until each such resident is relocated, and each family displaced by such action will be provided with comparable housing as determined by HANO and pursuant to applicable HUD regulations.

We invite you to submit comments using the enclosed form or you can post your comments on HANO's website at info@hano.org. All comments must be received by December 1, 2006. We look forward to your participation in the upcoming meeting on November 29th.

Sincerely,

C. Donald Babers
Board of Commissioners

HANO 017669

# Housing Authority of New Orleans

## Resident Comments
## on the
## Proposed Demolition and Disposition of Property

Name: _____          Phone Number: _____

Current Address: _____          Pre-Katrina HANO Address: _____

_____          _____

_____          _____

_____

Comments:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

All written comments should be forwarded to:
Housing Authority of New Orleans
ATTN: Strategic Planning Department
4100 Touro Street
New Orleans, LA 70122

Or you can post your comments on HANO's website at info@hano.org.
All comments must be received by December 1, 2006

## HOUSING AUTHORITY OF NEW ORLEANS
### PROPERTIES SUBJECT TO PLANNED DEMOLITION AND/OR DISPOSITION

| CONVENTIONAL DEVELOPMENTS: | | | | |
|---|---|---|---|---|

*This page consists of a very dense multi-column listing of property addresses organized under development headings including: C.J. PEETE LA1-2, LA1-19; FLORIDA LA1-4, LA1-47; LAFITTE LA1-5; ST. BERNARD LA1-4, LA1-5; IBERVILLE LA1-7, LA1-13; SCATTERED SITES; DELERY LA1-18; CAMBRONNE LA1-19; ST. CLAUDE LA1-2; IMPERIAL COURT LA1-12; SCATTERED SITES LA1-25; SCATTERED SITES LA1-25; DALE HOMES LA1-26; CHRISTOPHER PARK LA1-30; ALLEN STREET LA1-21; PRESS PARK LA1-32, LA1-50; POLAND-MURAT LA1-38; IMPERIAL LA1-54; VACANT ROYAL LA1-44; and others. The individual address entries are too small and low-resolution to transcribe reliably.*

# HANO B



HANO Home | Announcements | Section 8 | Employees | Contractors | Client Services

## Resident Notice

HANO invites all affected HANO residents, resident organizations and the Resident Advisory Board to attend a
consultation meeting on the proposed demolition and disposition of certain HANO public housing properties.

**Wednesday, November 29, 2006**
**6:00 PM**
**John McDonough High School Auditorium**
**2462 Esplanade Avenue**
**New Orleans, LA 70119**

All written <u>comments</u> should be forwarded to:
Housing Authority of New Orleans
c/o Strategic Planning Department
4100 Touro Street
New Orleans, LA 70122
504-670-3300

You may also email comments to <u>info@hano.org.</u>

HANO.017670



**HANO**
Housing Authority of New Orleans

# RESIDENT NOTICE

## THE HOUSING AUTHORITY OF NEW ORLEANS (HANO) INVITES ALL AFFECTED HANO RESIDENTS, RESIDENT ORGANIZATIONS, AND THE RESIDENT ADVISORY BOARD TO ATTEND A CONSULTATION MEETING ON THE PROPOSED DEMOLITION AND DISPOSITION OF CERTAIN HANO PUBLIC HOUSING PROPERTIES

### THE MEETING WILL BE HELD ON
### WEDNESDAY, NOVEMBER 29, 2006
### 6:00 P.M.
### JOHN MCDONOUGH HIGH SCHOOL AUDITORIUM
### 2462 ESPLANADE AVENUE
### NEW ORLEANS, LA 70119

Further information is available on HANO's website at
www.HANO.org

ALL WRITTEN COMMENTS SHOULD BE FORWARDED TO

Housing Authority of New Orleans
c/o Strategic Planning Department
4100 Touro Street
New Orleans, LA 70122
504-670-3300



EQUAL HOUSING
OPPORTUNITY



**Housing Authority of New Orleans**

June 7, 2007

BURBANK, GILDA

Dear Resident:

This letter is to inform you that a unit in the Iberville Development is expected to be available for occupancy on August 7, 2007  As Head of Household, if you wish to return to one of these units, you must notify us of your intent to return within thirty (30) days of the date of this letter  Please indicate your intentions by completing one of the following attached Family Certification of Intent forms.

- *Family Certification of Intent to Reoccupy Pre-Disaster Project-Based Assisted Housing*. Complete this form if you want to live in an available unit at the Iberville Development.
- *Family Certification of Intent to Return to Pre-Disaster Tenant-Based Voucher Location*. Complete this form if you **do not** want to live in an available unit at the Iberville Development. BUT, you want to receive a tenant-based voucher or comparable tenant-based assistance.

Please send your completed Family Certification of Intent Form to this address:
>  Housing Authority of New Orleans
>  4100 Touro Street
>  New Orleans, LA  70122
>  ATTN.  Management Department

Once HANO receives your Family Certification of Intent Form, you will receive further confirmation for your selected intention.

If you have indicated your intent to return and accept an available unit at the Iberville Development, please anticipate moving to a unit within sixty (60) days of the date of this letter

If you have any questions, please contact the Iberville Office at (504) 822-8162.

Sincerely,

Dwayne Muhammad
Director of Management

ANDER 02407
CONFIDENTIAL

EXHIBIT
23



**HANO**

Housing Authority of New Orleans

## FAMILY CERTIFICATION OF INTENT TO REOCCUPY
## PRE-DIASTER UNIT

☐ I do NOT want to occupy a unit in the Iberville Development. I UNDERSTAND THAT CHECKING THIS BLOCK MEANS THE OFFERED UNIT WILL BE LEASED TO ANOTHER FAMILY AND THAT I ELECT TO HAVE MY NAME PLACED ON THE DISASTER REOCCUPANCY PRIORITY LIST ( THE  DISASTER VOUCHER PROGRAM IS EXPECTED TO END ON 9/30//07 ). HUD cannot guarantee that housing assistance will continue indefinitely for families whose pre-disaster project-based housing is not ready for occupancy.

_____

Print Name of Head of Household

_____    _____

Signature of Head of Household          Date

_____    _____

Current Address          Phone Number

Add only for families that occupied their pre-disaster project-based voucher unit for 12 months or more before Hurricanes Katrina or Rita

☐ Instead of returning to the project-based voucher project that I lived in prior to Hurricanes Katrina or Rita, I want to receive a tenant-based voucher or comparable tenant-based assistance.

_____

Print Name of Head of Household

_____    _____

Signature of Head of Household          Date

_____    _____

Current Address          Phone Number

**ANDER 02408**
**CONFIDENTIAL**



**Housing Authority of New Orleans**

## FAMILY CERTIFICATION OF INTENT TO REOCCUPY
## PRE-DIASTER UNIT

☐    I want to occupy a unit. Please notify me of the actual date a unit will be ready for occupancy.

Please check below if any of the following circumstances apply to your family

☐    My family is larger or smaller than before Hurricanes Katrina or Rita

☐    Other such as wheel chair accessibility (please explain): ____

_____

Print Name of Head of Household

_____    _____
Signature of Head of Household          Date

_____    _____
Current Address          Phone Number

**ANDER 02409**
**CONFIDENTIAL**



**HANO**

...ng Authority of New Orleans

March 16, 2007

_Ms. Gilda Burbank,_
_..........._
_..........._

Re: Request for updated information
Note: This is not an offer

Dear Resident,

The Housing Authority of New Orleans (HANO) is currently in the process of finalizing information on residents who are interested in transferring to the Iberville Development.

In order to be considered for possible placement in the Iberville Development, we are asking your assistance in providing the Agency with the following information.

Please **initial** in the space provided next to the statement that applies to your family.

|        |                                                                                           |
|--------|-------------------------------------------------------------------------------------------|
|        | Yes I wish to transfer to Iberville Development.                                           |
| _____  | No I am not interested transferring to an apartment in the Iberville Development, but will consider Scattered Sites, if available. |
|        | Note: You are responsible for your own utilities in S.Sites.                              |
| _Yes_  | I am currently being assisted with my rent by FEMA                                        |
|        | I am currently being assisted with my rent through the Disaster Voucher Program (DVP).     |
|        | I am leased with another Public Housing Authority.                                         |

When an offer is made, how soon will it take for you to move into the unit?

I will return by _when the offer_ Signature: _Mrs. Burbank_
_is made_

Please list below your current address and telephone number;

Address: _____ Phone Number _____
City/State Zip Code: _____

Please return this form within seven (7) days from the date of this letter. Should you have any questions or concerns, you may call Diane Cormier at (504) 522-8162.

Sincerely,
D. Cormier

4100 Touro Street • New Orleans, LA 70122 • (504) 670-3443 • FAX (504) 286-8228
The Housing Authority of New Orleans is an Equal O...

Confidential



*"Creating Effective Partnership"*

Guste Homes
Resident
Management
Corporation

2300 ERATO STREET  SUITE D  •  NEW ORLEANS, LA 70113
PHONE  (504) 525-9506  •  FAX:  (504) 525-5002

September 28, 2006

MS. GILDA M BURBANK
650°...
ROUS...

Dear GILDA BURBANK:

We are pleased to announce the opening of our newly renovated family units at Guste
Homes.  Because you are an existing public housing resident, you have first preference to
be considered for moving into our brand new units before we begin advertising to the
general public. You must complete an application, be income eligible and pass the
normal screening and suitability requirements to be considered,

If you are interested, you may pick up an application form our office located at 1301
Simon Bolivar Avenue, New Orleans, LA or contact us to receive an application via
postal mail.

An apartment offer will be determined in the order in which the application is returned
and by the original public housing lease date.

PLEASE ACT NOW!  There are a limited number of available units.

Should you have any questions or are in need of an application, feel free to contact our
office at 504.529.3392.

Yours in affordable housing,

Keywanda W. Cowart
Property Manager



*"Equal Housing Opportunity"*

**Confidential**                                                      **ANDER 02156**



**HANO**
Housing Authority of New Orleans

October 30, 2006
Ms. Hilda Burbank

Re: Request for information from
Families Transferring to Iberville

Dear Resident,

The Housing Authority of New Orleans (HANO) is currently in the process of finalizing information on residents who are interested in transferring to the Iberville Development.

In order to begin your actual return to the Iberville Development, we are asking your assistance in providing the Agency with the following information.

Please initial in the space provided next to the statement that applies to your family.

_____ Yes I wish to transfer to the Iberville Development.
_____ No I am not interested transferring to an apartment in the Iberville Development.
_____ I am currently being assisted with my rent by FEMA
_____ I am currently being assisted with my rent through the Disaster Voucher Program (DVP).

When an offer is made, how soon will it take for you to move into the unit?

I will return by _____  Signature: _____

Please list below your address and telephone number:

Address: _____

City/State/Zip Code: _____

Telephone Number: _____

Please return this form within next Seven days from the date of this letter. Should you have any questions or concerns, you may call Edith Kennedy, Client Services Department at (504) 522-8162.

Sincerely,

E. Kennedy
Administrative Director

4100 Touro Street • New Orleans, LA 70122 • (504) 670-3443 • FAX (504) 286-8228
The Housing Authority of New Orleans is an Equal Opportunity Employer

**Confidential**

**ANDER 02170**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| YOLANDA ANDERSON, *et al.* | * CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * |
| VERSUS | * SECTION "B" |
| | * |
| ALPHONSO JACKSON, SECRETARY OF THE | * JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * |
| AND URBAN DEVELOPMENT; *et al.* | * MAGISTRATE ALMA CHASEZ |
| | * |
| Defendants. | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

      Defendants William C. Thorson, C. Donald Babers, and the Housing Authority of New Orleans (collectively "HANO") respectfully submit the following memorandum in opposition to plaintiffs' amended motion for class certification (Rec. Doc. 361). Because a significant portion of the class plaintiffs purport to represent does not support plaintiffs' efforts to prevent the demolition of storm-damaged, obsolete public housing developments, plaintiffs' proposed class cannot satisfy the requirements of Federal Rule of Civil Procedure 23.

## I.    INTRODUCTION

      The Court should deny plaintiffs' amended motion for class certification because the plaintiffs do not and cannot establish the prerequisites for class certification set forth in Rule

EXHIBIT

23. "A plaintiff cannot make a lawsuit into a class action simply by labeling it a 'class action.'"
5 Moore's Federal Practice § 23.60[2] (Matthew Bender 3d ed. 1997). In order to satisfy Rule
23, the moving party must meet all of the requirements of Rule 23(a), in addition to at least one
requirement of Rule 23(b). *Pederson v. La. State Univ.*, 213 F.3d 858, 867 (5th Cir. 2000).
Plaintiffs, however, cannot satisfy any elements necessary for class certification because a large
number of the proposed class simply does not want the relief that plaintiffs purport to seek on its
behalf.

A review of the evidence produced during discovery and of the deposition
testimony of the named plaintiffs themselves reveals that the named plaintiffs not only fail to
adequately represent, but on the contrary, have interests that are directly antagonistic to
substantial portions of the proposed class that they purport to represent. Plaintiffs, perhaps in a
futile effort to address this problem, have attempted to omit from the class those HANO residents
who (1) support demolition and redevelopment of their former units and/or (2) do not wish to
return to New Orleans for reasons that have nothing to do with HANO's alleged conduct. In
doing so, plaintiffs have failed to propose an objectively definable and clearly ascertainable
class, but instead have submitted class and subclass definitions that are impermissibly subjective
and which require the merits of the case to be litigated before individual class membership can
be determined. Furthermore, plaintiffs assert claims that are highly individualized and not
subject to class-wide proof.

In their motion for class certification, plaintiffs belabor the point that they purport
to represent a class of African-American public housing residents, yet this fact does not absolve
them from compliance with the strictures of Rule 23. "[I]t is not the task of the federal court to
create class action rules that favor those with whom we empathize." *Thorn v. Jefferson-Pilot*

- 2 -

*Life Ins. Co.*, 445 F.3d 311, 328 n. 20 (4th Cir. 2005). Setting aside the issue of whether, as plaintiffs contend, the confinement of future generations of public housing residents to damaged, obsolete, high-density, high-poverty housing actually serves the interests of the proposed class, the Fifth Circuit has repeatedly counseled that class certification is simply not a superior procedural device when, as here, the individual nature of a class member's specific claims and injuries predominates over any common issues of law or fact. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006)(affirming denial of certification of proposed class of individuals allegedly exposed to chemicals where individual issues of medical causation, injury, and damages predominated and where plaintiffs sought damages for emotional distress and other intangible injuries); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)(reversing district court's certification of class of smokers because individual nature of each plaintiff's claim predominated over any common issues of law or fact). The Court therefore should deny plaintiffs' motion for class certification.

## II.    STATEMENT OF THE FACTS

This putative class action was originally filed on June 26, 2006 by twenty-one named plaintiffs[1] who purport to represent "[a]ll African-Americans citizens of the United States

---

[1]    One named plaintiff, Emelda Paul was subsequently voluntarily dismissed after she expressed support for HANO's redevelopment of the four public housing developments that are the subject of this suit. Rec. Docs. 159, 165. *See* Gwen Filosa, *Nagin Wants to Run Road Home in N.O.*, THE TIMES-PICAYUNE, (Feb. 23, 2007), *available at* http://www.nola.com/timespic/stories/index.ssf?/base/news-4/1172215324171540.xml&coll=1; *see also*, Ex. 1, Jarmon Dep. at 182:18 - 183:22. The plaintiffs later filed a pending motion to voluntarily dismiss five additional named plaintiffs, Yolanda Anderson, Donna Johnigan, Kim Paul, and Judith Watson. Rec. Doc. 264. At least two of these named plaintiffs, Ms. Watson and Ms. Johnigan, also support ***(continued on next page)***

- 3 -

who resided in public housing developments in New Orleans, Louisiana, as of August 29, 2005,

pursuant to written leases with defendant Housing Authority of New Orleans, who were

involuntarily displaced as a result of Hurricane Katrina and who, as of January 1, 2006, had not

been permitted to return to their pre-Katrina public housing units in New Orleans due to

Defendants' actions or inactions." Pls.' Memo. at 2. Plaintiffs propose a Subclass A comprised

of "those members of the class who have been prevented from returning to public housing in

New Orleans due to Defendants' actions or inaction." *Id.* Plaintiffs' proposed Subclass B

consists of "the class members who have returned to public housing in New Orleans but who

have been prevented from returning to their own pre-Katrina units due to Defendants' actions or

inaction." *Id.* Plaintiffs' proposed Subclass C is composed of "class members who have returned

to their pre-Katrina public units, but who were not permitted to return prior to January 1, 2006,

due to Defendants' actions or inactions." *Id.* Plaintiffs seek certification pursuant to Rules

23(b)(2) and 23(b)(3).

   In their Complaint, plaintiffs alleged, *inter alia*, that HANO and/or HUD had

violated the Fair Housing Act, the U.S. Housing Act of 1937, the Louisiana Civil Code, the

terms of the HANO lease, international law, and the Fifth and Fourteenth Amendments of the

United States Constitution. After extensive briefing by the parties and oral argument, the Court

granted partial summary judgment in favor of the defendants, dismissing several of the plaintiffs'

claims and defining the scope of the remaining issues to be tried. Specifically, the Court held

that genuine issues of material fact existed with regard to plaintiffs' (1) 42 U.S.C. § 3608 claims

---

  HANO's demolition and redevelopment plans. Ex. 2, Johnigan Dep. at 238:18 - 239:17;
246:17 - 247:16; Ex. 3, Watson Dep. at 97:4-18; 54:3-16.

- 4 -

as to HUD and HANO; (2) constructive eviction claims as to HANO; (3) breach of lease claims as to HANO; and (4) due process claims as to HUD and HANO. Rec. Doc. 175. The Court then ordered the parties to engage in simultaneous class certification and merits discovery. Rec. Doc. 210. Class-certification discovery has not yet been completed.[2]  Plaintiffs now move to certify their damages claims pursuant to Rule 23(b)(3) and their claims for injunctive and declaratory relief pursuant to Rule 23(b)(2).

Subsequent to the Court's February 6, 2007 Order, both plaintiffs and defendants, for different reasons, have sought to significantly reduce the number of named plaintiffs. On May 1, 2007, the plaintiffs moved to voluntarily dismiss as named plaintiffs Ms. Anderson, Ms. Johnigan, Ms. Doucet, Ms. Kim Paul, and Ms. Watson. (Plaintiffs' motion is still pending.)  On June 11, 2007, HANO moved to dismiss the claims of Ms. Paul, Ms. Banks, and Ms. Bell with prejudice due to their repeated failure to appear for their depositions and to respond to written discovery requests. Rec. Doc. 341. On July 18, 2007, Magistrate Chasez issued her Report and Recommendations, in which she recommended that the Court dismiss the claims of Ms. Paul, Ms. Banks, and Ms. Bell with prejudice. On August 9, 2007, HUD and HANO jointly moved to dismiss the claims of Ms. Gibson with prejudice after she repeatedly failed to appear for her deposition. Rec. Doc. 389.

If the Court adopts the Report and Recommendations of the Magistrate and also grants the defendants' and plaintiffs' pending motions, nine named plaintiffs will remain as putative class representatives: Ms. Burbank, Mr. Harris, Ms. Lewis, Ms. May, Ms. Johnson, Ms.

---

[2]    The expert discovery cut-off is August 13, 2007. HANO reserves the right to supplement its Opposition to Class Certification to reflect any information discovered subsequent to the filing of this memorandum.

883931v.2

DeGruy, Ms. Wright, Ms. Moten, and Ms. Williams. Mr. Harris, Ms. Moten, Ms. Johnson, Ms. May, and Ms. Williams all resided in C.J. Peete prior to Hurricane Katrina. Ms. Burbank resided at St. Bernard prior to Hurricane Katrina. Ms. DeGruy resided at Iberville prior to Hurricane Katrina. None of the remaining putative class representatives resided at B.W. Cooper or Florida prior to the storm.[3]

       The Court should deny plaintiffs' amended motion to certify the remaining claims against HANO. A significant portion of the proposed class does not desire and will not benefit from the relief plaintiffs purport to seek on their behalf. Many residents do not wish to return to storm-damaged, obsolete, high-density, high-poverty developments, and support HANO's demolition and redevelopment plans. Many other residents, like many New Orleanians of all races and economic circumstances, have decided to relocate permanently in order to access better schools and opportunities for themselves and their families. Moreover, any determination as to the merits of plaintiffs' remaining claims would require the trier of fact to make highly individualized inquiries into the physical condition of each putative class member's unit and as to his or her state of mind. For all of these reasons and those discussed more fully below, the Court should deny plaintiffs' motion for class certification.

---

[3]    The fact that there is no named plaintiff from B.W. Cooper, Florida, or any HANO development other than C.J. Peete, Iberville, or St. Bernard is sufficient in and of itself, to preclude certification of any putative classes consisting of residents from those developments. No named plaintiff has an interest in the outcome of HANO's redevelopment plans for those units, and thus lack standing to bring claims pertaining to those units. Moreover, they cannot adequately represent putative classes consisting of residents from these units.

- 6 -

### III.   LAW & ARGUMENT

Under Rule 23, a proponent of class certification must satisfy all four prerequisites of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation in paragraph (a) and one of the elements set forth in paragraph (b). Fed. R. Civ. P. 23. Additionally, a proper class definition is "an essential prerequisite to maintaining a class action." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976). It is well-established that the proponent of certification bears the burden of establishing that all of the Rule 23 requirements for class certification have been met. *See e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Applewhite v. Reichhold Chems.*, 67 F.3d 571, 573 (5th Cir. 1995).

After a rigorous analysis, the Court must be satisfied that all of the prerequisites of Rule 23 have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 568, 601 (5th Cir. 2006); *Castano*, 84 F.3d at 740; *Applewhite*, 67 F.3d at 573 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (3rd Cir. 1981). As explained by one court, "[b]ecause class-wide relief is an exception to the general rule that litigation be conducted by and on behalf of individual named parties only, a district court must rigorously analyze a motion for class certification to insure that the requirements of Rule 23 are met." *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 365 (E.D. La. 1997)(citing *Falcon*, 457 U.S. at 155). In doing so, the district court must go "beyond the pleadings" and "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues" set forth in Rule 23. *Castano*, 84 F.3d at 744. Courts must deny class certification when a class proponent cannot demonstrate one or more of the necessary class-certification elements established in Rule 23.

8839311v.2

A.    <u>Plaintiffs Have Failed To Define A Proper Class.</u>

As an initial matter, plaintiffs fail to define an objectively ascertainable class because their proposed class impermissibly requires the Court to determine each class member's state of mind before class membership can be determined.  A proper, objectively defined class definition is "an essential prerequisite to maintaining a class action." *Roman,* 550 F.2d at 1348 (4th Circ. 1976); *see also* WRIGHT, MILLER & KANE, FEDERAL PRACTICE PROCEDURE § 1760; *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir 1970)("It is elementary that in order to maintain a class action, the class sought be represented must be adequately defined and clearly ascertainable.").  "[T]he requirement that there be a class will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cook v. Rockwell Intern. Corp.,* 151 F.R.D. 378, 382 (D. Colo. 1993).  Class certification should be denied where plaintiffs do not define a proper class.  *Id., see also Rappaport v. Katz,* 62 F.R.D. 512-13 (S. D. N. Y. 1974); *Abromovitz v. Ahern,* 96 F.R.D. 208, 212 (D. Conn. 1982).

Here, plaintiffs seek to define the class as "[a]ll African-Americans citizens of the United States who resided in public housing developments in New Orleans, Louisiana, as of August 29, 2005, pursuant to written leases with defendant Housing Authority of New Orleans, who were involuntarily displaced as a result of Hurricane Katrina and who, as of January 1, 2006, had not been permitted to return to their pre-Katrina public housing units in New Orleans due to Defendants' actions or inactions."  Plaintiffs' vague, amorphous class definition is improper for several reasons.

First, it is axiomatic that a proposed class is insufficiently defined when it requires a court to determine a prospective class member's state of mind in order to establish membership within the class.  "[A]n identifiable class does not exist if membership is contingent on a

- 8 -

883931v.2

particular state of mind." *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 581 (N.D. Ill. 2005)(citing *Zapka v. Coca-Cola Co.*, 2000 WL 1644539 (N.D. Ill. 2000); *see also Wallace v. Chicago Housing Auth.*, 224 F.R.D. 420, 425-27 (N.D. Ill. 2004)(proposed class of public housing residents who had "attempted to" relocate but failed to do so "as result of" defendant housing authority's alleged conduct was not sufficiently definite). "[Class definitions] should avoid criteria that are subjective (e.g., a plaintiff's state of mind) or that depend on the merits (e.g., persons who were discriminated against). Such definitions frustrate efforts to identity class members, contravene the policy against considering the merits of a claim in deciding whether to certify a class, and create problems of manageability." *Jones v. Nat'l Sec. Fire & Cas. Co.*, 2006 WL 3228409 at *4 (W.D. La. 2006) (citing Manual for Complex Litigation, Third § 30.14). "[W]ithout reasonable specificity the court cannot define the class, cannot determine whether the representation is adequate, and the [defendant] does not know how to defend" against the claims. *Falcon*, 457 U.S. at 161.

The plaintiffs' proposed class is impermissibly contingent upon each individual resident's state of mind. In order to determine whether a HANO resident is a member of the class, the Court must determine (1) whether the resident in question has in fact returned to New Orleans; (2) when those residents who have returned did so; (3) why those residents who did return did not return on an earlier date; and (4) why those residents who have not returned have not done so. A number of former HANO residents have decided to relocate to other cities for personal reasons that have nothing to do with HANO's alleged conduct, and as such, were not "prevented from" returning to their former units by HANO's conduct. As plaintiff Johnigan testified during her deposition:

> [T]here are some [public housing residents] who had an
> opportunity to buy homes, some who had a lot of kids maybe with

- 9 -

> special needs. And here in the city, they [*sic*] still not a real good
> school or place that deal with children with physical or mental
> disabilities, a lot of them. And proud to say a lot of young women
> stepped up to the plate and said here's an opportunity for me to do
> something better for myself and my children, who are employed,
> and working, and satisfied where they are.

Ex. 2, Dep. of Johnigan at 337:20 - 338:5. Plaintiff Watson testified that one neighbor had

decided not to return to New Orleans because her blind son, who had "not been getting the help

he needed" in the New Orleans school system, had thrived at a special needs school in Fort

Worth, graduated from high school, and planned to enroll in college in Texas. Ex. 3, Dep. of

Watson at 93:15 - 94:8. The residents described by plaintiffs Watson and Johnigan are not being

prevented from returning by the alleged conduct of HANO; rather, they have made personal

decisions to relocate based upon a desire to provide a better life for themselves and their

families. In doing so, they, like many other New Orleanians of all walks of life who have been

forced to make the same decision, considered a number of factors wholly beyond HANO's

control, such as the quality of the schools, employment opportunities, and the strength of the

flood protection system. Yet there is no objective criteria by which the Court, the plaintiffs, or

the defendants can distinguish these residents, who are clearly not members of the putative class,

from those who may desire to return to their former units. Because any determination as to why

a resident did or did not return requires an inquiry into each resident's unique state of mind, the

proposed class definition is improper.

      Plaintiffs' proposed subclasses fare no better. When subclasses are requested by

the moving party or ordered by the court, it is generally settled that each subclass must

independently satisfy class action criteria." 1 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON

CLASS ACTIONS, § 3.9. Plaintiffs' proposed Subclass A consists of "those members of the class

who have been prevented from returning to public housing in New Orleans due to" HANO's

- 10 -

883931v.2

alleged conduct. Pls. Memo. at 2. As demonstrated above, there is no objective means for the Court, the plaintiffs, or the defendants to distinguish those class members, if any, who have not returned to New Orleans "due to" HANO's alleged conduct from those who have not returned due to a myriad of unrelated causes. Plaintiff Johnigan estimated that, based upon her interactions with other residents in her capacity as a member of the B.W. Cooper Resident Management Corporation ("RMC"), approximately 40%[4] of the proposed class had no desire to return to obsolete, high-density, high-poverty housing in New Orleans. HANO expert Dr. Ivan J. Miestchovich, Jr. states in his report that, as of the date of his report, there were 700 units being advertised on HANO's website for occupancy. Ex. 5, Report of Dr. Miestchovich at 22, 24-29.[5] Moreover, Messrs. Babers and Thorson testified that, as of the date of their depositions, there were 400 public housing units that had been repaired and were otherwise ready for occupancy were vacant due to a lack of interest on the part of HANO residents. Ex. 4, Babers Dep. at 134; Ex. 6, Thorson Dep. at 184:18-21. The evidence clearly demonstrates that numerous HANO residents have decided not to return to New Orleans for reasons that have nothing to do with HANO's alleged conduct.

In addition, even amongst the residents who wish to or who have already returned to New Orleans, there is no objective manner by which the Court, the plaintiffs, or the defendants can distinguish those residents who wish to return to public housing from those who

---

[4]     Ms. Johnigan's estimate is roughly consistent with the results of HANO's preliminary post-storm survey of its residents. *See* Ex. 4, Babers Dep. at 82:11-25. The results of a formal resident survey are still pending as of the date of this filing.

[5]     Although plaintiffs have repeatedly alleged that New Orleans landlords will not rent to HANO residents, this fact is belied by the fact that at least 700 private landlords have contacted HANO in an effort to rent apartments to HANO residents.

- 11 -

desire or will accept private apartments. Plaintiff Lewis, who resided at Lafitte prior to the storm as is identified as a representative of Subclass A,[6] testified that she would be willing to return to a unit in any public development or to a private apartment, provided it was affordable and located in a "nice area." Ex. 7, Lewis Dep. at 86:24 - 87:11. Plaintiff Harris, on the other hand, refused HANO's offer of an alternate public housing unit in New Orleans. Ex. 8, Dep. of Harris at 93:3-15. Plaintiff Moten, who currently uses a disaster assistance voucher to rent an apartment in New Orleans, stated in her response to HANO's Interrogatories that she was "not interested" in a unit at Iberville. *See* Ex. 9, at Response to Interrogatory 3. Moreover, many of the named plaintiffs are currently using vouchers to reside in private apartments that are in as good or superior condition to their pre-storm units. *See* Ex. 5, Report of Dr. Miestchovich at 29-30. It is perfectly conceivable that any number of similarly situated plaintiffs continue to use disaster assistance vouchers simply because they prefer their new apartments; clearly, neither these residents, nor Mr. Harris or Ms. Moten, have been "denied the opportunity" to return to public housing units in New Orleans. Because membership in Subclass A depends upon the subjective desires of a putative class member to return to a public housing unit in New Orleans, Subclass A has not been objectively defined.

---

[6]    Due to their failure to respond to the defendants' written discovery and/or their repeated failure to appear for their depositions, Magistrate Chasez has recommended that the claims of plaintiffs Bell and Banks be dismissed with prejudice. HANO and HUD have filed a pending motion to dismiss the claims of plaintiff Gibson with prejudice due to her failure to appear for her deposition. Rec. Doc. 389. Although plaintiff Watson is identified as a representative of Subclass A, she testified in her deposition that she planned to return to her pre-storm unit at B.W. Cooper as of July 22, 2007. Ex. 3, Watson Dep. at 6:6-15. As such, she will be treated as a proposed representative of Subclass C for the purposes of this memorandum.

- 12 -

883931v.2

Nor is plaintiffs' proposed Subclass B objectively definable. Subclass B "includes those members of the class who have returned to public housing in New Orleans but who have been prevented from returning to their own pre-Katrina units due to" HANO's alleged conduct. As at least one named plaintiff has demonstrated, there are HANO residents who prefer their current public housing units to their pre-storm units.[7] Plaintiff Doucet, who resided at Iberville prior to Hurricane Katrina but returned to a different unit at Iberville after the storm, is identified as a representative of Subclass B. Yet in her deposition, Ms. Doucet, testified that she preferred her new Iberville unit to her pre-Katrina Iberville unit. Ex. 11, Dep. of Doucet at 40:4-5. Plaintiff May, another putative representative of Subclass B, currently resides at Iberville. In her deposition, she testified that her children, who resided with her prior to Hurricane Katrina, are no longer members of her household, and that, as a result of the reduction of the size of her household, she is no longer eligible for her former unit. Ex. 12, May Dep. at 102:8 - 103:1, 111:23 - 112:1.

Plaintiff Anderson, the third and final named plaintiff identified as a representative of Subclass B, has recently been arrested in an unrelated criminal matter. Ex. 13; Anderson Dep. at 163:24 - 164:7. While Ms. Anderson is entitled to a presumption of innocence as to any pending charges against her, her arrest constitutes a breach of the HANO Amendment

---

[7] Similarly, other named plaintiffs who have been identified as members of other Subclasses have expressed a desire to return to units other than their pre-storm units. Ms. Lewis, as noted above, stated that she would return to any development, provided it was located in a "nice area". Ex. 7, Lewis Dep. at 86:24 - 87:11. Plaintiff Wright, another proposed representative of Subclass A, resided at Lafitte, but was placed on the waiting list for River Gardens prior to the storm at her own request. Ex. 10, Dep. of Wright, 46:24-48:1. Ms. Wright and others who had pending transfer requests prior to Hurricane Katrina have expressed a clear desire to live in units other than their pre-storm units.

88393 fv.2

to Dwelling Lease attached hereto as Ex. 14. As a result, she, like Ms. May, may no longer be eligible for her pre-storm unit. Because HANO residents who prefer their current units to their post-storm units do not desire to return to their former units, HANO is not "preventing" them from returning their former units. As such, they are not members of Subclass B. Similarly, residents who are no longer eligible for their former units are not being "prevented" from returning by HANO's alleged conduct, and are not members of Subclass B. Thus, according to their own deposition testimony, none of the identified representatives of Subclass B are actually members of Subclass B.

In addition to exposing a major intra-class conflict between (1) those HANO residents who wish to return to units other than their former units or to the first available units and (2) those who insist upon returning to their former units (for which they may no longer be eligible), plaintiffs' depositions demonstrate the impropriety of plaintiffs' proposed class and subclass definitions. There is no objective manner for the Court, the plaintiffs, or the defendants to determine whether a public housing resident who has returned to New Orleans has been prevented from returning to his or her former unit as a result of HANO's alleged conduct, or whether the resident simply prefers his or her new unit. As such, plaintiffs' proposed class and subclass definitions are not objectively defined.

Plaintiffs' proposed Subclass C is similarly improper. Subclass C "consists of the class members who have returned to their pre-Katrina units, but who were not permitted to return prior to January 1, 2006." Pls. Memo. at 3. As noted above, there are a host of reasons unrelated to HANO's conduct that may have prevented a resident from returning to New Orleans prior to

- 14 -

883931v.2

the arbitrarily-selected dated of January 1, 2006.[8]  No public high schools on the East Bank of

New Orleans had reopened as of January 1, 2006; in fact, Eleanor McMain, the first public high

school to reopen, did not do so until January 9, 2006.  By January 2006, both Eleanor McMain

and Benjamin Franklin Elementary (the only functioning public elementary school on the East

Bank as of January 1, 2006) had already reached full capacity.[9]  As of January 1, 2006, there was

only one full-service hospital operating in New Orleans (not including the make-shift tents that

had replaced the severely damaged Charity Hospital, which has since been permanently closed

by Louisiana State University).[10]  Local universities such as Xavier, Tulane, Loyola, and Dillard,

which in addition to educating thousands of students, also employ thousands of New Orleans

---

[8]     Plaintiffs make much in their brief on the fact that the mandatory evacuation was lifted
on October 5, 2005, and mistakenly seem to believe that this was the date on which life in
New Orleans returned to normal.  Many New Orleanians may recall, however, that, due
to the near total absence of functioning street lamps or stop lights in the 80% of the City
that flooded, the areas surrounding nearly all of the developments in question would have
been plunged into total darkness once the sun set on October 5, 2005.  The areas
surrounding most of these developments were utterly devoid of grocery stores, post
offices, fully operational fire stations, and other necessities that most HANO residents
would take for granted.  *See* "Situation Report for New Orleans," dated October 5, 2005,
attached hereto as Ex. 15.

[9]     *See* Steve Ritea, *Orleans Board to Reopen High School*, THE TIMES-PICAYUNE (Jan. 7,
2006,    available    at    http://www.nola.com/printer/printer.ssf?/base/news-
2/113661708761500.xml

[10]    Nearly two years after Hurricane Katrina, the local health care crisis persists.  As of July
23, 2007, only one hospital in New Orleans was operating at pre-Katrina capacity.  Leslie
Eaton, *For New Orleans, Reviving Health Care System Will Be City's Future*, NEW YORK
TIMES (July 23, 2007)(attached hereto as Exhibit 16).  The lack of medical care has most
severely impacted the poor and uninsured.  *Id.*  In addition to limiting access to health
care, the closing of health care facilities has also impacted the job market.  The health
care industry was the third-largest employer prior to Katrina, and generally offered
higher-paying jobs that the hotel or retailing industries.  *Id.*  As a result, a putative class
member employed at Charity or Lindy Boggs prior to Katrina would have difficulty
finding similar work in New Orleans after the storm.

- 15 -

883931v.2

residents, did not reopen until January 2006.[11]  Public transportation remained drastically reduced as a result of the storm.[12]

While it is conceivable that, as plaintiffs contend, there are large portions of the proposed class that, having no apparent need for public schools, public transportation, medical care, or employment, would have been able to return to New Orleans the very instant the mandatory evacuation was lifted, it is likely that the limited public services as they existed prior to January 1, 2006 prevented or discouraged a significant portion of HANO residents from returning.  HANO residents, like many other displaced New Orleans residents, may have opted to delay their return until the end of the school year or until they secured employment in New Orleans.[13]  Plaintiff Johnigan, who is identified as a representative of putative Subclass C,[14] testified in her deposition did not return to New Orleans until September 2006 in order to allow her grandchildren to complete their school year in Houston, where, incidentally, her

---

[11]   *See, e.g.,* Mary Beth Marklein, *Tulane's Disaster Plan Includes Cutbacks, Higher Standards,* USA TODAY (Dec. 8, 2005), available at http://www.usatoday.com/news/education/2005-12-08-tulane-cuts_x.htm.  In response to Katrina-related financial setbacks, Tulane, Xavier, Dillard, and Loyola laid off large numbers of their employees, further weakening the New Orleans job market.

[12]   *See* "Situation Report of City of New Orleans" dated December 30, 2005, attached hereto as Exhibit 17.

[13]   Mr. Thorson, in discussing the fact that, at the time of his deposition, HANO had 400 vacant repaired units, attributed the lack of interest in these units in part to this phenomenon.  "[I]n September, for example, the families are going to be all set and ready to get their kids in school where [they evacuated].  So you are going to have less of an inclination to be able to [return], to want to come back....[I]n June, for example, when the kids are coming out [of school], there is going to be a greater inclination to want to come home."  See Ex. 4, Dep. of Thorson at 183:25 - 184:21.

[14]   Because plaintiff Paul did not appear for her deposition or respond to defendants' written discovery requests, Magistrate Chasez has recommended that her claims be dismissed with prejudice.  Rec. Doc. 366.

- 16 -

883931v.2

grandchildren attended schools better than those attended in New Orleans prior to Hurricane Katrina. Ex. 2, Johnigan Dep. at 125:17 - 129:10. There is no objective manner by which the Court, the plaintiffs, or the defendants can distinguish those residents who did not return prior to January 1, 2006 because of HANO's alleged conduct from those who, like plaintiff Johnigan, opted not to do so for a myriad of factors beyond HANO's control. Plaintiffs' proposed class and subclass definitions, therefore, are improper.

Furthermore, it is well-settled that certification is not appropriate when, as here, determination of the identities of the class members would require individualized inquiries into the merits of each class member's claims. *See Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D. Ga. 1995)(proposed class of plaintiffs who have been exposed to chemicals and subsequently developed a form of cancer cannot be certified because it would require examination and diagnosis before class member could be designated). The definitions of the proposed subclasses are improper because it requires the Court not only to determine the subjective motivations underlying any potential class member's failure to return to his or her former unit, but also to make individual findings as to the conditions of each putative class member's unit.

As this Court has already ruled (Rec. Doc. 175), the condition of the plaintiffs' former units and HANO's obligation, if any, to make such repairs, are questions to be determined at trial. If plaintiffs' former units were rendered uninhabitable by unforeseen events rather than by the alleged conduct of HANO, then plaintiffs' proposed class and subclasses contain no members. Because the proposed class definition is premised on facts that will not be determined until trial, the plaintiffs' claims must be fully litigated before class membership can even be determined by the Court or by the putative members themselves. As such, plaintiffs' class

- 17 -

definition is improper and certification should therefore be denied. *See Mueller v. CBS, Inc.*, 200 F.R.D. 227 (W.D. Pa. 2001)(proposed class of plaintiffs in age discrimination suit could not be certified because court would be required to hold "mini-hearings" on the merits of each claim in order to designate class members). In addition to having failed to satisfy the threshold requirement of proposing an objectively definable class, the plaintiffs cannot meet any of the elements of Rule 23(a).

**B.    Plaintiffs Have Not Demonstrated Typicality And Cannot Adequately Represent The Interests Of The Absent Class.**

Plaintiffs cannot adequately represent the proposed class because (1) their interests are antagonistic to those of the class and (2) their claims are not typical of the proposed class. As noted by the Supreme Court, the purpose of the typicality requirement is "to limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330, 100 S. Ct. 1698, 1706 (1980). A critical element of the typicality inquiry is the principle that the alignment of the named plaintiffs' claims with those of the putative class members will permit the representatives to advance the interests of the class members as they pursue their own. *See* NEWBERG, § 3.13 at 3-74 to 3-76 (3d Ed. 1992); *see also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) ("[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class").

Typicality is important, not just because it is one of the mandatory prerequisites established in 23(a), but also because it is closely related to another mandatory prerequisite—adequacy of representation. The tests of typicality and adequacy of representation merge because "[i]f the representatives' claims are not typical of the class, they cannot adequately protect the interests of the absent class members.'" *Spivak v. Petro-Lewis Corp.*, 120 F.R.D. 693,

- 18 -

698 (D.Colo.1987) (citing *Kas v. Financial Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C.1984)); *see also Sollenbarger v. Mountain States Tel & Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988). Only when the named plaintiffs' claims are typical is there any chance that a class action will be an efficient dispute resolution mechanism or that the class representatives will have a genuine incentive to pursue the "common" class interest.

Adequacy of representation "demands that the class representative be 'squarely aligned in interest'" with the absent class members. NEWBERG, § 3.01 at 3-5. A plaintiff cannot be an adequate class representative when facts specific to his case are disparate from other class members or create an arguable defense specific to his claim. *See e.g., J.H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). This requirement is one of constitutional dimension. *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657, 662 (E.D. Pa. 1980). As previously discussed, the named plaintiffs are not squarely aligned in interest with all of the proposed class members because their claims are not the same as those of other insureds. Thus, the named plaintiffs cannot adequately protect the interests of the putative class members.

"It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented." 7A FED. PRAC. & PROC. § 1768. But only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. *Hansberry v. Lee*, 61 S. Ct. 115, 311 U.S. 32, 85 ED. 22 (U.S 1940). The party opposing class certification is not required to show actual antagonistic interest; the potential of such antagonism is sufficient to defeat class certification. *Piekowski v. Ralston Purina*, Co., 68 F.R.D. 443 (D. Ga. 1975), *appeal dismissed*, 557 Fed. 1218 (5th Cir. 1977).

883931v.2

The evidence in the case *sub judice* reveals far more than the mere potential for antagonism between the proposed class and the putative representatives. Rather, the evidence shows that a vast percentage of the putative class support the demolition and rebuilding plans that plaintiffs seek to enjoin. One named plaintiff, Emelda Paul, withdrew from this litigation after publicly expressing support for the demolition and redevelopment of these units "I want things better. I don't want to go back to it like that. I had mold in my (home) way before Katrina. I want to see (residents) coming back to something decent."[15] Ms. Paul is not the only putative class member who supports the demolition and rebuilding plans. Rather, 70% of polled former residents of the Lafitte development support demolition and redevelopment of the site. Ex. 1, Jarmon Dep. at 182:9-17. Likewise, plaintiff Judith Watson of the B.W. Cooper development testified that she and other residents support HANO's redevelopment plans not only for B.W. Cooper, but for the other developments as well. Ex. 3, Watson Dep. at 97:4-18. Not surprisingly Ms. Watson further testified that she wants to withdraw as a plaintiff in this matter. *Id.* at 54:3-16.

During her deposition, plaintiff Johnigan also explained that she also supports the redevelopment plans, as do a substantial number of the residents whom she represents in her capacity as a member of the B.W. Cooper RMC. Ex. 2, Johnigan Dep. at 238:18 - 239:17; 246:17 - 247:16. As noted above, she estimated that approximately 40% of the proposed class had no desire to return to obsolete, high-density, high-poverty housing in New Orleans.

---

[15] *See* Gwen Filosa, *Nagin Wants to Run Road Home in N.O.*, THE TIMES-PICAYUNE, (Feb. 23, 2007), *available at* http://www.nola.com/timespic/stories/index.ssf?/base/news-4/1172215324171540.xml&coll=1; Ex. E, Jarmon Dep. at 182:18 - 183:22.

- 20 -

883931v.2

Moreover, the B.W. Cooper RMC, in a letter to HANO dated April 17, 2007, expressed full support for the demolition and redevelopment plans for that site:

> . . . [W]e are anxiously looking forward to a productive relationship with HANO and are very exited about the opportunity to be a part of the plan for redevelopment of this mixed income community.
>
> . . .
>
> B.W. Cooper RMC Board and KMK are on one accord regarding our interest and intent to move forward with HANO in the redevelopment of B.W. Cooper.
>
> . . .
>
> . . .[O]ur position is to be removed from any [and] all issues that could result in slowing down our development efforts including, but not limited to the federal lawsuit filed by the NAACP.[16]

In addition, residents submitting written comments in connection with HANO's resident consultation regarding demolition made statements such as, (1) "I'm for the demolition to rebuild, to the better projects;" (2) "It is about time someone did something with those projects;" (3) "Demolish the project and make it better;" (4) "I have no problem with the demolition as long as they have somewhere to place all displaced residents;" (5) "I think its a good thing to consider tearing down those complexes. They are no longer livable for anyone;" (6) "I am for redevelopment of the Laffite Housing and all the others. Fighting a decision could delay opportunities for residents to come home;" (7) "I think you should demolish B.W. Cooper and rebuild a new public housing; and I think the proposed demolition is a very smart move at a

---

[16] These sentiments are consistent with recent statements by other HANO residents whose developments were demolished and redeveloped prior to Hurricane Katrina. *See* Gwen Filosa, *"New Desire" Set to Re-Open in July,* THE TIMES-PICAYUNE, (June 6, 2007), *available at* http://blog.nola.com/times-picayune/2007/06/new_desire_public_housing_to_o.html and attached hereto as Ex. 18; *see also* Rob Nelson, *HUD Plans to Use Revitalized Fischer as Model to Rebuild,* TIMES-PICAYUNE (Aug. 22, 2006). *Id.*

883931v.2

much needed time and I am very happy about the new change." *See* Sampling of Written

Resident Consultation Comments, attached *in globo* as Ex. 19, at HANO 017741, 017743,

017781, 017820, 017823, 017845, 017870, and 017878.

Evidence, including the statements of Ms. Paul, Ms. Watson, Ms. Johnigan, the

written comments of the residents, the B.W. Cooper RMC, and Nadine Jarmon, indicates that

there are significant portions of the proposed class whose interests are not being adequately

represented by the named plaintiffs with regard to a matter that is at the heart of this litigation

[i.e., whether the "Big Four" developments should be demolished and redeveloped]. Rather,

their interests are in direct conflict with those advanced by this lawsuit since they support the

redevelopment plans that plaintiffs in this case seek to enjoin. Plaintiffs seek not only damages

for prior alleged injuries, but also for injunctive relief -- in effect, plaintiffs urge the Court to

order HANO to take actions opposed by a substantial portion of the class. *See Langbecker v.

Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007)(vacating district court's certification of

class of employees alleging mismanagement of retirement fund and ordering district court to

consider on remand whether impermissible conflict is created by named plaintiffs' efforts to

dissolve fund that members of proposed class desire to maintain). *See also Pickett v. Iowa Beef

Processors*, 209 F.3d 1276 (11th Cir. 2000)(named plaintiffs alleging violations of Packers and

Stockyards Act could not adequately represent class of cattle producers when some class

members benefited from alleged conduct); *Bolin Farms v. Am. Cotton Shippers Ass'n.*, 370

F.Supp. 1353 (W.D. La. 1974) (citing *Danner v. Phillips Pet. Co.*, 447 F.2d 159 (5th Cir.

1971))(plaintiffs challenging forward contracting system could not represent class of cotton

farmers when there was no showing that the desired relief was desired by or would benefit the

class as a whole). As a result, the named plaintiffs' claims cannot be deemed to be typical of the

883931v.2

proposed class, nor can they adequately represent absent class members who desire that HANO pursue the very redevelopments that plaintiffs propose to enjoin.

Moreover, conflicts exist between residents who wish to return to their former units and those members of the putative class who, like plaintiffs Wright, Lewis, and Doucet, prefer different units or would accept the first-available unit. Plaintiffs, by adopting the position that HANO must return residents to their former units, seek to have this Court declare which residents can return to which units. If, for example, a putative class member's pre-storm unit has not been repaired as of this date, that class member is not entitled to a vacant, repaired unit under plaintiffs' theory of the case, because only the former resident must be returned to that unit. As a result, a plaintiff who seeks to return only to his or her own unit clearly cannot represent the interests of a class member who would return to the first-available unit.

Furthermore, the legal theories advanced by the named plaintiffs in this case are in direct conflict with other HANO residents currently engaged in pending legal disputes with HANO as to the pre-storm condition of their units. In one putative class action pending the Civil District Court for the Parish of Orleans, State of Louisiana, styled *Claborne v. HANO, et al.*, and bearing Docket No. 2001-20605, the named plaintiffs allege that they have suffered injury due to the alleged presence of so-called "toxic" mold in their HANO units, and seek to certify a class of all similarly situated HANO residents who lived in a HANO unit from 1980 to the present date.[17]

---

[17]    HANO's reference to this suit or to any other pending litigation is not and should not be deemed as an admission to the allegations made therein.

- 23 -

The legal theories advanced by the *Claborne* plaintiffs[18] are in direct conflict with those of the named plaintiffs in the above-captioned proceedings, who have submitted the report of David Martinez, a "Mold Assessor/Consultant" who opines that "the great majority of the units had no visible mold growths," that the small amount of mold he purports to have observed "consisted of a common allergen," and that all of the mold observed grew within the last year. See Ex. 20, excerpt of Report by David Martinez. Moreover, plaintiffs with pending legal claims against HANO alleging various pre-storm defects to their units, would probably take issue with plaintiffs' expert John Fernández's general conclusions that the developments in question are seemingly impervious to flood, wind, wind-driven rain, neglect, vandalism, and deferred maintenance, and essentially exist in a perpetual state of "move-in condition."[19] *See generally*, Ex. 21, Excerpts of Fernández Report. Regardless of the merits of these other suits, the factual assertions advanced by the *Anderson* plaintiffs and their experts are in direct conflict with the those of the plaintiffs in *Claborne* and other HANO litigation. For all of the above reasons, plaintiffs' interests are directly antagonistic to those of the proposed class, and the Court therefore should deny their motion for class certification.

In addition, several of the named plaintiffs do not appear to be sufficiently informed about the purpose of the litigation and their role as putative class representatives. As

---

[18]    Plaintiff Burbank testified during her deposition that she was involved in the mold litigation and that she had mold in her apartment prior to Hurricane Katrina. Ex. 22, Burbank Dep. at 12:1-13; 52:13-23.

[19]    As the Court ruled in its February 6 Order, the conditions of plaintiffs' units are genuine issue of material fact pertaining to their due process claims, which plaintiffs seek to certify pursuant to Rule 23(b)(2). If plaintiffs prevail on their motion to certify their due process claims, the opt-out provisions of Rule 23(b)(3) will not apply, and putative class members who have brought other suits against HANO may be bound to this Court's findings as to the habitability of their units.

- 24 -

883931v.2

noted above, plaintiffs Bell, Banks, Paul, and Gibson have repeatedly failed to appear for depositions and/or to respond to written discovery propounded by the defendants. Others have not responded to written discovery in a timely fashion. *See, e.g.*, Rec. Doc. 305. Some plaintiffs have not been able to testify as to the relief they purport to seek or the nature of the class they purport to represent without blatant prompting by their counsel. Ex. 23, Johnson Dep. at 161-162.    In fact, even those named plaintiffs who have not sought to withdraw as class representatives testified that they have no objection to HANO's demolition and redevelopment plans per se. *See* Ex. 8, Harris Dep. at 248; Ex. 7, Lewis Dep. at 106; Ex. 12, May Dep. at 111; Ex. 10, Wright Dep. at 248-249; Ex. 24.    No plaintiff has testified as to a desire to compel HANO to affirmatively further the goals of fair housing, nor has any named plaintiff expressed a desire for the administrative grievance proceedings described in plaintiffs' pleadings. These facts seriously call into question plaintiffs' assertion that they, rather than their counsel, are directing this litigation. Pls.' Memo. at 18.

Additionally, plaintiffs have failed to demonstrate that their claims are typical of the claims of other purported class member.    As will be discussed further below, any determination as to the merits of a class member's claims will require the trier of fact to engage in an individualized assessment of the class member's claim.    The conditions of each class member's pre-storm and current units will differ from those of every other class member; also, not every HANO resident desires to return to his or her former unit in New Orleans. The need for such individualized inquiries into the conditions of each unit and into each resident's state of mind precludes a finding of typicality.

Furthermore, not all of the named plaintiffs purport to have suffered injuries alleged in the Complaint. "[A] class representative must be a part of the class and possess the

883931v.2

same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. Yet

plaintiffs Anderson, Doucet, and Johnigan, for example, testified in their deposition that they are

not seeking recoveries for alleged emotional distress. See Ex. 13, Anderson Dep. at 154:25; Ex.

7, Doucet Dep. at 61:9-12; Ex. 2, Johnigan Dep. at 284:21-25.[20] Moreover, plaintiff Harris, who

testified that he is actually paying less in rent and utilities for his unit in Houston than he did for

his pre-storm unit, does not seek compensatory damages for utilities or rent. *See* Ex. 8, Harris

Dep. at 256:10-20. Plaintiff DeGruy testified that she is not aware of any needed repairs to her

unit, and seeks only damages. See Ex. 26, DeGruy Dep. at 20; 246-247. These named plaintiffs

---

[20]    Plaintiffs' expert Dr. Denise Shervington states in her report that, based upon her exchanges with six of the named plaintiffs, she "can extrapolate that a significant number of all the remaining displaced public housing plaintiffs are suffering" emotional distress as a result of HANO's alleged conduct. Setting aside for the moment any challenges as to the soundness of Dr. Shervington's methodology and conclusions, she is simply wrong as a matter of law. *See Exxon Mobil*, 461 F.3d at 598 ("The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.")(citing *Allison*). The plaintiffs must establish that the emotional distress they are alleged to have suffered is the direct result of HANO's conduct, yet an examination of the plaintiffs' testimony reveals that, even amongst the named plaintiffs, there exists a host of potential causes for plaintiffs' alleged emotional distress that are completely unrelated to HANO's alleged conduct. The sister of plaintiff Williams, for example, passed away following her evacuation to Macon, Georgia. See Ex. 25, Williams Dep. at 110-111. Plaintiffs Doucet and Harris testified that they had spent days at the Superdome and Convention Center, respectively, prior to being evacuated. Ex. 8, Harris Dep. at 39-41; Ex. 11, Doucet Dep. at 21. Plaintiffs Anderson and Wright testified that they were evacuated from their units by helicopter in the wake of Hurricane Katrina. Ex. 13, Anderson Dep. at 33; Ex. 10, Wright Dep. at 66. Any one of these events, which could not even conceivably be alleged to be fault of HANO, could cause lasting emotional distress. Yet Ms. Anderson and Ms. Doucet do not seek recovery for emotional distress, while the others do. These facts only serve to highlight not only the variation, but also the highly subjective nature of an individual's response to unique personal experiences in the aftermath of Hurricane Katrina. As a result, these claims are simply inappropriate for class certification.

- 26 -

Plaintiffs' claims for breach of contract and due process also require an individual examination of each unit. In order to establish the existence of HANO's liability to plaintiffs under the breach of lease claims, under plaintiffs' theory of the case, the trier of fact must determine the condition of each unit and what, if any, repairs were necessary. Most importantly, the trier of fact must also determine the "reasonable" amount of time to make such repairs in the post-Katrina environment. The "reasonable" amount of time to repair the hole in Ms. Johnigan's ceiling, for example, would be different than the "reasonable" amount of time to repair her daughter's flooded, wind-damaged unit.

The variation in "reasonable" repair times is also borne out by Fernández's report. For one unit described in his report, Fernández states that "wiring and outlet boxes require replacement when flooded." Ex. 21, Excerpts of Fernández Report at 178. In a second unit at the same development, he observes "some [ceiling] damage, peeling, and spalling plaster." *Id.* at 168. In a third unit at the same development, he observes that the bathroom plumbing has been "looted resulting in wall damage and destroyed toilet fixture, possible that further damage was done to bathroom plumbing." *Id.* at 165. None of the three apartments, located at the same development, has the same type of damage, and none will require exactly the same repairs; as such, the "reasonable" time to repair each of the aforementioned units will vary greatly amongst units at the same development. Plaintiffs' effort to certify a class of thousands of residents of different developments located throughout New Orleans therefore is clearly improper.

While plaintiffs may argue that these variations are distinctions without difference, the very existence of HANO's liability to any putative class member is predicated upon the "reasonableness" of the length of time for repairs to his or her unit. But there can be no "reasonable" amount of time that will be common to all residents. To fix one uniform

- 31 -

883931v.2

"reasonable" amount of time to repair every HANO unit would be tantamount to declaring that there is one standardized "reasonable" amount of time to repair every property in New Orleans that suffered damage in the wake of Hurricane Katrina, regardless of the individual characteristics of the property or the extent or cause of the damage. Yet that is exactly the argument that plaintiffs urge upon the Court, and it is precisely the reason why their due process and breach of contract claims cannot be certified on a class-wide basis.

        **b.**    **The Adequacy Of The Vouchers Will Require An Individualized Inquiry As To Each Resident's Circumstances.**

Furthermore, any finding as to the adequacy of HANO's disaster vouchers to provide replacement housing under the lease will also require individualized inquiries that preclude a finding of commonality. While plaintiffs argue that the putative class "shares a common fact issue as to whether HANO provided them with comparable replacement housing through the voucher program during their time of displacement", the evidence revealed during discovery and plaintiffs' deposition testimony and discovery responses indicate that the overwhelming majority many of the named plaintiffs have secured a replacement unit in New Orleans (either in public housing or through the use of HANO vouchers) that is comparable or superior to their pre-Katrina units. As HANO expert Dr. Ivan J. Miestchovich, Jr. notes in his report, "With very few exceptions, the HANO payment standard meets or exceeds average rents across the range of unit types and for the different geographic centers of the market....Among [non-Warehouse District units] in Orleans Parish for which comparative data was available, the HANO payment standard exceeded the average market rent sufficiently to allow for coverage of other monthly costs such as utilities." Ex. 5, Excerpts of Meistchovich Report. (In fact, plaintiffs' own expert states that the disaster vouchers, rather than preventing HANO residents from returning, have in fact given HANO residents a competitive advantage in the post-Katrina

- 32 -

housing market. *See* Ex. 27, excerpts from Report of Dr. Andrew Beveridge at ¶39; Ex. 28, Beveridge Dep. at 270-271.)[24]    Any determination as to the adequacy of HANO's disaster vouchers will require an examination as to the circumstances of each putative class member. The need for such individualized treatment precludes a finding of commonality.

Each of the plaintiffs in this case has secured alternate housing or has refused HANO's offer to provide it. Plaintiffs Anderson, DeGruy, May, Johnigan, Paul,[25] Doucet and Watson are all currently living in HANO units at Iberville, River Gardens, and/or B.W. Cooper.[26] *See* Ex. 28, plaintiffs' discovery responses and deposition testimony showing their current addresses. Ms. DeGruy testified that she had returned to her pre-Katrina unit at Iberville and that she was not aware of any needed repairs. See Ex. 26, DeGruy Dep. at 20, 246-247. Ms. Doucet describes her current unit at Iberville as being nearly identical in size to and in better physical condition that her pre-storm Iberville unit; in fact, she prefers her current unit to her former unit. *See* Ex. 11, Doucet Dep. at 40. Ms. May, who currently resides at Iberville, testified that her children who resided with her are no longer members of her household, and that, as a result, she is not even seeking (and is not eligible for) a unit comparable in size to her pre-Katrina unit, but instead wants a smaller, one-bedroom unit. *See* Ex. 12, May Dep. at 102:8 - 103:1, 111:23 - 112:1. Both Ms. May and Ms. DeGruy's Iberville units were inspected by HANO expert Dr. Ivan J. Miestchovich, who states in his report that their units were of adequate

---

[24]    Because HANO has not received the final version of Dr. Beveridge's transcript, this cite is taken from the rough draft.

[25]    Because Ms. Paul never appeared for her deposition and failed to respond to the defendants' written discovery requests in a timely fashion, Magistrate Chasez recommended that her claims be dismissed with prejudice. Rec. Doc. 366.

[26]    Prior to returning to B.W. Cooper on July 22, 2007, Ms. Watson rented an apartment in Baton Rouge.

- 33 -

883931v.2

size, air-conditioned, and appeared to be "free of mold or other storm-related moisture damage." Ex. 5, Excerpts of Miestchovich Report at 30.

The testimony of other named plaintiffs further demonstrates the degree of variability between their claims. Plaintiffs Moten, Johnson, Banks,[27] and Williams have used disaster assistance vouchers to rent apartments in New Orleans. Dr. Miestchovich states that Ms. Williams' apartment has heating, air-conditioning, washer and dryer units, and was generally in good condition. He further stated that it was located in a well-maintained area with easy access to public transportation. _Id._ at 30-31. Ms. Johnson's Mid-City apartment had been recently renovated, as had Ms. Moten's Central City unit. Both had new appliances and air-conditioning. _Id._

Plaintiff Odessia Lewis has a FEMA trailer in New Orleans and spends a significant amount of time in Florida with her family. Ex. 7, Lewis Dep. at 29. Plaintiffs Harris, Wright, Gibson[28] and Burbank reside in Houston in units procured through their disaster assistance vouchers. Ex. 8, Harris Dep. at 79-80; Ex. 10, Wright Dep. at 79; Ex. 22, Burbank Dep. at 32. Plaintiff Cynthia Bell has not responded to HANO's discovery requests so HANO cannot ascertain where she is living.[29]

---

[27] Because Ms. Banks never appeared for her deposition or responded to the defendants' written discovery, Magistrate Chasez recommended that her claims be dismissed with prejudice. Rec. Doc. 366.

[28] Because Ms. Gibson has never appeared for her deposition, HUD and HANO have jointly moved to dismiss her claims with prejudice.

[29] Because Ms. Bell has never responded to the defendants' written discovery requests or appeared for her deposition, Magistrate Chasez recommended that her claims be dismissed with prejudice. Rec. Doc. 366.

8839311v.2

In many cases, the prior monthly rent amount equals or exceeds the amount now being paid for utilities. For example, Ms. Wright would have paid at least $373 in rent per month starting October 1, 2005, had it not been for the hurricane. Her voucher now covers the entire amount of her rent. Ms. Wright testified that her utility bills currently run between $40 and $60 per month. Ex. 10, Mary Wright Dep. at 207-209, 267-269. Plaintiff Harris similarly testified that he is actually paying less for utilities and rent for his current unit than he did for his pre-storm unit. *See* Ex. 8, Harris Dep. at 256. Ms. DeGruy also testified that she had incurred no out-of-pocket expenses for rent or utilities for her replacement unit in Houston (prior to her return to Iberville). See Ex. 26, DeGruy Dep. at 60-61. The claims of plaintiffs Wright, Harris, and DeGruy, therefore, are not common to those of plaintiff Williams, who testified in her deposition that she currently incurs out-of-pocket utility expenses. *See* Ex. 25, Williams Dep. at 116.

The degree of variability between the facts of the named plaintiffs' claims demonstrates the lack of commonality. Any determination as to the adequacy of the vouchers will require the trier of fact to determine such individual factors as (1) whether the amount of money, if any, that the resident pays for his or her current unit exceeds the amounts paid for the pre-storm unit; (2) whether each resident's current unit is comparable in size and condition to the pre-storm unit; and (3) whether the resident is eligible to receive a unit comparable to his or her pre-storm unit. The evidence has revealed that the claims of the named plaintiffs are not even common to each other, much less to those of the vast class they purport to represent. The Court should therefore deny plaintiffs' amended motion for class certification.

c.    **Plaintiffs' Section 3608 Claims Do Not Satisfy Commonality.**

While plaintiffs correctly note that the commonality requirement has not been interpreted as being overly burdensome, *see Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106

- 35 -

883931v.2

(5th Cir. 1993), conclusory allegations that a defendant has breached a statute or legal duty are not sufficient, in and of themselves to satisfy Rule 23 commonality. *See Falcon*, 457 U.S. at 157 (an allegation of discrimination "neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified."); *see also Sprague v. Gen. Motors. Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)("Conclusory allegations and general assertions of discrimination are not sufficient to establish commonality."); *see also Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 644 (6th Cir. 2006)(reversing district court's certification of class of inmates alleging discriminatory treatment when district court failed to consider whether the alleged discriminatory policy affected the inmates in the same manner).

Plaintiffs' Section 3608 claims do not satisfy the commonality requirement because they are precisely the sort of conclusory allegations deemed improper for certification by *Falcon* and its progeny. Plaintiffs allege the putative class "shares a common issue of fact as to whether Defendants failed to consider, or purposefully ignored, the effects that their decision to decrease the supply of public housing would have on public housing residents and whether the Defendants provided fair housing opportunities to Plaintiffs while denying or delaying plaintiffs' access to their homes. The named Plaintiffs and putative class share the same legal issues to whether the Defendants failed to affirmatively further fair housing under Section 3608 of the [Fair Housing Act]." Pls.' Memo. at 16. Yet plaintiffs, who bear the burden of establishing commonality as to this claim, have failed repeatedly to describe with any detail or specificity exactly how HANO has failed affirmatively to further the goals of fair housing.[30] In their prior

---

[30]    In response to HUD's Interrogatory No. 1, which instructed plaintiffs to provide the factual and/or legal basis for their Section 3608 claims against HUD, plaintiffs merely
*(continued on next page)*

883931v.2

pleadings, plaintiffs make only conclusory statements and vague references to statutory violations, yet they have not, to date, cited any statute that HANO is alleged to have violated with regard to this claim. Plaintiffs cannot establish commonality without first elucidating with specificity what it is that HANO is alleged to have done or failed to do. For this basic reason alone, plaintiffs' 3608 claims do not satisfy the 23(a) requirement of commonality.

Furthermore, plaintiffs' Section 3608 claims do not satisfy Rule 23(a) commonality because the resolution of the allegedly common questions identified by plaintiffs will not benefit a significant number of the class. As noted more fully *supra*, a significant portion of the proposed class does not want the relief prayed for in the Complaint. Some named plaintiffs and putative class members support demolition and redevelopment, while others do not wish to return to New Orleans at all. Other named plaintiffs, such as Wright and Doucet, have expressed a preference for public housing units other than their former units. Furthermore, the Complaint, by seeking to return HANO residents such as plaintiff May to units to which they may no longer be eligible, deprives other HANO residents of the opportunity to reside in such units.

Moreover, the resolution of this issue will not advance the litigation. Plaintiffs do not and cannot allege that Section 3608 either bars HANO from demolishing and redeveloping damaged, obsolete, high-density, high-poverty housing or requires HANO to spend millions of dollars repairing obsolete, high-density, high-poverty housing. Rather, plaintiffs allege that HANO has "failed to consider" the impacts of its demolition plans; thus, even if plaintiffs

---

refer HUD to the conclusory allegations contained in their earlier pleadings. See, e.g., Ex. 30.

883931v.2

prevailed on this claim, the only injunctive remedy to which they would presumably be entitled would be an injunction ordering HANO "to consider" the effects of its decision. This injunctive relief would fall well short of plaintiffs' demands that HANO spend in excess of $100 million to repair and reopen storm-damaged units. Because the resolution of these supposedly common issues will not advance the litigation, plaintiffs' Section 3608 claims do not satisfy Rule 23 commonality.

**D.    Numerosity Does Not Exist.**

For all of the reasons that plaintiffs have not satisfied the requirements of an objectively defined class, adequacy, typicality, or commonality, plaintiffs also fail to satisfy the numerosity requirement. Plaintiffs' own deposition testimony establishes the claims of the remaining eight plaintiffs are not even typical of each other. While plaintiffs repeatedly state that they represent 5,146 families residing in public housing prior to Hurricane Katrina (Pls.' Memo. at 3), the evidence has already demonstrated that not all of the families wish to return to their pre-storm units in New Orleans. Plaintiffs concede that HANO, to date, has provided housing in New Orleans to at least 1,324 households, while other residents (such as plaintiff Harris) have refused HANO's offer of housing in New Orleans. While plaintiffs presume that every HANO resident that has not returned to his or her New Orleans is "unnecessarily displaced," a significant portion of HANO residents may simply prefer to reside in a location other than their former units, and should not be required to do otherwise because plaintiffs deem it "necessary". Because plaintiffs do not even attempt to provide an estimate of the number of residents who wish to return to their pre-storm units, they have failed to meet their burden of establishing numerosity.

883931v.2

**E.**     **Rule 23(b)(2) Certification Is Improper.**

Certification of a class pursuant to Rule 23(b)(2) is improper not only due to the intra-conflicts between those who favor and those who oppose redevelopment, but also because plaintiffs' claims for damages predominate over their claims for injunctive relief.  The Fifth Circuit and other appellate courts agree that a putative class should not be certified pursuant to Rule 23(b)(2) when monetary damages predominate over injunctive or declaratory relief. *Allison, et al. v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998); *see also Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir.), cert denied, 531 U.S. 957, 121 S.Ct. 381 (2000); *Maldonado v. Ochsner Clinic Found.*, --- F.3d ---, 2007 WL 2054906 (5th Cir. 2007).  In order to be certified as a Rule 23(b)(2) class, plaintiffs must show that 1) the class members have been harmed in essentially the same way by the defendants' alleged acts and 2) that injunctive relief predominates over any monetary damages that are sought. In *Allison*, the Fifth Circuit held that "monetary relief 'predominates' under Rule 23(b)(2) when its presence in the litigation suggests that procedural safeguards of notice and opt-out are necessary, that is, when the monetary relief is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case." 151 F.3d at 413.

There are good reasons why the (b)(2) class vehicle is not appropriate when the putative class members seek a monetary award.  The requirement that injunctive and/or declarative relief predominate over monetary damages ensures the cohesiveness of a Rule 23(b)(2) class.  As the Fifth Circuit observed in *Allison*, "The underlying premise of the (b)(2) class --that its members suffer from a common injury properly addressed by class-wide relief -- begins to break down when the class seeks to recover...forms of monetary relief to be allocated based on individual injuries." *Id.*

- 39 -

883931v.2

The "predomination test" set forth by the Fifth Circuit in *Allison* and subsequent cases effectively fixes the burden upon the party seeking certification to establish that the injunctive or declaratory relief sought clearly predominates over the monetary relief. The imposition of such a burden "serves essentially the same functions as the procedural safeguards and efficiency and manageability standards mandated in (b)(3) class actions." *Allison*, 151 F.3d at 414-15. .

An examination of Plaintiffs' proposed class reveals its lack of the cohesiveness required for Rule 23(b)(2) class treatment. "To qualify for class-wide injunctive relief...the injunctive relief sought must be specific." *Maldonado v. Ochsner Clinic Found.*, --- F.3d ---, 2007 WL 2054906 at *2 (5th Cir. 2007)(affirming district court's denial of Rule 23(b)(2) and Rule 23(b)(3) certification of class alleging statutory violations and breach of contract when plaintiffs sought injunction ordering hospital to provide "reasonably affordable health care"). Plaintiffs seek an injunction ordering HANO to repair "units that can be rendered habitable" within a "reasonable" amount of time. Like the *Maldonado* plaintiffs, who sought an injunction ordering the defendant health care provider to provide care at a "reasonable" rate, the plaintiffs here "have failed, however, to identify any way to determine what a reasonable" amount of time to repair these units would be. *Id.* "The amount plaintiffs were charged and the amount that is 'reasonable' for the services they received is necessarily an individual inquiry that will depend on the specific circumstances of each class member, the time frame in which the care was provided. and both Ochsner's and other hospitals' costs at the time." *Id.* Plaintiffs' requests for injunctive relief are similarly amorphous, and impermissibly require the trier of fact to examine the physical conditions of each unit to determine which repairs are necessary and the "reasonable"

- 40 -

amount of time to provide such repairs. Plaintiffs' request for Rule 23(b)(2) certification therefore should be denied.

Additionally, plaintiffs have failed to establish that the putative class has been harmed in the same manner by HANO's alleged conduct. As noted more fully above, a significant portion of HANO residents, who would not be permitted to opt-out of plaintiffs' proposed Rule 23(b)(2) class, support the demolition and redevelopment of these units, and do not wish to return to obsolete, high-density, high-poverty housing. Other residents like plaintiff Doucet have been transferred to units (either traditional public housing units or units secured through disaster assistance vouchers) in New Orleans that they prefer to their pre-storm units. Some residents, like plaintiff DeGruy, have returned to their pre-storm units and do not seek any repairs, while other residents have no desire to return to New Orleans at all. None of these residents could be deemed to have been harmed in the same manner, and as a result, significant portions of the proposed class do not desire and will not benefit from the injunctive relief sought by plaintiffs. *See Davis v. Roadway Express, Inc.*, 590 F.2d 140, 144 (5th Cir. 1979)(class certification improper when significant portion of class opposes relief sought); *Bailey v. Ryan Stevedoring Co., Inc.*, 528 F.2d 551, 553 (5th Cir. 1976)(same). (In fact, more of the named plaintiffs have expressed support for some form of demolition and redevelopment than have expressed support for the relief sought by the Complaint (i.e., the perpetuation of obsolete, high-density, high-poverty developments)).

Moreover, plaintiffs' claims for damages clearly predominate over the injunctive relief sought, thereby rendering Rule 23(b)(2) certification improper. "Liability for 'incidental damages' should not require additional hearings to resolve the disparate merits of each individual's case: it should neither introduce new and substantial legal or factual issues, nor

- 41 -

883931v.2

entail complex, individualized determinations." *Allison*, 151 F.3d at 415. The plaintiffs seek an injunction essentially ordering HANO to spend money on repairs.[31] The monetary relief sought is this neither a group remedy nor incidental to the injunctive relief, but rather would depend upon and would reflect the individual conditions of each class member's unit. For all of these reasons, Rule 23(b)(2) certification is inappropriate.

      **F.**    **Rule 23(b)(3) Certification Is Improper Because The Predominance And Superiority Requirements Are Not Satisfied.**

      Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) because the facts of their individual claims predominate over any common questions of law or fact, thereby precluding class certification from being the superior method of adjudicating their claims. Rule 23(b)(3) requires that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Castano*, 84 F.3d at 739, n. 10. For all of the reasons that plaintiffs' claims fail to satisfy the less stringent requirement of Rule 23(a) commonality, they also fail to satisfy the more rigorous Rule 23(b)(3) standard.

      In cases arising from damage to immovable and/or movable property during and in the wake of Hurricane Katrina, numerous courts in Louisiana and Mississippi have ruled that the individualized nature of every plaintiff's alleged injury precluded class certification. "Each property owner...who had real and personal property damaged in Hurricane Katrina is uniquely

---

[31]    In addition, plaintiffs purport to seek injunctions ordering HANO "to consider" the impacts of its proposed demolition plans and to hold administrative hearings. Yet there is no evidence that a significant portion of the proposed class or the named plaintiffs desire that relief. On the contrary, most named plaintiffs testified that they sought either compensatory damages and/or the repair of their individual units.

883931v.2

situated. No two property owners will have experienced the same losses. The nature and extent of the property damage the owners sustain from the common cause, Hurricane Katrina, will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage." *Comer v. Nationwide Mut. Ins. Co.*, 2006 WL 1066645 (S.D. Miss. 2006)(ordering sua sponte that named plaintiffs file individual suits because Rule 23 requirements cannot be satisfied). Judge Senter further stated:

> Thus, at least with respect to the issue of damages, each individual claim will require particular evidence to establish the cause of and the extent of the loss.... Given the preponderance of individual questions of damage...and the other relevant particulars involved in the case of each individual property owner who sustained damage as a result of Hurricane Katrina, I simply do not believe that the extremely broad classes of parties the plaintiffs are proposing are practical in the context of this civil suit. In my opinion, under the standards embodied in [Rule 23], the questions of law and fact common to the members of the plaintiff class do not predominate over the questions affecting individual members of the plaintiff class.

Judge Senter's ruling is consistent with nearly every court that has examined the propriety of certifying a class of property owners alleged to have suffered property damage in the aftermath of Hurricane Katrina. *See also Vaz v. Allstate Prop. & Cas. Co.*, 2006 WL 25883733 (S.D. Miss. 2006)("No two property owners will have experienced the same losses [as a result of Hurricane Katrina]. The nature and extent of the property damage...will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage.")(citing *Comer*); *Aguilar v. Allstate Ins. Co.*, 2007 WL 734809 (E.D. La. 2007)(denying certification of class alleging insurer bad faith because certification would require court to engage in individual examinations as to the cause and extent of each insurance claim); *Spiers v. Liberty Mut. Fire Ins. Co.*, No. 064493, R. Doc. 11 (E.D. La. Nov. 21, 2006)(certification of insurance adjusting suit inappropriate when insurer's

883931v.2

liability depends on the individual facts concerning the nature and extent of damage to each property).    While these cases arise primarily in the context of insurance disputes, they are analogous in that HANO's duties under the lease, which, as with the case of the insurer's responsibilities under the terms of the insurance contract, are not absolute and all-encompassing. Just as the insurer's duty to indemnify is predicated on the unique causes and circumstances of the individual loss, so too does HANO's duty to each resident depend on the cause and extent of the damage to his or her respective former unit.    Class-wide treatment is inappropriate when, as here, the existence of liability is dependent on facts and circumstances that cannot be extrapolated from those of the named plaintiff to those of the entire class.    Because a determination of HANO's liability as to each plaintiff would require the trier of fact to examine the facts of each resident's claim, a class action is not the superior method by which to try these claims.    *See Exxon Mobil*, 461 F.3d at 604-605 (predominance of individual issues detracts from superiority of class action device).    Plaintiffs' request for Rule 23(b)(3) certification must therefore be denied.

883931v2

IV.   **CONCLUSION**

For the foregoing reasons, the Court should deny plaintiffs' motion for class certification.

Respectfully submitted,

*/s/Heather S. Lonian*
Rachel W. Wisdom, 21167, T.A.
Walter F. Wolf, III, 21953
Ashlee M. Robinson, 28743
Heather S. Lonian, 29956
Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Telephone: (504) 581-3200

Attorneys for Housing Authority of New
Orleans (HANO), and the HUD
Administrators of HANO, C. Donald
Babers, and William C. Thorson

**C E R T I F I C A T E**

I hereby certify that a copy of the above and foregoing Memorandum in Opposition to Plaintiffs' Amended Motion for Class Certification has been served upon all counsel of record by notice from the Court's CM/ECF system, this 10th day of August, 2007.

*/s/ Heather S. Lonian*

883931v.2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| YOLANDA ANDERSON, *Et al.* | * | CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * | |
| VERSUS | * | SECTION "B" |
| | * | |
| ALPHONSO JACKSON, SECRETARY OF THE | * | JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * | |
| AND URBAN DEVELOPMENT; *Et al.* | * | MAGISTRATE ALMA CHASEZ |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF LOUISIANA

PARISH OF ORLEANS

### AFFIDAVIT OF DORIAN RAWLES

**BEFORE ME,** the undersigned authority, a notary public duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared:

### DORIAN RAWLES

who, after being duly sworn, deposed and stated:

1.

I am a person of the full age of majority and a citizen of the State of Louisiana. I am competent to execute this Affidavit, and I make the statements in this Affidavit based on my own personal knowledge.

- 1 -



**2.**

I have been employed by the Housing Authority of New Orleans ("HANO") since January, 2001. I am currently a Deputy Director of HANO.

**3.**

My duties at HANO include supervision over the following departments: Client Services, Development, Home Ownership, Management/Maintenance, Modernization, Procurement/Contracts, Section 8 and Security.

**4.**

Since Hurricane Katrina, I have visited each of HANO's traditional public housing sites on numerous occasions and I have viewed a large number of units at these sites. The condition of the properties and work needed to repair them varies dramatically from site to site, building to building and even unit to unit.

**5.**

Attached hereto as Exhibit A, is a true and correct copy of HANO's unit status update as of September 5, 2007.

**6.**

Exhibit A shows that 1,615 HANO units are currently occupied and that 215 units are ready for occupancy immediately but are not occupied.

**7.**

Attached hereto, *in globo*, as Exhibit B are true and correct copies of weekly unit count tracking reports from March, April, May, and July. These reports are made and kept by HANO in the ordinary course of its operations and are submitted by me periodically.

891622v.1

**8.**

These documents in Exhibit B show that HANO had 986 units occupied prior to June 1, 2006, 1,298 occupied units and 374 additional units available for occupancy in March, 2007, 1,324 occupied units and 402 additional units available for occupancy in April, 1,390 occupied units and 448 additional units available for occupancy in May, and 1,538 occupied units and 313 additional units available for occupancy in July.

**9.**

Samples of letters to residents regarding the re-occupancy of units at Iberville are attached hereto, *in globo*, as Exhibit C. These letters were prepared and kept by HANO in the ordinary course of its operations.

**10.**

Attached hereto as Exhibit D are true and correct copies of letters sent to former residents of other HANO developments informing them that units would be available for them in the Iberville development within 60 days. These letters were prepared and kept by HANO in the ordinary course of its operations.

**11.**

The large number of currently available units indicates that many residents do not wish to return to public housing in New Orleans.

891622v.1

12.

Attached hereto as Exhibit E, is a true and correct copy of a list of 683 private apartments available for rent to voucher holders as of August 20, 2007. Attached hereto as Exhibit F is a true and correct copy of this list as it appeared on January 9, 2007, with well over 800 available apartments listed. Landlords request that their properties be put on this list for voucher holders and the list is updated monthly.

13.

The list is provided to voucher holders on HANO's website and at HANO's offices, and is prepared and kept by HANO in the ordinary course of its operations.

14.

HANO has not completed any formal survey post-Katrina to measure whether former public housing residents intend to return to public housing in New Orleans, or to New Orleans in general.

15.

HANO has tried to gauge former residents' intentions to return to New Orleans by asking them to fill out forms, drafted by HANO personnel, which were mailed to residents' last known addresses and are available at HANO's offices and on HANO's website. The residents are responsible for returning these forms to HANO.

16.

HANO has received completed forms from traditional public housing residents, Section 8 residents and others who did not specify what their living arrangements were before the storm.

891622v.2

**17.**

HANO has not received responses from the vast majority of pre-Katrina public housing residents.

**18.**

Attached hereto, *in globo*, as Exhibit G are examples of these forms from residents who report they do not wish to return to New Orleans at all. These forms are kept by HANO in the ordinary course of its operations.

**19.**

On August 1, 2006, a letter was sent to HANO residents from Mr. C. Donald Babers updating residents on the status of HANO's plans, at true and correct copy of which is attached hereto as Exhibit H. This letter was prepared and kept by HANO in the ordinary course of its operations.

**20.**

Attached hereto as Exhibit I is a true and correct copy of a letter sent to all residents from HANO notifying them of the resident consultation meeting to be held on November 29, 2006. This letter was prepared and kept by HANO in the ordinary course of its operations.

**21.**

HANO held a resident consultation meeting on November 29, 2006.

**22.**

At this meeting, HANO provided information regarding its redevelopment plans and allowed time for attendees to comment on these plans. Residents were also given the opportunity to submit written comments.

891622v2

**23.**

Resident comments were also solicited via mail and e-mail. HANO provided residents with forms on which to write their comments on HANO's proposed redevelopment plans.

**24.**

Examples of these written comments (which have been redacted for purposes of this litigation) are attached hereto, *in globo*, as Exhibit J. These forms were collected and kept by HANO in the ordinary course of its operations.

_Dorian Rawles_
Dorian Rawles

Sworn to and subscribed before me
this /4th day of September, 2007.

_Ashlee Robinson_
NOTARY PUBLIC
MY COMMISSION IS FOR LIFE.

Print Name ASHLEE ROBINSON

Bar No. 28743

- 6 -

## Weekly Unit Count Tracking

### UNIT TURNOVER STATUS - 09.05.07

| | Total Units Available | Total Units occupied prior to 6.01.06 | Total Units Currently Occupied | Units currently under repair | **Units Scheduled for Pre-Occupancy** | Total Current Available Units | |
|---|---|---|---|---|---|---|---|
| Iberville | 821 | 194 | 516 | 100 | 140 | 65 | |
| B. W. Cooper | 303 | 0 | 233 | 0 | 28 | 42 | |
| Fischer 1 & 3*** | 123 | 0 | 119 | 0 | N/A | 4 | |
| Fischer Sr. Village | 100 | 72 | 96 | 0 | N/A | 4 | |
| Fischer Lo-Rise * | 180 | 57 | 0 | 0 | N/A | 0 | *To Be Demolished |
| Guste New Homes | 82 | 0 | 27 | 0 | 26 | 29 | |
| Guste Hi Rise**** | 385 | 212 | 271 | 34 | 0 | 40 | |
| Guste Low Rise | 228 | 219 | 89 | 0 | N/A | 0 | *To Be Demolished |
| Scattered Sites | 219 | 111 | 136 | 55 | N/A | 28 | |
| River Gardens***** | 122 | 121 | 128 | 0 | N/A | 3 | |
| | 2563 | 986 | 1615 | 189 | 194 | 215 | |

| | |
|---|---|
| Total Units Occupied Pre-Katrina. | 5146 |
| Total Current Units Available for Occupancy After Renovations. | 2155 |
| % of Current Occupancy vs. Pre-Katrina Occupancy. | 31% |
| Net Increase in leased units since 06.01.06. | 629 |
| % of Units Available vs. Pre-Katrina Units Available. | 42% |

* Units @ the Fischer & Guste Low Rises are scheduled for demolition and will not remain in the available unit stock.*
** Pre-Occupancy Includes completion of minor UPCS items and all pending environmental clearances**
*** Fischer I & III includes LIHTC units leased to former Public Housing tenants through the S8 Voucher program.
****43 Units @ the Guste High Rise are off line due to interior renovations relocation. The balance are being prepared for re-occupancy. Originally, 320 units were scheduled for occupancy at the B.W. Cooper Site. 11 units were removed from due to extensive termite damage and 5 units are being used by management for site administration.****
***** River Gardens leasing info includes units leased to former public housing tenants through the DVP program. These units increase the number of affordable housing opportunities at this site.*****


EXHIBIT
A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

YOLANDA ANDERSON, et al.,   )
      Plaintiffs         )
                        )
    v.                 )    Civil Action No. 06-3298
                        )    SECT. B MAG 5
                        )    JUDGE LEMELLE
ALPHONSO JACKSON, et al.,   )
      Defendants      )

**DECLARATION OF DAVID A. VARGAS**

I, David A. Vargas, hereby declare:

1. I am of majority age and otherwise competent to testify as to the matters herein, based on my personal knowledge.



2. I am currently the Director, Office of Housing Voucher Programs, Office of the Assistant Secretary for Public and Indian Housing, United States Department of Housing and Urban Development ("HUD"). I have managed voucher programs for HUD since September 16, 2004. I make the following statements based on my personal knowledge or on the basis of information made available to me in my capacity as the Director of the Office of Housing Voucher Programs.

<u>Background</u>

3. Following Hurricane Katrina, many of HANO's displaced public housing tenants received (and continue to receive) Disaster Voucher Program ("DVP") assistance from funds appropriated to HUD under Pub. L. 109-148, December 30, 2005. By the terms of that appropriation, these funds could not be obligated after September 30, 2007, and HUD had



EXHIBIT
26

implemented this program as ending on that date. See PIH Notice 2006-3. Subsequently,

Congress passed the U.S. Troop Readiness, Veterans Care, Katrina Recovery, and Iraq

Accountability Appropriations Act, 2007, Pub. L. No. 110-28, extending HUD's ability to grant

administrative waivers through December 31, 2007. Accordingly, HUD has modified the terms

of its program in PIH Notice 2007-17 to allow families to remain on DVP through that date.

Pursuant to PIH Notice 2007-17, after December 31, 2007, tenants who were receiving Housing

Choice Vouchers prior to Katrina, and who now receive DVP assistance, will resume their

Housing Choice Voucher assistance under HANO's Housing Choice Voucher program.

Approximately 3,600 families currently receiving DVP assistance will not be eligible for

conversion to the Housing Choice Voucher program because they were not part of HANO's

Housing Choice Voucher program pre-Katrina. These ineligible families must remain in the

DVP program until those funds run out. HUD projects that it will have funds sufficient to

continue DVP assistance to these families through June 2008, provided those families do not

move outside of their current Public Housing Agency's ("PHA") jurisdiction. Thereafter,

beginning in July 2008, displaced tenants currently receiving DVP assistance that cannot be

covered under the Housing Choice Voucher program will need to receive housing assistance

from another source.

    4. As of August 10, 2007, approximately 3,572 displaced HANO public housing families

have registered to receive DVP assistance. DVP assistance consists of rental assistance in the

private market of 100 percent of the fair market rents ("FMRs") in the area where the family

resides. Though DVP assistance does not provide an allowance for utilities, to the extent

2

recipients' rent includes utilities and does not exceed the FMR, utilities are covered. DVP

recipients are only responsible for any rent in excess of the FMR and utilities not covered as part

of the rent. As of July 3, 2007, approximately 2,616 of these families were receiving DVP

assistance under a lease. Of this number, approximately 1,112 were receiving DVP assistance

under a lease in the City of New Orleans. In addition, approximately 758 families are shown on

HUD's records as having an expired DVP lease as of July 3, 2007; of this number, 101 families

are shown as having an expired lease in the City of New Orleans. HUD believes that, in most

cases, the families shown on its records as having an expired lease are continuing to rent month

to month at the pre-expiration location using DVP assistance. Finally, available records show

that as of June 1, 2007, an additional 1,453 pre-Katrina HANO public housing families are

currently residing in HANO public housing, while approximately 60 such families are currently

residing in public housing in other cities. Thus, the vast majority of HANO's approximately

5,251 pre-Katrina public housing residents are continuing to receive some form of housing

assistance.

   5.  Upon the termination of DVP assistance at the end of June 2008, most displaced

public housing residents who are currently receiving that assistance will need to transition to the

recently announced HUD/FEMA temporary program called the Disaster Housing Assistance

Program (DHAP). DHAP will require families to pay a minimum rent of $250 at the time of

transition in July 2008, and the rent will increase by $50 per month every month (e.g. $300 in

August, $350 in September, etc.) until the program ends on March 1, 2009 or when no further

subsidy is paid on behalf of the family, whichever comes first. The next three paragraphs of this

declaration will consider the only three possible sources of housing assistance for these families once DHAP ends.

6. HANO receives limited funding to issue Housing Choice (Section 8) Vouchers under its Annual Contributions Contract ("ACC") with HUD. Under the Housing Choice Voucher program, the PHA determines a payment standard that is the amount generally needed to rent a moderately-priced dwelling unit in the local housing market. Housing Choice Voucher recipients must pay thirty percent of their monthly adjusted gross income for rent and utilities, and, if the unit rent is greater than the PHA's payment standard, the recipient must pay the additional amount. HUD's ability to issue such vouchers is limited by the availability of funds and by rules governing the Section 8 program. As explained above, after December 31, 2007, tenants who were receiving Housing Choice Vouchers prior to Katrina and who now receive DVP assistance will resume their Housing Choice Voucher assistance under HANO's Housing Choice Voucher program. HANO's displaced public housing families that were not receiving Housing Choice Voucher assistance prior to Katrina, by contrast, have no automatic right to receive Housing Choice Vouchers from HANO. Moreover, HANO has only a very limited capability of making such vouchers available to those families. The reason comes down to money. HANO does not have sufficient funds to make Housing Choice Voucher assistance available to its former public housing tenants, and HUD is not empowered to make additional funds for that purpose available to HANO. The situation is exacerbated by the increase to approximately 140 percent of pre-Katrina FMRs for the New Orleans FMR area. While the purpose of this increase was to make apartment units in New Orleans affordable to DVP and Housing Choice Voucher holders, and the

4

increase has been effective in achieving that purpose, this increase also means that HANO can

issue fewer Housing Choice Vouchers because the cost of assistance per resident—the cost of

each voucher—is higher. For these reasons, the vast majority of persons who were HANO

public housing tenants prior to Katrina and who are currently receiving DVP assistance are quite

unlikely to receive Section 8 assistance from HANO after June 30, 2008, the date by which HUD

expects DVP funds to have been exhausted.

    7. Former HANO public housing residents who now reside in other cities and who

remain income eligible have the right to apply to PHAs in those cities for Housing Choice

Voucher assistance. However, these families have no statutory or regulatory preference for the

receipt of such vouchers. Funds are limited, and in many large cities there is a long waiting list.

    8. HUD's only viable authority to issue Housing Choice Voucher assistance to these

displaced public housing tenants arises under Section 18(h) of the U.S. Housing Act of 1937, 42

U.S.C. § 1437p(h). That section provides that, "Of the amounts appropriated for tenant-based

assistance under section 8 in any fiscal year, the Secretary may use such sums as are necessary

for relocation and replacement housing for dwelling units that are demolished and disposed of

from the public housing inventory...." Vouchers issued under this section are Housing Choice

vouchers and through portability can be used across the United States, thus giving recipients

freedom to choose where to live. The properties that HANO intends to demolish (in whole or in

part) are Lafitte, St. Bernard, C.J. Peete, and B.W. Cooper. In the HANO context, only tenants

who formerly resided in one of these properties prior to the hurricanes and whose building has

been approved by HUD for demolition will be eligible to receive voucher assistance under this

5

provision. If a court order were to bar HUD from approving demolition of these properties, HUD would be legally prohibited from making voucher assistance available to the displaced tenants from these projects under its Section 18(h) authority.

9. For the reasons explained above, the majority of HANO's displaced public housing tenants are unlikely to receive any housing assistance from any source after February 28, 2009, if the demolition of the four HANO projects listed above were to be enjoined.

Under the penalty of perjury, I, David A. Vargas, declare that the foregoing declaration is true and correct to the best of my knowledge, information, and belief.

_____
David A. Vargas

_____
8 | 10 | 07
Date

6



LHFA Project Schedules for HANO Projects

| Benchmarks | St.Bernard I | B.W. Cooper I | Lafitte | C.J. Peete III | C.J. Peete I | Fischer IV-3 |
|---|---|---|---|---|---|---|
| Environmental Clearance | 17-Sep-07 | 17-Sep-07 | 17-Sep-07 | 17-Sep-07 | 17-Sep-07 | 17-Sep-04 |
| 10% CARRYOVER EXPENDITURE | 26-Sep-07 | 26-Sep-07 | 26-Sep-07 | 26-Sep-07 | 30-Sep-06 | 30-Sep-06 |
| DEMOLITION START | 15-Dec-07 | 15-Dec-07 | 17-Dec-07 | 15-Dec-07 | NA | 15-Dec-07 |
| FINAL ZONING APPROVAL | 17-Oct-06 | 17-Oct-06 | 12-Oct-06 | 17-Oct-06 | 6-Apr-06 | 6-Apr-06 |
| TRANSFER OF PROPERTY | 24-Sep-07 | 24-Sep-07 | 26-Sep-07 | 24-Sep-07 | 29-Sep-06 | 29-Sep-06 |
| Execution of Construction Contract | 15-May-08 | 1-Jul-08 | 16-Jun-08 | 30-Jul-08 | 30-Jul-08 | 13-May-08 |
| BUILDING PERMITS OBTAINED | 1-May-08 | 15-Jun-08 | 23-May-08 | 15-Jul-08 | 15-Jul-08 | 6-May-08 |
| CONSTRUCTION START | 15-Jun-08 | 15-Jul-08 | 30-Jun-08 | 15-Aug-08 | 15-Aug-08 | 27-May-08 |
| 10% CONSTRUCTION COMPLETED | 30-Sep-08 | 15-Oct-08 | 7-Oct-08 | 15-Oct-08 | 15-Oct-08 | 1-Jul-08 |
| 50% CONSTRUCTION COMPLETED | 30-Apr-09 | 15-Oct-09 | 19-Jun-09 | 15-Jun-09 | 15-Jun-09 | 1-Dec-08 |
| 90% CONSTRUCTION COMPLETED | 30-Dec-09 | 15-Oct-10 | 31-Jul-10 | 15-Apr-10 | 15-Apr-10 | 1-May-09 |
| CERTIFICATE OF OCCUPANCY/PIS | 30-Mar-10 | 31-Dec-10 | 30-Sep-10 | 9-Jul-10 | 9-Jul-10 | 1-Aug-09 |
| COST CERTIFICATIONS SUBMITTED | 30-Mar-11 | 31-Mar-11 | 31-Dec-10 | 30-Oct-10 | 30-Oct-10 | 1-Nov-09 |

Completed Task

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| YOLANDA ANDERSON, *Et al.* . | * CIVIL ACTION NO. 06-3298 |
| Plaintiffs, | * |
| VERSUS | * SECTION "B" |
| | * |
| ALPHONSO JACKSON, SECRETARY OF THE | * JUDGE IVAN LEMELLE |
| UNITED STATES DEPARTMENT OF HOUSING | * |
| AND URBAN DEVELOPMENT; *Et al.* | * MAGISTRATE ALMA CHASEZ |
| | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF LOUISIANA

PARISH OF ORLEANS

### AFFIDAVIT OF NAOMI MINOR

**BEFORE ME,** the undersigned authority, a notary public duly commissioned and

qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared:

### NAOMI MINOR

who, after being duly sworn, deposed and stated:

1.

I am a person of the full age of majority and a citizen of the State of Louisiana. I

am competent to execute this Affidavit, and I make the statements in this Affidavit based on my

own personal knowledge.

- 1 -



**2.**

I currently reside at 1844 LeBoeuf Court, New Orleans, Louisiana 70114 in HANO's Fischer development.

**3.**

Prior to August 29, 2005, I lived in HANO's LA1-8 St. Bernard development.

**4.**

From _2000_ to 2007, I have served as president of the St. Bernard LA1-8. Resident Council.

**5.**

I support the Housing Authority of New Orleans' ("HANO") plans to redevelop St. Bernard LA1-8 as a mixed-income community.

**6.**

Based on communications I have had with them, other former residents of St. Bernard LA1-8 also support these plans.

Naomi Minor

Sworn to and subscribed before me
this _17_ day of September, 2007.

_____
NOTARY PUBLIC

Print Name_____

Bar No._____

Rachel Wendt Wisdom
State of Louisiana - Bar No. 21157
My commission is issued for life

- 2 -

892449v.1